UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMUEL INDIG, MEIR KAHANA, and ROBERT KLEIN,<br><br>*Plaintiffs,*<br><br>-*against*-<br><br>THE VILLAGE OF POMONA, BRETT YAGEL, LOUIS ZUMMO, LEON HARRIS, and DORIS ULMAN,<br><br>*Defendants.* | Case No.: 18-cv-10204<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Samuel Indig, Meir Kahana, and Robert Klein, for their Complaint against Defendants the Village of Pomona (the "Village"), Brett Yagel ("Yagel" or the "Mayor"), Louis Zummo ("Zummo"), Leon Harris ("Harris"), and Doris Ulman ("Ulman"), allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to hold accountable a village government thoroughly rotted with bigotry.  The deeply disturbing facts alleged herein were uncovered in a whistleblower complaint to the New York Division of Human Rights and a months-long investigation by counsel.

2.      The Mayor and Deputy Mayor, the Building Inspector, the Village attorney and other leaders in the Village of Pomona, Rockland County, have orchestrated a campaign of harassment and exclusion against Orthodox Jewish residents.  Defendants have turned Pomona's local government against a discrete religious minority, weaponizing local code enforcement and zoning laws to target Orthodox Jews for disparate treatment, while conspiring to deny basic municipal services to them.  Defendants' thinly-veiled agenda is clear:  to make life intolerable for current Orthodox residents of Pomona, and in the long term, to deter more of "them" or

"those people" (as the Mayor derisively refers to Orthodox Jews) from moving to the community.

3.       Judge Colleen McMahon, in an unrelated case, explained the danger and harm of intentional government discrimination: "a government that sets out to discriminate intentionally . . . will rarely if ever fail to achieve its purpose." The Village has harnessed the power of a municipal authority to harass its Orthodox Jewish residents – and it has achieved that invidious purpose.

4.       This shocking "agenda against Jewish residents" of Pomona was recently exposed in a bombshell report by an investigator from the New York State Division of Human Rights. Plaintiffs Samuel Indig, Meir Kahana, and Robert Klein are among the many victims of this agenda against Jewish residents.

5.       Plaintiffs are all residents of Pomona, living in single family homes on properties of one-acre or more. In this action, Plaintiffs seek damages for the illicit discriminatory treatment they suffered, as well as injunctive relief to prevent further such misconduct, and ultimately to ensure that Defendants respect the fundamental constitutional right of equal treatment under the law for all residents of Pomona.

6.       Founded in 1967, Pomona is a small village in Rockland County with a growing population. Over the past decade, and more so in the last five years, Hasidic and other Orthodox Jews have moved to Pomona from neighboring communities. Defendant Yagel was elected a Village trustee in 2007 on a platform of opposing the establishment of an Orthodox rabbinical college in Pomona. He has served as Mayor since 2011.

7.      The Village, acting at the direction of Yagel and Harris, and with the assistance of Building Inspector Zummo, and Village attorney Ulman, have sought to prevent the increase of Jewish residents.

8.      Defendants have employed a range of discriminatory techniques to achieve their unlawful agenda – 1) enacting unconstitutional new zoning laws and practices; 2) pretextual delays and denials of permits and certificates of occupancy to Jewish homeowners and developers; 3) harassing real estate brokers (and their customers) known for selling to Orthodox clients; 4) targeting Jewish-owned residences for selective enforcement of code violations – for example, executing pre-dawn Saturday morning ticketing blitzes (referred to by Yagel as "shul patrols"); and 5) accepting and encouraging deranged and blatantly anti-semitic "complaints" from non-Jewish residents as legitimate justifications for intrusive inspections and harassment (e.g., complaints referring to Orthodox Jews as "Corporation members" and prayer groups as business meetings and "the people living on the hill").

9.      For several years, Plaintiffs have observed anecdotal examples of such unfair treatment of Orthodox Jews by the Village authorities.  For example, Plaintiffs have been subjected to discriminatory ticketing for minor and often odd alleged code violations – relating to issues such as dog waste (without owning a dog); leaf disposal tickets (with far worse violators on the same block left unticketed); and a ticket for a Toys 'R' Us pool -- when similarly-situated non-Jewish residents have not been ticketed for the same infractions.

10.      Indeed, before the influx of Orthodox Jewish residents, Pomona did not engage in routine enforcement of minor code issues at all.  But as the Jewish community has grown, the Village enlisted Building Inspector Zummo – and later deputized a special code enforcer – to target and harass Orthodox Jewish residents with discriminatory ticketing.

3

11.    Plaintiff Robert Klein is an elected member of the Village board of trustees. But even this has not shielded him from Defendants' discriminatory treatment. Quite the contrary, he has been targeted by the Village with denials of construction permits (claiming that his new plans were lost and falsely claiming that the construction was not in conformity with older plans) and subjected to serial, unjustified stop work orders that have made it impossible for him to complete construction on his home.

12.    Even worse, Mr. Klein has been treated as a second-class member of the board of trustees. Yagel has denied him a key to the Village offices that other non-Jewish board members have, and has withheld records from him that are necessary to perform his duties. A year after his election, the Village has refused to update its website to include Mr. Klein in the list of trustees.

13.    Recent revelations have confirmed that Plaintiffs' experiences are not one-off incidents of unfair treatment, but part and parcel of Defendants' deliberate agenda of discrimination against Orthodox Jews. Findings by Federal District Judge Kenneth M. Karas in a lawsuit by a rabbinical college, and facts uncovered in the Division of Human Rights investigation sparked by the whistleblower complaint of a former Village employee, have laid bare the discriminatory animus underlying Defendants' mistreatment of Plaintiffs and other Orthodox Jewish residents.

14.    Both Defendants Yagel and Ulman have already been found by Judge Karas to have intentionally engaged in an effort "to thwart the spread of the Orthodox/Hasidic Jewish community into the Village."

15.    More recently, a report issued by the New York Division of Human Rights (the "Human Rights Report"), in June 2018, shows that Defendants' agenda against Orthodox Jews

extended much further -- to the general population of Orthodox Jewish families. The Human Rights Report is the result of a whistleblower complaint filed by Noreen Shea, a non-Jewish former Deputy Clerk in the office of the Village Clerk, who objected to the discriminatory treatment of Orthodox Jewish residents -- and was fired for that reason.

16.     Ms. Shea revealed to the Human Rights Division what she described as Defendants' "hidden agenda against [] Jewish residents," stating in stark terms: "*If anyone dares tell me there is no religious discrimination in the Village of Pomona, they have not worked a day in the building department.*"

17.     Some of the more troubling examples of discriminatory animus described by Ms. Shea in the Human Rights Report -- and the testimony of other victims and municipal officials who were prompted to come forward by her whistle-blowing -- include the following:

- Mayor Yagel routinely referring to Orthodox Jews in the Village office with open hostility as "*Them*" or "*Those People.*"

- Mayor Yagel confronting a long-time village resident who had sold her home, and demanding to know if she had sold the property to one of "*Them.*"

- Mayor Yagel chastising Ms. Shea for talking with a Jewish developer, Avrohom Manes, who is also a Village resident, and instructing her that she should have "very little conversation with '*those types.*'"

- Mayor Yagel suggesting that Ms. Shea place pork rinds on the public counter of the village clerk's office to deter the growing Orthodox Jewish population seeking access to municipal services.

- The Village building inspector, Louis Zummo, *admitting* to the Human Rights Division that he mocked Orthodox Jewish residents, in the course of performing his official duties, through "comical" imitations of their manner of talking, while disparaging them as "carrying on" when they were denied services.

- Building Inspector Zummo advising the village zoning board not to issue a construction permit to Plaintiff Robert Klein to build a basement because it would be "just like them" to then use it as an illegal apartment.

5

- Building Inspector Zummo refusing to issue a permit requested by an Orthodox Jewish family to accommodate his two severely disabled children – and commenting: "maybe he should stop having children".

- Orthodox Jewish residents facing arbitrary and unjustified delays in the issuance of building permits and certificates of occupancy – a fact attested to by a non-Jewish village trustee, Ian Banks, who spoke to the Human Rights Division investigators.

- Village Attorney Doris Ulman admitting to Mr. Manes and his attorney in another action, on or about July 19, 2018, that "certain residents' lives were made miserable by the discriminatory actions of people working for the Village," and attempting to justify her involvement with the excuse that, "it's my job to represent Mayor Yagel," when in fact she represents the Village, including its Jewish residents.

- The Village government "target[ing] the Jewish community for disparate treatment" through "selective ticketing of Jewish residences" and prayer gatherings.

18.     Ms. Shea alleges that her refusal to participate in such discriminatory treatment of Orthodox Jewish residents led Defendant Yagel to retaliate against her.  In a shocking example, Ms. Shea alleges that Mayor Yagel referred to her as a *"Jew Lover"* – an accusation that was reported to Trustee Banks at the time (Mr. Banks confirmed that Ms. Shea contemporaneously reported this slur to him prior to her termination).  Ms. Shea was ultimately terminated when she refused to heed Yagel's instructions to "stop being too cooperative with Jewish residents."

19.     The Human Rights Division found "probable cause to support" Ms. Shea's allegations and has taken the unusual step of ordering the matter to proceed to a public hearing before an administrative law judge.

20.     Plaintiffs respectfully ask this Court to put an end to Defendants' discriminatory practices once and for all and to restore the rule of law to the Village of Pomona.

## THE PARTIES

21.     Plaintiff Samuel Indig is a resident of Pomona and is an Orthodox Jew.  On the instructions of Yagel and Ulman, Mr. Indig has been denied permission to complete grading

work on his backyard that the building inspector initially approved.  As a result, he is left with an unsafe slope in his backyard, creating a risk of mud slides and serving as a breeding ground for mosquitos and ticks.

22.     Plaintiff Meir Kahana is a resident of Pomona and is an Orthodox Jew.  Mr. Kahana has been targeted by Defendants for discriminatory code enforcement, including a ticket he received for a Toys 'R' Us pool he temporarily placed in his yard and a warning notice for dog waste, though he has no dog.

23.     Plaintiff Robert Klein is a resident of Pomona and is an Orthodox Jew.  Mr. Klein is also a member of the Village board of trustees.  However, Mr. Klein's election to the board has not shielded him from the same religious-based discrimination the other Plaintiffs have suffered, including discriminatory ticketing for supposed leaf disposal violations, and denial of construction permits that have prevented him for years from completing renovations to his house.

24.     Defendant the Village of Pomona is a municipal corporation formed pursuant to the laws of the State of New York, located in Rockland County and in this judicial district.

25.     Defendant Bret Yagel is a resident of Pomona and has served as the Mayor of the Village since 2011, when he was elected on a platform of curtailing the growth of the Orthodox Jewish community in Pomona.

26.     Defendant Louis Zummo is the Building Inspector of the Village.

27.     Defendant Leon Harris is a resident of Pomona and is the Deputy Mayor of the Village.

28.     Defendant Doris Ulman is a resident of Pomona and has served for decades as the Village attorney.  In another lawsuit in this Court, Judge Karas found that Ulman authored local

ordinances that were intended to discriminate against Orthodox Jews by preventing a rabbinical seminary from entering the community.

## JURISDICTION AND VENUE

29.     This suit is brought pursuant to 42 U.S.C. § 1983 and § 1988 *et seq.* based on Defendants discrimination against Plaintiffs on the basis of their religion in violation of the Fourteenth Amendment to the United States Constitution.  Accordingly, this Court has subject matter over this case pursuant to 28 U.S.C. § 1331 and § 1343(3).

30.     In addition, this Court has supplemental jurisdiction, under 28 U.S.C. §1367(a) over Plaintiffs' state law claims.

31.     Venue is proper in this district under 28 U.S.C. §1391(b) in that all claims arose in this district.

## THE FACTS

A.     Pomona's Hostility To A Growing Orthodox Jewish Population

32.     Pomona is a small village nestled next to the Cheesecote Mountain in a bucolic section of Rockland County.  Founded in 1967, the Village, which is located partly in the town of Ramapo and partly in the town of Haverstraw, occupies a total of approximately 2.4 square miles and has an estimated population of 3,235.

33.     Over the past decade, and increasingly in the last five years, Hasidic and other visibly Orthodox Jews have begun moving into Pomona.  Their arrival has been met with hostility by the Village government.  Defendant Yagel was elected a Village trustee in 2007 on an explicit platform of preventing a rabbinical college from building a seminary with housing for Orthodox rabbinical students and their families in the Village.  In the run-up to the election,

8

Yagel co-authored a letter to a local newspaper, lamenting the arrival in the Village of what he called "homogenous individuals" (i.e., Orthodox Jews), a development that Yagel protested was not a "natural" progression for the Village. At around the same time, Yagel was quoted in the *New York Times* calling the rabbinical college "disgusting." Another candidate, who ran on the same ticket as Yagel, warned in a campaign video that the seminary threatened to change "the make-up of the village."

34.    Although they employed code words, such as "homogeneous individuals" and "the make-up of the village," the harsh reality is that Yagel and his associates simply did not want to see Orthodox Jews moving to Pomona. Judge Karas reached this conclusion in a lawsuit challenging local ordinances the Village passed to prevent the rabbinical college from coming to Pomona. In a decision issued on December 7, 2017, Judge Karas found that in enacting the laws the Village was motivated by an illicit agenda to prevent the growth of Pomona's Orthodox Jewish community. Specifically, Judge Karas held: "There is no escaping the fact that . . . Defendants passed the Challenged Laws to thwart the spread of the Orthodox/Hasidic Jewish community into the Village."

35.    Both Defendants Yagel and Ulman were implicated in Judge Karas' decision. Yagel was a named defendant in the lawsuit and both Yagel and Ulman were trial witnesses. Judge Karas observed that he did not credit Yagel's testimony because of his discriminatory comments. Judge Karas similarly held that he "credits very little of Ulman's testimony about what motivated the adoption of the laws," since "Plaintiffs have proven that their intended purpose was to thwart the development of the rabbinical college because it was proposed by Orthodox/Hasidic Jews."

Case 7:18-cv-10204   Document 1   Filed 11/02/18   Page 10 of 26

36.     After serving on the board of trustees for four years, Yagel was elected Mayor of Pomona in 2011. Despite the damning findings by a federal judge, the same individuals that expressly violated civil rights of Orthodox residents have remained in their respective positions in Pomona.

37.     Over the course of Yagel's tenure in office, he has treated the growing number of Orthodox Jewish residents with hostility.

38.     Consistent with the tone of his original campaign for Village Trustee, Yagel has responded to this demographic development by using the local government to target current Orthodox Jewish residents for harassment, and taking steps to deter Orthodox Jews from moving to Pomona – including by discouraging current residents from selling property to them.

39.     At the direction of Yagel and Ulman, the Village has habitually denied permits and certificates of occupancy to current Jewish residents, such as Plaintiff Robert Klein, and to a prominent Orthodox Jewish developer, Avrohom Manes, to prevent him from creating new housing on previously-subdivided property that could attract additional Jewish residents to the Village.

40.     Defendants have also harassed real estate brokers known for selling to Orthodox clients, by ticketing them for supposedly placing for sale signs too close to the road, although non-Jewish brokers were not similarly ticketed. In an email obtained by the Human Rights Division, Yagel himself directed the code enforcer to ticket the Orthodox Jewish brokers.

41.     Defendants have also targeted Jewish owned residences and synagogues for selective enforcement of code violations. Code enforcement did not exist at all in Pomona until Orthodox Jews began arriving in the Village – Yagel has wielded the power to issue code violations to harass Jewish residents.

Case 7:18-cv-10204   Document 1   Filed 11/02/18   Page 11 of 26

42.     Pomona has also used building ordinances as a means of discouraging current residents from selling their properties to Orthodox Jews. In most municipalities, when a title company or prospective seller inquiries about outstanding violations on a property, there is no physical inspection, merely a review of records to determine if there is an outstanding violation.

43.     As Orthodox Jews began moving into Pomona, Defendants introduced an onerous policy – without passing any authorizing law or ordinance – that makes it more difficult to sell property or to assess whether closing will be possible. Under the new policy, internal inspections of each home for code violations are required as a matter of course in almost any property sale, adding another roadblock to selling properties to the Orthodox Jewish buyers.

44.     The message this sends is clear: if long term residents have illegal basements or renovations, they are overlooked. However, as soon as they attempt to sell their property they will be subjected to an invasive and potentially costly code enforcement process -- a significant roadblock to efficiently selling a property, and in particular to selling to a group that Mayor Yagel has made perfectly clear is disfavored by the local authorities.

45.     Indeed, email correspondence uncovered by the Human Rights Division shows that one long-time, non-Orthodox resident was given a pass and allowed to continue using her illegally-renovated basement, so long as she does not "sell the property." (At the same time, Plaintiff Klein was denied permission to build a basement because it would purportedly be "just like them" to use it as an "illegal apartment".)

46.     The individual acts of discrimination might have seemed unrelated until a whistle-blower came forward and exposed Defendants' intentional discriminatory scheme.

**B.    Whistle-Blower Noreen Shea Exposes A Widespread "Hidden Agenda Against Jewish Residents" of Pomona**

47.    In June 2018, the New York State Division of Human Rights issued a report, following an investigation of alleged discrimination against Orthodox Jewish residents by the Village government. The non-public investigation was sparked by a whistleblower complaint filed by Noreen Shea, a former non-Jewish employee in the Village Clerk's office, who alleges that she was terminated because she was unwilling to be complicit in "an ongoing hidden agenda against [] Jewish residents" of Pomona. Ms. Shea's revelations – and other evidence uncovered by the Human Rights investigator – paints a disturbing picture of a local government targeting a segment of its residents for mistreatment on the basis for their religious identity.

48.    The revelations from the Human Rights Report (including documents obtained by the investigator), as well as witnesses that have come forward as a result, are summarized below.

49.    **"Us vs. Them" Culture.** Ms. Shea described an "Us vs. Them" culture cultivated by Mayor Yagel in the Village offices with respect to Orthodox Jewish residents. According to Ms. Shea, Mayor Yagel routinely refers to Orthodox Jews with contempt as "Them" or "Those People."

50.    In one instance, he berated a long-standing resident who had sold her home through a broker known for working with Orthodox Jews, demanding to know whether she had sold the property to one of "Them." At the same time, according to emails obtained by the investigator, Yagel went out of his way to help a potential resident (with a non-Jewish sounding surname) locate an acceptable rental property.

51.    In another troubling incident, Mayor Yagel suggested that pork rinds be placed on the public counter of the Clerk's office to deter Orthodox Jews who come in the office seeking municipal services.

12

52.     Mayor Yagel chastised Ms. Shea for being pleasant to a prominent Jewish developer, Avrohom Manes, who is also a Village resident, and instructed her that she should have "very little conversation with *'those types.'*"

53.     Mayor Yagel criticized Ms. Shea for responding too quickly to FOIL requests from Orthodox Jewish residents, instructing her that they should be made to wait until the last day of the deadline even when records were readily available – although Yagel told her to provide records immediately to a non-Jewish man who came to the office.

54.     The open hostility to Orthodox Jews was not limited to Mayor Yagel.  Building Inspector Louis Zummo admitted to the Human Rights Division that he openly mocked Orthodox Jews complaining about the denial of municipal services through Jackie Mason-style "impersonations" of Orthodox Jewish residents "carrying on."

55.     Because she did not want to participate in the unequal treatment of the Village's Orthodox Jewish residents, the Mayor referred to Ms. Shea as a "*Jew Lover.*"  A non-Jewish Village Trustee, Ian Banks confirmed to the Human Rights Division investigator that, prior to her termination, Ms. Shea had reported the use of the terms "*Jew Lover*" (to refer to her) and "*Those People*" (to refer to Orthodox Jews).

56.     **Zoning and Construction Permit Issues.**  The Human Rights Report reveals that the Village abused its authority by withholding certificates of occupancy and construction permits as part of a broader effort to discriminate against Orthodox Jewish residents.

57.     The Human Rights Division investigator reports testimony that other Orthodox Jewish residents, including Plaintiff Klein, faced arbitrary and unjustified delays in the issuance of building permits and certificates of occupancy – a fact attested to not only by Ms. Shea but also by a non-Jewish village trustee, Ian Banks.

13

58.     Ms. Shea described how Zummo refused to issue a permit requested by an Orthodox Jewish family to accommodate the needs of two severely disabled children. Upon information and belief, before this resident moved to the Village, Zummo had informally approved the changes he planned to make. However, Zummo refused to issue the necessary permit, and was overheard by Ms. Shea saying, "maybe he should stop having children". In another incident, Zummo advised the Village zoning board not to allow Plaintiff Robert Klein to renovate his basement because it would be "just like them" to then use the basement as an illegal apartment.

59.     Ulman informed a village resident that she resigned from representing the Village zoning board because it was discriminating against Orthodox Jewish residents. Upon information and belief, this was after Ms. Ulman learned that counsel for Plaintiffs was conducting an investigation regarding discrimination in the Village and that residents of the Village had obtained the files of the Division of Human Rights investigation.

60.     **Code Enforcement and Selective Ticketing.** The Human Rights Report also reflects evidence that Defendants improperly "targeted the Jewish community for disparate treatment" through "selective ticketing of Jewish residences" and synagogues. Plaintiff Klein received a ticket for a garbage/recycling violation at 4:25 am on the Sabbath, which was part of a pre-dawn ticketing blitz, ordered by Mayor Yagel, targeting Jewish residents.

61.     The Village at the time did not have a dedicated code enforcer. Yagel directed Building Inspector Zummo to target the Jewish community referring to the overnight enforcement as "shul patrols".

62.     Upon information and belief, Yagel assumed that since Orthodox Jews do not drive after sunset on Fridays, there would be Jewish cars parked overnight in violation of the overnight parking ordinances in Pomona.

63.     Upon information and belief, based on Zummo's discussions with residents at the time, the only cars violating the parking ordinance belonged to Village officials and their friends. Undeterred, Zummo then issued garbage violations to a number of Jewish residents living next to shuls (synagogues), including Plaintiff Robert Klein.  Upon information and belief, Pomona has not engaged in any overnight enforcement activities in general or against other groups.

64.     Mayor Yagel has also directed Village personnel to call the police to complain about Jewish residents walking home from synagogue on the Sabbath -- falsely claiming that these residents walking on the side of the street is somehow blocking traffic.

65.     Plaintiffs have also been subjected to discriminatory ticketing for minor and often odd alleged code violations -- relating to issues such as dog waste (without owning a dog); leaf disposal tickets (with far worse violators on the same block who were not ticketed at all); and a ticket for a small pool purchased at Toys 'R' Us.

66.     Upon information and belief, two former Village employees (Zummo's predecessor and a separate code enforcer) resigned their positions because they were unwilling to heed Yagel's directives to selectively target members of the Orthodox Jewish community.

C.     **Plaintiffs Fall Victim to Defendants' "Hidden Agenda Against Jewish Residents"**

67.     Each of the Plaintiffs has fallen victim to the discriminatory agenda against Orthodox Jewish residents revealed in the Human Rights Report.  As detailed below, they have been treated with hostility and ill-will by a village government that is meant to serve the interests of all residents of Pomona.

Case 7:18-cv-10204   Document 1   Filed 11/02/18   Page 16 of 26

1.   **Samuel Indig**

68.   Samuel Indig is an Orthodox Jewish resident of Pomona. In 2015, he purchased a house on a property with a steeply-sloped yard, intending to do grading work to create a useable backyard space. This was a necessary improvement to make the property livable for Mr. Indig's family, which includes young children, ranging in age from one to eleven.

69.   Non-Jewish neighbors have told Mr. Indig that, in their experience, the Village Building department and Building Inspector Zummo have been reasonable and accommodating. However, like many other Orthodox Jewish residents of Pomona, Mr. Indig's experience has been completely different: Zummo – directed and assisted by Yagel, Harris, and Ulman – has conspired to prevent Mr. Indig from making necessary improvements to his property, severely curtailing his family's use and enjoyment of their home.

70.   Mr. Indig obtained a permit prior to beginning any work. In a by-now familiar pattern, Building Inspector Zummo initially approved a slope grading plan prepared by Mr. Indig's engineer and issued a permit for the project in his backyard. However, as soon as the work commenced, Defendants set out to thwart it.

71.   The grading work contemplated by the approved plan required the use of a tractor. Given the steep slope, it was necessary to create a dirt path to enable the tractor to reach the bottom of the hill. This was an obvious component of the project. The only other alternative would have been to use an enormous crane to hoist the tractor up and down the incline – an unnecessarily dangerous and complicated process.

72.   Zummo, acting with the direction and assistance of Yagel, Harris and Ulman, seized on the temporary dirt path as an excuse to interfere with the grading project. Zummo issued a stop work order, claiming falsely that the path constituted a "road," which required a

separate complex approval process.  This was a clear pretext, as the project was already approved with a permit, and Zummo had not requested any additional submissions.  Moreover, upon information and belief, based on how commonly this type of grading work is performed in Pomona, no other residents had been required to use a crane to raise and lower a tractor up and down a hill, nor have other residents been required to create a formal "road" in order to use a tractor on the residents' own property.

73.    Mr. Indig appealed the stop work order to the Village zoning board.  By law, the stop work order was automatically stayed during the pendency of the appeal, allowing the project to proceed.  However, Defendants intimidated the workers who were performing the grading project by seeking to have Rockland County revoke their licenses, even though they were legally performing the work.

74.    Mr. Indig's engineer ultimately refused to continue working on the project, telling Mr. Indig that Pomona's building department was making demands that he had never before seen in years of working on similar projects in the area.

75.    Mr. Indig is now left with a dangerously steep incline on his property, making it impossible for his family, including his young children, to use the yard, and creating a risk of mud slides.  To add insult to injury, Defendants have not permitted Mr. Indig to do any landscaping work on the property.  As a result, the incline is grown-in with wild grass, creating a breeding ground for mosquitos and ticks.

76.    In short, as part of their agenda against Jewish residents in Pomona, Defendants have done everything in their power to make Mr. Indig's property uninhabitable and to prevent him from integrating into the community.

**2.    Meir Kahana**

77.    Meir Kahana is a Hasidic Jewish resident of Pomona who has been targeted by the Village with discriminatory ticketing. Mr. Kahana received a ticket for a small pool (purchased at Toys 'R' Us) that was temporarily on his property.

78.    Mr. Kahana also received a "warning" regarding an alleged dog waste violation – although he has no dog.

79.    Plaintiff Klein saw a text message from Deputy Mayor Harris to Zummo demanding that Mr. Kahana receive not just one, but multiple violations. There was no reason for the Deputy Mayor to be involved in the process of issuing code violations, and, indeed, no legitimate reason for targeting Mr. Kahana at all. The motivation was clearly to harass him because he is an Orthodox Jewish resident.

**3.    Robert Klein**

80.    Robert Klein is an Orthodox Jewish resident of Pomona, and since 2017, a member of the Village Board of Trustees. During the election, Defendant Yagel told Mr. Klein that he should not be running for the Board. And after Mr. Klein was elected, Yagel threatened him to "watch your back" because "people are watching you."

81.    Defendants have made good on Yagel's threats: Mr. Klein has been a target of a deliberate campaign of harassment that has prevented him from completing necessary renovations to his home for more than two years.

82.    In 2016, Mr. Klein embarked on a project to lift and expand his home. He submitted a set of plans to the Village building office and was initially sent to the zoning board. During the board meeting, Mr. Zummo claimed that the project would require installation of fire sprinklers because the house would be deemed to have three full floors (including the basement).

During the same meeting Mr. Zummo made an explicitly anti-Jewish comment, advising the board that Mr. Klein should not be permitted to construct a basement because it would be "just like them" – clearly referring to Orthodox Jews – to build an illegal basement apartment.

83.     The board ultimately advised Mr. Klein's architect to submit new plans. He did so, and after six months of delays, and with persistent follow up by Mr. Klein, a permit was finally issued in December 2016. Because it was then the middle of winter, the project was put on hold until the spring. In March – a full month before the work was scheduled to commence – Mr. Klein submitted some alterations to the plans to the Village.

84.     On April 24, 2017, phase one of the project began – the house was lifted and placed on temporary supports, which were to be removed on July 5, with the house then resting on a permanent foundation. Defendants engaged in a deliberate campaign of harassment to prevent the project from ever being completed.

85.     On Friday, June 30, 2017, Mr. Zummo issued a stop work order. There was no basis for the order, since all that had been done was the lifting of the house, pursuant to the approved plans. Mr. Klein subsequently saw a text message that Defendant Yagel sent to Building Inspector Zummo directing him to "give Klein a SWO by 3 pm or you are fired."

86.     Zummo directed Mr. Klein to resubmit the architect's revised plans – which had already been submitted in March. Again, he complied.

87.     In August, 2017, Zummo did two inspections of the foundation, and approved the work. However, in October, in the middle of the Sukkot holiday, and in full view of neighbors who had gathered to pray at the synagogue across the street, Zummo posted another stop work order on Mr. Klein's property. The timing of this second stop work order is questionable, as no

work had been done for several weeks – and no work was going to be done during the Sukkot holiday in any event.

88.    After the holiday, Mr. Klein spoke with Defendant Ulman who arranged a meeting with Building Inspector Zummo. During this meeting, Zummo again raised the issue of fire sprinklers as a pretext for the stop work order. In response, Mr. Klein agreed to submit a new plan on condition that it would be reviewed promptly so that work could begin before the winter set in. The new plans were submitted on November 20. But the Village refused to take any action.

89.    Although there was no official response, Mr. Klein's engineer was copied – apparently inadvertently – on an internal memorandum from the Village engineer, which stated that the plans complied with the code and other applicable regulations and could be approved, but suggested that plans could nevertheless be rejected on the pretext that they lacked unspecified "details." This internal memo reveals that the Village was searching for excuses to deny the permit and prevent Mr. Klein from completing the work on his home.

90.    Mr. Klein continued to wait for months for a response from the Village building department, but heard nothing. With the onset of winter, the house, which was not inhabitable, began to suffer damage due to exposure to the elements. Mr. Klein then decided unlilaterally to revise the plans in an effort to respond to the November 28, 2017 memo. After receiving no response from the Village despite numerous inquiries, he submitted those revised plans in April 2018. Again, the Village simply refused to take any action, leaving Mr. Klein in limbo and without a home for his family.

91.    Building Inspector Zummo subsequently revealed that the failure to act on Mr. Klein's application was part of a deliberate strategy to deny him due process. A neighbor from

20

the Village who attempted to intervene on Mr. Klein's behalf overheard Zummo telling

Defendant Ulman that "nothing will happen if I don't respond [to Mr. Klein's plans]" and "if I

don't respond he has no way to appeal because there is nothing to appeal." In other words, by

refusing to act, Defendants could deny Klein the ability to build a home in the Village and could

effectively render their conduct unreviewable.

92.     Defendants' discriminatory intent is further demonstrated by the fact that non-

Jewish residents were permitted to move forward with even more ambitious construction and

renovation projects with no pretextual delays. For example, through a FOIL request, Mr. Klein

obtained building department files for the home of a non-Jewish resident, Peter Obe, who,

between 2013 and 2017, built a wood frame home with four stories – and no sprinkler system.

Yet he was permitted to move forward with no stop work orders or other delays.

93.     Not coincidentally, as part of Defendants' deliberate scheme to curtail the growth

of the Jewish community, when Mr. Obe eventually sold his home to a Jewish family,

Defendants required these new residents to incur significant expense by claiming and enforcing

alleged code violations.

94.     Mr. Klein has also been the victim of discriminatory ticketing for alleged code

violations. As noted above, he is one of the Jewish residents who received a garbage ticket in

one of the pre-dawn "shul patrols" ordered by Mayor Yagel. Mr. Klein also received a ticket for

an alleged failure to properly dispose of leaves, even though there were far worse violators on

the same block, who were not Jewish, and did not receive any ticket.

95.     Mr. Klein has also been treated as a second-class member of board of trustees

based on his religion. Yagel has refused to give him a key to the Village office that other

trustees have and has denied him access to records necessary to perform his duties. Yagel has

also made explicitly anti-Jewish comments, including in one instance suggesting that a board meeting should be held on the Sukkot holiday, so that Mr. Klein would not be able to attend. In other instances, Mr. Klein observed that after officially adjourning meetings, the other board members would wait for Mr. Klein to leave and then would continue conducting Village business without him.

96.     Numerous other Orthodox Jewish residents have faced similar discrimination but have been reluctant to come forward for fear of retribution.

97.     Defendants' orchestrated a campaign of harassment and exclusion against Orthodox Jewish residents must be put to an end.  Plaintiffs ask for nothing more than to be allowed to live in Pomona in peace and free from illicit discrimination based on their religion.


### FIRST CLAIM FOR RELIEF
(Violations of the Equal Protection Clause
United States Constitution, Fourteenth Amendment
42 U.S.C. § 1983)

98.     Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

99.     Defendants' actions deprived and continue to deprive all Plaintiffs of their right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution by discriminating against and targeting Plaintiffs for disfavor in, among other things, the application of local zoning laws, and the enforcement of alleged code violations.

100.    Defendants' contemporaneous actions and statements show that Defendants mistreatment of Plaintiffs is motivated by discriminatory animus against Orthodox Jews.

101.    The Plaintiffs have suffered and continue to suffer damages caused by Defendants' violations of their constitutional rights.

Case 7:18-cv-10204   Document 1   Filed 11/02/18   Page 23 of 26

102.   Defendants are entitled to damages in an amount to be determined at trial, as well as injunctive relief to prevent further violations of their constitutional rights, including without limitation an order appointing an independent third party to oversee code inspections and permit applications.

### SECOND CLAIM FOR RELIEF
**(Violations of the Free Exercise Clause**
**United States Constitution, First Amendment**
**42 U.S.C. § 1983)**

103.   Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

104.   By targeting Plaintiffs for mistreatment and disfavor because of their religious identity as Orthodox Jews, Defendants have improperly deprived Plaintiffs of their right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment.

105.   The Plaintiffs have suffered and continue to suffer damages caused by Defendants' violations of their constitutional rights.

106.   Defendants are entitled to damages in an amount to be determined at trial, as well as injunctive relief to prevent further violations of their constitutional rights, including without limitation an order appointing an independent third party to oversee code inspections and permit applications.

### THIRD CLAIM FOR RELIEF
**(Violations of the Fair Housing Act**
**42 U.S.C. §§ 3604(a), 3604(b) and 3617)**

107.   Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

108.     Through the conduct described herein, including unjustified delays and outright refusal to provide building permits to Plaintiffs, and selective ticketing for alleged code violations, on the basis of Plaintiffs' religion, Defendants have discriminated against Plaintiffs by making housing "unavailable" within the Village of Pomona, and have subjected Plaintiffs to discrimination "in the provision of services or facilities in connection therewith" on the basis of religion in violation of 42 U.S.C. § 3604(a) and §3605(b).

109.     Defendants' conduct has also "interfere[d] with Plaintiffs' "exercise or enjoyment" of rights protected by 42 U.S.C. §§ 3604(a) and 3604(b) in violation of 42 U.S.C. § 3617.

110.     Plaintiffs are aggrieved persons as that term is defined in the Fair Housing Act, 42 U.S.C. § 3602(i), and they have suffered harm, damage and injury as a result of Defendants' conduct.

111.     The Plaintiffs have suffered and continue to suffer damages caused by Defendants' violation of their rights under the Fair Housing Act.

112.     Defendants are entitled to damages in an amount to be determined at trial, as well as injunctive relief to prevent further violations of their rights, including without limitation an order appointing an independent third party to oversee code inspections and permit applications.

## FOURTH CLAIM FOR RELIEF
### (Violations of New York State Constitution
### Article 1, §§ 3 and 11)

113.     Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

114.     The Defendants, by their acts, have acted under color of law and have conspired and continue to conspire, in breach of the rights of all Plaintiffs under the New York State

Constitution, *viz.* Article I, § 3 (freedom of worship; religious liberty) and Article 1 § 11 (equal protection of laws; discrimination in civil rights prohibited).

115.     The Plaintiffs have suffered and continue to suffer damages caused by Defendants' violations of their constitutional rights.

116.     Defendants are entitled to damages in an amount to be determined at trial, as well as injunctive relief to prevent further violations of their constitutional rights, including without limitation an order appointing an independent third party to oversee code inspections and permit applications.

### FIFTH CLAIM FOR RELIEF
**(Violations of Section 40-c of the New York Civil Rights Law)**

117.     Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

118.     The Defendants, by their acts, have conspired under color of law and continue to conspire to abridge the rights of all Plaintiffs under Section 40-c(1) and (2) of the New York Civil Rights Law to be free from discrimination on the basis of their religion.

119.     The Plaintiffs shall duly serve notice of this claim on the Attorney General of the State of New York, pursuant to Civil Rights Law § 40-d.

**WHEREFORE,** Plaintiffs respectfully requests that the Court enter judgment in their favor and against Defendants as follows:

(1)     Awarding Plaintiffs compensatory, consequential and punitive damages in an amount to be determined at trial;

(2)     Enjoining Defendants from discriminating against Plaintiffs on the basis of their religion;

(3)    Appointing an independent third party to oversee code inspections and permit applications.

(4)    Awarding Plaintiffs their reasonable attorneys' fees and costs; and

(5)    Granting such other and further relief to Plaintiffs as the Court deems just and proper.

Dated: November 2, 2018
New York, New York

Respectfully submitted,

**SCHLAM STONE & DOLAN LLP**

_(signature)_

Bradley J. Nash
26 Broadway
New York, New York 10004
Telephone No.: (212) 344-5400
Fax No.: (212) 344-7677
bnash@schlamstone.com

_Attorneys for Plaintiffs Samuel Indig, Meir Kahana and Robert Klein_

26