UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMUEL INDIG, MEIR KAHANA, and ROBERT KLEIN,<br><br>*Plaintiffs*,<br><br>-against-<br><br>THE VILLAGE OF POMONA, BRETT YAGEL, LOUIS ZUMMO, LEON HARRIS, and DORIS ULMAN,<br><br>*Defendants*. | Case No.: 18-cv-10204 (VB)<br><br>**DECLARATION OF BRADLEY J. NASH IN OPPOSITION TO MOTION TO DISQUALIFY PLAINTIFFS' COUNSEL** |

Pursuant to 28 U.S.C. § 1746, Bradley J. Nash, declares the following to be true under penalty of perjury:

1. I am an attorney duly licensed to practice before this Court and am counsel for the Plaintiffs in the above-captioned matter.

2. I make this declaration in opposition to Defendants' motion to disqualify my firm, Schlam Stone & Dolan LLP ("Schlam Stone"), my partner Solomon N. Klein, and me from representing Plaintiffs in this action.

3. As shown below, and the accompanying papers, there was no violation of the no-contact rule because neither I nor my firm had any contact with the Village Building Inspector, Louis Zummo, until he was represented by his own counsel. Furthermore, Mr. Zummo communicated with us, not as a representative of the Village, but as a whistleblower seeking to expose wrongdoing by the Village, including the Village attorney Doris Ulman. In that context, there was no requirement to give notice of the meeting to Ms. Ulman.

## BACKGROUND

### A. The Retention of Schlam Stone

4. In addition to the plaintiffs in this action, my firm represents Avrohom Manes, another Pomona resident who suffered religious-based discrimination at the hands of the Village government.

5. In March 2017, Mr. Manes, represented by other counsel, filed two lawsuits against the Village:

> (1) ***TAL Properties v. Village of Pomona, et al.***, Index No. 031216/2017 (the "Roads Lawsuit"). This action seeks a declaration that the roads adjacent to property Mr. Manes owns in Pomona are Village roads (and therefore the Village is responsible for the cost of maintaining them). Mr. Zummo is named as a defendant in the Roads Lawsuit, as is Ms. Ulman.
>
> (2) ***TAL Properties v. Village of Pomona***, Case No. 7:17-cv-02928-CS (the "Civil Rights Lawsuit"). This is a civil rights action originally filed in Rockland Supreme Court against the Village, Mayor Brett Yagel and Ms. Ulman, alleging violations of the equal protection and free exercise clauses of the United States Constitution, which was removed to this Court. Mr. Zummo was not named as a defendant in this action.

6. The Roads Lawsuit remains pending. Mr. Manes is represented in that action by another attorney, Esther Engelson.

7. On January 10, 2018, Judge Seibel granted defendants' motion to dismiss the Civil Rights Lawsuit for failure to state a claim. The court concluded that "plaintiffs have done a fine job of showing that the defendants indeed gave plaintiffs a hard time . . . and treated them unfairly . . . but they have not alleged facts suggesting that they were treated unfairly because Manes was Jewish." (Manes Decl., Ex. 1 at 17:11–17).

8. In June, 2018 – five months after the dismissal of Mr. Manes' Civil Rights Lawsuit – the New York State Division of Human Rights issued an investigation report, based on interviews of Village officials and employees, and a review of voluminous internal documents, which provided previously unavailable evidence that he and other Orthodox Jewish residents of

2

Pomona were, in fact, victims of an intentional campaign of religious discrimination by Defendants and others in the Village government.

9. The Human Rights Division's investigation was sparked by a whistleblower complaint filed by Noreen Shea, a non-Jewish former deputy clerk in the office of the Village Clerk, who objected to the discriminatory treatment of Orthodox Jewish residents – and alleged that she was fired for that reason.

10. At around that time, Mr. Manes retained Schlam Stone to determine whether the Civil Rights Lawsuit could be revived based on newly-discovered evidence revealed by the Human Rights Division investigation.[1]

11. After conducting an investigation, including obtaining and reviewing the records from the Human Rights Division's investigation, Schlam Stone & Dolan filed a motion under Fed. R. Civ. P. 60 to vacate the judgment of dismissal in the Civil Rights Lawsuit based on newly-discovered evidence. That motion is fully briefed and remains *sub judice* before Judge Seibel.

**B.** **Mr. Manes Discusses Mr. Zummo's Potential Cooperation**

12. On August 1, 2018, Mr. Zummo was deposed in the Roads Lawsuit by Mr. Manes' attorney, Esther Engelson.

13. Neither I, nor any other Schlam Stone attorney, was present at that deposition. However, I understand that during a break in the deposition, Mr. Zummo approached Mr. Manes in the restroom, and the two of them subsequently agreed to have a face-to-face meeting.

---

[1] In his declaration, Mr. Zummo states that I told him that I "had had a number of conversations with Noreen Shea" and that I had "received documents from her." Zummo Decl. ¶ 11. In fact, my partner, Solomon Klein, and I had one meeting with Ms. Shea in June 2018 – after the issuance of the Human Rights Division investigation report, and long after her termination by the Village. At that time, Ms. Shea to my knowledge was not represented by counsel; she filed the complaint with the New York State Division of Human Rights *pro se*.

14. I did not direct or otherwise cause Mr. Manes to engage in this or any discussion with Mr. Zummo – and neither did any other Schlam Stone attorney. I understand that Mr. Manes and Mr. Zummo have known each other for several years, and had a working relationship, and it was not unusual for them to talk with each other.

15. On August 6, 2018, Mr. Zummo and Mr. Manes had a meeting at Mr. Manes' house. The two of them arranged that meeting on their own. Following that meeting, Mr. Manes reported to me that Mr. Zummo wanted to blow the whistle on discriminatory actions and other misconduct by the Village government, including the Village attorney, Doris Ulman. In particular, he reported that Ms. Ulman had directed Mr. Zummo to delete emails from his phone, anticipating that the phone would be "scanned" for discovery in litigation or in connection with the Human Rights Division's investigation. The allegation of document deletion was of particular concern because a Court had previously found that Village had engaged in spoliation of relevant electronic documents in another discrimination lawsuit. *See Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 138 F. Supp. 3d 352 (S.D.N.Y. 2015).

16. Mr. Manes wanted to enter into a cooperation agreement with Mr. Zummo under which he would provide relevant documents and truthful testimony in exchange for a release of any claims against him and an agreement that Mr. Manes would indemnify him for costs relating to his cooperation.

**C.  Mr. Zummo Retains Glenn Jones, Esq. to Negotiate a Cooperation Agreement on his Behalf**

17. Neither I nor any other attorney at Schlam Stone ever spoke to Mr. Zummo until he was represented by his own counsel. I told Mr. Manes that we would not speak with Mr. Zummo unless he had his own counsel to represent his interests. I recommended to Mr. Manes a potential lawyer who could represent Zummo, Glenn Jones. Mr. Jones is a former prosecutor in

the New York Attorney General's office. I understood that he has experience dealing with government employees, and with whistleblower witnesses, particularly in the healthcare field where he handles Medicare and Medicaid fraud cases. Mr. Zummo contacted Mr. Jones and apparently met with him at his office.

18. Following that meeting, Mr. Jones told me that Mr. Zummo was interested in entering into a cooperation agreement with Mr. Manes.

19. I prepared a draft cooperation agreement, which I sent to Mr. Jones on August 27, 2018. *See* Exhibit 1.

20. Mr. Zummo does not actually dispute that Mr. Jones acted as his attorney and represented his interests in negotiating the cooperation agreement. I can confirm that Mr. Jones did so.

21. On August 29, 2018, I spoke with Mr. Jones by telephone to discuss his comments on the agreement.

22. Mr. Jones had two principal comments. First, he wanted the indemnification provision expanded to include any related government investigations (as originally drafted it only covered costs arising out of the cooperation).

23. Second, Mr. Jones told me that the provision requiring Mr. Zummo to provide documents would have to be modified, as he would not allow Mr. Zummo to provide any documents from Village computers or files, except in response to a formal subpoena. This was potentially an issue, since at that time, there was no pending action alleging civil rights claims against the Village. Mr. Manes' Civil Rights Lawsuit had been dismissed, and we would not be able to seek discovery unless the Court granted a motion to vacate the judgment of dismissal.

However, Mr. Jones took the position that Mr. Zummo could provide documents from his personal phone, even without a subpoena.

24. Mr. Jones and I continued to discuss modifications to the draft agreement to accomplish these goals. All the communications we had were with Mr. Jones – neither I nor any other Schlam Stone attorney spoke directly to Mr. Zummo. Mr. Jones and I ultimately agreed to have a in-person meeting to finalize the agreement, and to discuss what documents Mr. Zummo would be in a position to provide. Attached as Exhibit 2 is an email from Mr. Jones to me confirming the date and time of the appointment.

**D.** **In Schlam Stone's Only Contact with Mr. Zummo, He Was Represented by Counsel**

25. The meeting was held on September 13. I attended, along with my partner Solomon Klein. Mr. Zummo and Mr. Jones arrived together and left together. There were no discussions with Mr. Zummo outside Mr. Jones' presence.

26. The atmosphere of the meeting was respectful and professional. The principal focus was what documents Mr. Zummo would be able to provide. Mr. Jones reiterated his position that, without a formal subpoena, he would only allow Mr. Zummo to provide documents stored on his personal phone. Mr. Zummo showed that he had voicemails on his personal phone going back to 2016. He also said that he believed his text messages sent and received on that phone could be retrieved from a cloud, and that he would discuss this with his service provider. Mr. Zummo also answered some general questions about the Village's recordkeeping, and the selective targeting of Jewish residents and houses of worship for alleged code violations.

27. I state categorically that neither I nor my partner did anything to "frighten and intimidate" Mr. Zummo, as he claims in his declaration. Tellingly, Mr. Zummo provides no details about the alleged "intimidation"; there was none.

28. Nor did anyone demand that Mr. Zummo sign the cooperation agreement at the meeting. That would have made no sense, as there were changes to the agreement that still needed to be made concerning the documents he would provide, as required by Mr. Jones on Mr. Zummo's behalf.

29. Indeed, the next day, September 14, Mr. Jones sent me a revision to the cooperation agreement. *See* Exhibit 3. I sent further revisions to Mr. Jones later that day. *See* Exhibit 4.

30. Following these exchanges, Mr. Zummo evidently decided not to sign the agreement.

31. Attached hereto as Exhibit 5 is a true and correct copy of the Affidavit of Mr. Zummo, sworn to February 11, 2019, in the Roads Lawsuit.

Dated: March 26, 2019
      New York, New York

                                          **BRADLEY J. NASH**