UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMUEL INDIG, MEIR KAHANA, and ROBERT KLEIN,<br><br>*Plaintiffs*,<br><br>-against-<br><br>THE VILLAGE OF POMONA, BRETT YAGEL, LOUIS ZUMMO, LEON HARRIS, and DORIS ULMAN,<br><br>*Defendants*. | Case No.: 18-cv-10204 (VB)<br><br>**DECLARATION OF AVROHOM MANES IN OPPOSITION TO MOTION TO DISQUALIFY PLAINTIFFS' COUNSEL** |

Pursuant to 28 U.S.C. § 1746, Avrohom Manes, declares the following to be true under penalty of perjury under the laws of the United States of America:

1. I own a residence in the Village of Pomona in Rockland, County New York (the "Village") and am an investor in real estate. I am not a party to this action, but, as explained below, I have been subjected to discrimination on the basis of religion by the Defendants in this action.

2. I make this declaration in opposition to the motion to disqualify Plaintiffs' counsel.

## INTRODUCTION

3. The motion to disqualify is based on two meetings I had with Defendant Louis Zummo, the Village Building Inspector, which Defendants now claim were improper because the Village attorney, Doris Ulman, was not present:

- A meeting between Mr. Zummo and myself at my house; and

- A subsequent meeting with Mr. Zummo and my attorneys – during which Mr. Zummo was represented by his own counsel – to discuss Mr. Zummo's potential

cooperation as a whistleblower in the prosecution of religious discrimination claims against the Village and Village officials, including Ulman. (I attended this meeting by phone).

4. As shown below, Defendants' motion omits – but does not and cannot dispute – facts that show these meetings were entirely proper.

5. I have known Mr. Zummo for more than three years, and have had a working relationship with him including dozens of meetings over the years. The issue of his possible cooperation with me in litigation against the Village was first raised when he approached me in the restroom during a break in a deposition in a state court litigation and apologized for not telling "the whole truth" in his testimony. We agreed to have a separate face-to-face meeting to discuss this further. That meeting took place at my house and was arranged by Mr. Zummo and myself with no involvement from any lawyers.

6. At that time, whistleblowers had started to come forward to reveal discriminatory practices by the Village government (including, most notably, Noreen Shea, a former deputy clerk in the Village office who filed a complaint with the New York State Division of Human Rights). I thought that Mr. Zummo might be willing to do the same.

7. At the meeting at my house, Mr. Zummo told me that he did not trust Ms. Ulman. Shockingly, he revealed that Ms. Ulman had instructed him to delete emails from his phone expecting that the phones were going to be "scanned" for discovery. He and I proceeded to discuss the Village's discriminatory practices, and I offered to pay for any legal fees he incurred in connection with his cooperation, if he would provide documents and truthful testimony. The issue of documents was of particular concern, given his disturbing claim that Ms. Ulman was instructing Village employees to delete their emails.

8. My attorneys told me that they would not speak with Mr. Zummo without a lawyer present to represent his interests. That lawyer could not be Ms. Ulman, given that she was herself a defendant, and Mr. Zummo was, in part, exposing her misconduct. My attorneys recommended a lawyer, Glenn Jones, Esq., who has experience representing whistleblower witnesses. I sent Mr. Jones' contact information to Mr. Zummo as a potential attorney for him. Mr. Zummo contacted and retained him to negotiate a cooperation agreement on his behalf. When we thought the negotiations were drawing to a close, Mr. Jones arranged for Mr. Zummo to meet with my attorneys – with Mr. Jones present to represent Mr. Zummo – to discuss the anticipated cooperation (in particular the documents Mr. Zummo could provide) and to finalize the written agreement. I participated in that meeting. As far as I know, this was the only contact my attorneys had with Mr. Zummo, and he was represented by his own counsel the entire time.

9. Following the meeting, further revised drafts of the cooperation agreement were exchanged, but Mr. Zummo never signed it and ceased communicating with me.

## BACKGROUND

### A. The Underlying Litigations

10. On December 3, 2015, I purchased a residential home at 22 High Mountain Road in Pomona, as well as other property in the Village. This property had already been subdivided and approved for residential use years before. However, in reaction to the influx of Orthodox Jewish residents, the Village changed course and has actively worked to impede the construction of new residences and the issuance of certificates of occupancy.

11. The Village delayed for months in issuing a certificate of occupancy for the 22 High Mountain property – even though Mr. Zummo had confirmed by early 2016 that I

3

completed all necessary repairs and was in compliance with applicable building codes and promised at that time that a certificate of occupancy would be issued promptly.

12. The Village also withheld a grading permit that would have permitted me to create useable backyard space out of steep slopes on the property, thus enhancing its value. I spent time and money developing a grading plan in conjunction with the Village engineer, but Defendants Yagel and Ulman pressured the Village engineer to retract his approval of the plan, and to insist that I comply with costly prerequisites that were never imposed on other similarly-situated owners. And even after I agreed to these conditions, Defendants still denied the grading permit.

13. Ultimately, I signed a contract of sale for 22 High Mountain in the fall of 2016 – though at a greatly reduced price because of the inability to complete the grading work in the backyard. But even then, Defendants' harassment did not end. Although Defendants eventually issued a certificate of occupancy, they threatened to revoke it unless I would sign a document acknowledging that the access road was not a Village road, and that its maintenance was the sole responsibility of the property's owner. This demand was contrary to Village practice, and not authorized by law, and represented another attempt by Defendants to complicate and impede the sale of the property to a Jewish family. Although the sale ultimately closed, the extensive and unjustified delays in issuing the certificate of occupancy and the discriminatory imposition of grading conditions caused a substantial decline in the sale price of the Property, as a result of which I lost out on other profitable business opportunities.

**1.** **The Roads Lawsuit**

14. In March 2017, my company TAL Properties of Pomona, LLC ("TAL Properties"), represented by another law firm, filed a lawsuit against the Village in Rockland

4

County Supreme Court, *TAL Properties v. Village of Pomona, et al.*, Index No. 031216/2017 (the "Roads Lawsuit"). That action seeks a declaration that the roads adjacent to property I own in Pomona are Village roads (and therefore the Village is responsible for the cost of maintaining them). Mr. Zummo is named as a defendant in the Roads Lawsuit, as is Ms. Ulman.

15. I am currently represented the Roads Litigation by an attorney named Esther Engelson. Schlam Stone & Dolan LLP has never represented me in connection with this case.

16. In September 2018, following the conclusion of discovery, TAL Properties filed a motion for summary judgment, which is now fully briefed and awaiting decision.

**2. The Civil Rights Lawsuit**

17. Also in March 2017, I commenced a civil rights action in the same court against the Village, Mayor Brett Yagel and Ms. Ulman, alleging violations of the equal protection and free exercise clauses of the United States Constitution, which was removed to this Court, *TAL Properties v. Village of Pomona*, Case No. 7:17-cv-02928-CS (the "Civil Rights Lawsuit"). Mr. Zummo was not named as a defendant in this action.

18. On January 10, 2018, Judge Seibel granted defendants' motion to dismiss the Civil Rights Lawsuit for failure to state a claim. The court concluded that "plaintiffs have done a fine job of showing that the defendants indeed gave plaintiffs a hard time . . . and treated them unfairly . . . but they have not alleged facts suggesting that they were treated unfairly because Manes was Jewish." (Exhibit 1 at 17:11–17).

**B. Noreen Shea's Whistleblower Complaint**

19. At around the time of Judge Seibel's decision dismissing the Civil Rights Lawsuit, witnesses began to come forward with evidence that the Village government was motivated by discriminatory animus. Most notably, in June 2018, the New York State Division

of Human Rights issued an investigation report, based on interviews of Village officials and employees, and a review of voluminous internal documents, which provided previously unavailable evidence that I and other Orthodox Jewish residents of Pomona were, in fact, victims of an intentional campaign of religious discrimination by Defendants and others in the Village government.

20. The Human Rights Division's investigation was sparked by a whistleblower complaint filed by Noreen Shea, a non-Jewish former deputy clerk in the office of the Village Clerk, who objected to the discriminatory treatment of Orthodox Jewish residents – and alleged that she was fired for that reason. Ms. Shea's shocking allegations are spelled out in the Complaint in this action.

21. At this time, I retained Schlam Stone to explore whether my Civil Rights Lawsuit could be revived based on newly-discovered evidence revealed by the Human Rights Division investigation.

22. Simultaneously with the filing of this action, on November 2, 2018, Schlam Stone filed on my behalf a motion to vacate the judgment of dismissal in my Civil Rights Lawsuit based on newly-discovered evidence.

C. **Mr. Zummo's Potential Cooperation**

23. On August 1, 2018, Mr. Zummo was deposed in the Roads Lawsuit by my attorney in that matter, Esther Engelson.

24. I have known Mr. Zummo for more than three years. Although he was partially responsible for implementing the Village's policy of discrimination against Jewish residents, Mr. Zummo and I have had a working relationship and have met dozens of times over the years, including in my home. It was in the context of this relationship that Mr. Zummo approached me

6

in the restroom, during a break in the August 1 deposition, and apologized for having given untruthful testimony. Specifically, Zummo admitted to me that Ms. Ulman had added a "record" to the official Village file for the property I owned at 22 High Mountain Road in order to substantiate a bogus claim that there was a $6,000 bill for work associated with the property that I was responsible for paying. At the deposition, at which Ulman was supposedly representing him, Mr. Zummo denied this. We agreed to have a separate one-on-one meeting after the deposition. Both my attorney and Ms. Ulman were waiting for us outside the restroom, and it was pretty obvious when we came out together after some time that we had a discussion.

25. Given that other whistleblowers from the Village Government had been coming forward, I believed that Mr. Zummo might be in a position to expose wrongdoing by the Village. Based on his comments to me during the deposition, I had the impression that he wanted to come forward with the truth about the Village government's mistreatment of me and other Orthodox Jewish residents.

26. On August 6, 2018, I met with Mr. Zummo alone in my house. He and I arranged the meeting on our own without the involvement of my attorneys. In a lengthy conversation, Mr. Zummo confirmed that Mayor Brett Yagel "hates change" (referring to the influx of Jewish residents); that Yagel would say in reference to Orthodox Jews, "we don't want this element" in the Village; and that Yagel and the Deputy Mayor tried to pressure him to issue jaywalking tickets to Jews walking to and from synagogue on the Sabbath, and otherwise to harass Jewish residents.

27. Mr. Zummo also revealed that he did not trust Ms. Ulman – in his words, "I don't trust her as far as I can throw her." Ms. Ulman was conflicted in that she was individually named as a defendant in the Roads Lawsuit and also appeared as counsel for the other defendants

in the same case. Apart from that inherent conflict, Mr. Zummo was concerned that Ulman had advised him to delete emails from his phone. Zummo explained:

> Knowing that we were going to have our phones scanned for one of these days, Doris told me to get rid of a lot of our older emails . . . So I lost all the emails . . . and that's Doris' advice.

28. We discussed Mr. Zummo cooperating with me, by providing documents and truthful testimony regarding instances of discrimination against Orthodox Jewish residents. I offered to pay for Mr. Zummo's legal fees in connection with his cooperation.

29. When I reported this to my attorneys, they told me that they would not speak with Mr. Zummo unless he was represented by counsel. They recommended a potential lawyer named Glenn Jones, who I understand is a former lawyer from the New York Attorney General's Office, with experience representing whistleblower witnesses. I gave Mr. Jones contact information to Mr. Zummo, but I never told him that he had to be represented by Mr. Jones. In fact, I told him he could use whatever lawyer he was comfortable with. Mr. Zummo initially told me that he was considering using a lawyer he knew from Vermont, but he ultimately decided to retain Mr. Jones. Mr. Zummo contacted Mr. Jones and apparently met with him at his office.

30. My attorneys prepared a draft cooperation agreement and sent it to Mr. Jones. A few weeks later, after the attorneys discussed certain revisions to the agreement, we arranged a an in-person meeting among Messrs. Zummo and Jones, and my attorneys to discuss the anticipated cooperation (in particular what documents Mr. Zummo could provide), and finalizing the agreement. I participated by conference call.

31. The meeting was cordial. Mr. Zummo and Mr. Jones arrived together and were late. The meeting lasted approximately two hours. Most of the time was spent discussing what documents Mr. Zummo could provide. Mr. Jones stated that, without a formal subpoena, he would only allow Mr. Zummo to provide documents stored on his personal phone. Mr. Zummo

8

showed that he had voicemails on his personal phone going back to 2016. He also said that he believed his text messages sent and received on that phone could be retrieved from a cloud, and that he would discuss this with his service provider. Mr. Zummo also answered some general questions about the Village's recordkeeping, and the selective targeting of Jewish residents and houses of worship for alleged code violations.

32. Neither my attorneys nor I did anything to "frighten and intimidate" Mr. Zummo, as he claims in his declaration. That vague allegation is as false as it is outrageous. It is telling that Mr. Zummo does not provide any details as to how he was frightened or intimidated, especially given that he was represented by his own counsel throughout the meeting. Nor did anyone demand that he sign the cooperation agreement at the meeting. To the contrary, there were changes to the agreement that still needed to be made concerning the documents he would provide, so there was no final agreement for him to sign.

33. Following the meeting, Mr. Zummo evidently decided not to sign the agreement, and he and I had no further substantive discussions after that time.

Dated: March 26, 2019
Haifa, Israel

                                                    AVROHOM MANES

Scanned by CamScanner