UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMUEL INDIG, MEIR KAHANA, and ROBERT KLEIN,<br><br>*Plaintiffs*,<br><br>-*against*-<br><br>THE VILLAGE OF POMONA, BRETT YAGEL, LOUIS ZUMMO, LEON HARRIS, and DORIS ULMAN,<br><br>*Defendants*. | Case No.: 18-cv-10204 (VB)<br><br>**<u>DECLARATION OF<br>W. BRADLEY WENDEL</u>** |

Pursuant to 28 U.S.C. § 1746, I, W. Bradley Wendel, declare the following to be true under penalty of perjury:

1.      I have been retained by the plaintiffs in this matter, to serve as an expert witness in connection with defendants' motion to disqualify counsel. I am being compensated at a rate of $650 per hour for work on this matter.

2.      My opinion is based on the pleadings and papers filed, including the declarations of Avrohom Manes and Bradley J. Nash, as well as my experience, knowledge and expertise in the topics described in the opinions given. My opinions and conclusions were reached after careful consideration of the information described above, and are true and correct within a reasonable degree of professional certainty.

3.      Within the last four years I have testified by deposition in the following matters:

1

*Wadler v. Bio-Rad Laboratories, Inc.*, U.S. District Court, N.D. Cal., Case No. 3:15-cv-2356. Deposition November 17, 2016. (Testimony for former general counsel of corporation in wrongful termination action, alleging he was terminated for blowing the whistle on Foreign Corrupt Practices Act violations.)

*Arkansas Teacher Retirement System v. State Street Bank and Trust*, U.S. District Court, D. Mass., No. 11-cv-10230 MLW. Deposition April 3, 2018. (Testimony for plaintiffs' securities class action law firm in fee proceedings.)

*Verano Land Group, LP v. VTLM Texas, LP*, Clark County, Nevada, District Court, Case No. A-12-655514-B. Deposition June 15, 2018. (Testimony for plaintiffs in legal malpractice and breach of fiduciary duty action against large law firm.)

## Qualifications

4.      I am a tenured full Professor of Law and the Associate Dean for Academic Affairs at Cornell Law School in Ithaca, New York. Prior to joining the Cornell faculty I was an Assistant and then Associate Professor of Law at Washington and Lee University, a law clerk to the Honorable Andrew J. Kleinfeld on the U.S. Court of Appeals for the Ninth Circuit in Fairbanks, Alaska, and a products liability litigator at Bogle & Gates in Seattle, Washington. I am admitted to practice in New York and am on inactive status in Washington State, where I was initially admitted in 1994. I received a B.A. from Rice University, a J.D. from Duke Law School, and an LL.M. and J.S.D. from Columbia Law School. My qualifications are set out more fully in my CV, which is attached as an Exhibit to this Report.

5.      My primary area of teaching and research specialization is legal ethics, professional responsibility, and the law governing lawyers. I am a co-editor of a widely adopted law school casebook, Hazard, Koniak, Cramton, Cohen & Wendel, *The Law and*

*Ethics of Lawyering*, now in its Sixth Edition with Foundation Press; the sole author of a textbook, Wendel, *Professional Responsibility: Examples and Explanations*, the Sixth Edition of which is now in production, with Wolters Kluwer; and co-editor of a rules supplement, Martyn, Fox & Wendel, *The Law Governing Lawyers: National Rules, Standards, Statutes, and State Lawyer Codes*, also with Wolters Kluwer. In addition I have published numerous law review articles on these topics. I have regularly taught law school courses on legal ethics and professional responsibility for 19 years, frequently teach CLE programs on legal ethics for practicing lawyers throughout the country, and serve as a consultant or expert witness regarding legal ethics and professional responsibility nationwide, including on a pro bono basis for capital defense lawyers in trial, direct appeal, and collateral review proceedings. Since 2007, I have been a member of the drafting committee for the Multistate Professional Responsibility Examination (MPRE). In 2011-12 I served as a Reporter to a working group within the ABA Commission on Ethics 20/20, which considered amendments to the ABA Model Rules of Professional Conduct. In 2012 I was the recipient of the Sanford D. Levy Memorial Award from the New York State Bar Committee on Professional Ethics.

## Summary of Opinion

6.      Communication between counsel for the plaintiffs and Louis Zummo, the Building Inspector for the Village of Pomona, was permitted under Rule 4.2 of the New York Rules of Professional Conduct (hereinafter "N.Y. Rule 4.2," sometimes referred to as the "no contact rule"). Zummo initially communicated with Avrohom Manes, a plaintiff in other lawsuits against the Village. This communication  does not implicate

the no-contact rule. *See* Rule 4.2, cmt. [11] ("Persons represented in a matter may communicate directly with each other."). Zummo had indicated to Manes that he had information relevant to Mr. Manes' claims of religious discrimination against the Village. After that communication, Zummo retained his own lawyer to assist him in negotiating a cooperation agreement with Mr. Manes. At the point Zummo indicated his desire to blow the whistle on civil rights violations by Village officials and cooperate with Mr. Manes, his interests were adverse to the interests of the defendants. Thus, the consent of counsel for the Village was not required for the communication between Zummo and counsel for the plaintiffs. To put this point in a different way, Zummo was not communicating the plaintiffs' counsel in his capacity as a Village official, but in his *personal* capacity as someone who wished to reveal wrongdoing by other Village officials. Thus, the consent of his personal counsel, which was given, was the only permission required before the lawyers representing the plaintiffs here could communicate with Zummo.

7.      Any indirect contacts between counsel for the plaintiffs and Zummo was authorized by N.Y. Rule 4.2. Rule 4.2(b) permits a lawyer to advise a client on communications with a represented person. At the point Zummo and Manes had their conversation in which Zummo revealed evidence of wrongdoing by Village officials, Zummo was unrepresented in his personal capacity. Manes suggested that Zummo retain a lawyer who had experience representing whistleblowers. There was no lawyer to whom the plaintiffs' lawyers could have given notice of this communication, because Zummo was as yet unrepresented individually. Importantly, the plaintiffs' lawyers did

not encroach upon Zummo's interests, as they are protected by Rule 4.2, because they did not seek information that Zummo was not authorized to disclose.

8. Counsel for plaintiffs had no choice but to either communicate with Zummo directly, in his individual capacity (in which he was not represented by counsel), or recommend a lawyer to represent him personally and then communicate with Zummo with the consent of his personal counsel. The reason they could not and did not need to seek the consent of counsel for the Village is that the Village's lawyer, Doris Ulman, was implicated in the wrongdoing that Zummo wished to disclose. In particular, she advised him to destroy evidence relevant to the plaintiffs' claims of discrimination. Since Ulman was part of the problem Zummo was revealing to the plaintiffs, it would be perverse to require her consent before plaintiffs' counsel could communicate with Zummo. The lawyers for the plaintiffs chose to proceed carefully, by recommending an independent lawyer to represent Zummo and then communicating with him, but they never had the option of seeking Ulman's consent on behalf of the Village.

### Applicable Law

9. An attorney is subject to discipline or other relief in the District Court for the Southern District of New York for violating the New York Rules of Professional Conduct. *See* S.D.N.Y. Local Rule 1.5(b)(5). The Local Rule provides that, in the absence of a contrary federal decision, the court will give due regard to decisions of New York State courts. The leading decision in New York state courts on the applicability of the no-contact rule to opposing parties that are organizations is *Niesig v. Team I*, 76 N.Y.2d

363, 559 N.Y.S.2d 493 (1990). That case was decided under the former New York Code of Professional Responsibility, specifically DR 7-104(A)(1). However, the adoption in 2009 of the New York Rules of Professional Conduct, and specifically Rule 4.2, does not alter the analysis in *Niesig*. The requirements of the former Code and the present Rules are the same in all relevant respects. *Niesig* remains an important case in the national law governing lawyers, and is included in many casebooks.

10.     The New York Rules of Professional Conduct are promulgated by the four Appellate Divisions of the Supreme Court and published as Part 1200 of the Joint Rules of the Appellate Division, 22 NYCRR Part 1200. The Appellate Divisions did not adopt the comments to the Rules, but they are published by the New York State Bar Association as an aid to interpreting the Rules.

11.     The test in *Niesig* applies to parties that are government entities, such as the municipality that is the defendant in this matter. *See* N.Y. State Bar Ass'n Ethics Op. 1080 (2015) (reviewing history of application of DR 7-104(A), Rule 4.2, and *Niesig* to state and local government units); N.Y. City Bar Op. 1991-4.

<u>Opinion</u>

<u>Zummo and the Village Had Different Legal Interests</u>.

12.     Rule 4.2, the no-contact rule, prohibits a lawyer from communicating "about the subject of the representation with a party the lawyer knows to be represented

6

by another lawyer in the matter." The relevant party in this matter is the Village of Pomona. As applied to organizational clients, such as corporations or government entities, the rule also prohibits communication with certain natural person agents or officials of the organization. The *Niesig* test, which also applies to government entities, prohibits communications with individuals who (a) have authority, individually or as part of a larger body, to bind the government or to settle a litigable matter, or (b) whose acts or omissions gave rise to the matter in controversy. *See* N.Y. State Bar Ass'n Ethics Op. 812 (2007); *see also* N.Y. Rule 4.2, cmt. [7]. Because Zummo's acts of religious discrimination, if proven, could be imputed to the Village for the purpose of vicarious liability, Zummo would be within the protection of the no-contact rule as applied to the Village, but only if he was communicating in his capacity as an official of the Village and not as a private individual, communicating about his own personal legal rights and duties, or as a whistleblower, cooperating with the plaintiffs in the litigation.

13.     I assume *arguendo* that the matters on which Zummo and Manes, and subsequently Zummo and the plaintiffs' lawyers, communicated are related to the representation of the plaintiffs in this matter.

14.     The no-contact rule permits communication with a represented party with the prior consent of that party's lawyer. If Zummo had been acting in his capacity as a Village official, the lawyer would have been Doris Ulman, the Village's regular lawyer. It is undisputed that no lawyer for the Village gave prior consent to the communication by plaintiffs' counsel with Zummo.

15.     Importantly, however, Zummo was not communicating with plaintiffs'
counsel as an agent or official of the Village. He was communicating as an individual, a
potential co-defendant, and a whistleblower who had knowledge of civil rights violations
by other Village officials. He had legal interests that were adverse to those of the Village.
His interests were to reveal evidence of wrongdoing by other Village officials and,
presumably, to avoid his own personal liability for participation in prohibited
discrimination. By analogy, Zummo was in a role similar to that of a corporate
whistleblower disclosing wrongdoing under the False Claims Act or a similar statute. No
one would contend that a relator in a *qui tam* action could communicate with counsel
pursuing the False Claims Act lawsuit only with the consent of the alleged wrongdoer's
counsel. The reason is that the whistleblower's interests are separate from those of the
corporation, even though the whistleblower is an employee of the corporation. Similarly,
Zummo had his own separate set of legal interests which were adverse to those of the
Village. It therefore would make no sense to require – or even permit – the lawyer for
the Village to decide whether to allow Zummo to communicate with the plaintiffs' law
firm.

16.     This is the position taken by a New York City Bar ethics opinion (ABCNY
Op. 1991-4) on the application of the no-contact rule to government entities. In footnote
2, the City Bar committee concluded: "This opinion does not necessarily prohibit a
lawyer for a private litigant from receiving information relevant to a litigated matter
from a so-called 'whistleblower.' If a lawyer has not initiated the communication, one of
the principal concerns underlying [the no-contact rule] — that a lawyer may exploit the
disparity in legal skills between the lawyer and an unsuspecting lay person who is

speaking outside the presence of counsel, is diminished. In addition, First Amendment solicitude for communications initiated by 'whistleblowers', expressing their disagreement with existing governmental policies or reporting instances of misconduct by governmental officials, is greater than for communications initiated by counsel in an effort to persuade officials to provide information." (Citations omitted.)

17.     To further illustrate why Zummo is not within the protection of Rule 4.2 as applied to the Village, imagine that the lawyer for the Village sought to represent both the Village and Zummo individually in defense of the civil rights action. Doing so would clearly be prohibited by conflict-of-interest rules. N.Y. Rule 1.13(d) states that "[a] lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, *subject to the provisions of Rule 1.7*" (emphasis added). (Comment [9] clarifies that the rule applies to government entities.) Rule 1.7, the concurrent representation conflicts rule, prohibits the simultaneous representation of clients with differing interests. N.Y. Rule 1.7(a)(1). Comment [23] to this rule notes that "simultaneous representation of parties whose interests in litigation may conflict, such as co-plaintiffs or co-defendants, is governed by paragraph (a)(1). A conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question." For example, Zummo may have evidence of religious discrimination by other Village officials. Or, Zummo may testify that he was asked to perform an illegal act. Risks of this kind of adversity among the parties is the definition of "differing interests"

under Rule 1.7(a)(1) and would prohibit the lawyer for the Village from representing Zummo.

17.     It follows from this application of the simultaneous-representation conflicts rule that counsel for the Village *could not* provide the prior consent required before plaintiffs' counsel could communicate with Zummo. Only a lawyer representing Zummo personally, in his capacity as a whistleblower or an individual with interests potentially adverse to those of the Village, would be the appropriate lawyer to give consent to the communication. Zummo's personal lawyer, Glenn Jones, gave the required prior consent for the plaintiffs' lawyers to communicate with Zummo.

18.     Support for this position comes from a Ninth Circuit case applying the California no-contact rule, which is substantively identical to the New York no-contact rule. *See United States v. Talao*, 222 F.3d 1133 (9th Cir. 2000). In that case, an employee of the opposing party was worried that her corporate superiors would pressure her to give false testimony; she therefore communicated directly with the Assistant U.S. Attorney to convey these concerns. *Id.* at 1135-36. The court held that this communication did not violate the no-contact rule:

> [W]hen an employee/party of a defendant corporation initiates communications with an attorney for the government for the purpose of disclosing that corporate officers are attempting to suborn perjury and obstruct justice, [the rule] does not bar discussions between the employee and the attorney. Indeed, under these circumstances, an automatic, uncritical application of [the no-contact rule] would effectively defeat its goal of protecting the administration of justice.

*Id.* at 1140. The court also noted that the AUSA did the right thing by following the procedure employed by the plaintiffs' law firm in this case – namely, advising the employee to obtain individual counsel. *Id.* at 1141.

<u>Direct Party-to-Party Communications</u>

19.    A lawyer may advise a client to communicate with a person the lawyer knows is represented by counsel in the matter. N.Y. Rule 4.2(b). That rule ordinarily requires notice to the represented party's lawyer. Mr. Nash states that "he did not direct or otherwise cause Mr. Manes" to speak with Mr. Zummo at the time he came forward as a whistleblower. Nash Dec. ¶ 14.  As discussed above (see ¶ 15), insofar as Zummo was acting as an individual and a whistleblower, not as a Village official, notice to the Village's lawyer was not required. Furthermore, as discussed below (see ¶ 20), Zummo informed Manes that the Village's lawyer had advised him to destroy potentially relevant evidence. Thus, giving notice to the Village's lawyer would not only be ineffective – because Zummo was acting in his individual capacity – but may have substantially prejudiced Zummo. Plaintiffs' counsel therefore decided to recommend, through Manes, that Zummo retain an independent, experienced lawyer to advise him as a whistleblower. *See* Manes Dec. ¶¶ 8, 29; Nash Dec. ¶ 17.  This was the only indirect communication plaintiffs' counsel had with Zummo; they had no direct communications at all. The lawyer, Glenn Jones, acted as a truly independent lawyer in advising Zummo about the possibility of entering into a formal cooperation agreement with the plaintiffs. After Zummo retained Jones, the plaintiffs' law firm had no communications with Zummo without the consent of Jones.

20.     In their *indirect* communication with Zummo, through Manes, plaintiffs'
counsel were careful not to overreach or coerce Zummo in any way.  Indeed, all they did
was suggest an attorney who could represent Zummo in negotiating a cooperation
agreement with Manes. Comment [11] to New York Rule 4.2 provides that "a lawyer may
not advise the client to seek privileged information or other information that the
represented person is not personally authorized to disclose or is prohibited from
disclosing, such as a trade secret or other information protected by law, or to encourage
or invite the represented person to take actions without the advice of counsel." Plaintiffs'
counsel did none of those things. Similarly, ABA Ethics Opinion 11-461 (2011) permits a
lawyer to advise a client on communications the client is permitted to have with the
adverse party. The opinion warns lawyers not to violate the purposes of Rule 4.2, which
is to protect parties from being tricked into revealing sensitive information or agreeing
to something against their interests. In language very similar to N.Y. Rule 4.2, cmt. [11],
the ABA opinion states: "Prime examples of overreaching include assisting the client in
securing from the represented person an enforceable obligation, disclosure of
confidential information, or admissions against interest without the opportunity to seek
the advice of counsel." ABA Op. 11-461, at 5. Again, plaintiffs' counsel were careful to
avoid doing any of those things in advising Manes on his communications with Zummo.


Evidence of Wrongdoing by Doris Ulman


21.     Plaintiff Manes testified that Zummo told him that the attorney for the
Village, Doris Ulman, instructed him to delete emails from his phone so they would not

be revealed in discovery. *See* Manes Dec. ¶ 7. Specifically, Manes testified that Zummo said: "Knowing that we were going to have our phones scanned one of these days, Doris told me to get rid of a lot of our older emails. . . . So I lost all the emails. . . . and that's Doris' advice." Manes Dec. ¶ 27. As Zummo put it, he didn't trust Ulman as far as he could throw her. *Id.* Under the circumstances, with Zummo coming forward voluntarily to cooperate with the plaintiffs and offering credible evidence of wrongdoing by the lawyer for the Village, the plaintiffs' lawyers did not have the option of seeking the consent of the Village's lawyer to communicate with Zummo.

Dated this 25th day of March, 2019,
At Ithaca, New York

_____

W. Bradley Wendel