UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

SAMUEL INDIG, LEAH INDIG, MEIR KAHANA,
ROBERT KLEIN, and NAFTALI KLEIN

                             Plaintiffs,

      -against-

THE VILLAGE OF POMONA, BRETT YAGEL, LOUIS
ZUMMO, LEON HARRIS, and DORIS ULMAN,

                            Defendants.

-------------------------------------------------------------------- X

Case No: 18-cv-10204

**DECLARATION OF
PROFESSOR J. ANDREW
KENT**

I, J. Andrew Kent, declare the following under penalty of perjury:

**Qualifications**

1.    I am a Professor of Law at Fordham University School of Law. I received my bachelor's

degree from Harvard College and a J.D. from Yale Law School in 1999. After law school, I

clerked for the Honorable Carol B. Amon of the U.S. District Court for the Eastern District of

New York and the Honorable Robert A. Katzmann of the U.S. Court of Appeals for the Second

Circuit. I then practiced litigation at Sullivan & Cromwell in New York and Wilmer Hale in

Boston. During 2005-2007, I was a Climenko Fellow and lecturer on law at Harvard Law

School. I have been a professor at Fordham since 2007, and have had tenure since 2012. I teach

and write about U.S. constitutional law, federal courts law, professional responsibility and ethics,

and other topics. My academic writings have been published, or accepted for publication, in law

journals such as the *Harvard Law Review*, *Columbia Law Review*, *Georgetown Law Journal*,

*Texas Law Review*, and *Vanderbilt Law Review*. From 2014-15, while on leave from Fordham, I

served as Senior Counsel to the Solicitor General of New York, in the Office of the Attorney

1

General. In that position, I represented New York State and component entities in federal and state appellate courts. I am a member in good standing of the bars of New York State, the U.S. Supreme Court, the Second Circuit, and the U.S. District Courts for the Southern and Eastern Districts of New York. I serve on the Pro Bono Panel of the Second Circuit, representing indigent civil appellants when requested by the Court.

2.   I teach Professional Responsibility at Fordham Law School either once or twice every calendar year. In addition, I taught Professional Responsibility in fall 2018 as a visiting professor at Columbia Law School, and have accepted an invitation to do so again in fall 2019. Since 2016 I have been a member of the Professional Responsibility Committee of the New York City Bar. My resume is attached to this declaration. Within the past four years I have not given testimony in court or at a deposition.   My CV is attached as **Exhibit A** to this declaration.

**My Retention and Review of Documents**

3.   I have been retained by defendants at $600 per hour to opine on whether, based on the present record, plaintiffs' attorneys committed ethics violations that could give good cause for disqualification.

4.   I have reviewed the declarations, memoranda of law and exhibits filed in the present case concerning the disqualification issue, and also the Complaint, ECF No. 1, the Related Case Statement, ECF No. 3, and the Amended Complaint, ECF No. 62.

**Violation of the "No-Contact Rule"**

5.  Based on the current record, my review of applicable authorities, and my professional experience and judgment, my opinion is that plaintiffs' lawyers violated Rule 4.2 of the New York Rules of Professional Conduct, often called the "no-contact rule."

6.  The New York Rules of Professional Conduct, which became effective in 2009, are codified at 22 N.Y.C.R.R. Part 1200. Local Rule of the Southern District of New York, Rule 1.5(b)(5), incorporates the New York Rules of Professional Conduct as grounds for attorney discipline.

7.  In ruling on motions to disqualify concerning New York practice, federal courts are informed by the New York Rules of Professional Conduct, though the final decision lies within the discretionary authority of the court. *See Hempstead Video, Inc. v. Incorporated Village of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005); *Muniz v. Re Spec Corp.*, 230 F. Supp. 3d 147, 152 (S.D.N.Y. 2017); *Mori v. Saito*, 785 F. Supp. 2d 427, 432 (S.D.N.Y. 2011).

8.  New York's Rule 4.2, the "no-contact rule," provides in relevant part:

(a) In representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law.

(b) Notwithstanding the prohibitions of paragraph (a), and unless otherwise prohibited by law, a lawyer may cause a client to communicate with a represented person unless the represented person is not legally competent, and may counsel the client with respect to those communications, provided the lawyer gives reasonable advance notice to the represented person's counsel that such communications will be taking place.

9.  Before 2009, a substantially identical rule was found in DR 7-104 of the New York Code of Professional Responsibility. *See In re Amgen Inc.*, 2011 WL 2442047 at \*9 n.15 (E.D.N.Y. Apr. 6, 2011) ("New York did not intend to effect any substantive change in the no-contact rule in amending and re-numbering it in 2009."), *Report & Recommendation Adopted*, 2011 WL 2418815 (E.D.N.Y. June 14, 2011); *Muniz*, 230 F. Supp. 3d at 156 (to the same effect); N.Y.S. Bar Ass'n Ethics Op. 1080 (2015) (to the same effect).

10.  One of the core purposes of the no-contact rule is to prevent one side's lawyers from "obtaining a tactical advantage by knowingly contacting a represented party without notifying her lawyer." *Velez v. Novartis Pharm. Corp.*, 2010 WL 339098, at \*3 (S.D.N.Y. Jan. 26, 2010). The rule is meant to help ensure that "unwise statements" are not extracted from an uncounseled adversary, that privileged or confidential information is not inadvertently disclosed, and that "unprincipled attorneys" cannot "exploit[ ] the disparity in legal skills between attorney and lay people," *Polycast Tech. Corp. v. Uniroyal, Inc.*, 129 F.R.D. 621, 625 (S.D.N.Y. 1990) (citations and quotation marks omitted); *accord* Rule 4.2 comment 1.  In addition, "[b]arring lawyers from communicating directly with an opposing party represented by counsel preserves the integrity of the attorney-client relationship, including by preventing counsel from driving a wedge between the opposing attorney and that attorney's client." *Jackson v. Bloomberg L.P.*, 2015 WL 1822695, at \*2 (S.D.N.Y. Apr. 22, 2015) (quotation marks and citation omitted).

11.  As described in the declarations and briefs of the parties, the person contacted by attorneys Solomon Klein and Bradley Nash of Schlam Stone & Dolan (SS&D), and by their client Avrohom Manes, was Louis Zummo, the building inspector for the Village of Pomona, a

4

defendant in the instant case and a key figure in multiple related lawsuits pending when the contacts at issue occurred.

*The Timeline*

12. The initial complaint in the instant action was filed on November 2, 2018 by Nash of SS&D. *See* Complaint, ECF No. 1. It has now been amended. The communications at issue with Zummo occurred prior to this filing, in August and September 2018.

13. Those communications were:

   a. A conversation between Zummo and Manes, the principal of TAL Properties, on August 1, 2018, in connection with a deposition, *see* Zummo Decl., ECF No. 29-1, ¶¶ 2-3; Manes Decl., ECF No. 40, ¶¶ 23-24;

   b. "[D]aily email messages" from Manes after this meeting and before the next one, *see* Zummo Decl., ECF No. 29-1, ¶ 3;

   c. A meeting between Zummo and Manes at Manes' home, on or about August 6, *see* Zummo Decl., ECF No. 29-1, ¶ 4; Manes Decl., ECF No. 40, ¶ 26;

   d. A communication by Manes to Zummo to tell Zummo the details of a meeting with a lawyer that Manes had arranged and agreed to pay for, *see* Zummo Decl., ECF No. 29-1, ¶¶ 7-8; Manes Decl., ECF No. 40, ¶ 29; and

   e. A meeting at the offices of SS&D, in mid- to late-September, attended by Zummo, Glenn Jones (the lawyer arranged and paid for by Manes, but whom Zummo had apparently not agreed to formally retain), Nash and Klein of SS&D, and Manes joining by telephone, *see* Zummo Decl., ECF No. 29-1, ¶ 11; Nash Decl., ECF No. 38, ¶ 25; Manes Decl., ECF No. 40, ¶ 30.

14.     Nash of SS&D states that the representation of Manes began "around" June 2018.
*See* Nash Decl., ECF No. 38, ¶¶ 8, 10. Thus, SS&D attorneys represented Manes during
August and September 2018, when the above communications occurred.

15.     It also appears that the SS&D lawyers were representing plaintiffs in the instant
case during the August and September 2018 period.[1]

16.     It appears to be undisputed that all of the above communications concerned
alleged discrimination regarding property development and related issues against Orthodox
Jews by certain officials of the Village of Pomona, including the Mayor and Zummo.

*.Application of Rule 4.2 (The No-Contact Rule)*

17.     A threshold question about application of Rule 4.2 is whether contacting Zummo at the
above times counted as contacting "a party" who was "represented by another lawyer" at the
time of the communication. *See* Rule 4.2(a). In my opinion, the answer is yes.

18.     Plaintiffs and their expert focus their analysis primarily on Zummo as an individual, and
suggest that he was contacted in his "personal" not "official" capacity and therefore Rule 4.2 was
not violated. *See* Wendel Decl., ECF No. 41, ¶ 6. This analysis confuses the issues and reaches
an incorrect result. The key to understanding the application of Rule 4.2 is to understand the
relationship Zummo had with the Village government, and the nature of then-pending litigation
involving the Village and Zummo.

19.     Contact with Zummo was contact with a "party" because of his official position with the
Village and his relationship to various pending and impending litigations about alleged

---

[1] As noted above, the instant case was filed on November 2, 2018 by SS&D. Plaintiffs' counsel were
engaged in pre-suit investigation for at least several months prior, *see* Amended Complaint, ECF No. 62,
¶ 1 (stating that the suit was based on a "months-long investigation by counsel").

discrimination against Orthodox Jews in the granting or failing to grant property development approvals in the Village of Pomona.

20. The first step in my analysis is to ascertain whether the Village of Pomona was a "party" to a "matter" and that the communications at issue concerned "the subject matter of the representation." Rule 4.2. Then we can ask whether contact with Zummo should be considered to be contact with the Village.

21. According to Manes, the August-September 2018 communications with Zummo—both the bilateral ones at the start and then the later communications that involved his SS&D attorneys—concerned "discriminatory practices by Village government" in the issuance or denial of property development permits and related matters, against Orthodox Jews, including Manes and plaintiffs in the instant action. *See* Manes Decl., ECF No. 40, ¶¶ 6-7, 10-13, 19, 25-26, 31. Zummo agrees. *See* Zummo Aff., ECF No. 38-5, ¶¶ 5-9. The various drafts of the "Settlement and Cooperation Agreement" confirm this. *See, e.g.,* ECF No. 29-3, ¶ 1. As does the declaration of SS&D attorney Nash. *See* ECF No. 38.

22. At the time of these communications with Zummo in August-September 2018, the following legal actions were pending, concerning either the same or substantially similar events and issues as those being litigated in the present case:

- *Naftali and Frieda Klein v. Village of Pomona*, Supreme Court Rockland County, Index No. 34966/2018. Article 78 proceeding. This matter concerned the denial of a building permit for the same property as plaintiffs Naftali and Robert Klein are suing about in instant case. *See* Riley Decl., ECF No. 29-2, ¶ 3. Naftali and Frieda are the parents of Robert. *See id.* According to New York's eCourts Web Civil Supreme portal, the Village was represented by the Village attorney. This matter appears to cover the same incidents

7

as are alleged in the complaint in the instant action, ECF No. 1, ¶¶ 80-91, concerning

alleged discrimination against Orthodox Jews by Zummo and the Village.

- *People v. Naftali and Frieda Klein*, Justice Court Town of Haverstraw. This action seeks
to enforce the Pomona Village Code regarding the same Klein property as plaintiffs
Robert and Naftali Klein are suing about in the instant case. Zummo as building inspector
is the complainant. *See* Riley Decl., ECF No. 29-2, ¶ 4. The People have been
represented by Christopher Riley acting as special prosecutor.

- *People v. Leah Indig*, Justice Court Town of Ramapo. This is an enforcement proceeding
against the plaintiff in the instant action, the wife of plaintiff Samuel Indig, regarding
same property as the Indigs are suing about in instant case. Zummo as building inspector
is the complainant. *See* Riley Decl., ECF No. 29-2, ¶ 5. The People have been
represented by Christopher Riley acting as special prosecutor, now by Roger Bernstein.

- *TAL Properties of Pomona LLC v. Village of Pomona, Doris Ulman, Brett Yagel, Louis
Zummo, et al.*, Supreme Court Rockland County, Index No. 312165/2017. *See* Zummo
Decl., ECF No. 38-5 (showing the caption in the Rockland lawsuit). TAL is owned by
Manes. Defendants are represented by Village attorney Doris Ullman. This is the
"Roads" case referred to in the Manes Declaration, ECF No. 40, ¶ 14, concerning
allegedly discriminatory actions in relation to property development issues, allegedly on
the basis of Manes being an Orthodox Jew. It was during the deposition in this case that
Manes and Zummo had a conversation in the bathroom or hallway on August 1, 2018.
*See* Riley Decl., ECF No. 29-2, ¶ 5; Manes Decl., ECF No. 40, ¶¶ 24-25.

- *TAL Properties of Pomona LLC v. Village of Pomona, Brett Yagel, Doris Ullman*,
S.D.N.Y., No. 7:17-cv-02928-CS. *See* Manes Decl., ECF No. 40, ¶ 17. Originally

8

TAL/Manes was represented in this action by Sussman & Watkins of Goshen, New York. *See* ECF No. 40-1. Sometime around June 2018 SS&D attorneys started representing Manes to try to revive this case after dismissal of the action. *See* Manes Decl., ECF No. 40, ¶¶ 21-22. This action concerned alleged discrimination by the Village of Pomona against Manes and other Orthodox Jews concerning property development approvals and related issues.

23. Thus, at the time of the communications with Zummo in August-September 2018, the Village of Pomona was a party, represented by counsel (the village attorney Doris Ulman, with Wilson Elser becoming counsel in the federal civil rights action), in three actions concerning alleged discrimination related to property development against Orthodox Jews by the Village and Village officials including Zummo. In two other actions, the People of the State of New York, represented by counsel and with Zummo as the complaint, were seeking to enforce property rules against plaintiffs in the instant case. And at the same time, SS&D attorneys were investigating alleged discrimination against Orthodox Jews by the Village in preparation for filing in the instant case. See *supra* ¶ 15.

24. To repeat, the Village was the relevant represented "party" under Rule 4.2. There can be no dispute that the communications in August-September 2018 involving Zummo, Manes, and SS&D concerned the "subject of the representation," Rule 4.2(a)—the same or related topics about which the Village was then currently represented by counsel in three pending cases, namely alleged discrimination by the Village in property development and related issues against Orthodox Jews. The Village should also be considered represented at the time, for purposes of

the no-contact rule, in regard to the soon-to-be-filed present case.[2] Plaintiffs do not appear to dispute that the communications with Zummo concerned the subject matter of then-pending litigation in which the Village was represented. *Cf.* Wendel Decl., ECF No. 41, ¶ 13 ("I assume *arguendo* that the matters on which Zummo and Manes, and subsequently Zummo and the plaintiffs' lawyers, communicated are related to the representation of plaintiffs in this matter.").

25.   The next step is to determine whether these communications with Zummo himself are treated as communications by Manes and SS&D lawyers with the "party . . . represented," that is, as communications with the Village. Rule 4.2(a). A corporate or governmental entity can only communicate through natural persons who work for or represent it. The question is whether Zummo in particular had such a relationship to the Village government in relation to the pending litigation that contacting him counts as contacting the Village. There is a well-established test in New York to determine which corporate employees or government officials are covered by the no-contact rule when the organization employing him or her is "represented . . . in the matter." Rule 4.2.

26.   Comment 7 to Rule 4.2 sets out the test, which is drawn from *Niesig v. Team I*, 76 N.Y.2d 363 (1990) (applying DR 7-104). An employee or official of a represented corporate or governmental entity cannot be communicated with about the subject matter of the representation—unless some exception to the no-contact rule applies—if, among other things, the official or employee either "regularly consults with the organization's lawyer concerning the matter" or is someone "whose act or omission in connection with the matter may be imputed to

---

[2] *See, e.g., Gidatex, S.r.L v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 119, 125 (S.D.N.Y. 1999) (noting that it was "unrealistic" to conclude that counsel did not know that a party was represented before a complaint was filed, even when that party had not yet retained its current counsel, where there had been years of related litigation in which the party was in fact represented).

10

the organization for purposes of civil or criminal liability." Rule 4.2, comment 7. This test is

regularly applied by federal courts in New York, *see, e.g., Lozama v. Samaritan Daytop Village,*

*Inc.,* 2019 WL 1002954, at *1 (E.D.N.Y. Mar. 1, 2019); *Muniz,* 230 F. Supp. 3d at 156-57;

*Amgen,* 2011 WL 2442047 at *9 n.15, as well as ethics authorities, *see, e.g.,* N.Y.S. Bar Ass'n

Ethics Op. 1080 (2015); N.Y.S. Bar Ass'n Ethics Op. 812 (2007).

27.  Zummo, the building inspector, is an employee covered by the *Niesig*/Rule 4.2 test under

the circumstances presented here and therefore contact with him in August-September 2018 was

covered by Rule 4.2. It cannot truly be disputed that acts or omissions by Zummo concerning the

property development disputes and allegations of discriminatory motive covered by the instant

case and the five other pending action could be imputed to the Village for purposes of civil

liability. Plaintiffs' expert acknowledges that statements by Zummo concerning his actions "in

his capacity as an official of the Village" could be imputed to the Village for liability purposes.

*See* Wendel Decl., ECF No. 41, ¶ 12. Even if this basis for applying the *Niseig*/Rule 4.2 test is

somehow contested by plaintiffs, Zummo also "regularly consult[ed] with" Village and other

government lawyers "concerning the matter," Rule 4.2, comment 7, at the time of the August-

September 2018 communications. *See* Zummo Reply Decl., dated May 8, 2019, ¶¶ 4-7.

28.  The next step in the analysis is to see whether any specific actions by SS&D attorneys

violated Rule 4.2. As noted above, my opinion is that the answer is yes. The SS&D attorneys

Nash and Klein admit that they attended the September meeting with Zummo at their law offices

to discuss allegedly discriminatory Village practices against Orthodox Jews with regard to

property development issues. *See* Nash Decl., ECF No. 38, ¶¶ 25-26; Klein Decl., ECF No. 39, ¶

3; Settlement and Cooperation Agreement, ECF No. 29-3, ¶ 1. On its face, this violates Rule 4.2,

because SS&D met with Zummo, who counts as the Village under the *Niseig*/Rule 4.2 test, and

11

the attorneys did not have "the prior consent" of the Village's lawyer. Rule 4.2(a). *See* Wendel Decl., ECF No. 41, ¶ 14 ("It is undisputed that no lawyer for the Village gave prior consent to the communications by plaintiffs' counsel with Zummo.").

29. As outlined in plaintiffs' papers, their defense to this facial violation of Rule 4.2 is that the communications with Zummo did not involve Zummo "in his capacity as an official of the Village," but rather Zummo "as a private individual . . . or as a whistleblower." Wendel Decl., ECF No. 41, ¶ 12. And plaintiffs emphasize that when Zummo was communicating with them, he was being advised by a separate attorney, Glenn Jones, a private attorney whose fees Avrohom Manes had agreed to pay.

30. In my opinion, the involvement of Jones is irrelevant to the no-contact rule issue. Rule 4.2 protects entities as much as it protects individuals. The primary no-contact rule problem concerns circumvention of the legal representation that the Village had with its lawyer. The Village was a "party" represented concurrently in multiple other legal actions involving the same or similar facts and legal issues to the instant lawsuit. The Village was a party who could be held civilly responsible for actions or statements by its official, Zummo. The Village stood to lose if "unwise statements" were made by Zummo, *Polycast Tech. Corp.*, 129 F.R.D. at 625, if privileged or otherwise protected information was disclosed by Zummo, *see id.*, or if SS&D could "driv[e] a wedge" between the Village and Zummo, *Jackson*, 2015 WL 1822695, at *2 (quotation marks and citation omitted). Jones might have been looking out for Zummo's personal interests,[3] but he was certainly not representing and protecting the interests of the Village.

---

[3] As discussed below, the fact that Jones was going to be paid by Manes, the client of SS&D, raises concerns.

12

31. Plaintiffs primarily focus on whether actions of SS&D attorneys and Manes infringed on Zummo's relationship with Village counsel who was representing him in several of the pending lawsuits. This is the apparent point of the "personal" versus "official" capacity distinction they attempt to draw. There might well be *additional* no-contact rule problems regarding the Zummo/Village counsel representation, but the obvious and clear violations here concern the Village/Village counsel representation, in which communication with Zummo counts as communication with the Village under the *Niesig*/Rule 4.2 test because of Zummo's key position in the government with regard to the pending litigation.

32. Plaintiffs' "whistleblower" defense cannot, in my opinion, excuse their conduct. First, there is a factual dispute about whether Zummo was a whistleblower at all. Zummo disputes plaintiffs' assertions that he was, averring instead that he "told Mr. Manes that, to the best of my knowledge, there was and is no targeting of Orthodox Jewish property owners in the Village nor targeting or any property owners in the Village." Zummo Aff., ECF No. 38-5, ¶ 6. *See also* Zummo Reply Decl., dated May 8, 2018, ¶¶ 16-17. Zummo explains instead that he met with Manes first, and then Manes, Jones, and the SS&D lawyers, because he was "concerned about being sued personally," unable to "afford costly legal fees," "unsure of [his] legal rights," and unaware at the time that in suits arising out of his job the Village would provide counsel and indemnification. Zummo Aff., ECF No. 38-5, ¶¶ 7-10. Notably, Zummo has also sworn that in the September in-person meeting, "Mr. Manes' attorneys attempted to frighten and intimidate me." Zummo Aff., ECF No. 38-5, ¶ 9. Based on the meeting with Manes and SS&D attorneys, Zummo got "the impression that Mr. Manes' proposal [to pay for separate counsel for Zummo] was to buy my testimony and that he did not care of my testimony was truthful or not so long as it was in his favor and against the Mayor and the Village of Pomona." Zummo Aff., ECF No. 38-

13

5, ¶ 9. Plaintiffs' attorneys deny that anything untoward occurred at the meeting. *See* Nash Decl., ECF No. 38, ¶¶ 26-27. Quite obviously, if Zummo's account of these disputed facts is the more accurate one, the behavior attributed to plaintiffs' counsel must rule out any claim that a supposed good-faith "whistleblower" exception to the no-contact rule should apply here.

33.   Second, even assuming that plaintiffs' attorneys and Manes are right about the disputed facts, and further assuming that they reasonably and truly thought that Zummo was a whistleblower, the SS&D attorneys handled the situation improperly, in my view. There are narrow circumstances in which the public has the right to communicate with government officials, even when the communications concern a matter that is *sub judice* or otherwise being contested, and the governmental entity is represented by counsel. New York ethics law has long taken account of this possibly and provided doctrinal exceptions to accommodate both the policies of the no-contact rule and the First Amendment-type interests of the public. *See* ROY D. SIMON & NICOLE HYLAND, SIMON'S NEW YORK RULES OF PROFESSIONAL CONDUCT ANNOTATED 1310-15 (2016 ed.). *See generally* Rule 4.2(a) (excusing communications that would otherwise violate the no-contact rule if the attorney was "authorized to do so by law"); Rule 4.2 comment 5 ("Communications authorized by law may include communications by a lawyer on behalf of a client who is exercising a constitutional or other legal right to communicate with the government.").

34.   N.Y.S. Bar Ass'n Ethics Op. 812 (2007) addresses this situation, where a government entity has counsel in a matter for purposes of the no-contact rule, but "a lawyer who is representing a private party in a controversy" nevertheless wants to communicate with a responsible government official who is covered by the *Niesig*/Rule 4.2 test outside the presence of government counsel. Drawing on an American Bar Association ethics opinion, the NYS

14

opinion notes the "tension between a citizen's right of access and the government's right to be protected from uncounselled communications by an opposing party's lawyer." Following the ABA, the New York committee adopted the following test for when such communications without government counsel, that would otherwise be barred by the no-contact rule, are allowed:

> First, the official to be contacted must have authority to take or recommend action in the controversy. Second, the sole purpose of the communication must be to address a policy issue. Third, advance notice of the proposed communications must be given to the lawyer representing the government official in the matter so as to afford government counsel the opportunity to advise his or her client with respect to the communication, including whether even to entertain it.

N.Y.S. Bar Ass'n Ethics Op. 812 (2007).

35. This narrow safe-harbor cannot, in my opinion, cover SS&D's communications with Zummo for at least two reasons. First, the communications concerned both pending and anticipated[4] litigation against the Village and Village officials, not—or, at least, not solely— "policy" issues. Second, the SS&D attorneys did not give advance notice to counsel for the Village.

36. Nor do the two authorities cited by plaintiffs' counsel and their expert, *see* Wendel Decl., ECF No. 41, ¶¶ 16, 18, provide any defense to the violation of the no-contact rule.

37. The case *United States v. Talao*, 222 F.3d 1133 (9th Cir. 2000), concerns an AUSA who was approached by the bookkeeper for a company which was being investigated for criminal

---

[4] The no-contact rule can apply even before a formal legal proceeding has been filed. *See, e.g.*, *Miano v. AC&R Advertising, Inc.*, 148 F.R.D. 68, 77 (S.D.N.Y. 1993); N.Y.S. Bar Ass'n Ethics Op. 904 (2012); N.Y.S. Bar Ass'n Ethics Op. 735 (2001). *See also* N.Y Rules of Professional Conduct, Rule 1.0(*l*) (defining "matter," a term used in Rule 4.2, very broadly).

15

fraud. The company was represented by counsel during that investigation. The bookkeeper approached the AUSA and said that she did not want to give testimony in the presence of the company lawyer because she would feel pressure to lie. *See id.* at 1135-36. The AUSA communicated with the bookkeeper about this issue without the consent or notice to company counsel. *See id.* A U.S. Attorney's Office supervisor advised that this contact was ethical because the company lawyer "was wrongfully tampering with a witness." *Id.* at 1136. In determining that these communications did not violate California's no-contact rule, the Ninth Circuit stated:

> [T]he interests in the internal integrity of and public confidence in the judicial system weigh heavily in favor of the conclusion that Harris' conduct was at all times ethical. We deem manifest that when an employee/party of a defendant corporation initiates communications with an attorney for the government for the purpose of disclosing that corporate officers are attempting to suborn perjury and obstruct justice, Rule 2–100 [California's no-contact rule] does not bar discussions between the employee and the attorney. *Id.* at 1140.

38. There are many ways in which the case is distinguishable from the instant one. First, it is well-established in the Second Circuit that the no-contact rule applies differently in the criminal law enforcement setting than in purely civil matter, both because of the stronger governmental interests and unique criminal investigatory needs, *see United States v. Hammad*, 858 F.2d 834, 839-40 (2d Cir. 1988), and because of the constitutional rights of criminal defendants to an adequate defense, *see Grievance Comm. for S. Dist. of New York v. Simels*, 48 F.3d 640, 650-51 (2d Cir. 1995). *See also* Rule 4.2 comment 5 ("This Rule is not intended to effect any change in the scope of the anti-contact rule in criminal cases."). The Ninth Circuit case, which relies on *Hammad*, should not be considered directly applicable to a quite different situation in the instant

16

case. Second, although plaintiffs suggest that Village attorney Ulman might have been subject to a conflict of interest, that is obviously quite a different and lesser matter than obstructing justice and suborning perjury, as in *Talao*. If plaintiffs believed that a conflict existed, the proper recourse would be to raise it with Ulman or another Village official, seek appropriate relief from a court, if applicable, and/or report it to disciplinary authority. Private plaintiff's lawyers cannot take it upon themselves to devise their own remedy for a supposed conflict on the other side of civil disputes, especially when their chosen remedy involves violation of the professional ethics rules.[5]

39. Plaintiffs also cite a footnote in a 1991 opinion of a New York City Bar Association ethics committee. That opinion agrees with the general position I described above, see *supra* paragraphs 33-34, concerning the narrow exception to the bar on contacting high-level officials of represented government entities, when an attorney for a member of the public is exercising "[t]he right to petition the government for the redress of grievances." N.Y.C. Bar Ass'n Ethics Op. No. 1991-4. Notably, the opinion cited by plaintiffs' expert agrees that attorneys seeking to contact a represented governmental entity under the narrow exception must first notify counsel for the government, if the official to be contacted could bind the government or if the official's statements or actions could be imputed to the government. *See id.* As discussed, SS&D did not give prior notice to the Village's lawyer.

40. In a footnote, the 1991 opinion states that its discussion in the main text *"does not necessarily prohibit* a lawyer for a private litigant from receiving information relevant to a

---

[5] Plaintiffs also claim that Zummo stated that Village attorney Ullman had counseled him to delete electronic documents. *See* Manes Decl., ECF No. 40, ¶ 7. Zummo denies this. *See* Zummo Reply Decl. dated May 8, 2018, ¶ 2. Disputes like this over whether a potentially damaging admission was made by a nonlawyer government official, outside the presence and without the knowledge of government counsel, are precisely why we have the no-contact rule.

17

litigated matter from a so-called 'whistleblower'" (emphasis added). Of course, given the express caveat, this footnote *does not necessarily allow* that conduct either. Rather, the committee seeks to reserve the question about whistleblowers for another time. But the committee does note the potential exception would apply where the "communications" were "initiated by 'whistleblowers.'" *Id.* It is disputed in this case whether Zummo was a whistleblower at all, and who initiated the communications. For all of these reasons, the footnote in the 1991 opinion does not change my view about the Rule 4.2 violation by plaintiffs' counsel.

41. In addition to the problematic direct contact between Zummo and SS&D lawyers, there was also, in my opinion, a violation of Rule 4.2 in the contacts between Zummo and Manes, the client of SS&D.

42. "Clients, of course, have the power to communicate with one another directly without the presence of counsel or without notifying counsel ahead of time." *Misiewicz v. D'Onofrio Gen. Contractors Corp.*, No. 08-CV-4377, 2010 WL 2545439, at *6 (E.D.N.Y. May 17, 2010) (citing Rule 4.2 comment 11), *Report & Recommendation adopted*, 2010 WL 2545472 (E.D.N.Y. June 18, 2010). But there are rules governing how counsel may be involved in these client-client communications.

43. Rule 4.2(b) allows a lawyer to either "cause" his or her client "to contact a represented person," or to "counsel the client with respect to those communications." But crucially, counsel doing either of these two things must "give[ ] reasonable advance notice to the represented person's counsel that such communications will be taking place." Rule 4.2(b). It is undisputed that the SS&D attorneys gave no advance notice to counsel for the Village.

18

44. On this record, it appears to me somewhat unclear whether SS&D "caused" their client Manes to communicate with Zummo without the knowledge or consent of counsel for the Village. I will assume that they did not. *See* Nash Decl., ECF No. 38, ¶ 14.

45. On the other hand, it does seem likely that the SS&D attorneys, without giving notice to a lawyer for the Village, did "counsel the client," Manes, "with respect to those communications" with Zummo. Rule 4.2(b). As noted above, SS&D was at the time engaged in pre-suit investigation for the instant action, which overlaps substantially with Manes' concerns about alleged discrimination against Orthodox Jews by the Village, and it seems reasonable to infer that they discussed with Manes how evidence gathered from Zummo could be useful. Also it is undisputed that Manes and SS&D were at the time trying to revive Manes' dismissed federal civil action against the Village and Village employees. Moreover, the SS&D lawyers and Manes were hoping that Zummo would sign the "Cooperation and Settlement Agreement," to testify about alleged discrimination by the Village, and again it seems reasonable to infer that this involved some conversation between Manes and SS&D attorneys about Zummo and their interactions with him. And in fact, Nash admits to counseling Manes about communications with Zummo. *See* Nash Decl., ECF No. 38, ¶ 17. *See also* Manes Decl., ECF No. 40, ¶¶ 8, 29.

**Other Ethical Concerns**

46. In addition to the improper contacts with Zummo in violation of Rule 4.2, there is another ethical concern raised by Zummo's account of the behavior of Manes and the SS&D attorneys.

47. *The Cooperation and Settlement Agreement.* Rule 3.4(b) of the New York Rules of Professional Conduct provides that a "lawyer shall not . . . . offer an inducement to a witness that

19

is prohibited by law or pay, offer to pay or acquiesce in the payment of compensation to a witness contingent upon the content of the witness's testimony or the outcome of the matter." The word "inducement" is broad, covering situations in which "the witness does not personally receive money" but where the witness "merely breaks even or receives free goods or services that he would not have purchased on his own." ROY D. SIMON & NICOLE HYLAND, SIMON'S NEW YORK RULES OF PROFESSIONAL CONDUCT ANNOTATED 1141 (2016 ed.). According to Zummo, because he was made to fear for personal legal liability or at least the costs of defending himself, and because he was unaware that he would be provided counsel and indemnification by the Village, he was initially open to the possibility of having a separate lawyer, Jones, be retained and paid for by Manes, in exchange for giving testimony favorable to Manes, even if it was not true. *See* Zummo Aff., ECF No. 38-5, ¶¶ 7-9; Zummo Reply Decl., dated May 8, 2018, ¶¶ 8-11. Jones, the lawyer who was to be paid by Manes, did not inform Zummo that Zummo would likely be provided counsel and indemnification by the Village. *See* Zummo Reply Decl., dated May 8, 2018, ¶ 11. If Zummo's account of these events is correct, it would appear that Rule 3.4(b) could have been violated by the SS&D attorneys because Zummo was being offered legal services that he would not otherwise have purchased in order to provide testimony favorable to Manes, and the attorneys "acquiesce[d]"—indeed assisted—with that arrangement. Manes and Nash dispute Zummo's account of these events. Without further factual clarification, it is impossible for me to render a definite opinion on the application of Rule 3.4(b).

7681882v.1

I declare under penalty of perjury that the above is true and correct to the best of my

knowledge.

New York, NY
May 10, 2019

J. Andrew Kent

# Exhibit A

v. 05-10-19

## J. ANDREW KENT

150 W. 62nd Street
New York, NY 10023
212.636.6774 akent@law.fordham.edu

### PROFESSIONAL EXPERIENCE

Fordham Law School
      Professor of Law (2013-present)
      Dean's Distinguished Research Scholar (2016-17)
      Associate Professor (2007-13), with tenure (2012-13)

Columbia Law School

      Visiting professor of law (fall 2018, scheduled to return fall 2019)

Pro Bono Panel of the U.S. Court of Appeals for the Second Circuit (2015-present)

      Provide appellate representation to indigent upon request of the court

Office of the Attorney General of New York

      Senior Counsel to the Solicitor General (2014-2015) (while on leave from Fordham)

Harvard Law School

      Climenko Fellow and Lecturer on Law (2005-2007)

Wilmer Cutler Pickering Hale and Dorr, Boston, MA

      Associate in Litigation and Securities Departments (2004-2005)

Sullivan & Cromwell, New York, NY

      Associate in Litigation Department (2002-2004)

      Pro Bono Fellow (2001-2002)

Hon. Robert A. Katzmann, U.S. Court of Appeals for the Second Circuit. Law clerk (2000-2001)

Hon. Carol B. Amon, U.S. District Court for the Eastern District of New York. Law clerk (1999-2000)

### EDUCATION

Yale Law School, J.D.

Harvard College, A.B. in Social Studies, *magna cum laude*, 1993

### MAJOR COURSES TAUGHT

Constitutional Law, Federal Courts, Foreign Relations Law, Professional Responsibility, National Security Law

### PUBLICATIONS: LONGER FORM

*Faithful Execution and Article II,* 132 HARVARD LAW REVIEW (forthcoming 2019) (with Ethan J. Leib and Jed H. Shugerman)

*Congress and Federal Law Enforcement Independence,* 52 UNIVERSITY OF CALIFORNIA AT DAVIS LAW REVIEW 1927 (2019)

*Executive Power and National Security Power* (with Julian D. Mortensen), in THE CAMBRIDGE COMPANION TO THE UNITED STATES CONSTITUTION, edited by J.W. Compton and K. Orren, Cambridge University Press (2018)

*Piracy and Due Process*, 39 MICHIGAN JOURNAL OF INTERNATIONAL LAW 385 (2018)

NEW YORK CITY BAR COMMITTEE ON PROFESSIONAL RESPONSIBILITY, *Report on Proposed Amendment to Rule 1.8(e), N.Y. Rules of Professional Conduct,* (Mar. 16, 2018) (principal author for the Committee), www.nycbar.org/member-and-career-services/committees/reports-listing/reports/detail/proposed-amendment-to-rule-18e-ny-rules-of-professional-conduct

*The Jury and Empire: The Insular Cases and the Anti-Jury Movement in the Gilded Age and Progressive Era,* 91 SOUTHERN CALIFORNIA LAW REVIEW 375 (2018)

> Cited in *Oriental Financial Servs. Corp. v. Umpierre,* No. CV 3:17-01745, 2018 WL 3629674 (D.P.R. 2018)

*The Rebel Soldier Who Became Chief Justice of the United States: The Civil War and its Legacy for Edward Douglass White of Louisiana,* 56 AMERICAN JOURNAL OF LEGAL HISTORY 209 (2016)

*Disappearing Legal Black Holes and Converging Domains: Changing Individual Rights Protection in National Security and Foreign Affairs,* 115 COLUMBIA LAW REVIEW 1029 (2015)

*Are Damages Different?: Bivens and National Security,* 87 SOUTHERN CALIFORNIA LAW REVIEW 1123 (2014)

> Cited in *Ziglar v. Abassi,*137 S. Ct. 1843 (2017); *Meshal v. Higgenbotham,* 804 F.3d 417 (D.C. Cir. 2015)

*Citizenship and Protection,* 82 FORDHAM LAW REVIEW 2115 (2014) (symposium contribution)

*Judicial Review for Enemy Fighters: The Court's Fateful Turn in Ex parte Quirin, the Nazi Saboteur Case,* 66 VANDERBILT LAW REVIEW 153 (2013)

*The New Originalism and the Foreign Affairs Constitution,* 82 FORDHAM LAW REVIEW 757 (2013) (symposium contribution)

*Evaluating the Palestinians' Claimed Right of Return,* 34 UNIVERSITY OF PENNSYLVANIA JOURNAL OF INTERNATIONAL LAW 149 (2012)

*Do Boumediene Rights Expire?,* 161 UNIVERSITY OF PENNSYLVANIA LAW REVIEW PENNUMBRA 20 (2012)

*Understanding the Exceptional and Dynamic Nature of Boumediene Rights to Court Access,* 161 UNIVERSITY OF PENNSYLVANIA LAW REVIEW PENNUMBRA 92 (2012)

*Habeas Corpus, Protection, and Extraterritorial Constitutional Rights,* 97 IOWA LAW REVIEW BULLETIN 34 (2012)

*Boumediene, Munaf and the Court's Misreading of the Insular Cases,* 97 IOWA LAW REVIEW 101 (2011)

> Cited in *Aurelius Inv., LLC v. Puerto Rico,* 915 F.3d 838 (1st Cir. 2019)

*The Constitution and the Laws of War During the Civil War,* 85 NOTRE DAME LAW REVIEW 1839 (2010)

*A Textual and Historical Case against a Global Constitution,* 95 GEORGETOWN LAW JOURNAL 463 (2007)

> Cited in *Boumediene v. Bush,* 476 U.S. 981 (D.C. Cir. 2007)

*Congress's Under-Appreciated Power to Define and Punish Offenses against the Law of Nations,* 85 TEXAS LAW REVIEW 843 (2007)

> Cited in *United States v. Bellaizac-Hurtado,* 700 F.3d 1245 (11th Cir. 2012); *Al Bahlul v. United States,* 767 F.3d 1 (D.C. Cir. 2014) (Brown, J., concurring in part and dissenting in part); *Sarei v. Rio Tinto, PLC,* 671 F.3d 736 (9th Cir. 2011) (Ikuta, J., dissenting)

## PUBLICATIONS: SHORT FORM

*Faithful Execution of the Office and Laws: New Research on the Original Meaning of Article II,* LAWFARE, Oct. 10, 2018, www.lawfareblog.com/faithful-execution-office-and-laws-new-research-original-meaning-article-ii

*Don't Forget Congress When Assigning Blame: Thoughts on Trump v. Hawaii,* HARVARD LAW REVIEW BLOG, June 27, 2018, https://blog.harvardlawreview.org/dont-forget-congress-when-assigning-blame-thoughts-on-trump-v-hawaii/

*Self-Pardons, Constitutional History, and Article II* (with Ethan Leib and Jed Shugerman), Take Care, June 16, 2018, https://takecareblog.com/blog/self-pardons-constitutional-history-and-article-ii

*Law Professor Letter on President's Article II Powers* (with co-authors), June 4, 2018, https://protectdemocracy.org/law-professor-article-ii/

*FBI Independence: Some Thoughts in Response to Robert Litt,* LAWFARE, July 18, 2017, www.lawfareblog.com/fbi-independence-some-thoughts-response-robert-litt

*Congress Should Reconsider Giving the FBI Director Independence from Presidential Control,* LAWFARE, July 14, 2017, www.lawfareblog.com/congress-should-reconsider-giving-fbi-director-independence-presidential-control

*What Happened in Hernandez v. Mesa?,* LAWFARE, June 27, 2017, www.lawfareblog.com/what-happened-hernandez-v-mesa

*Legal Ethics Questions for Trump's Personal Lawyer,* LAWFARE, June 12, 2017, www.lawfareblog.com/legal-ethics-questions-trumps-personal-lawyer

*The Most Troubling Part of James Comey's Testimony,* FORTUNE, June 8, 2017, http://fortune.com/2017/06/08/comey-testimony/

*Ex parte Milligan and the Fourth Circuit's Travel Ban Decision,* LAWFARE, May 30, 2017, www.lawfareblog.com/ex-parte-milligan-and-fourth-circuits-travel-ban-decision

*The Scope of the Mueller Probe: Will the Public Learn What Was Uncovered?,* LAWFARE, May 21, 2017, www.lawfareblog.com/scope-mueller-probe-will-public-learn-what-was-uncovered

*Why Did Congress Set a Ten-Year Term for the FBI Director?,* LAWFARE, May 17, 2017 (with Susan Hennessey and Matthew Kahn), www.lawfareblog.com/why-did-congress-set-ten-year-term-fbi-director

*James Comey's Firing Just Got More Disturbing,* FORTUNE, May 10, 2017, http://fortune.com/2017/05/10/james-comey-fired-timing/

*Extraterritorial Constitutional Rights: How Does Originalism Answer the Question in Hernandez v. Mesa?, Part II,* THE ORIGINALISM BLOG, Apr. 25, 2017, https://originalismblog.typepad.com/the-originalism-blog/2017/04/extraterritorial-constitutional-rights-how-does-originalism-answer-the-question-in-hernandez-v-mesa--1.html

*Extraterritorial Constitutional Rights: How Does Originalism Answer the Question in Hernandez v. Mesa?, Part I,* THE ORIGINALISM BLOG, Apr. 24, 2017, *https://originalismblog.typepad.com/the-originalism-blog/2017/04/extraterritorial-constitutional-rights-how-does-originalism-answer-the-question-in-hernandez-v-mesa-.html*

*An Addendum on the Constitutionality of Presidential War Powers,* LAWFARE, Apr. 7, 2017, www.lawfareblog.com/addendum-constitutionality-presidential-war-powers

*What Lies Behind Flynn's Public Request for Immunity?,* LAWFARE, Apr. 1, 2017, www.lawfareblog.com/what-lies-behind-flynns-public-request-immunity

*What is a Civil War? (book review),* LAWFARE, Mar. 28, 2017, www.lawfareblog.com/what-civil-war

*The Michael Flynn Scandal Just Got a Lot Worse,* FORTUNE, Mar. 27, 2017, http://fortune.com/2017/03/27/michael-flynn-turkey-russia/

*How Will We Know if the Russia-Trump Investigations by Congress and the FBI Are Credible?,* LAWFARE, Feb. 27, 2017, www.lawfareblog.com/how-will-we-know-if-russia-trump-investigations-congress-and-fbi-are-credible

*Michael Flynn's Resignation Is Just the Start of Trump's Legal Drama With Russia,* FORTUNE (Feb. 17, 2017), https://fortune.com/2017/02/17/michael-flynn-russia-donald-trump/

*Can Department Heads Refuse White House Orders?,* LAWFARE (Feb. 7, 2017), www.lawfareblog.com/can-department-heads-refuse-white-house-orders

*The Lower Federal Courts and Nationwide Injunctions,* LAWFARE (Feb. 3, 2017), www.lawfareblog.com/nationwide-injunctions-and-lower-federal-courts

*Response to Steve Vladeck on the Hernandez Briefing*, LAWFARE (Jan. 2, 2017), www.lawfareblog.com/response-steve-vladeck-hernandez-briefing

*Thoughts on the Briefing to Date in Hernandez v. Mesa—The Cross-border Shooting Case*, LAWFARE (Dec. 27, 2016), www.lawfareblog.com/thoughts-briefing-date-hernandez-v-mesa%E2%80%94-cross-border-shooting-case

*The Search for Authorization: Three Eras of the President's National Security Power*, LAWFARE (Oct. 19, 2016), www.lawfareblog.com/search-authorization-three-eras-presidents-national-security-power

*On the DOJ White Paper as a Plus for Civil Liberties*, LAWFARE (Feb. 8, 2013), www.lawfareblog.com/2013/02/andrew-kent-on-the-white-paper-as-a-plus-for-civil-liberties

*Judicial Review for Enemy Fighters? Andrew Kent on the Quirin Case*, LAWFARE (Jan. 4, 2013), www.lawfareblog.com/2013/01/judicial-review-for-enemy-fighters-andrew-kent-on-the-quirin-case

*On the Expiration of* Boumediene *Rights*, LAWFARE (Nov. 3, 2012), www.lawfareblog.com/2012/11/andrew-kent-on-the-expiration-of-boumediene-rights

*On Al-Aulaqi and Bivens,* LAWFARE (Aug. 3, 2012), www.lawfareblog.com/2012/08/andrew-kent-on-al-aulaqi-and-bivens

*Just Don't Ask for Money: Why won't courts ever award damages to the victims of drone strikes?*, SLATE (July 23, 2012), www.slate.com/articles/news_and_politics/jurisprudence/2012/07/anwar_al_awlaki_suit_courts_should_award_damages_in_national_security_cases_.html

*Symposium on* INTERNATIONAL LAW IN THE U.S. SUPREME COURT (Oxford Univ. Press 2011), OPINIO JURIS (July 26, 2011), www.opiniojuris.org

*Supreme Court Holds that Noncitizens Detained at Guantanamo Have a Constitutional Right to Habeas Corpus Review by Federal Civilian Courts*, AMERICAN SOCIETY OF INTERNATIONAL LAW INSIGHT (June 20, 2008)

*Symposium on Supreme Court's Decision in* Boumediene v. Bush, OPINIO JURIS (June 13, 2008), www.opiniojuris.org

*CIA Interrogation Tactics: Honesty Won't Aid Enemies*, NATIONAL LAW JOURNAL (Nov. 26, 2007)

*Symposium on "The Constitution's Text in Foreign Affairs" by Michael Ramsey*, OPINIO JURIS (Aug. 1 & 2, 2007), www.opiniojuris.org

*Has Congress Already Authorized Bush to Attack Iran?*, HUFFINGTON POST (May 18, 2007)

*D.C. Circuit Upholds Constitutionality of Military Commissions Act Withdrawal of Federal Habeas Jurisdiction for Guantanamo Detainees*, AMERICAN SOCIETY OF INTERNATIONAL LAW INSIGHT (March 21, 2007)

*Symposium on* Boumediene/Odah *Guantanamo Litigation in D.C. Circuit*, OPINIO JURIS (Feb. 26, 2007), www.opiniojuris.org

*Justice for Terrorists*, COMMENTARY (June 2004)

## PRESENTATIONS

Presented at academic conferences or workshops at Albany, American, BYU, Columbia, Duke, Fordham, George Mason, Georgetown, Harvard, Hastings, Northwestern, NYU, Pace, University of Pennsylvania, Pepperdine, San Diego, Seton Hall, South Texas, St. Johns, Temple, University of Texas, Vanderbilt, and Yale law schools, and at events sponsored by, among others, the American Association of Law Schools, American Constitution Society, American Society of International Law, Association of the Bar of the City of New York, Center for Constitutional Originalism, Center on National Security at Fordham Law, Federalist Society, Lincoln Forum, International Law Association, and Truman National Security Project.

## CONGRESSIONAL TESTIMONY

U.S. House of Representatives, Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights, and Civil Liberties, written and oral testimony, March 27, 2019, on constitutional issues concerning abuse of the President's pardon power

U.S. House of Representatives, Committee on Natural Resources (with jurisdiction over U.S. territories), written and oral testimony, April 13, 2016, on the constitutionality of H.R. 4900, the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA)

## APPELLATE BRIEFS

### As amicus curiae:

Brief for Scholars of Constitutional Law and Legal History as Amici Curiae Supporting Petition for Writ of Certiorari, *Tuaua v. United States,* 136 S. Ct. 2461 (2016) (U.S., No. 15-981)

Brief of Amici Curiae Scholars of Constitutional Law and Legal History, *Tuaua v. United States*, 788 F.3d 300 (D.C. Cir. 2015) (No. 13-5272)

Brief for Amici Curiae Scholars of Constitutional Law and Legal History, *Segovia v. Board of Election Commissioners of the City of Chicago*, 880 F.3d 384 (7th Cir. 2018) (No. 16-4240)

### As counsel:

Selected briefs available at www.fordham.edu/info/23154/andrew_kent/8849/appellate_briefs

## BAR ADMISSIONS AND AFFILIATIONS

New York, U.S. Supreme Court, U.S. Court of Appeals for the First and Second Circuits, U.S. District Courts for the Southern and Eastern Districts of New York

New York City Bar, Member of Professional Responsibility Committee (2016-present)

American Society of International Law, co-chair of Interest Group on International Law in Domestic Courts

Citizens Union, member of Policy Committee (2018-present)