**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SAMUEL INDIG, LEAH INDIG, MEIR
KAHANA, ROBERT KLEIN, and NAFTALI
KLEIN,

*Plaintiffs*,

-*against*-

THE VILLAGE OF POMONA, BRETT
YAGEL, LOUIS ZUMMO, LEON HARRIS,
and DORIS ULMAN,

*Defendants*.

18-CV-10204 (VB)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT**

**SCHLAM STONE & DOLAN LLP**

Bradley J. Nash
Samuel L. Butt
26 Broadway, 19th Floor
New York, NY 10004
Phone: 212-344-5400
Fax: 212-344-7677
E-mail:  bnash@schlamstone.com
Email:  sbutt@schlamstone.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 1

   A.   Whistle-Blower Noreen Shea Exposes A Widespread  "Hidden Agenda Against Jewish Residents" of Pomona .................................................................................................... 2

   B.   Plaintiffs Fall Victim to Defendants' "Hidden Agenda Against Jewish Residents" ......... 3

       1.   The Indigs ............................................................................................................. 3

       2.   Meir Kahana ......................................................................................................... 5

       3.   Robert And Naftali Klein ..................................................................................... 5

ARGUMENT ..................................................................................................................... 9

   I.   STANDARD ....................................................................................................... 9

   II.   PLAINTIFFS ROBERT KLEIN AND SAMUEL INDIG HAVE STANDING ...... 10

   III.   *YOUNGER* AND *HECK* ABSTENTION DO NOT APPLY ................................... 12

   IV.   PLAINTIFFS HAVE STATED AN EQUAL PROTECTION CLAIM ................... 15

       A.   Plaintiffs Are Not Required To Allege Comparators .......................................... 15

       B.   Plaintiffs Have Plausibly Alleged An Equal Protection Claim Under *Pyke* ...... 17

   V.   PLAINTIFFS' REMAINING CLAIMS ARE PLAUSIBLY PLED ....................... 24

CONCLUSION ................................................................................................................ 26

## **TABLE OF AUTHORITIES**

**Cases**                                                                                              **Pages**

*62-64 Kenyon St., Hartford LLC v. City of Hartford*,
   2017 WL 6731712 (D. Conn. Dec. 29, 2017)..................................................................... 12

*Abington Sch. Dist. v. Schempp*,
   374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963)............................................................ 25

*Amaker v. Schiraldi*,
   2017 WL 4402443 (E.D.N.Y. Sept. 29, 2017) ....................................................................... 18

*Andujar v. Hewitt*,
   No. 02 CIV. 2223 (SAS), 2002 WL 1792065 (S.D.N.Y. Aug. 2, 2002) ................................. 11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................................ 9

*Azor v. City of New York*,
   2012 WL 1117256 (E.D.N.Y. Mar. 30, 2012) ....................................................................... 15

*Barua v. City of New York*,
   2016 WL 7494875  (S.D.N.Y. Dec. 28, 2016) ....................................................................... 17

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................................ 9

*Bernstein v. Village of Wesley Hills*,
   95 F. Supp. 3d 547 (S.D.N.Y. 2015) ..................................................................................... 25

*Blackwelder v. Safnauer*,
   689 F.Supp. 106 (N.D.N.Y. 1988).......................................................................................... 14

*Bloomingburg Jewish Educ. Ctr. v. Vill. Of Bloomingburg*,
   111 F. Supp.3d 459 (S.D.N.Y. 2015) ..................................................................................... 12

*Bradshaw v. City of New York*,
   2017 WL 6060781 (S.D.N.Y. Dec. 7, 2017) .......................................................................... 21

*Brown v. City of Rochester*,
   2011 WL 4352395 (W.D.NY. Sept. 16, 2011) ....................................................................... 22

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993)........................................................ 25

*Cleveland v. Caplaw Enters.*,
   448 F.3d 518 (2d Cir. 2006) ................................................................................................... 10

*Clyburn v. Shields,*
  33 Fed. Appx. 552 (2d Cir. 2002) ........................................................................ 21

*Collings v. New York City Transit Authority,*
  305 F.3d 113 (2d Cir. 2002) ............................................................................... 24

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, *NY,*
  280 F. Supp. 3d 426 (S.D.N.Y. 2017) ................................................................. 25

*Conyers v. Rossides,*
  558 F.3d 137 (2d Cir. 2009) ............................................................................... 10

*County of Nassau,*
  No. 05–CV–2301, 2006 WL 2053732 (E.D.N.Y. July 21, 2006) ........................ 11

*Deleon v. Putnam Valley Bd. Of Educ.,*
  2006 WL 236744 (S.D.N.Y. Jan. 26, 2006) ........................................................ 23

*Doe v. Village of Mamaroneck,*
  462 F. Supp. 2d 520 (S.D.N.Y. 2006) ...................................................... 16, 17, 18

*Donohue v. Mangano,*
  886 F. Supp. 2d 126 (E.D.N.Y. 2012) ................................................................. 14

*Dosiak v. Town of Brookhaven,*
  2017 WL 7048912 (E.D.N.Y. Nov. 27, 2017) ...................................................... 14

*Dotson v. Farrugia,*
  No. 11–CV–1126, 2012 WL 996997 n. 3 (S.D.N.Y. Mar. 26, 2012) .................... 25

*Durham v. City of New York,*
  2019 WL 1316472 (S.D.N.Y. Mar. 22, 2019) ...................................................... 24

*Golodner v. Martinez,*
  2017 WL 6540269 (D. Conn. Dec. 21, 2017) ...................................................... 20

*Graham v. Elmira City Sch. Dist.,*
  2015 WL 1383657 (E.D.N.Y. Mar. 25, 2015) ...................................................... 22

*Green v. Montgomery,*
  219 F.3d 52 (2d Cir. 2000) ................................................................................. 13

*Hamzik v. Office for People with Developmental Disabilities,*
  859 F. Supp.2d 265 (N.D.N.Y. 2012) ................................................................. 21

*Harris v. McRae,*
  448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) ...................................... 25

*Hayden v. Paterson*,
  594 F.3d 150 (2d Cir. 2010) ........................................................................ 9, 18

*Heck v. Humphrey*,
  512 U.S. 477 (1994)......................................................................................... 1, 13

*Helms Realty Corp. v. City of New York*,
  320 F. Supp. 3d 526 (S.D.N.Y. 2018) .................................................................. 13

*Huang v. Johnson*,
  251 F.3d 65 (2d Cir. 2001) .................................................................................. 13

*In re Miller*,
  252 A.D.2d 156, 684 N.Y.S.2d 368 (4th Dep't 1998)........................................... 25

*Jones v. JC Penny's Dep't Stores*,
  2007 U.S. Dist. LEXIS 104120 (W.D.N.Y. Jan. 22, 2007).................................... 21

*Leather v. Eyck*,
  180 F.3d 420 (2d Cir. 1999) .......................................................................... 13, 24

*Louis v. Metropolitan Transit Auth.*,
  145 F. Supp. 3d 215 (E.D.N.Y. 2015) .................................................................. 20

*Lynn v. Vill. Of Pomona*,
  373 F. Supp.2d 418 (S.D.N.Y. 2005) ................................................................... 25

*Mosdos Chofetz Chaim, Inc. v. Vill. Of Wesley Hills*,
  701 F. Supp. 2d 568 (S.D.N.Y. 2010) ............................................................ 10, 11

*Muhammad v. Maduekwe*,
  2016 WL 829740 (S.D.N.Y. Feb. 29, 2016)......................................................... 16

*Parks v. New York City Police Dep't*,
  No. 00-CV-2564 (JG), 2000 WL 1469574 (E.D.N.Y. Aug. 24, 2000) .................... 13

*Patterson v. City of New York*,
  2017 WL 3432718 (E.D.N.Y. Aug. 9, 2017)......................................................... 18

*Petrovits v. New York City Transit Authority*,
  2003 WL 22349676 (S.D.N.Y. Oct. 15, 2003)..................................................... 24

*Powell v. Bucci*,
  No. 04-CV-1192, 2006 WL 2052159 (N.D.N.Y. July 21, 2006) ............................ 13

*Pyke v. Cuomo*,
  258 F.3d 107 (2d Cir. 2001) .......................................................................... 1, 16

*Quackenbush v. Allstate Ins.*,
  517 U.S. 706 (1996) ........................................................................................... 14

*Rodriguez v. Clinton*,
  357 Fed. Appx. 355 (2d Cir. 2009) ..................................................................... 16

*Rodriguez v. Clinton*,
  2009 WL 261203 (N.D.N.Y. Feb. 4, 2009) .......................................................... 23

*Roman Catholic Diocese of Rockville Ctr., N.Y. v. Inc. Vill. of Old Westbury*,
  128 F. Supp. 3d 566 (E.D.N.Y. 2015) .................................................................. 23

*Roman v. Velleca*,
  2012 WL 4445475 (D. Conn. Sept. 25, 2012) ..................................................... 18

*Rosario v. Town of Mount Kisco*,
  2018 WL 2209487 (S.D.N.Y. May 11, 2018) ...................................................... 18

*Russo v. Golding*,
  2008 U.S. Dist, LEXIS 113152 (S.D.N.Y. Feb. 11, 2008) .................................... 17

*Savino v. Town of Southeast*,
  983 F. Supp. 2d 293 (S.D.N.Y. 2013) ...................................................... 17, 20, 21

*Schreiber v. Worldco, LLC*,
  324 F. Supp. 2d 512 (S.D.N.Y. 2004) .................................................................. 21

*Simpson v. New York State Dep't of Civil Services*,
  166 Fed. Appx. 499 (2d Cir. 2006) ...................................................................... 24

*Sprint Commc'ns, Inc. v. Jacobs*,
  571 U.S. 69 (2013) ............................................................................................... 12

*Stone v. Eamer*,
  2018 WL 557872 (N.D.N.Y. Jan. 19, 2018) ................................................... 20, 23

*Vill. of Arlington Heights v. Metropolitan Housing Develop. Corp.*,,
  429 U.S. 252 (1977) ................................................................................. 10, 12, 20

*Wharton v. County of Nassau*,
  2010 WL 3749077 (E.D.N.Y. Sept. 20, 2010) ..................................................... 24

*Wolongevicz v. Town of Manlius*,
  2018 WL 3769857 (N.D.N.Y. Aug. 8, 2018), which decision amended ................ 23

*Younger v. Harris*,
  401 U.S. 37 (1971) ................................................................................................. 1

**<u>Statutes</u>**

N.Y. Civil Rights Law 40-c ........................................................................................................... 25

Plaintiffs submit this memorandum of law in opposition to Defendants' Motion to Dismiss the Amended Complaint ("Compl.").

## PRELIMINARY STATEMENT

The Amended Complaint clearly states viable claims for religious discrimination – a fact Defendants acknowledged when they declined to seek dismissal of the initial complaint, which asserted the same claims.  In their motion, Defendants focus on only certain of Plaintiffs and on only certain allegations pertaining to those Plaintiffs.  Defendants' cherry-picking of allegations should be seen for what it is and their motion denied.  First, Plaintiffs Samuel Indig and Robert Klein have standing because Defendants' delays in issuing permits and other actions precluded them from living in their homes, regardless of who is the actual title holder of the property.  This is sufficient for standing under well settled case law.  Second, Plaintiffs' claims are not barred by any pending state court proceedings or convictions.  Abstention under *Younger v. Harris*, 401 U.S. 37 (1971), applies only to claims for injunctive relief as to specific state court proceedings, which relief is not sought here.  *Heck v. Humphrey*, 512 U.S. 477 (1994), does not apply because none of Plaintiffs were ever incarcerated. Third, Plaintiffs have stated an Equal Protection claim based on direct evidence of discriminatory intent (a *Pyke* claim), thus dispensing with the need for allegations of comparators.  *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001).  Fourth, Plaintiffs' other claims are adequately pled largely for the same reasons their Equal Protection claim is proper.

## STATEMENT OF FACTS

The Plaintiffs' allegations are as set forth in the Amended Complaint.  In sum, Defendants orchestrated a campaign of harassment and exclusion against Orthodox Jewish residents of the Village of Pomona ("Pomona" or the "Village") in an attempt to drive out such residents and deter other Orthodox Jewish residents from moving into the Village.

A.     **Whistle-Blower Noreen Shea Exposes A Widespread**
       **"Hidden Agenda Against Jewish Residents" of Pomona**

In June 2018, the New York State Division of Human Rights issued a report, sparked by

a whistleblower complaint filed by Noreen Shea, a former non-Jewish employee in the Village

Clerk's office, who alleges that she was terminated because she was unwilling to be complicit in

"an ongoing hidden agenda against [] Jewish residents" of Pomona.  Ms. Shea's revelations –

and other evidence uncovered by the Human Rights investigator – paints a disturbing picture of a

local government targeting a segment of its residents for mistreatment on the basis for their

religious identity.  (Compl. ¶ 48).  The revelations from this report included:

- Mayor Yagel routinely referring to Orthodox Jews in the Village office with open hostility as "Them" or "Those People."

- Mayor Yagel confronting a long-time village resident who had sold her home, and demanding to know if she had sold the property to one of "Them."

- Mayor Yagel chastising Ms. Shea for talking with a Jewish developer, who is also a Village resident, and instructing her that she should have "very little conversation with 'those types.'"

- Mayor Yagel suggesting that Ms. Shea place pork rinds on the public counter of the village clerk's office to deter the growing Orthodox Jewish population seeking access to municipal services.

- The Village building inspector, Louis Zummo, admitting to the Human Rights Division that he mocked Orthodox Jewish residents, in the course of performing his official duties, through "comical" imitations of their manner of talking, while disparaging them as "carrying on" when they were denied services.

- Building Inspector Zummo advising the village zoning board not to issue a construction permit to Plaintiff Robert Klein to build a basement because it would be "just like them" to then use it as an illegal apartment.

- Building Inspector Zummo refusing to issue a permit requested by an Orthodox Jewish family to accommodate his two severely disabled children – and commenting: "maybe he should stop having children".

- Orthodox Jewish residents facing arbitrary and unjustified delays in the issuance of building permits and certificates of occupancy – a fact attested to by a non-Jewish village trustee, Ian Banks, who spoke to the Human Rights Division investigators.

2

- Village Attorney Doris Ulman admitting that "certain residents' lives were made miserable by the discriminatory actions of people working for the Village," and attempting to justify her involvement with the excuse that, "it's my job to represent Mayor Yagel," when in fact she represents the Village, including its Jewish residents.

- The Village government "target[ing] the Jewish community for disparate treatment" through "selective ticketing of Jewish residences" and prayer gatherings.

(*See* Compl. ¶¶ 48-67). Ms. Shea alleged that Mayor Yagel disparaged her as a "Jew Lover", and ultimately fired her because of her unwillingness to participate in Defendants' deliberate discrimination against Orthodox Jewish residents. (*Id.* ¶ 18). Plaintiffs are among the many victims of Defendants' "hidden agenda" against Jewish residents of Pomona.

**B.**     <u>**Plaintiffs Fall Victim to Defendants' "Hidden Agenda Against Jewish Residents"**</u>

     **1.**     <u>**The Indigs**</u>

The Indigs are Orthodox Jewish residents of Pomona. In 2015, they purchased a house on a property with a steeply-sloped yard, intending to do grading work to create a useable backyard space. This was a necessary improvement to make the property livable for the Indig's family, which includes young children, ranging in age from one to eleven. (*Id.* ¶ 69).

Non-Jewish neighbors have told Mr. Indig that, in their experience, the Village Building department and Building Inspector Zummo have been reasonable and accommodating. However, like many other Orthodox Jewish residents of Pomona, Mr. Indig's experience has been completely different: Zummo – directed and assisted by Yagel, Harris, and Ulman – has conspired to prevent the Indigs from making necessary improvements to his property, severely curtailing his family's use and enjoyment of their home. (*Id.* ¶ 70).

The Indigs obtained a permit prior to beginning any work. In a by-now familiar pattern, Building Inspector Zummo initially approved a slope grading plan prepared by the Indigs' engineer and issued a permit for the project in their backyard. However, as soon as the work commenced, Defendants set out to thwart it. (*Id.* ¶ 71).

The grading work contemplated by the approved plan required the use of a tractor.  Given the steep slope, it was necessary to create a dirt path to enable the tractor to reach the bottom of the hill.  This was an obvious component of the project.  The only other alternative would have been to use an enormous crane to hoist the tractor up and down the incline – an unnecessarily dangerous and complicated process.  (*Id.* ¶ 72).

Zummo, acting with the direction and assistance of Yagel, Harris and Ulman, seized on the temporary dirt path as an excuse to interfere with the grading project.  Zummo issued a stop work order, claiming falsely that the path constituted a "road," which required a separate complex approval process.  This was a clear pretext, as the project was already approved with a permit, and Zummo had not requested any additional submissions.  No other residents had been required to use a crane to raise and lower a tractor up and down a hill, nor have other residents been required to create a formal "road" in order to use a tractor on their own property.  (*Id.* ¶ 73).

The Indigs appealed the stop work order to the Village zoning board.  By law, the stop work order was automatically stayed during the pendency of the appeal, allowing the project to proceed.  However, Defendants intimidated the workers who were performing the grading project by seeking to have Rockland County revoke their licenses, even though they were legally performing the work.  (*Id.* ¶ 74).

The Indigs' engineer ultimately refused to continue working on the project, telling Mr. Indig that Pomona's building department was making demands that he had never before seen in years of working on similar projects in the area.  (*Id.* ¶ 75).

The Indigs are now left with a dangerously steep incline on their property, making it impossible for their family, including their young children, to use the yard, and creating a risk of mud slides.  Defendants have also not permitted the Indigs to do any landscaping work on the

property.  As a result, the incline is grown-in with wild grass, creating a breeding ground for mosquitos and ticks.  (*Id.* ¶ 76).

### 2.   Meir Kahana

Meir Kahana is a Hasidic Jewish resident of Pomona who has been targeted by the Village with discriminatory ticketing.  Mr. Kahana received a ticket for a small pool (purchased at Toys 'R' Us) that was temporarily on his property.  (*Id.* ¶ 78).   Mr. Kahana also received a "warning" regarding an alleged dog waste violation – although he has no dog.  (*Id.* ¶ 79).

Plaintiff Robert Klein saw a text message from Deputy Mayor Harris to Zummo demanding that Mr. Kahana receive not just one, but multiple violations.  There was no reason for the Deputy Mayor to be involved in the process of issuing code violations, and, indeed, no legitimate reason for targeting Mr. Kahana at all.  (*Id.* ¶ 80).

### 3.   Robert And Naftali Klein

Robert Klein ("Mr. Klein") is an Orthodox Jewish resident of Pomona, and since 2017, a member of the Village Board of Trustees.  During the election, Defendant Yagel told Mr. Klein that he should not be running for the Board.  And after Mr. Klein was elected, Yagel threatened him to "watch your back" because "people are watching you."  (*Id.* ¶ 81).

 In 2016, Mr. Klein embarked on a project to lift and expand his home.  The home is owned by Mr. Klein's father, Plaintiff Naftali Klein.  (*Id.* ¶ 83).

Mr. Klein submitted a set of plans to the Village building office and was initially sent to the zoning board.  During the board meeting, Mr. Zummo claimed that the project would require installation of fire sprinklers because the house would be deemed to have three full floors (including the basement).  During the same meeting Mr. Zummo made an explicitly anti-Jewish comment, advising the board that Mr. Klein should not be permitted to construct a basement

5

because it would be "just like them" – clearly referring to Orthodox Jews – to build an illegal basement apartment.  (*Id.* ¶ 84).

The board ultimately advised Mr. Klein's architect to submit new plans.  He did so, and after six months of delays, and with persistent follow up by Mr. Klein, a permit was finally issued in December 2016.  Because it was then the middle of winter, the project was put on hold until the spring.  In March – a full month before the work was scheduled to commence – Mr. Klein submitted some alterations to the plans to the Village.  (*Id.* ¶ 85).

On April 24, 2017, phase one of the project began – the house was lifted and placed on temporary supports, which were to be removed on July 5, with the house then resting on a permanent foundation.  Defendants engaged in a deliberate campaign of harassment to prevent the project from ever being completed.  (*Id.* ¶ 86).

On Friday, June 30, 2017, Mr. Zummo issued a stop work order.  There was no basis for the order, since all that had been done was the lifting of the house, pursuant to the approved plans.  Mr. Klein subsequently saw a text message that Defendant Yagel sent to Building Inspector Zummo directing him to "give Klein a SWO by 3 pm or you are fired."   (*Id.* ¶ 87).

Zummo directed Mr. Klein to resubmit the architect's revised plans – which had already been submitted in March.  Again, he complied.  (*Id.* ¶ 88).

In August 2017, Zummo did two inspections of the foundation, and approved the work. However, in October, in the middle of the Sukkot holiday, and in full view of neighbors who had gathered to pray at the synagogue across the street, Zummo posted another stop work order on Mr. Klein's property.  Significantly, no work had been done for several weeks – and no work was going to be done during the Sukkot holiday in any event.  (*Id.* ¶ 89).

After the holiday, Mr. Klein spoke with Ulman who arranged a meeting with Zummo. During this meeting, Zummo again raised the issue of fire sprinklers as a pretext for the stop work order.  In response, Mr. Klein agreed to submit a new plan on condition that it would be reviewed promptly so that work could begin before the winter set in.  The new plans were submitted on November 20.  But the Village refused to take any action.  (*Id.* ¶ 90).

Although there was no official response, Mr. Klein's engineer was copied – apparently inadvertently – on a November 28, 2017, internal memorandum from the Village engineer, which stated that the plans complied with the code and other applicable regulations and could be approved, but suggested that plans could nevertheless be rejected on the pretext that they lacked unspecified "details."  This internal memo reveals that the Village was searching for excuses to deny the permit and prevent Mr. Klein from completing the work on his home.  (*Id.* ¶ 91).

Mr. Klein continued to wait for months for a response from the Village building department, but heard nothing.  With the onset of winter, the house, which was not inhabitable, began to suffer damage due to exposure to the elements.  Mr. Klein then decided unilaterally to revise the plans in an effort to respond to the November 28, 2017 memo.  After receiving no response from the Village despite numerous inquiries, he submitted those revised plans in April 2018.  Again, the Village simply refused to take any action, leaving Mr. Klein in limbo and without a home for his family.  (*Id.* ¶ 92).

Building Inspector Zummo subsequently revealed that the failure to act on Mr. Klein's application was part of a deliberate strategy to deny him due process.  A neighbor from the Village who attempted to intervene on Mr. Klein's behalf overheard Zummo telling Defendant Ulman that "nothing will happen if I don't respond [to Mr. Klein's plans]" and "if I don't respond he has no way to appeal because there is nothing to appeal."  (*Id.* ¶ 93).

Defendants' discriminatory intent is further demonstrated by the fact that non-Jewish residents were permitted to move forward with even more ambitious construction and renovation projects with no pretextual delays.  For example, through a FOIL request, Mr. Klein obtained building department files for the home of a non-Jewish resident, Peter Obe, who, between 2013 and 2017, built a wood frame home with four stories – and no sprinkler system.  Yet he was permitted to move forward with no stop work orders or other delays.  (*Id.* ¶ 94).

Not coincidentally, as part of Defendants' deliberate scheme to curtail the growth of the Jewish community, when Mr. Obe eventually sold his home to a Jewish family, Defendants required these new residents to incur significant expense by claiming and enforcing alleged code violations.  (*Id.* ¶ 95).

Mr. Klein has also been the victim of discriminatory ticketing for alleged code violations. He is one of the Jewish residents who received a garbage ticket in one of the pre-dawn "shul patrols" ordered by Mayor Yagel.  Mr. Klein also received a ticket for an alleged failure to properly dispose of leaves, even though there were far worse violators on the same block, who were not Jewish, and did not receive any ticket.  (*Id.* ¶ 96).

Mr. Klein has also been treated as a second-class member of board of trustees based on his religion.  Yagel has refused to give him a key to the Village office that other trustees have and has denied him access to records necessary to perform his duties.  Yagel has also made explicitly anti-Jewish comments, including in one instance suggesting that a board meeting should be held on the Sukkot holiday, so that Mr. Klein would not be able to attend.  In other instances, Mr. Klein observed that after officially adjourning meetings, the other board members would wait for Mr. Klein to leave and then would continue conducting Village business without him.  (*Id.* ¶ 97).

8

Numerous other Orthodox Jewish residents have faced similar discrimination but have been reluctant to come forward for fear of retribution.  (*Id.* ¶ 98; *id.* ¶¶ 40-46, 50-65).

**ARGUMENT**

I.      **STANDARD**

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). First, plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and thus are not sufficient to withstand a motion to dismiss.  *Id.* at 678; *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." *Iqbal*, 556 U.S. at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (*quoting Twombly*, 550 U.S. at 556).

When, as here, the case is at the pleading stage, in deciding a motion to dismiss under Rule 12(b)(1), the Court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009).  "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is

9

the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 520 (2d Cir. 2006).

## II.   PLAINTIFFS ROBERT KLEIN AND SAMUEL INDIG HAVE STANDING

Defendants contend that Robert Klein and Samuel Indig should be dismissed because they do not own the properties at issue and thus lack standing.  (Defs' Mem. at 10).  To satisfy Article III's standing requirements, Plaintiffs must show that (1) they have "suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Mosdos Chofetz Chaim, Inc. v. Vill. Of Wesley Hills*, 701 F. Supp. 2d 568, 581 (S.D.N.Y. 2010) (citing cases).

Messrs. Klein and Indig need not have owned the properties at issue to have been harmed by the discrimination concerning those properties – it is sufficient that they intended to live there or enjoy full use of the property but were prohibited from doing so by Defendants' discriminatory actions.  *See Vill. of Arlington Heights v. Metropolitan Housing Develop. Corp.*, 429 U.S. 252, 264 (1977) (concluding that individual who sought to live in planned housing community had sufficiently alleged standing where he claimed that his efforts to obtain housing in the defendant-village was "thwarted by official action" in refusing to re-zone site for multiple dwelling units and nonprofit developer satisfied constitutional standing requirements because it had specific project it intended to build and suffered economic injury in preparing plans for the site at issue, despite not owning property); *ACORN v. County of Nassau*, No. 05–CV–2301, 2006 WL 2053732, at *11 (E.D.N.Y. July 21, 2006) (determining that individuals had standing where they sought affordable housing in the defendant-locality, a developer sought to develop a specific

project that would provide that affordable housing, and the locality's zoning ordinances prevented construction); *see also Mosdos Chofetz Chaim,* 701 F. Supp. 2d at 582 ("Plaintiffs Bernstein and Ambers also have sufficiently alleged an injury in fact, as they allege that they plan to study and live at Kiryas Radin, but are barred from doing so" in case raising equal protection, free exercise, Fair Housing Act, and New York Civil Right Law claims); *Andujar v. Hewitt*, No. 02 CIV. 2223 (SAS), 2002 WL 1792065 (S.D.N.Y. Aug. 2, 2002) (tenant, her son, and her goddaughter had standing to sue landlord and others under the Fair Housing Act).

Robert Klein intended to live at the property owned by his father, Naftali Klein.  (Compl. ¶ 83).  Mr. Klein submitted plans to the Village, and it was with respect to Mr. Klein's plans that Mr. Zummo stated that Mr. Klein should not be permitted to construct a basement because it would be just "just like them" – referring to Orthodox Jews, to build an illegal basement.  (*Id.* ¶ 84).  Thus, Mr. Klein, personally, was subjected to harassment.  (*Id.* ¶ 82).  As a result of Defendants' discriminatory actions, Mr. Klein has a half-finished house that he, and his family, cannot live in that, if he is ever permitted to complete it, will be years behind schedule.  (*Id.* ¶¶ 85-92).  Finally, Mr. Klein's claims of discrimination are not limited to the property where he intended to live.  The Amended Complaint also alleges that Mr. Klein received tickets concerning garbage at the property and for failure to properly dispose of leaves.  (*Id.* ¶ 96).  His claims are further based on being treated as a second-class member of the Village Board of Trustees due to his religion.  (*Id.* ¶ 97).  Accordingly, Robert Klein has standing.

Similarly, Samuel Indig also intended to live in the house purchased in his wife's name, with his family.  (*Id.* ¶ 69).  He lives in a house in which neither he, nor any of his family, can use the backyard.  (*Id.* ¶ 76).  He obtained a permit, which required payment, engaged an

engineer and had some work performed, including the creation of a grading plan and a dirt path. (*Id.* ¶ 74).  Thus, he has standing for the same reasons as Robert Klein.[1]

### III.  *YOUNGER* AND *HECK* ABSTENTION DO NOT APPLY

Plaintiffs argue that this court should abstain from adjudicating Plaintiffs' dispute under *Younger v. Harris*, 401 U.S. 37 (1971), because a decision would interfere with a pending prosecution against Ms. Indig.  (Defs' Mem. at 11).  *Younger* abstention, however, applies only to claims of injunctive relief.  *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013) ("*Younger* exemplifies one class of cases in which federal-court abstention is required: When there is a parallel, pending state criminal proceeding, federal courts must refrain from enjoining the state prosecution").  As Defendants admit, the only pending state court action is against Ms. Indig, (Defs' Mem. at 11), and there is no claim to specifically enjoin that action nor any pending motion to enjoin that proceeding.  Thus, *Younger* abstention does not apply.  *Helms Realty Corp. v. City of New York*, 320 F. Supp. 3d 526, 538 (S.D.N.Y. 2018) (*Younger* inapplicable where "Plaintiff does not in the federal action seek to enjoin or otherwise supervise the state courts").

Defendants also argue that Plaintiffs' claims should be dismissed under *Heck v. Humphrey*, 512 U.S. 477 (1994), because a decision in this case would undermine the validity of a state criminal conviction which has not been reversed on appeal or invalidated by habeas corpus.  (Defs' Mem. at 11).[2]  However, *Heck* does not apply because Plaintiffs were never

---

[1] Defendants' citations to *Bloomingburg Jewish Educ. Ctr. v. Vill. Of Bloomingburg,* 111 F. Supp.3d 459, 481 (S.D.N.Y. 2015) and *62-64 Kenyon St., Hartford LLC v. City of Hartford*, 2017 WL 6731712 (D. Conn. Dec. 29, 2017) are not to the contrary.  In *Bloomingburg*, the Plaintiffs failed to allege "any concrete, particularized alleged injury" and merely claimed discrimination against "Jewish-owned properties" and "Jewish building in the Village" rather than particular projects or properties.  111 F. Supp.3d at 481.  Similarly, in *Kenyon St.*, the claim for damages was that the value of the property was limited due to the unconstitutional ordinance, the property was owned by an LLC, and the individual plaintiff had abandoned his claim for injunctive relief.  2017 WL 6731712, at *5.  In this matter, both Plaintiffs Robert Klein and Samuel Indig have alleged individual injuries, as set forth in the above paragraphs, and both have claims for injunctive relief.

[2] Defendants admit that there has been no conviction obtained against Leah Indig, as the case remains pending.  Mastellone Decl. Ex. F consists merely of tickets and summonses, but not evidence of any conviction.  While

incarcerated.  *Huang v. Johnson*, 251 F.3d 65, 74-75 (2d Cir. 2001) (holding that *Heck* did not

bar the plaintiff's § 1983 action, in part, because he had long since been released from custody,

rendering a habeas remedy unavailable); *Leather v. Eyck*, 180 F.3d 420, 424 (2d Cir. 1999)

(Plaintiff, who was convicted but was not ever in the custody of the State, may pursue § 1983

action); *Green v. Montgomery*, 219 F.3d 52, 61, n.3 (2d Cir. 2000) (*Heck* acts only to bar § 1983

suits when the plaintiff has a habeas corpus remedy available to him); *Powell v. Bucci*, No. 04-

CV-1192, 2006 WL 2052159, at *4 (N.D.N.Y. July 21, 2006) ("there is no indication that

Plaintiff was incarcerated because of her convictions on the traffic violations, and, therefore, the

*Heck* Rule does not apply to any of the Counts. Accordingly, the motion is denied in this regard

and the Court proceeds to address the merits of the remaining counts").[3]

What is more, even if *Heck* or *Younger* did apply, which they do not, Defendants ignore

that the claims of Leah Indig, Meir Kahana, and Naftali Klein are premised on more than their

prosecutions and any convictions[4] – the claims also concern other conduct by the Defendants,

including delays, regardless of any violations of stop work orders, that have prevented the Indigs

from having a safe yard, (Compl. ¶ 76), a warning for an alleged dog waste violation when Mr.

Kahana has no dog (Compl. ¶ 79), and, with respect to Naftali Klein, the inability to expand and

live in a home he owned.  (Compl. ¶ 82).

What is more, neither *Heck* nor *Younger* would apply to the claims of Samuel Indig or

Robert Klein, who are not subject to any prosecutions.  *Blackwelder v. Safnauer*, 689 F.Supp.

---

Mastellone Decl. Ex. G purports to be a post-trial memorandum of law in Ms. Indig's case, Defendants do not attach any final decision and concede there has not been one.  Similarly, Mastellone Ex. H is simply an unsigned and undated summons, that does not indicate Mr. Kahana pled guilty and Ms. Mastellone's assertion, upon information and belief, that he was convicted is insufficient and improper on a motion to dismiss.  Additionally, Naftali Klein was found not guilty with respect to the alleged violation of allowing work without a permit on or about July 6, 2017.  (Mastellone Decl. Ex. E).

[3] *Parks v. New York City Police Dep't*, No. 00-CV-2564 (JG), 2000 WL 1469574, at *2 (E.D.N.Y. Aug. 24, 2000) and *Russo v. Golding*, 2008 U.S. Dist, LEXIS 113152 (S.D.N.Y. Feb. 11, 2008), cited by Defendants, are inapposite for this reason as they concerned individuals incarcerated at the time of the decisions.

[4] Naftali Klein has appealed his conviction.

106, 119 (N.D.N.Y. 1988), aff'd on other grounds, 866 F.2d 548 (2d Cir.1989) ("As a general proposition, abstention is mandated under *Younger* only when the federal plaintiff is actually a party to the state proceeding; the doctrine does not bar non-parties from raising constitutional claims in federal court, even if the same claims are being addressed in a concurrent state proceeding involving similarly situated parties.") (citation omitted); *see also Donohue v. Mangano*, 886 F. Supp. 2d 126, 143 (E.D.N.Y. 2012) ("Generally, where the plaintiff in a federal action is not a party to the state proceeding, *Younger* concerns about federal adjudication do not arise") (internal quotation marks omitted).  Even though related, neither is party to any proceeding in state court and neither can challenge the constitutionality of Defendants' actions in the state court proceedings.

Defendants argue that the damages claims should be stayed under *Younger* until the end of proceedings in state court against Ms. Indig, citing *Dosiak v. Town of Brookhaven*, 2017 WL 7048912 (E.D.N.Y. Nov. 27, 2017).  *Dosiak*, however, stayed such claims without discussion, citing to *Quackenbush v. Allstate Ins.*, 517 U.S. 706, 730-31 (1996), which, in turn, notes only that a stay may be entered, but does not explain under what circumstances.  No stay would be appropriate here, as there are multiple plaintiffs, and the claims arise from conduct well beyond that which is the subject of the pending state court proceeding against Ms. Indig.

Defendants lastly argue that Mr. Kahana's guilty plea waived his constitutional claims. (Defs' Mem. at 13).  As noted, they do not submit any documents demonstrating a conviction or any such waiver.  Further, *Azor v. City of New York*, 2012 WL 1117256 (E.D.N.Y. Mar. 30, 2012), cited by Defendants, cites only a single case that a guilty plea waived the right to challenge the search of a van where drugs were allegedly found, and applies the *Heck* doctrine to claims that might invalidate Azor's conviction, but nowhere states there is a blanket waiver of

14

constitutional rights by guilty plea, particularly concerning causes of action that would not

invalidate the conviction.   As will be discussed below, it is clear that, even if Plaintiffs could

have raised selective enforcement or other forms of discrimination in their state cases, it would

not require dismissal of their § 1983 claims.

## IV.     PLAINTIFFS HAVE STATED AN EQUAL PROTECTION CLAIM

Defendants contend that Plaintiffs have failed to state an Equal Protection claim because:

1) the claim must be analyzed under a selective enforcement claim and Plaintiffs have not

alleged any comparators granted more favorable treatment; and 2) Plaintiffs have not alleged

intentional discrimination.  Each argument fails.

### A.     Plaintiffs Are Not Required To Allege Comparators

Defendants contend that an Equal Protection claim that "challenges discretionary

enforcement of local laws," must always be "analyzed as a selective enforcement claims,

regardless of the manner in which they are denominated by plaintiffs."  (Defs' Mem. at 13; *id*. at

16).  Defendants then spend a great deal of time unnecessarily discussing the requirements of an

equal protection claim using comparators.  (*Id.* at 13-15).  But Defendants concede, as they must,

(Defs' Mem. at 15), that Plaintiffs may plead an Equal Protection claim based on direct evidence

of discriminatory intent (a *Pyke* claim), thus dispensing with the need for evidence of

comparators.  *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001) ("a plaintiff . . . who alleges that

a facially neutral law or policy has been applied in an intentionally discriminatory . . . manner . .

. is not obligated to show a better treated, similarly situated group of individuals of a different

[group] in order to establish a claim of denial of equal protection"); *Rodriguez v. Clinton*, 357

Fed. Appx. 355, 357 (2d Cir. 2009) (plaintiff could have pursued Equal Protection claim under

*Pyke* theory); *Doe v. Village of Mamaroneck*, 462 F. Supp. 2d 520, 543 (S.D.N.Y. 2006)

(McMahon, J.) ("Once racially discriminatory intent infects the application of a neutral law or

policy, the group that is singled out for discriminatory treatment is no longer similarly situated to any other in the eyes of the law, so adverse effects can be presumed.").

The cases Defendants cite do not stand for the proposition that "discretionary enforcement decisions" can *only* be the subject of a "selective enforcement theory."   The Equal Protection claims in those cases were assessed under the selective-enforcement framework because, unlike in this case, the plaintiff had no direct evidence of discriminatory animus, and therefore intent had to be established circumstantially through comparing the treatment plaintiff received to the treatment of similarly-situated comparators.  *See, e.g.*, *Jones v. JC Penny's Dep't Stores*, 2007 U.S. Dist. LEXIS 104120, at *19 (W.D.N.Y. Jan. 22, 2007) ("Defendants argue that Plaintiff has failed to produce any evidence suggesting that any of the challenged conduct was motivated by racial animus . . . but have not directly addressed the equivocal selective prosecution claim."); *Muhammad v. Maduekwe*, 2016 WL 829740, at *8, 9 (S.D.N.Y. Feb. 29, 2016) (finding "no competent evidence suggests that [defendant] singled Muhammad out for special punishment simply because he was a Black Muslim"; *Pyke* was inapplicable because plaintiff "does not complain about the enactment or application of any facially neutral law or policy"); *Barua v. City of New York*, 2016 WL 7494875, at *12  (S.D.N.Y. Dec. 28, 2016) (finding that "no reasonable inference of discriminatory intent can be drawn from the facts").

By contrast, where, as here, there is *direct* evidence of discriminatory intent, Courts have applied *Pyke* to claims arising from the discriminatory application of "discretionary enforcement decisions."  Thus, in *Savino v. Town of Southeast*, 983 F. Supp. 2d 293, 299–300 (S.D.N.Y. 2013) (Román, J.), the Court, applying *Pyke*, found evidence of a discriminatory motive for a zoning enforcement officer's discretionary issuance of a cease and desist order based on the officer's derogatory comment about Italians.  *See also Village of Mamaroneck*, 462 F. Supp. 2d

16

at 543–49 (applying *Pyke* to claim arising from discretionary ticketing by Village police motivated by discrimination against Hispanic day laborers).[5]

### B.  Plaintiffs Have Plausibly Alleged An Equal Protection Claim Under *Pyke*

Defendants further argue that even with a *Pyke* claim alleging a facially neutral law or policy that has been applied in an unlawfully discriminatory manner, the Plaintiffs must allege that the government actor possess a "discriminatory purpose" and that even under a comparator-free theory of discriminatory application, Plaintiffs must plead the defendants intentionally applied a facially neutral law to Plaintiffs because of religion.  (Defs' Mem. at 16).  They further contend that plaintiff "must do more than merely allege that community members believed there was discriminatory bias among relevant government officials or that a vaguely defined culture of discrimination existed in the government."  (*Id.*)

Plaintiffs, however, need only allege that the challenged actions were adopted "at least in part 'because of', not merely 'in spite of' its adverse effects" on Orthodox Jews, *Hayden v. Paterson*, 594 F.3d 150, 163 (2d Cir. 2010) – and this Plaintiffs have surely done.  To imply, as Defendants do, that Plaintiffs have merely alleged their belief or some "vaguely defined culture of discrimination" is to grossly mischaracterize Plaintiffs' pleading.[6]

---

[5] Because comparators are not required, Defendants' argument that Plaintiffs' failure to identify one requires dismissal, (Defs' Mem. at 17-20), is irrelevant.  However, Plaintiffs have alleged that a non-Orthodox Jew, Peter Obe, was permitted to build a sprinkler free home with no issues from the Building Department.  (Compl. ¶ 94). While Defendants suggest that Mr. Obe's construction occurred at an earlier time, they make no showing that the Village codes were any different in 2013 and merely suggest that the Village did not know Mr. Obe was not installing sprinklers.  Assuming the relevance of each of these matters, these are questions for summary judgment that are inappropriate at the pleading stage.  Plaintiffs also alleged that non-Jews were not ticketed for the same offenses for which Orthodox Jews received tickets, and that code enforcement was virtually unknown until Orthodox Jewish residents began moving into the Village.  (*E.g.*, Compl. ¶¶ 41, 42, 96).

[6] Defendants cite several cases in support of this argument, (Defs' Mem. at 17), but in each the allegations are significantly less robust than those here and therefore the cases are inapposite.  *See Patterson v. City of New York*, 2017 WL 3432718, at *12 (E.D.N.Y. Aug. 9, 2017) (generalized allegations that focused on treatment of suspects and not victims like plaintiff insufficient to demonstrate intent); *Amaker v. Schiraldi*, 2017 WL 4402443, at *8 (E.D.N.Y. Sept. 29, 2017) (no factual support for claim that defendants were trained to view black prisoners as untrustworthy and general claims did not show any specific actor held discriminatory intent); *Roman v. Velleca*, 2012 WL 4445475, at *5 (D. Conn. Sept. 25, 2012) (only a conclusory allegation that defendant had a history of

Plaintiffs allege that Noreen Shea testified, based on first-hand experience as the Village

Deputy Clerk to an "ongoing hidden agenda against [] Jewish residents" of Pomona.  (Compl.

¶ 48).  Ms. Shea supported this with specific examples of discriminatory animus.  Indeed, at the

same time Defendants were subjecting Plaintiffs to "unfair" treatment, Defendant Yagel

routinely disparaged Orthodox Jews as "Them," "Those People" (Compl. ¶ 50); chastised Ms.

Shea for having a "nice, friendly conversation" with an Orthodox individual and instructed her to

"have very little conversation with 'those types'" (Compl. ¶ 53); berated a Village resident for

selling her home to one of "Them" (Compl. ¶ 51); instructed Ms. Shea to place pork rinds on the

public counter in the Village office to deter Orthodox Jews who came to the office seeking

municipal services, (Compl. ¶ 52); and criticized her for responding too quickly to requests from

Orthodox Jewish residents, instructing her that they should be made to wait (although he told her

provide records immediately to a non-Jewish person who requested them).  (Compl. ¶ 54).  Even

more shockingly, Yagel branded Ms. Shea a "Jew Lover," and terminated her employment for

refusing to be complicit in a "hidden agenda" against Orthodox Jewish residents.  (Compl. ¶¶ 48,

56).  He threatened to fire Zummo unless he gave Mr. Klein a stop work order by 3pm, told Mr.

Klein to "watch your back" because "people are watching you", and denied him a key to Village

offices and looked for ways to conduct Village business without him.  (Compl. ¶¶ 81, 87, 97).[7]

The evidence of discriminatory animus is not limited to Mayor Yagel.  Plaintiffs allege

that Zummo admitted to the Human Rights investigator that he openly mocked Orthodox Jewish

residents by performing "impersonations" of their "carrying on."  (Compl. ¶ 55).  Plaintiffs

further allege Plaintiff Robert Klein reported to the investigator that Zummo told the Village

---

racism, with no specific facts supporting the conclusion); *Rosario v. Town of Mount Kisco*, 2018 WL 2209487, at *9
(S.D.N.Y. May 11, 2018) ("the allegations provided here are not factual, but rather, conclusory").

[7] Defendants' suggestion that Yagel's comment to hold meetings on Sukkot and Yagel's conducting meetings after
Mr. Klein cannot be construed as allegations of animus on a motion to dismiss is make-weight.

zoning board that it was "just like them" (i.e., Orthodox Jews) to build illegal basement apartments. (Compl. ¶ 59). And Ms. Shea revealed another incident where Zummo disparaged an Orthodox resident who required a permit to accommodate two severely disabled children, saying that he should "stop having children." (Compl. ¶ 59).

Similarly, Plaintiffs allege that Defendant Ulman directed that the Indigs not be permitted to complete grading work their backyard even though such work was initially approved. (Compl. ¶ 21). The Complaint also alleges that Ulman authored ordinances that Judge Karas found were intended to prevent Orthodox Jews from moving to the Village, and directed that Orthodox Jews be denied permits and certificates of occupancy. (Compl. ¶¶ 29, 40). Further, Ms. Ulman advised a Village resident that she resigned from representing the Village zoning board because it was discriminating against Jewish residents. (*Id.* ¶ 60). Last, the Complaint alleges that Defendant Harris demanded Mr. Kahana receive multiple violations because he was an Orthodox Jew. (*Id.* ¶ 80).

It is well-established that "contemporaneous statements by decision-makers" are probative of a discriminatory motive. *Louis v. Metropolitan Transit Auth.*, 145 F. Supp. 3d 215, 226 (E.D.N.Y. 2015) (Glasser, J.) (citing *Village of Arlington Heights v. Metro Housing Dev. Corp.*, 429 U.S. 252, 266–68 (1977)). In particular, the use of "epithets" – such as "Jew Lover," "Them", and "Those People" – "may be regarded as direct evidence of . . . animus." *Id.* Defendants admit that slurs or negative comments can be probative of discriminatory purpose (Defs' Mem. at 17), but contend that comments by others or that do not specifically reference the protected class do not support such an inference. (*Id.*) (citing *Stone v. Eamer*, 2018 WL 557872 (N.D.N.Y. Jan. 19, 2018) and *Golodner v. Martinez*, 2017 WL 6540269 (D. Conn. Dec. 21,

2017).)[8]  In this matter, there are specific comments by each of the individual Defendants, and numerous references to Orthodox Jews.

In *Savino*, 983 F. Supp. 2d at 303–305, the Court held that a plaintiff could establish a discriminatory motive for a Zoning Enforcement Officer's issuance of a cease and desist order based on a single "derogatory comment" the Officer made about Italians.  This coupled with evidence that the plaintiff sustained an economic loss resulting from Officer's conduct was sufficient for the plaintiff's *Pyke* claim to survive summary judgment.  Here, the extensive allegations of anti-Jewish animus noted herein – which far surpass a single derogatory comment – together with the evidence of Defendants' "unfair" treatment of Plaintiffs is more than sufficient to establish a *Pyke* claim at the pleading stage.

Defendants also argue that, despite the numerous allegations concerning discriminatory conduct alleged in the Amended Complaint, many of which Defendants list (*see*, *e.g.*, Defs' Mem. at 21), they are conclusory.  (*Id.*)  The allegations, however, are far from conclusory or "thread-bare" and, as discussed herein, there are many specific facts alleged supporting the claims of targeting or anti-Semitic animus.  Thus, this case is easily distinguishable from *Bradshaw v. City of New York*, 2017 WL 6060781 (S.D.N.Y. Dec. 7, 2017) (summary judgment case in which the only evidence of discrimination were that corrections officer acted more quickly to respond to request of Hispanic prisoners), *Hamzik v. Office for People with Developmental Disabilities*, 859 F. Supp.2d 265, 281 (N.D.N.Y. 2012) (no allegations of any discriminatory animus or statements), and *Clyburn v. Shields*, 33 Fed. Appx. 552, 555 (2d Cir.

---

[8] *Stone* is inapposite since it was decided on a motion for summary judgment, and the issue was whether the defendant had engaged in a conspiracy to frame an inmate, in retaliation for filing a discrimination complaint, but the comments were made after the event and did not evince any knowledge of a plan to frame the inmate.  2018 WL 557872, at *1, 12-13.  Similarly, *Golodner* is inapposite because it is a summary judgment case and there was no discussion of any statements of gender bias at all.

2002) (bare allegation, without any facts in support), which Defendants apparently cite to support their contention that conclusory allegations are insufficient.

Defendants claim that there are no allegations that the statements of Defendants Yagel, Zummo, or Ulman were made at the exact time of the claimed discriminatory acts.  First, this is incorrect, as, for example, Zummo made his comment that it would be "just like them" to use the basement as an illegal apartment when Mr. Klein's plans were being considered.  (Compl. ¶¶ 60, 84).  Second, Defendants cite no cases requiring exactly contemporaneous statements, and it is alleged that anti-Semitic comments and activities were all undertaken during the same period that Plaintiffs suffered discriminatory treatment.  (*See* Compl. ¶ 61).  When considering whether a remark is subject to the stray comment doctrine, Courts look to (1) who made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decision-making process.  *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 519 (S.D.N.Y. 2004).  These factors favor Plaintiffs.  In addition, even stray remarks may be relevant when considered within the totality of evidence.  *Id.* (citing cases). It would be improper to dismiss this action at the pleading stage given Plaintiffs' robust allegations of anti-Semitic animus and the attendant consequences in unwarranted delays, denials of permits or certificate of occupancy, and tickets, among other offenses.

While Defendants cite *Brown v. City of Rochester*, 2011 WL 4352395, *15, n.5 (W.D.NY. Sept. 16, 2011), and *Graham v. Elmira City Sch. Dist.,* 2015 WL 1383657, at *6-8 (E.D.N.Y. Mar. 25, 2015), (Defs' Mem. at 22), neither is apposite.  In *Brown*, a summary judgment case, the plaintiff admitted the case was not about race and the only racial allegation

21

was that another employee, who, like plaintiff, was African-American, had called white employees "crackers" on a single occasion. *Graham* was similarly a summary judgment case, several of the alleged statements were barred as hearsay, and the remaining statements were not made by decisionmakers or supervisors or were not indicative of racial animus, unlike this matter. And, again, Defendants ignore that the claimed discrimination is not simply enforcement decisions, but other mistreatment, including the intimidation of workers performing work for the Indigs, (Compl. ¶ 74), the Deputy Mayor's demand that multiple violations be issued against Mr. Kahana (Compl. ¶ 80), and the delay in responding to any request or review plans submitted by Plaintiffs for an inordinate amount of time. (Compl. ¶¶ 85, 90, 92, 93).

Defendants also argue that, at most, comments by Mr. Zummo reflect a personal animosity towards the Kleins rather than a discriminatory motive. (Defs' Mem. at 21, n. 4). However, the allegation is that Mr. Zummo stated, in reference to Robert Klein, it would be "just like them" to use the basement as an illegal apartment (Compl. ¶¶ 60, 84). The allegation is not that Mr. Zummo said it would be "just like him", as one would expect when referring to an individual person, but "them", referring to Orthodox Jews, just as Defendant Yagel referred to Orthodox Jews as "them" or "those people." (Compl. ¶ 50). In any event, dismissal would not be proper at the pleading stage.

Defendants also claim there are no specific statements as to Mr. Kahana and the Indigs, that comments made at the zoning board meeting are not indicative of Defendant Zummo's intent in ticketing or issuing stop work orders, and that Mr. Yagel's comments to Mr. Klein might reflect only a personal animosity. (Defs' Mem. at 21, n. 4). It is incorrect that there were no comments concerning the other Plaintiffs, (Compl. ¶ 80), and the argument also ignores the broader context that biased decisionmakers were acting with discriminatory animus towards

Plaintiffs.  (*See*, *e.g.*, Compl. ¶¶ 58, 59).  While Defendants cite several cases in footnote 4, they were all decided on summary judgment and/or based on much sparser facts.[9]

Defendants also make the incredible argument that Plaintiffs' allegations with respect to other Jewish residents do not reveal an intent to discriminate based on religion.  (Defs' Mem. at 22).  The specific comments by Defendants, coupled with acts that affected only Jewish residents of Pomona, is sufficient to allege a discriminatory intent.  The cases cited by Defendants, *Amaker*, *Patterson*, and *Roman*, are inapposite for the reasons discussed above.  *Roman Catholic Diocese of Rockville Ctr., N.Y. v. Inc. Vill. of Old Westbury*, 128 F. Supp. 3d 566, 595 (E.D.N.Y. 2015), is inapposite as it is a summary judgment case and there was no direct evidence of any anti-religious sentiment of motivation, in stark contrast to the allegations here.  Similarly, *Deleon v. Putnam Valley Bd. Of Educ.*, 2006 WL 236744 (S.D.N.Y. Jan. 26, 2006), is a summary judgment case without claims of direct evidence of animus.

Finally, Defendants argue that Plaintiffs cannot assert that the Village had a discriminatory purpose in enforcing code violations against them because they were convicted.  As noted above, not all enforcement decisions led to a conviction.  Further, the mere fact that an individual was convicted of a violation, when the prosecution was brought due to religious animus, does not preclude a claim under § 1983.  *Leather*, 180 F.3d at 424-25 (because plaintiff could not have sought damages in state court proceeding, as is the case here, § 1983 claim was not barred by conviction).  *Simpson v. New York State Dep't of Civil Services*, 166 Fed. Appx. 499 (2d Cir. 2006), yet another summary judgment case cited by Defendants, is not to the

---

[9] As noted, *Stone v. Eamer*, 2018 WL 557872, is a summary judgment case, as is *Rodriguez v. Clinton*, 2009 WL 261203 (N.D.N.Y. Feb. 4, 2009).  *See* footnote 8, *supra.*  In *Wolongevicz v. Town of Manlius*, 2018 WL 3769857, at *9 (N.D.N.Y. Aug. 8, 2018), which decision amended and superseded the decision cited by Defendants, the allegations as to two defendants were summarized as plaintiff "was a woman who sought protection 'from her abusive boyfriend' and 'Defendants are men seeking to protect another man." Thus, the Court concluded that the allegations did not demonstrate the complaints were made because of her gender rather than because she had broken up with one of the defendants.  In this matter, there is no such personal relationship and the animus in the statements is clear.

contrary, as the Court was simply noting that the district court had found the fact that a neutral hearing officer was guilty of charges of misconduct was probative, but not conclusive, of the defendant's lack of discriminatory motive.  In the very case cited by *Simpson*, *Collings v. New York City Transit Authority*, 305 F.3d 113, 119 (2d Cir. 2002), the Second Circuit held that a "negative arbitration decision . . . does not preclude a Title VII action by a discharged employee."[10]  There is no evidence that any claims of religious discrimination were raised in defense to the prosecutions.  *See Petrovits v. New York City Transit Authority*, 2003 WL 22349676, at *4 (S.D.N.Y. Oct. 15, 2003) (upholding Title VII award despite negative arbitration finding, noting "arbitrator was not presented with the evidence of sex discrimination").  In sum, based on the allegations, Plaintiffs have pled a viable Equal Protection claim based on direct evidence of discrimination under *Pyke* (and their New York State equal protection claim should survive for the same reasons).[11]

## V.        PLAINTIFFS' REMAINING CLAIMS ARE PLAUSIBLY PLED

Lastly, Defendants argue that Plaintiffs' claims under the Fair Housing Act, N.Y. Civil Rights Law 40-c, and the First Amendment should be dismissed because plaintiffs have not presented factual allegations showing the Village's issuance of stop work orders and tickets to them was discriminatory.  (Defs' Mem. at 24).  Again, Defendants ignore that Plaintiffs' claims rest on more than solely stop work orders and tickets, as discussed.  And, again, Defendants argue the claims fail because there are no similarly situated individuals who were treated

---

[10] *Durham v. City of New York*, 2019 WL 1316472, at *4 (S.D.N.Y. Mar. 22, 2019), and *Wharton v. County of Nassau*, 2010 WL 3749077, at *9 (E.D.N.Y. Sept. 20, 2010), are both inapposite.  In *Durham* there were absolutely no allegations that plaintiff's arrest and conviction were animated by race and dismissed the claim for that reason. The Court never concluded that the subsequent conviction barred Durham's claim.  *Wharton* was decided upon summary judgment, so is irrelevant for that reason, and, again, there was no evidence of racial animus of the officers.

[11] *Dotson v. Farrugia*, No. 11–CV–1126, 2012 WL 996997, at *8 n. 3 (S.D.N.Y. Mar. 26, 2012) ("The Equal Protection Clauses of the United States and the New York Constitutions are coextensive, and therefore an analysis under one equally supports an analysis under the other.").

differently (*id*. at 25), even though such comparators are unnecessary.

Since the considerations as to whether Defendants acted with discriminatory intent under the Fair Housing Act and N.Y. Civil Rights Law § 40-c are the same as those considered in connection with Plaintiff's equal protection claim, *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, *NY*, 280 F. Supp. 3d 426, 491 (S.D.N.Y. 2017) (Fair Housing Act), *Bernstein v. Village of Wesley Hills*, 95 F. Supp. 3d 547, 585 (S.D.N.Y. 2015) (analyzing §40-c claim under same standard as § 1983 Equal Protection claim), Plaintiffs' Fair Housing Act and Civil Rights Law § 40-c claim must survive dismissal.[12]  Plaintiffs need not allege similarly situated individuals when there is evidence of direct and intentional discrimination.

Plaintiffs' Free Exercise claim under the First Amendment, as well as the New York State Constitution, also are adequately pled.[13]   When a plaintiff claims his rights under the Free Exercise Clause have been violated, he must demonstrate that the official conduct at issue operated coercively against him "in the practice of [their] religion." *Harris v. McRae*, 448 U.S. 297, 321, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (q*uoting Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 223, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963)). "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).  Plaintiffs have alleged that they were targeted due to their religion, and this violates the neutrality required by the Free Exercise Clause, and thus Plaintiffs have stated a claim.  No similarly situated comparator is required.

---

[12] *Lynn v. Vill. Of Pomona*, 373 F. Supp.2d 418, 429 (S.D.N.Y. 2005), is inapposite since it is a summary judgment case.  Plaintiffs have also adequately alleged the "unavailability" element of a FHA claim, to the extent required, insofar as Mr. Klein has been unable to reside in his home, which remains unfinished.  (Compl. ¶ 92).

[13] Whether the Free Exercise Clauses of the First Amendment and New York State Constitution are co-extensive remains an open question, but courts generally analyze them together using the same or similar standards.  *See In re Miller*, 252 A.D.2d 156, 684 N.Y.S.2d 368, 370–71 (4th Dep't 1998) (analyzing free exercise claim under the New York Constitution based on federal case law).

## CONCLUSION

For the reasons explained above, Defendants' motion to dismiss should be denied in its

entirety.

Dated: New York, New York
      June 19, 2019

                                     **Respectfully submitted,**

                                     **SCHLAM STONE & DOLAN LLP**

                             By: _____

                                     Bradley J. Nash
                                     Samuel L. Butt
                           26 Broadway
                           New York, New York 10004
                           Telephone No.: (212) 344-5400
                           E-Mail: bnash@schlamstone.com
                           E-Mail: sbutt@schlamstone.com

                           *Attorneys for Plaintiffs*