UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

SAMUEL INDIG, LEAH INDIG, MEIR
KAHANA, ROBERT KLEIN, and NAFTALI
KLEIN,

                Case No.: 18-cv-10204

                **Defendants' Joint Statement of**
             Plaintiffs,     **Material Facts Pursuant to**
                **Local Rule 56.1**

      -against-

THE VILLAGE OF POMONA, BRETT
YAGEL, LOUIS ZUMMO, LEON HARRIS,
DORIS ULMAN, and IAN BANKS

              Defendants.
-----------------------------------------------------------------X

      Defendants, THE VILLAGE OF POMONA, BRETT YAGEL, LOUIS ZUMMO, LEON

HARRIS, DORIS ULMAN and IAN BANKS, hereby submit that the following facts are

undisputed for the purposes of the instant motion pursuant to Southern District Local Rule 56.1:

   **I.**    **PLAINTIFFS**

      1.    Plaintiffs Leah and Samuel Indig own a home at 21 White Birch Drive, Pomona,

NY. (Ex. 2, S. Indig Dep. 16:21-17:2).

      2.    Plaintiff Meir Kahana owns a home at 68 Halley Drive, Pomona, NY. (Ex. 4,

Kahana Dep. 9:9-15).

      3.    Plaintiff Naftali Klein owns a home at 63 Halley Drive, Pomona, NY, which

Plaintiff Robert Klein occupies with his family. (Ex. 5, R. Klein 11/22/2022 Dep. 35:16-18).[1]

   **II.**   **RELEVANT STATUTES AND LOCAL LAWS**

      4.    The Village of Pomona Code incorporates the requirements of the New York State

Uniform Fire Prevention and Building Code. (Ex. 25, Village Code §§ 130-18(B), 130-22(B)).

---

[1] The use of Mr. Klein throughout this document refers to Robert Klein. References to Naftali Klein will include his full name.

5.      Pursuant to the Village Code, removal of trees requires approval of the Code Enforcement Officer. (Ex. 25, Village Code § 130-18(G)).

6.      Section 130-18(H) provides "No person shall conduct or cause to be conducted any land operations to clear, fill or grade any property without securing a building permit (hereinafter referred to in this section as 'permit') from the Building Inspector." (Ex. 25, Village Code § 130-18(H)). The Village Code sets forth the materials that must be submitted to obtain a grading permit. (Ex. 25, Village Code § 130-18(H)(1)). The Village Code further permits the Building Inspector to refer applications for grading permits to the Village Engineer and other Village agencies for review and recommendation. (Ex. 25, Village Code §130-18(H)(3)). Building Inspector Zummo did not review or approve applications for grading permits; rather, he referred them to the Village Engineer, Joseph Corless. (Ex 10, Zummo Dep. 97:13-15).

7.      Pursuant to Section 130-22, the Building Inspector/Code Enforcement Officer is charged with, *inter alia*, (1) administering and enforcing "all provisions of laws, rules and regulations that apply to the construction, alteration, repair, removal and demolition of buildings and structures," (2) inspecting buildings or land to determine whether there has been a violation of state or local code, (3) issuing permits and certificates, and (4) issuing and posting notices of violation, stop-work orders, and orders of remedy. (Ex. 25, Village Code §§ 130-22(A)(1), (2), (3), (6)).

8.      Section 130-22(J) authorizes the Building Inspector to issue stop work orders and provides that:

> Whenever the Building Inspector shall determine that work on any building or structure is being or has been conducted in violation of any provision of this chapter, the New York State Fire Prevention and Building Code, state, federal, county or Village laws, rules or regulations or has failed to meet or violates any requirement of an approved site plan or subdivision plat, including, but not limited to,

2

… such other plans or specifications upon which a building permit was issued, or that the work is being conducted in a dangerous or unsafe manner, then the Building Inspector shall notify the owner of the property or the owner's agent, and the person performing the work, to suspend and halt work. … Should work continue in violation of the stop-work order, the Building Inspector may, without further notice, revoke the building permit and, if there is a certificate of occupancy or use, revoke the same.

(Ex. 25, Village Code § 130-22(J)).

9.    The Village Code defines a "swimming pool" as "[a] man-made body of water or receptacle for water having a depth of more than 20 inches and a water surface area of more than 80 square feet and constructed, installed or maintained in or above ground outside any building." (Ex. 25, Village Code § 130-4). The Village Code provides that swimming pools are permitted accessory uses, provided that:

(1) Such pool or court shall be completely enclosed by a fence or wall not less than five feet in height and so constructed as to deter climbing. All gates or doors opening through such enclosure shall be equipped with a self-closing and self-latching device for keeping the gate or door securely locked at all times when the pool or court is not in actual use. (2) If located within 50 feet of any lot line, such pool or court shall be screened from the view of the adjacent properties. Such screen shall be at least five feet high.

(Ex. 25, Village Code § 130-11(B)). The Village Code further provides that:

All swimming pools, as defined in this chapter, shall be completely enclosed by a fence or wall with a minimum height of five feet. All such fences must contain a maximum vertical interspace of two inches and must have self-closing and self-latching gates, with latches placed at least four feet above the ground or otherwise made inaccessible to small children. The fencing shall be determined by the Code Enforcement Officer to be strong enough to ensure pool security.

(Ex. 25, Village Code § 130-16).

10.    Due to its mountainous terrain, the Village Code contains provisions regarding "steep slopes." (Ex. 25, Village Code § 119-1) (definitions of "moderately steep slope," "very steep slope" and "extremely steep slope").

11.    Section 119-4(A) provides that the approving authority for all applications for site development plan permits shall be the Planning Board for applications involving a very steep slope or extremely steep slope. In all other instances, the approving authority is the Village Engineer; however, the Village Engineer has discretion to refer an application concerning a moderately steep slope to the Planning Board for review and approval. (Ex. 25, Village Code § 119-4(C)).

## III.    DEFENDANTS AND OTHER VILLAGE PERSONNEL

### *Defendant Brett Yagel – Former Village Mayor*

12.    Defendant Brett Yagel ("Yagel") ran for mayor in 2011 (Ex. 9, Yagel Dep. 45:8-9). He was the Mayor of the Village of Pomona for two terms. (Ex. 9, Yagel Dep. 206:10-14).

13.    Yagel testified that from the time he first became trustee in 2007 until the time his terms as mayor ended, the Orthodox Jewish population in Pomona increased over that time. (Ex. 9, Yagel Dep. 68:12-18).

14.    When a Village resident complained about the use of a home for religious purposes by Orthodox Jews, Yagel advised the resident that this was permitted under the U.S. Constitution and was allowed. (Ex. 9, Yagel Dep. 61:13-21).

15.    When complaints for potential violations were received, Yagel sent Zummo out to investigate, but Zummo was not sent out to target a specific organization or a specific religious organization. (Ex. 9, Yagel Dep. 83:24 to 84:13). If the Village received complaints of activity going on that was not according to plans, Zummo was "probably asked to go out and take a look." (Ex. 9, Yagel Dep. 173:24 to 174:7).

16.     Yagel never directed Zummo to issue a stop work order on Mr. Klein's house. (Ex. 9, Yagel Dep. 174:24-175:7). Yagel never directed Zummo to find a reason to issue a stop work order on Mr. Klein's house. (Ex. 9, Yagel Dep. 175:8-12).

*Defendant Louis Zummo – Village Building Inspector*

17.     Defendant Louis Zummo ("Zummo") is the Building Inspector for the Village of Pomona, a part-time position he has held since December 2013. (Ex. 10, Zummo Dep. 30:24-31:6; 32:12-15).

18.     Prior to taking the position, Zummo was interviewed by the entire Village board. (Ex. 10, Zummo Dep. 26:23-27:2).

19.     Zummo completed a building inspector training course in 2014. (Ex. 10, Zummo Dep. 37:16-24)

20.     Zummo is a state certified code enforcement officer. (Ex. 10, Zummo Dep. 39:21-40:5)

21.     Zummo never issued an inspection or stop work order because someone else told him to; rather, he only issued violations or stop work orders based upon his independent inspection or determination that there was a code violation. (Ex. 10, Zummo Dep.  253:10-254:5, 255:7).

22.     When Zummo became the building inspector, he was not aware of any policy to increase the number of violations issued in the Village. (Ex. 10, Zummo Dep. 83:22-25, 84:5). Zummo never had any discussions with Yagel about issuing increased violations. (Ex. 10, Zummo Dep. 85:2-7). He never had a discussion with Yagel about amending the Village Code to provide for additional violations. (Ex. 10, Zummo Dep. 85:8-14).

23.     Zummo never noticed any type of pattern in the types of potential violations Yagel and Leon Harris identified, nor in the violations he issued. (Ex. 10, Zummo Dep. 208:19-209-8).

24.     Zummo enforced the code even-handedly without regard to the religion of any resident or applicant. (See Ex. 10, Zummo Dep. at 253:10-19 (independently investigates potential violations); Ex. 19, Lasker Dep. at 160:8-162:9 (Trustee observed that Zummo treated residents the same); Ex. 15, Tolf Dep. at 75:10-76:12; see also Ex. 10, Zummo Dep. at 223:11-15 (Zummo did not know who owned the house at 68 Halley when he issued the pool violation); Ex. 26, Village Permit Applications and Permits Issued (The Village does not ask an applicant his religion on a permit application. The Village issues permits regardless of a resident's religion)). For example, on several occasions, when Orthodox Jewish property owners sought to use their residences as houses of worship, Zummo assisted them in obtaining the appropriate permit. (Ex. 10, Zummo Dep. 74:5-76:17).

25.     Zummo issued a permit for a shul located at 60 Halley in Pomona. (Ex. 10, Zummo Dep. 74:21-22, 76:2-10). Zummo did not receive any pushback from others at the Village regarding issuing that shul permit. (Ex. 10, Zummo Dep. 76:18-23). Zummo received complaints about the shul, which included complaints about parking, people walking in the street, and crowds gathering. (Ex. 10, Zummo Dep. 78:7-12). However, he never issued any violations to 60 Halley and he was never asked to. (Ex. 10, Zummo Dep. 78:16-22).

26.     Zummo also issued the permit for the shul at which Mr. Schwartz was the principal. (Ex. 10, Zummo Dep. 89:19-24). Zummo also issued a permit for the addition of an ark to the back of an existing shul located at 7 Galileo Court. (Ex. 26, Village Permit Applications and Permits Issued, D_01097). In addition, Zummo issued a permit to Avroham Manes for the construction of a retaining wall, driveway, fence, and drainage. (Ex. 26, Village Permit Applications and Permits Issued, D_01079). Mendy Lasker, who applied for multiple permits, felt he was treated fairly by Zummo. (Ex. 19, 161:8-162:9).

27.    Zummo received garbage complaints regarding a shul near Sherwood Ridge from a neighbor, but no violations were issued in response to the same. (Ex. 10, Zummo Dep. 148:9-24).

28.    Yagel never told Zummo to delay the inspection of homes that were used for shuls. (Ex. 10, Zummo Dep. 123:20-25).

29.    In 2012, Peter Obe submitted a building permit application for an addition to his home at 2 Riverview Court, Pomona, NY, which was approved by a prior building inspector, not Zummo. (Ex. 27, Peter Obe Permit Application, Village_013924-013925). The permit was issued by the prior building inspector. (Ex. 27, Peter Obe Permit Application, Village_013924-013925). Mr. Obe's construction was performed in accordance with the plans approved by the prior building inspector. (Ex. 24, Zummo Affidavit). Zummo interpreted the plans as providing for three floors above-ground, which would require a sprinkler system. As such, Zummo refused to issue a Certificate of Occupancy to Mr. Obe. Mr. Obe sold the property to a new owner without a Certificate of Occupancy being issued. The new owner installed a sprinkler system and Zummo issued a certificate of occupancy in 2019. (Ex. 24, Zummo Affidavit).

*Defendant Leon Harris – Former Village Trustee*

30.    Defendant Leon Harris ("Harris") was an elected trustee of the Village of Pomona for eight years. (Ex. 11, Harris Dep. 8:6-10; 10:22-24). He was appointed as the deputy mayor during his last term as trustee. (Ex. 11, Harris Dep. 19:10-16).

31.    As deputy mayor, Harris would run meetings if the mayor was not available. (Ex. 11, Harris Dep. 18:12-21). Harris did not supervise any employees of the Village and had no input in hiring and firing. (Ex. 11, Harris Dep. 20:18-25).

32.     Harris never directed Zummo to issue a Stop Work Order on a property or to issue a violation. (Ex. 11, Harris Dep. 35:25 to 36:6).

33.     As trustee and deputy mayor, Harris would occasionally be asked by neighbors about whether houses under construction had permits. (Ex. 11, Harris Dep. 71:12-19). If residents asked him about an issue, he would contact the Village staff. (Ex. 11, Harris Dep. 26:22-27:5).

34.     Harris is not aware of any statements by Yagel disparaging Mr. Klein. (Ex. 11, Harris Dep. 61:15-18).

*Defendant Doris Ulman – Former Village Attorney*

35.     Defendant Doris Ulman ("Ulman") was the attorney for the Village from July 2003 until April 2019. (Ex. 12, Ulman Dep. 9:1-5; 37:3-5). Since October 2021, she has been the attorney for the current mayor of the Village, Ian Banks. (Ex. 12, Ulman Dep. 58:18-59:14).

36.     As the Village attorney, Ulman represented the board of trustees, the planning board and the zoning board; she attended all meetings; she wrote memoranda; she represented the Village in Article 78 proceedings; and she worked with and advised all Village staff. (Ex. 12, Ulman Dep. 11:10-16).

37.     Ulman testified that the Orthodox Jewish population of the Village has significantly increased over the last ten years. (Ex. 12, Ulman Dep. 97:3-24).

38.     Ulman did not recall that Banks, Yagel or Zummo ever discriminated against Orthodox Jewish residents. (Ex. 12, Ulman Dep. 62:19-63:14). She was not aware of complaints by residents against the Orthodox population. (Ex. 12, Ulman Dep. 97:25-98:10).  She was also unaware of complaints about homes being used as synagogues as that is a permitted use. (Ex. 12, Ulman Dep. 98:11-21). Although there were complaints by residents about the construction or use of an eruv, Ulman testified that this was a permitted use. (Ex. 12, Ulman Dep. 100:9-23).

8

*Defendant Ian Banks – Village Mayor*

39.    Defendant Ian Banks ("Banks") was a trustee of the Village prior to being elected as the mayor in 2019. (Ex. 13, Banks 12/20/2022 Dep. 35:9-18).

40.    Robert Klein and Ian Banks campaigned on the same ticket for office prior to 2019. Banks recalled that plaintiff Klein likely introduced him to Mendy Lasker, who became his Campaign Chairman during the 2019 election. (Ex. 13, Banks 12/20/2022 Dep. 7:21-8:15).

41.    Banks was originally asked to run for Mayor by his Orthodox Jewish friends in the Village of Pomona, including Avrohom Manes and plaintiff Robert Klein. (Ex. 13, Banks 12/20/2022 Dep. 12:6-22).

42.    At a meeting at the Indigs' home, Banks recalled conversations of attendees about things that were going on in the Village but there was no specific discussion about discrimination or harassment against Orthodox Jews at that meeting. (Ex. 13, Banks 12/20/2022 Dep. 29:6-30:23).

43.    After the April 14, 2020 decision of the New York Department of State, Hudson Valley Board of Review finding that sprinklers were not required on Klein's project. (Ex. 87, NY State Board Decision, Village_015184-015185). Banks advised the building inspector, Zummo, to have Klein clear up his plans in order to expedite the completion of Mr. Klein's project. (Ex. 13, Banks 12/20/2022 Dep. 54:15-55:25).

44.    Banks did not express to Mr. Klein that Orthodox Jews had too much power in the Village. (Ex. 13, Banks 12/20/2022 Dep. 58:14-21).

45.    Banks never discussed with Zummo delaying the issuance of permits for plaintiff Klein. (Ex. 10, Zummo Dep. 233:12-14).

46.    Banks and Zummo had no discussions concerning delays regarding Mr. Klein's permits. (Ex. 10, Zummo Dep. 233-238).

9

47.    Lasker did not remember ever having a discussion with Ian Banks about religious discrimination in the Village. (Ex. 19, Lasker Dep. 80:19-21, 81:2-3).

48.    Lasker did not recall Banks ever referring to an Orthodox Trustee as "you people" (Ex. 19, Lasker Dep. 108:17-19), nor did he recall Banks ever referring to Orthodox Jews in Pomona as "you people." (Ex. 19, Lasker Dep. 109:3).

49.    Klein has no evidence to support the allegation in the complaint that Banks directed Zummo to harass, intimidate, and discriminate against Orthodox Jews. (Ex. 5, R. Klein 111/22/2022 Dep. 247:21-248:12). According to Klein, Banks did nothing to discriminate against Orthodox Jews when he was Mayor. (Ex. 6, R. Klein 11/28/2022 Dep. 138:6-139:4). Klein had no evidence of Banks personally harassing, intimidating, or discriminating against Orthodox Jews in Pomona. (Ex. 6, R. Klein 11/28/2022 Dep. 140:3-9).

50.    Klein is not aware of any false and frivolous code violations that Banks directed someone to issue to him. (Ex. 6, R. Klein 11/28/2022 Dep. 141:14-17).

51.    Banks never discussed with Zummo delaying the issuance of permits for plaintiff Klein. (Ex. 10, Zummo Dep. 233:12-14).

52.    Klein received building permits in 2020 when Banks was the Mayor. (Ex. 6, R. Klein 11/28/2022 Dep. 146:17-147:8).

53.    Plaintiff Samuel Indig testified that he was told that Banks would be "very nice to the Jews in Pomona." (Ex. 2, S. Indig Dep. 189:20-24).

*Joseph Corless – Former Village Engineer*

54.    Joseph Corless ("Corless") worked as the Village Engineer from 1978 to 2019 on a contract basis, with annual reappointments. (Ex. 14, Corless Dep. 82:2-5; 67:8-10; 11:18-12:15). His position had to be approved by the Village Board. (Ex. 14, Corless Dep. 58:17-23).

55.     As the Village Engineer, Corless worked for the Village, not individuals. (Ex. 14, Corless Dep. 39:2-4). The work he performed for the Village had to be work that was authorized by the Village. (Ex. 14, Corless Dep. 36:11-25). Corless did not undertake an assignment unless he was instructed to do so by someone from the Village administration. (Ex. 14, Corless Dep. 37:5-12).

56.     As the Village Engineer, Corless was responsible for reviewing site plans regarding the grading of property. (Ex. 14, Corless Dep. 23:2-3). A site plan is a representation of the improvements to be made on a private lot to provide access for vehicles or water and sewer or drainage. (Ex. 14, Corless Dep. 23:6-10).

57.     When Corless received a proposed site plan, he either accepted it or asked for clarification. If he was given an as-built site plan, he would take it and examine the site to ensure that the site reflected what he saw on the as-built plan. (Ex. 14, Corless Dep, 57:15-23).

58.     As the Village Engineer, Corless did not issue violations of the building code, but he would report them to the building inspector. (Ex. 14, Corless Dep. 52:11-19).

59.     Yagel did not have authority to tell Corless to approve or not approve certain projects. (Ex. 14, Corless Dep. 59:7-11).

60.     No one at the Village directed Corless on how to perform his job as engineer. (Ex. 14, Corless Dep. 79:22-25).

61.     Neither Yagel, Zummo, nor anyone else at the Village ever directed Corless to treat Mr. Klein or the Indigs differently than anyone else. (Ex. 14, Corless Dep. 79:10-21.)

62.     Pat Brady was Corless's alternate as Village engineer when Corless was unavailable. (Ex. 14, Corless Dep. 35:14-25).

63.    Technical advisory committee meetings with a landowner and his engineer would be scheduled by the Village to discuss Village laws and site plan regulations that had to be complied with before getting a permit. (Ex. 14, Corless Dep. 25:21-29, 54:23-25, 55:4-8).

*Kathryn Tolf – Former Village Code Enforcement Officer*

64.    Kathryn Tolf ("Tolf") worked as a part-time (15-hours per week) code enforcement officer for the Village of Pomona from January 2, 2018 until April 2018. (Ex. 15, Tolf Dep. 19:15-20:20, 21:11-16, 65:8-14).

65.    Prior to her employment by the Village, Tolf studied to become a certified code enforcement officer and was authorized to issue violations by the time she began working for the Village. (Ex. 15, Tolf Dep. 16:6-12, 27:23-28:22).

66.    Tolf submitted an application and interviewed with the Board of Trustees prior to being hired. (Ex. 15, Tolf Dep. 19:20-21:6, 23:2-6).

67.    Tolf did not know Yagel or Zummo before she applied for a job with the Village. (Ex. 15, Tolf Dep. 17:5-18:13, 23:12-22).

68.    When applying for the position of code enforcement officer, Tolf was informed by Yagel that the position involved patrolling the Village and enforcing the Village Code. (Ex. 15, Tolf Dep. 20:13-20). No one said anything to Tolf about Orthodox Jews in Pomona before she was hired or during the application process. (Ex. 15, Tolf Dep. 19:14-25:7).

69.    Zummo had no supervisory power over Tolf. (Ex. 15, Tolf Dep. 25:17-26:3).

70.    Tolf never engaged in selective enforcement of the Village Code. (Ex. 15, Tolf Dep. 45:14-47:15; 51:16-52:14, 55:11-15).

71.    Tolf engaged in independent investigations of any complaint or potential violation of the code and exercised her own judgment as to whether a violation existed. (Ex. 15, Tolf Dep. 45:14-46:19, 51:15-53:3, 83:2-84:4, 85:9-86:6).

72.    If a homeowner was present at the time Tolf identified a code violation, she attempted to work with them immediately to remedy the issue. If the homeowner was able to remedy the issue while Tolf was there, she would not write out an information summons for the property. If a violation was not remedied in her presence, Tolf would write out an "Information" identifying the property and the code violation, and she would provide the Information form to the Village Clerk.  The Village Clerk was responsible for issuing an Order of Remedy to the property owner. (Ex. 15, Tolf Dep. 51:22-56:22).

73.    Tolf received two complaints regarding lighting from shuls in the Village.  She investigated them and found that one was founded, and one was unfounded. With respect to the founded complaint, Tolf asked the rabbi to adjust the lights to remedy the issue. With respect to the unfounded complaint, Tolf told the property owner she did not think the lights were a problem. (Ex. 15, Tolf Dep. 83:2-84:4).

74.    Tolf was not involved in the issuance of Stop Work Orders at the Indig or Klein properties, but part of her job as code enforcement officer was monitoring to see whether construction was taking place during a Stop Work Order. (Ex. 15, Tolf Dep. 59:4-17, 61:5-62:4). Tolf issued violations to Leah Indig for having soil unloaded on the premises while the Stop Work Order was in effect. (Ex. 37, Appearance Tickets, Village_004884, Village_004891). Tolf also issued several violations to Naftali Klein for continuing construction while the October 2017 Stop Work Order was in effect. (Ex. 70, Appearance Tickets, Village_008891-008894)). Specifically,

Tolf completed an Information Summons stating that she observed workers putting a roof on the house. (Ex. 94, Information Summons, Village_008949-00951).

75.    Tolf resigned from her position with the Village in April 2018 because she obtained a better job as a full-time fire inspector for the New York State Office of Children and Family Services.  (Ex. 15, Tolf Dep. 65:8-24).

*Frances Arsa Artha – Former Village Clerk and Treasurer*

76.    Frances Arsa Artha ("Arsa Artha") was the Village Clerk and Village Treasurer from December 2014 through April 2019. (Ex. 16, Arsa Artha Dep. 6:13-18, 93:2-3).

77.    Arsa Artha testified that she had no duties related to building inspections, the building department, or any zoning or planning issues. (Ex. 16, Arsa Artha Dep. 28:13-16, 28:22-29:1; 39:10-12).

*Betty Vanderbeek – Former Deputy Village Clerk*

78.    Betty Vanderbeek ("Vanderbeek") was the Deputy Village Clerk from June 2017 to April 2019. (Ex. 17, Vanderbeek Dep. 15:4-6, 54:4-6).

79.    As the Deputy Village Clerk, she took care of building permits, planning, and zoning, as well as anything else assigned to her by Arsa Artha. (Ex. 17, Vanderbeek Dep. 23:9-15). When Zummo did an inspection, she would receive a copy of the inspection report and put it into the file. (Ex. 17, Vanderbeek Dep. 27:25-28:8). When a code enforcement officer found a violation, she would receive the information and put it into the building system, and then print the necessary paperwork and leave it on the code enforcer's desk for his or her signature. (Ex. 17, Vanderbeek Dep. 51:23-52:18).

80.    Vanderbeek never heard Yagel direct Zummo to issue violations on specific properties. (Ex. 17, Vanderbeek Dep. 36:14-17).

81.    Vanderbeek could not recall a time where Yagel directed her not to provide information to someone making an inquiry. (Ex. 17, Vanderbeek Dep. 51:14-18).

82.    Vanderbeek never had a discussion with Yagel regarding the second stop work order on Kleins' house. (Ex. 17, Vanderbeek Dep. 29:22-30:2).

*Martin Spence – Current Village Engineer*

83.    Martin Spence ("Spence") has been the Village Engineer since May 2019. (Ex. 18, Spence Dep. 8:2-9). His firm, Spence Engineering, is engaged on a contract basis with the Village. (Ex. 18, Spence Dep. 12:18-13:6, 13:13-18). Prior to May 2019, he never did any work for the Village. (Ex. 18, Spence Dep. 8:10-15).

84.    Spence Engineering provides municipal and civil engineering services to the Village of Pomona. (Ex. 18, Spence Dep. 19:18-24). The work Spence performs involves site work, drainage, soil erosion and sediment control, stabilization, and landscaping. (Ex. 18, Spence Dep. 20:21-25). He reviews plans and applications on engineering matters and either denies, conditionally approves, or approves the applications. (Ex. 18, Spence Dep. 24:6-9). He does not receive direction as to what determination he should make. (Ex. 18, Spence Dep. 24:10-14). He makes an independent assessment. (Ex. 18, Spence Dep. 24:15-19).

85.    Spence testified that the criteria for site plan approval includes satisfying adequate soil erosion and sediment control, stabilization of disturbed areas, checking some criteria if there is a steep slope, looking at development coverage and the increase of impervious areas, reviewing drainage calculations and design, and determining if any improvements will have negative impacts on the adjacent properties. All these criteria are based on code. (Ex. 18, Spence Dep. 41:13-42:5).

86.    After Spence approves an application, it is sent to the building department, which will then package it with all the other approvals required, and then issue the overall building permit.

(Ex. 18, Spence Dep. 51:10-19). An individual cannot begin working on their project based on just Spence's approval. (Ex. 18, Spence Dep. 51:20-24).

87.     Spence does not perform inspections of buildings. (Ex. 18, Spence Dep. 20:10-14). In addition, he does not do any inspection of the interior of homes or the structural components of new construction. (Ex. 18, Spence Dep. 28:7-19).

88.     Spence was never directed to respond in a slow manner to any applications by Klein or the Indigs. (Ex. 18, Spence Dep. 55:20-56:4). Spence testified that it was never suggested to him that he should delay in or refrain from reviewing or approving any plans submitted on behalf of Klein. (Ex. 18, Spence Dep. 56:5-13). It never occurred to Spence that Zummo was treating Klein differently from other residents in Pomona. (Ex. 18, Spence Dep. 71:25-72:14).

89.     Spence never had any conversations with Banks regarding the grading permit for 63 Halley Drive. (Ex. 18, Spence Dep. 38:4-12).

*Mendy Lasker – Village Trustee*

90.     Mendy Lasker ("Lasker") is an appointed trustee of the Village, a position he has held since June 2019. (Ex. 19, Lasker Dep. 94:20-95:13, 159:21-22). He lives on Woodfield Road in Pomona, NY. (Ex. 19, Lasker Dep. 5:17-18).

91.     Lasker is a member of the Orthodox Jewish community. (Ex. 19, Lasker Dep. 13:12-23).

92.     Lasker testified that Zummo follows protocol; that while Zummo may process applications in a slower manner, he is no slower to respond to one application compared to any other application that is submitted to the Village. Lasker has seen "hundreds of applications come in" and has not noticed any particular issues with Zummo's performance as building inspector. (Ex. 19, Lasker Dep. 160:8-20).

16

93.    Lasker testified that Zummo treated him fairly during his own permit applications. (Ex. 19, Lasker Dep. 161:3-162:9).

## IV.    21 WHITE BIRCH DRIVE – THE INDIGS' PROPERTY

94.    Leah and Samuel Indig purchased their home in 2015, which had a steeply sloped yard, with the intention of doing grading work to create usable space. (Ex. 2, S. Indig Dep. 17:16-24, 21:10-19).

95.    During a conversation with Zummo, Mr. Indig was advised that backfilling the property was possible and Zummo directed Mr. Indig to submit a plan to the Village. (Ex. 2, S. Indig Dep. 37:18-24, 38: 5-9).

96.    Mr. Indig hired Celentano Engineering to draw up the plans to be submitted to the Village related to the proposed grading work. (Ex. 2, S. Indig Dep. 24:13-20).

97.    In 2016, the Indigs submitted an application for a building permit for the regrading of their backyard. (Ex. 2, S. Indig Dep. 22:9-15; 29:11-24; Ex. 28, Application for Building Permit, Village_009204-009205).

98.    On July 8, 2016, Zummo emailed Corless the file submitted by Mr. Celentano to the Village regarding grading work at 21 White Birch. (Ex. 29, Email Correspondence, Village_001707).

99.    Corless reviewed the site plan for 21 White Birch. (Ex. 14, Corless Dep. 52:20-53:4).

100.    In an email dated July 10, 2016, from Corless to Zummo, Corless indicated that the submitted plan failed to meet the Village requirements. Specifically, he noted that "[a]ll proposed filling and grading of residential lots must have a site plan prepared in conformance with Chapter 119," which requires a professionally prepared plan with calculations conforming to steep slope

definitions, as well as a certification from a NYS Certified Professional Engineer regarding the source of the fill material being used, compaction results, soil erosion details, and certification on final grades. Mr. Celentano was copied on this email. (Ex. 29, Email Correspondence, Village_001707).

101.    On or about January 8, 2017, Corless received the revised Indig site plan from Mr. Celentano. Corless responded to Mr. Celentano's email noting that the revised site plan called for the removal of ten trees with a small retaining wall, and the final grading was unclear. Corless suggested that a technical advisory committee meeting be scheduled. (Ex. 30, Email Correspondence, Village_001711-001712).

102.    On April 9, 2017, Corless emailed Zummo and Celentano, with others copied, indicating that he was approving the proposed grading plan submitted and revised by Celentano on January 9, 2017, pursuant to the following conditions:

> 1.     The proposed fill quantity of 1,000 cy requires that the source of the material be identified prior to placement;
> 2.     The additional requirements of the plat require compaction results and grade certifications;
> 3.     The professional to be used by the homeowner/contractor should be identified, prior to the commencement of the fill and submit reports, as necessary, during the fill period;
> 4.     The drawing should be revised to show wetlands;
> 5.     The proposed 4-foot-high stone retaining wall requires clarification as to how it grades into the existing contours without impacting adjacent properties;
> 6.     Clarification is needed as to how discharge of water from bottom drain on wall will impact neighbors;
> 7.     Engineer is to provide several (3) cross sections through the final proposed plan as well as the details of the interconnection with existing grades on the adjacent property, with the collection of drainage runoff from the proposed slope to be clearly identified;
> 8.     The plan should not that the applicant bears responsibility for construction supervision.

In the email, Corless observed that "yesterday the erosion control details were not correctly or completely installed. The work on the site should be halted until the site is in compliance. I am requesting that you withhold any additional approvals on [the] project until the details [outlined above] have been clarified.  Please issue a stop order, until they are resolved."  (Ex. 31, Email Correspondence, Village_000448).

103.    On August 13, 2017, Celentano responded to Corless's April 9, 2017 email with another revised plan. Specifically, Celentano noted that (1) the top and bottom wall elevations were now provided; (2) the wetland area was shown; (3) the "daylight of wall shown away from neighbors"; (4) a note was added about certifications; and (5) three cross sections were provided. On August 14, 2017, Corless responded and asked Celentano to submit a D-sized drawing directly to the Village for review as the zip file did not print. (Ex. 31, Email Correspondence, Village_000448).

104.    On September 22, 2017, a permit was issued for the regrading of the backyard. (Ex. 2, S. Indig Dep. 28:16-25, 29:2-5; Ex. 32, Building Permit, Village_013288).

105.    During the course of the work, Mr. Indig decided to do what he wanted to do irrespective of the plans submitted to the Village. (Ex. 2, S. Indig Dep. 72:15-22, 66:11-18, 67:18-20 (Mr. Indig decided on his own that he did not have to comply with any approved plan from the Village)).

106.    On September 27, 2017, Zummo issued a stop work order for "failure to get an appropriate permit or that work was being performed not in accordance with plans." (Ex. 10, Zummo Dep. 215:17-25, 216:4-7; Ex. 2, S. Indig Dep. 132:4-8; Ex. 33, Stop Work Order, Village_004880-004881).

107.    The approved grading plan was for a tiered backyard with multiple tiers. However, the work being performed was for a straight out and straight down backyard, and an access road had been constructed. (Ex. 10, Zummo Dep. 216:8-14; Ex. 2, S. Indig Dep. 131:16-19).

108.    A temporary access road would not have been required if the Indigs followed the tiered plans submitted to the Village. (Ex. 10, Zummo Dep. 216: 24-25, 217:2-11).

109.    On October 25, 2017, Zummo issued an appearance ticket as on September 27, 2017 he observed over twelve trucks of soil being dumped and spread into the Indigs' yard in violation of the stop work order. (Ex. 34, Appearance Ticket, Village_006488). Then, on November 3, 2017, Zummo issued a second appearance ticket for violating the stop work order in that on October 24, 2017 he observed work being done in the yard. (Ex. 35, Appearance Ticket, Village_013422A).

110.    On or about December 12, 2017, the Indigs filed an application seeking review from the Zoning Board of Appeals (ZBA) with respect to the violations. In addition, they sought a special permit to finish grading in the backyard. (Ex. 36, ZBA Application, Village_006002-006023).

111.    In January 2018, Katherine Tolf issued multiple appearance tickets to the Indigs for failing to comply with the stop work order, based on her observing truckloads of soil being brought onto the Indigs' property. (Ex. 37, Appearance Tickets, Village_004884, Village_004891).

112.    On April 25, 2018, Vanderbeek emailed Mrs. Indig indicating that a review of plans dated June 9, 2016 and last revised in March 2018 revealed that the plans exceeded the steep slope requirements and, as such, would require the approval of the planning board for site plan approval. Vanderbeek also noted that the applicant needed to address previous engineering comments. (Ex. 38, Email Correspondence, Village_003037).

113.     On May 2, 2018, Vanderbeek emailed Mrs. Indig and reiterated that the Indigs needed to apply to the planning board to have the revised plans approved before the stop work order could be lifted. (Ex. 39, Email Correspondence, Village_003041).

114.     On May 18, 2018, Mrs. Indig submitted an application review form to the planning board with a letter from Celentano Engineering attached indicating that the Indigs were seeking to "backfill/grade partial backyard area on a 3/1 slope.". (Ex. 40, Planning Board Application, Village_009443-009456).

115.     On May 30, 2018, Vanderbeek sent a letter to the Indigs advising that the planning board application was incomplete, as landscape plans were missing. (Ex. 41, Village Letter, Village_009268).

116.     On June 5, 2018, Rockland County issued violations to Shining Star Landscaping, Inc. for violating Laws of Rockland County Sections 286-3 (working without a license) and 286-10(A)(6) (working during a stop work order) for work performed on the Indig property. (Ex. 42, Rockland County Violations, Village_003026-003029).

117.     On June 28, 2018, the ZBA issued its decision denying the Indigs' appeal of the appearance ticket, finding that the stop work order was properly issued because work was being performed on site that was not in compliance with the original plans and that the fill was delivered to the site after the stop work order was issued. (Ex. 43, ZBA Decision, Village_009224-009225).

118.     On August 1, 2018, the U.S. Army Corps of Engineers issued a Cease-and-Desist Order to the Indigs after a June 22, 2018 inspection was conducted by the Army Corps of Engineers due to fill material from the Indigs' property being discharged to a nearby waterway. (Ex. 44, Cease-and-Desist Order, Village_009038-009040; Ex. 10, Zummo Dep. 22:20-222:6 (backfilling the property was causing red clay to enter the watershed)).

119.     The Indigs contributed to the delays to the grading project, as there were several occasions throughout the project that the Village was waiting on documentation from either the Indigs or their engineer. (Ex. 2, S. Indig Dep. 149:2-19).

120.     After December 2017, before any new site plan was approved, the Indigs resumed the work in their backyard. (Ex. 2, S. Indig Dep.  59:2-16, 62:13-63:7).

121.     The Indigs completed the work to their backyard in the Spring of 2021 and it became usable in May or June of 2021. (Ex. 2, S. Indig Dep. 58:19, 25; 117:18-22).

122.     The Indigs did not end up using a tiered grading system for their property. (Ex. 2, S. Indig Dep. 65:11-14).

123.     Mr. Indig testified that the work completed in the Indigs' backyard does not comply with any plan approved by the Village. (Ex. 2, S. Indig Dep. 66:11-15). Mr. Indig decided on his own that he did not have to comply with any approved plan from the Village. (Ex. 2, S. Indig Dep. 66:16-67:20).

124.     Mr. Indig did not overhear any conversations between Yagel, Harris, Ulman, and/or Zummo talking about his grading work or grading operation. (Ex. 2, S. Indig Dep. 85:11-16).

125.     Mr. Indig is not claiming that his house is worth less money because of the Village's alleged actions. (Ex. 2, S. Indig Dep. 164:23-165:2-3).

126.     Mr. Indig never sought psychological help or assistance with respect to his dealings with the Village. (Ex. 2, S. Indig Dep. 165:14-19). He never took any psychological medications or psychiatric medications. (Ex. 2, S. Indig Dep. 165:23-166:2).

127.     Mrs. Indig never sought treatment with a mental health professional for the alleged stress caused by the grading situation in her backyard. (Ex. 3, L. Indig Dep. 91:21-24).

## V.    68 HALLEY DRIVE – MEIR KAHANA'S PROPERTY

128.    Mr. Kahana purchased his home located at 68 Halley Drive, Pomona, New York in 2016. (Ex. 4, Kahana Dep. 9:9-18, 9:24-10:3).

129.    A fatal drowning involving a child occurred in the Village on July 18, 2017. (Ex. 4, Kahana Dep. 90:5-93:15; Ex. 45, Kahana Dep. Exhibit 11).

130.    In or about July 2017, Zummo received a message from Leon Harris regarding a swimming pool on the driveway of a house at 68 Halley Drive asking if it was legal. (Ex. 10, Zummo Dep. 222:7-22).

131.    On or about July 28, 2017, Zummo stopped at the property and measured the height of the pool and removed a ladder from the pool. (Ex. 10, Zummo Dep. 222:24-223:4; Ex. 46, Appearance Tickets, Village_006501). Zummo left his business card at the front door of the house with a note asking the owner of the house to call him related to the pool (Ex. 10, Zummo Dep. 223:4-10). Zummo did not know the homeowner of the property at that time. (Ex. 10, Zummo Dep. 223:11-15). The homeowner did not contact Zummo in response to the note. (Ex. 10, Zummo Dep. 223:16-22).

132.    On August 2, 2017, Zummo issued two appearance tickets to Mr. Kahana for violations observed on July 28, 2017: one violation was for an above ground pool on the driveway and the second violation was for a ladder being in the pool and the pool being unfenced. (Ex. 10, Zummo Dep. 223:24-25, 224:2-4; Ex. 4, Kahana Dep. 20:18-25, 21:4, 10-13, 33:9-16, 34:24-25; Ex. 46, Appearance Tickets and Photos of Pool, Village_006501, Village_016378-013679 (also marked as Exhibit 10 at Kahana's deposition)).

133.    Mr. Kahana never contacted anyone from the Village regarding the pool in his driveway prior to receiving the appearance ticket. (Ex. 4, Kahana Dep. 89:23-25; 90:2-4).

134.    The pool that Mr. Kahana was ticketed for was visible from the street adjacent to his driveway. (Ex. 4, Kahana Dep. 40:10-14).

135.    The pool did not have a fence around it. (Ex. 4, Kahana Dep. 50:15-18).

136.    Mr. Kahana does not know of anyone else in the Village who had a pool on their driveway. (Ex. 4, Kahana Dep. 51:11-14).

137.    Mr. Kahana never saw nor learned of a text from someone in the Village demanding that Mr. Kahana be given a ticket or violation. (Ex. 4, Kahana Dep. 50:22-51:6).

138.    Mr. Kahana pled guilty to having an unfenced pool and was issued a $200 fine, which he paid. (Ex. 4, Kahana Dep. 46:22-25; 47:2-7; 53:16-18).

139.    Mr. Kahana testified that he received a written warning from the Village, not a violation or ticket, for dog waste on his property. He did not need to pay a fine related to the same. (Ex. 4, Kahana Dep. 23:15-22). After that one warning, he never received any other warning or ticket related to dog waste. (Ex. 4, Kahana Dep. 52:23-4).

140.    Mr. Kahana did not seek any psychological counseling and did not feel like he needed any counseling as a result of getting the pool ticket. (Ex. 4, Kahana Dep. 65:13-21).

## VI.    63 HALLEY DRIVE, POMONA – THE KLEINS' PROPERTY

141.    Naftali Klein, Robert Klein's father, purchased the house at 63 Halley Drive, Pomona, New York in 2015. (Ex. 5, R. Klein 11/22/2022 Dep. 35:16-20). Naftali Klein holds title to the house. (Ex. 8, N. Klein Dep. 29:21-25, 30:2, 24-25).

142.    Robert Klein ("Mr. Klein") lives at the property with his wife and child. (Ex. 5, R. Klein 11/22/2022 Dep. 18-25, P43:2-4; Ex. 8, N. Klein Dep. 43:2-5).

143.    In 2016, Mr. Klein embarked on a project to lift and expand the house located at 63 Halley Drive. (Ex. 5, R. Klein 11/22/2022 Dep. 278:4-18). Specifically, he wanted to lift the house

onto temporary supports, enlarge the area of crawlspace into a usable area below ground, and build a new permanent foundation. (Ex. 5, R. Klein 11/22/2022 Dep. 40:11-25).

144.    On June 20, 2016, a Regional Architect with the New York State Department of State Division of Building Standards and Codes, sent an email to Mr. Klein's architect, Eric Osborn. Zummo was copied on the email. In the email, the State explained that New York State Residential Code Section J802.3, Automatic Sprinkler Systems provides that, "Whenever a vertical addition is made to a building to create a third story above grade, or when the floor area of a legally existing third story is increased more than 10 percent, the building shall be equipped throughout with an automatic sprinkler system installed in accordance with NFPA 13D." The State employee further explained that "There are no-half stories in building code; if that bottom level has become a STORY ABOVE GRADE, then you have to comply with J802.3. It's all about the math…maybe you can manipulate the final grade." (Ex. 47, Email Correspondence, PLTF_0001974; Ex. 48, NYS Residential Code, J802.3; Ex. 49, ZBA Minutes 7/27/2016, Village_014368A (minutes show that Klein was aware of NYS Regional Architect Krieger's opinion)).

145.    Mr. Klein submitted an application for an interpretation of the Village Zoning Law and New York State Fire Prevention and Building Code relating to sprinkler systems in single family residences. (Ex. 49, ZBA Minutes 7/27/2016, Village_014364A-014369A). A ZBA hearing was held on the application on July 27, 2016. At the hearing, Mr. Klein stated that he was looking to raise his house by a few feet in order to enlarge his basement. (Ex. 49, ZBA Minutes 7/27/2016, Village_014365A). Mr. Klein also stated that the garage was not being raised and that he wanted to save the existing garage walls. (Ex. 49, ZBA Minutes 7/27/2016, Village_014366A). At the hearing, Ulman explained that there was a question of whether the lower level of the house, as

raised, would be a story or floor based on the existing grade. (Ex. 49, ZBA Minutes 7/27/2016, Village_014366A). Mr. Klein's architect, Eric Osborne, stated that, based on the existing grade, raising the house would create an additional story. (Ex. 49, ZBA Minutes 7/27/2016, Village_014366A). Mr. Klein asserted that installing a sprinkler system would cost $40,000 and would be a hardship. (Ex. 49, ZBA Minutes 7/27/2016, Village_014367A). The ZBA did not reach a determination on Mr. Klein's application, as two board members wanted a professional evaluation before making a determination. (Ex. 49, ZBA Minutes 7/27/2016, Village_014369A). Accordingly, the application was adjourned until the next meeting on August 17, 2016. (Ex. 49, ZBA Minutes 7/27/2016, Village_14368A).

146.    After the July 2016 ZBA meeting, Mr. Klein did not receive a ruling from the ZBA because he effectively withdrew his application for an interpretation, telling the ZBA that he would go about his construction in a different manner that did not require sprinkler installation. (Ex. 50, ZBA Minutes 5/23/2018, Village_018722-018723 (Appel noted at May 23, 2018 ZBA meeting that Klein had come before ZBA two years earlier, but withdrew the application without ZBA approval and told the ZBA he was going to do something else, i.e. "walked out saying he was going to do it another way")).

147.    On or about November 4, 2016, Naftali Klein submitted an application for a building permit for an addition to the house at 63 Halley Drive. (Ex. 51, Building Permit Application, PLTF_0002187-0002188). No site plans were submitted in conjunction with the permit application. (Ex. 10, Zummo Dep. 165:25-166:23).

148.    On December 19, 2016, Zummo issued a permit to Mr. Klein to lift the house and replace the foundation to close the newly raised portion. (Ex. 10, Zummo Dep. 166:14-23, 185:10-186:6); Ex. 5, R. Klein 11/22/2022 278:4-18; Ex. 52, 12/19/2016 Permit, Village_013270 (marked

as Exhibit 10 at Mr. Klein's deposition)). The permit did not approve construction of a third floor. (Ex. 10, Zummo Dep. 166:24-25, 167:2-4).

149.    Mr. Klein's house was lifted by contractor Wolfe House Moving in April of 2017 and remained lifted for over two months. (Ex. 5, R. Klein 11/22/2022 Dep. 284:20-285:8; Ex. 6, R. Klein 11/28/2022 Dep. 155:23-156:6; Ex. 7, R. Klein 3/20/2023 Dep. 8:19-21, 824-25). Mr. Klein scheduled Wolfe House Moving to return on July 5, 2017 to lower the house. (Ex. 5, R. Klein 11/22/2022 Dep. 285:15-286:4). Mr. Klein had to book the July 5, 2017 return date well in advance. (Ex. 5, R. Klein 11/22/2022 Dep. 285:21-286:4).

150.    During the course of lifting the house, the contractor damaged a wall of the garage. (Ex. 6, R. Klein 11/28/2022 Dep. 156:7-13). Mr. Klein then decided to remove the entire garage. (Ex. 6, R. Klein 11/28/2022 Dep. 156:3-158:11). Removing the garage was recommended by the contractor that lifted the house. (Ex. 6, R. Klein 11/28/2022 Dep. 156:21-158:11).

151.    Mr. Klein testified that while the house was lifted, some water leaked into the basement from the side of the house that was exposed. (Ex. 7, R. Klein 3/20/2023 Dep. 9:12-15). Mr. Klein did not put tarps or plywood around the house to prevent water from getting into the basement while it was lifted. (Ex. 7, R. Klein 3/20/2023 Dep. 12:13-20). Mr. Klein does not remember what contents, if any, were damaged in the basement while the house was lifted. (Ex. 7, R. Klein 3/20/2023 Dep. 9:21-10:1).

152.    On June 14, 2017, defendant Zummo performed a building inspection at 63 Halley Drive, at which time he disapproved the work because Mr. Klein did more than just raise the house. Specifically, Mr. Klein extended the front of the house and took the entire garage out, work that was not contemplated by the approved permit. (Ex. 53, Building Inspection, Village_009485; Ex.

10, Zummo Dep. 169:12-170:6 (issued first stop work order because enlargement of the garage deviated from the plans)).

153.    On June 30, 2017, Zummo issued a stop work order, which provided:

> PLEASE TAKE NOTICE that there exists a violation of Section 130-22J of the Village of Pomona Code on June 30th at the above location in that current plans and specifications supplied with the permit are incorrect or have been changed. Please stop all work until new plans are submitted and reviewed by the building department.

(Ex. 54, First Stop Work Order, Village_002053).

154.    Zummo did not have any communication with Yagel prior to issuing the first Stop Work Order. (Ex. 10, Zummo Dep. 168:15-23).

155.    The stop work order provided that work could continue on July 28, 2017, thereby giving Mr. Klein one month to supply the information and documentation for the changes that needed to be made. (Ex. 54, First Stop Work Order, Village_002053; Ex. 10, Zummo Dep. 174:11-14).

156.    After issuing the stop work order, Zummo lifted the stop work order on an emergency basis to allow Mr. Klein to lower the house. (Ex. 10, Zummo Dep. 175:3-20 (Zummo "took the Stop Work Order off so he could relower the house")).

157.    The contractor, Wolfe House Moving, lowered the house as previously scheduled on July 5, 2017, which was shortly after the stop work order was issued. (Ex. 6, R. Klein 11/28/2022 Dep. 155:23-156:6).

158.    After the house was lowered, in early August 2017, Zummo conducted footing and foundation inspections at 63 Halley Drive. (Ex. 10, Zummo Dep. 175:21-176:9; Ex. 55, Building Inspections, PLTF_0002022-0002024). During the inspection, Zummo reviewed plans on site

which, to Zummo's knowledge, were not on file with the Village. (Ex. 50, ZBA Minutes 5/23/2018, Village_018278).

159.    During the inspections in August 2017, Mr. Klein did not discuss revised plans with Zummo, nor had he started framing the third floor of the house. (Ex. 6, R. Klein 11/28/2022 Dep. 162:13-164:7).

160.    On September 13, 2017, Zummo spoke with Mr. Klein via phone regarding the project. Mr. Klein was instructed to provide the Village with updated insurance information. (Ex. 56, Correspondence, PLTF_0001958-0001959).

161.    On September 18, 2017, Mr. Klein applied for a fence permit. A neighbor obtained an injunction against the fence, which was not discontinued until October 30, 2017. The fence permit was issued on December 18, 2017. (Ex. 57, Correspondence from Zummo to Mr. Klein, Village_000682; Ex. 58, Fence Permit, Village_009056).

162.    On October 3, 2017, Zummo wrote to Mr. Klein and advised that in reviewing the permit issued on December 13, 2016, it was discovered that several required items were missing from Mr. Klein's file including letters from the counties, water and sewer districts related to disconnecting and reconnecting gas, electric, water, and sewer, as well as certificates of insurance from the contractors being used. (Ex. 56, Correspondence, PLTF_0002128-0002129).

163.    On October 6, 2017, Zummo drove by 63 Halley Drive and observed, for the first time, the construction of a third floor, which was visible from the road. (Ex. 10, Zummo Dep. 167:5-12; Ex. 50, ZBA Minutes 5/23/2018, Village_018730)). No one prompted Zummo to drive by 63 Halley Drive that day. (Ex. 10, Zummo Dep. 167:17-22).

164.    Zummo issued a second stop work order on October 6, 2017 based on his observation of construction of a third floor, which was not part of the approved permit. (Ex. 10, Zummo Dep. 167:5-10, 167:23-168:5; Ex. 59, Second Stop Work Order, Village_008910).

165.    Zummo did not have any conversation with Yagel regarding the basis for the second Stop Work Order. (Ex. 10, Zummo Dep. 178:18-21).

166.    Zummo was not aware of any plans regarding 63 Halley being submitted to the Village between the issuance of the June 2017 Stop Work Order and the October 2017 Stop Work Order. (Ex. 10, Zummo Dep. 176:10-23). After the October 2017 Stop Work Order, Mr. Klein submitted building plans to the Village which showed a three-story building but did not provide for a fire sprinkler system as required by New York State building code. (Ex. 50, ZBA Minutes, Village_018728; Ex. 22, Coleman Affidavit, ¶ 9).

167.    On or about November 3, 2017, Mr. Klein attended a meeting with Corless, Zummo, Vanderbeek, and Ulman to discuss what steps needed to be taken to resolve the October 2017 Stop Work Order. (Ex. 60, Audio Recording, Zummo 00002; Ex. 61, Correspondence from Ulman to Mr. Klein, PLTF_0002087 at ¶1). This included a discussion of regrading the property such that the lowest floor would be below grade to avoid the requirement that a three-story building be equipped with fire sprinklers. (Ex. 60, Audio Recording, Zummo 00002 at 47:10-47:50, 48:30-50:45, 57:50-58:27).

168.    Ulman explained that the Building Inspector is mandated to require compliance with the state code and that if Mr. Klein disagreed with the interpretation of the state code, the appropriate place to go is the State Code council. (Ex. 60, Audio Recording, Zummo 00002 at 36:22-38:52).

169.    At the November 3, 2017 meeting, Corless and Zummo both told Mr. Klein they would grant him emergency permission to close his house. (Ex. 60, Audio Recording, Zummo 00002 at 35:35-35:49, 1:00:35-1:01:03; Ex. 7, R. Klein 3/20/2023 Dep. 19:25-20:6 (acknowledging he was informed he could cover his house)).

170.    Specifically, at the November 3, 2017 meeting, Zummo noted that he had informed Mr. Klein during their prior meeting that Mr. Klein was permitted to take whatever steps he thought were necessary to close the property. (Ex. 60, Audio Recording, Zummo 00002 at 1:00:35-1:01:03). Mr. Klein stated he wanted the Village to pay to encapsulate his house. Corless explained that the Village could not pay for construction on private property, but told Mr. Klein:

> If you needed some sort of extra permission, we are willing to go to bat for you, but we can't spend Village money on personal property. You are welcome to sue the village, that you are entitled to do, but if you want permission to encapsulate, we can give you that.  I can give you a number of contractors that do that.  I can give you a list if you'd like.  You pay, it'll be water tight, rodent-proof and. … Holt construction very large contractor.  They can make your building water tight.

(Ex. 60, Audio Recording, Zummo 00002 at 1:00:48-1:04:04). Corless also stated that the contractor Hershkowitz would be capable of performing the work. (Ex. 60, Audio Recording, Zummo 00002 at 1:04:20-1:04:30).

171.    At the first meeting following the issuance of the October 2017 Stop Work Order, Mr. Klein agreed to raise the grade and do everything he needed to do to ensure he would not need to install fire sprinklers. (Ex. 6, R. Klein 11/28/2022 Dep. 24:13-25, 26:17-25, 27:2-9).

172.    At some point thereafter, Mr. Klein marked a line on the house showing the height to which he would re-grade. The line was covering windows of the first floor. (Ex. 62, Photographs from 2020 Inspection; Ex. 10, Zummo Dep. 181:8-18).

173.    On November 20, 2017, before the issues identified by the October 2017 Stop Work Order had been resolved, Zummo observed work being conducted at 63 Halley Drive in violation of the Stop Work Order. Accordingly, an appearance ticket was issued to Naftali Klein. (Ex. 63, Appearance Ticket, PLTF_0002013).

174.    On November 20, 2017, by and through his attorney, the Law Offices of Menashe & Associates, Mr. Klein submitted updated plot plans dated November 10, 2017, as well as an application for a permit to grade the property in accordance with the plot plan. (Ex. 64, Correspondence, Village_008996-008998). Zummo's duties do not include review of grading permits; rather, grading permits are only issued by the Building Inspector after review and approval by the Village Engineer. (Ex. 10, Zummo Dep. 183:2-21).

175.    On November 28, 2017, Corless emailed Tony Celentano, Mr. Klein's engineer, advising of certain deficiencies related to the proposed fill drawing dated November 10, 2017. (Ex. 65, Email from Corless to Celentano, Village_000492-000493 (also marked as Exhibit 1 at Corless's deposition)). Specifically, the proposed fill drawing lacked a number of details to comply with Village site plan standards and, as such, was incomplete. (Ex. 14, Corless Dep. 28:25-29:9, 30:2-12). Corless also sent a memo to Zummo, which Celentano was copied on, dated November 28, 2017, outlining the deficiencies with the November 19, 2017 drawings. (Ex. 66, Memo, Village_009015). Corless requested clarification. (Ex. 65, Email from Corless to Celentano, Village_000492-000493 (also marked as Exhibit 1 at Corless's deposition)).

176.    On December 13, 2017, Ulman wrote to Mr. Menashe in response to the November 20, 2017 email. In the letter, Ulman indicated that the delay in responding was due to the Village waiting on a response from Celentano to Corless's November 28, 2017 email. Ulman reiterated that there were several deficiencies with the plans submitted on November 20, 2017. She noted

that the plans also omitted revisions made on May 18, 20017 and August 29, 2017. (Ex. 67, Correspondence, PLTF_0002079-0002080).

177.    On December 11, 2017, Mr. Klein submitted an appeal of the October 6, 2017 Stop Work Order to the Village Zoning Board of Appeals. (Ex. 68, Appeal to ZBA, PLTF_0001976-0001987). The appeal stated that the applicant was not seeking a variance. (Ex. 68, Appeal to ZBA, PLTF_0001983).

178.    On December 13, 2017, Ulman wrote to Mr. Klein, noting that his ZBA application was incomplete and identified the additional materials to be submitted. (Ex. 69, Correspondence, PLTF_0002017).

179.    On February 2, 2018, Ulman wrote to Mr. Klein explaining the issues with the plans submitted by Mr. Klein's engineer (Celentano) and architect (Osborne), noting that the architectural plans contained numerous revision dates, and that the Village was awaiting an explanation from the architect. (Ex. 61, Correspondence, PLTF_0002087-0002088).

180.    On February 26, 2018, a hearing was scheduled in the Justice Court in the Town of Haverstraw on the violations issued by Katherine Tolf to Naftali Klein for working through the October 2017 Stop Work Order. (Ex. 70, Appearance Tickets, Village_008891-008894).

181.    The Board of Appeals scheduled a hearing on the application for February 28, 2018, but Mr. Klein requested, three different times, that his appeal be rescheduled to the next month's meeting. (Ex. 71, Adjournment Requests, PLTF_0002158, Village_003464-03465, Village_006132). The appeal was heard at a ZBA hearing on May 23, 2018 and continued on June 27, 2018. (Ex. 50, ZBA Minutes 5/23/2018, Village_018733; Ex. 72, ZBA Minutes 6/27/2018, Village_006136-006138).

182.     At the May 23, 2018 hearing, Zummo agreed that Mr. Klein could resolve the issue with his property by either (1) installing a fire-sprinkler system, or (2) obtaining approval of a grading plan from the Village Engineer to backfill the property so that it was no longer three floors above-grade. (Ex. 50, ZBA Minutes 5/23/2018, Village_018714). During the May 23, 2018 ZBA hearing, Mr. Klein conceded that he had never obtained a set of stamped building plans from the Village indicating that his plans were approved. (Ex. 50, ZBA Minutes 5/23/2018, Village_018728).

183.     Mr. Klein's appeal was also discussed at the June 27, 2018 ZBA meeting. Zummo was not in attendance at the June 27, 2018 meeting. Chris Riley, Esq., Special Counsel for Prosecutions for the Village attended the meeting and discussed the timeliness of the Kleins' appeal with the ZBA. Mr. Riley opined that the appeal was taken more than 60 days after the Stop Work Order was issued and could not be appealed. (Ex. 72, ZBA Minutes 6/27/2018, Village_006136-006138).

184.     On July 18, 2018, the ZBA issued a resolution regarding Mr. Klein's appeal, finding that the appeal was not timely and dismissing the appeal. (Ex. 73, ZBA Resolution, Village_009010-009011).

185.     A Pomona Planning Board Site Plan Check list dated May 21, 2018 indicates that the site plan was missing certain information. Specifically, the proposed grading around the residence was not clear. The plan lacked elevations for the basement and first floor and failed to address drainage concerns. In an email dated that same day from Corless to Zummo, Corless noted that "there are a number of items to be completed by this design professional to furnish a completed site plan" and identified various items. Corless's email also noted that the plans called for removal of several trees, which would require planning board approval. Corless enclosed his prior review

of the plans as it appeared that the previous outstanding items he identified remained open issues. (Ex. 74, Email with Site Plan Check List, Village_000643-000645).

186.    These Planning Board Site Plan Check Lists were not completed for every application; only when the Village was having difficulty communicating with the applicant or the applicant's hired professional as to what was required. (Ex. 14, Corless Dep. 75:8-18).

187.    On June 19, 2018, Mr. Klein submitted an application for a tree permit. On June 22, 2018, the permit application was denied because it contained inconsistent and incomplete information. (Ex. 57, Email from Zummo to Klein, Village_000682 (e.g., the permit requested removal of three trees, but the contractor's paperwork indicated four trees)).

188.    In July 2018, Mr. Klein sent Zummo an email inquiring as to the status of an application for a tree permit, a fence permit, and "plans." (Ex. 57, Email from Zummo to Klein, Village_000682-000683).

189.    On July 25, 2018, Zummo emailed Mr. Klein with a detailed response. Zummo explained that Mr. Klein's request for an extension of his 2016 building permit was not approved due to the October 2017 Stop Work Order and Mr. Klein's failure to submit drawings which resolved the need for a sprinkler system. Zummo noted that while Mr. Klein had submitted site plan drawings to the Village Engineer, the Village Engineer had identified a number of deficiencies, which Mr. Klein had not resolved. (Ex. 57, Email from Zummo to Klein, Village_000682-000683).

190.    On or about September 20, 2018, Mr. Klein submitted an appeal to the ZBA and architectural board regarding the denial of his request to extend his 2016 permit. The project listed was to "extend a single-family home with a basement first floor and second floor grading with retaining walls to be done in order for the basement to comply with Village and New York State

codes as a basement and not count as a story above grade." An emergency permit was requested to finish the house. (Ex. 75, ZBA Application, Village_002023-002038).

191.    In November 2018, in the Justice Court, Naftali Klein filed a motion to dismiss the criminal proceedings against him arising from the January 2018 violations of the Stop Work Order issued by Katherine Tolf. (Ex. 76, Motion to Dismiss). The motion was denied on January 3, 2018. (Ex. 77, Decision and Order).

192.    A non-jury trial was held on January 7 and 9, 2019, in the Justice Court on, *inter alia*, the Information charging that Naftali Klein had violated the October 2017 Stop Work Order in January 2018. In a Decision and Verdict dated March 29, 2019, the Justice Court found Naftali Klein guilty of violating Village Code § 130-22 on multiple dates in January 2018 when he "permitted or allowed numerous individuals to work on the roof of the subject premises in violation of a duly issue[d] posted Stop Work Order without a permit and by continuing to work on the aforementioned premises." (Ex. 78, Decision and Verdict).

193.    Naftali Klein filed an appeal from the Decision and Verdict. (Ex. 79, 5/29/2019 Notice of Appeal). The appeal was dismissed on September 16, 2019. (Ex. 80, Order of Dismissal).

194.    Klein obtained multiple architectural plans during the course of his project, including plans dated September 22, 2016; July 3, 2017; October 13, 2017; and October 24, 2017. (Ex. 81, Plans, Village_21014-21033).

195.    Plans prepared by Mr. Klein's architect and dated September 22, 2016 show the house being raised by 4' 10''. (Ex. 81, Plans, Village_21014-21018; Ex. 22, Coleman Aff. ¶ 5; Ex. U, Coleman Dep. 71:4-9). The September 22, 2016 plans do not show removal and expansion of the garage. (Ex. 81, Plans, Village_21014-21018; Ex. 22, Coleman Aff. ¶ 5). The 2016 plans do

not show three floors above grade. (Ex. 81, Plans, Village_21014-21018; Ex. 22, Coleman Aff. ¶ 5).

196.    The 2017 architectural plans show three floors above grade, which would necessitate the installation of automatic sprinklers under the NY State Building Code. (Ex. 81, Plans, Village_21019-21033; Ex. 22, Coleman Aff. ¶ 9).

197.    The first set of plans to demonstrate only two floors above-grade and, thus, obviate the need for sprinklers, were dated August 14, 2019. (Ex. 82, 2019 Plan, Village_020146; Ex. 21, Coleman Dep. 51:24-52:3, 71:13-19).

198.    On June 21, 2019, Spence emailed Mr. Celentano based on his initial review of the site plan a list of comments with things that needed to be completed in order for Spence to approve the site plan. (Ex. 18, Spence Dep. 48:20-49:5, Ex. 83, Email from Spence to Celentano, Village_012602-012603 (also marked as Exhibit 3 at Spence deposition)).

199.    On August 16, 2019, Spence conditionally approved Klein's application for site plan approval, meaning it was approved but certain conditions needed to be complied with during the construction. (Ex. 18, Spence Dep. 50:19-51:2, Ex. 84, Conditional Approval, Banks000157 (also marked as Exhibit 4 at Spence deposition).

200.    On September 27, 2019, Zummo sent a letter to Naftali Klein regarding an application for a building permit to "finish/renovate home as framed." In the letter, Zummo explained that the requested building permit could not be issued at the time as the plans did not resolve the issue of having three-floors above grade with no sprinkler system, based on Zummo's understanding of the grade of the property and Code Sections 502.1 Grade Plan and Code 404.1.5 Height Above Finished Grade. Zummo stated, "There are multiple methods available to remedy this situation, [1] closing some of the walk outs and or removing window wells, which will increase

the area at the higher grade[,] [2] "Installing a NFPA sprinkler system in the entire house[,] or [3] seeking a variance from the state for the codes mentioned above." (Ex. 85, Banks 001108-001109).

201.    In 2020, Naftali Klein submitted a petition to the NYS Uniform Fire Prevention and Building Code Board of Review "for relief related to the New York State Uniform Fire Prevention and Building Code"; in essence, a variance from the sprinkler requirement. On March 20, 2020, a hearing was held on the petition. (Ex. 86, Notice of Hearing, Village_021009).

202.    The Village did not receive notice of the New York State Department of State hearing on Naftali Klein's application until March 11, 2020, and Zummo did not receive notice of it until March 13, 2020, after the hearing and, thus, had no opportunity to attend the hearing. (Ex. 86, Notice of Hearing, Village_021005-021009; Ex. 10, Zummo Dep. 188:2-12).

203.    On April 14, 2020, the New York Department of State, Hudson Valley Board of Review issued a decision based on a site development plan dated August 14, 2019, holding that Code Section R404.1.6 was not applicable such that sprinklers were not required. (Ex. 87, NY State Board Decision, Village_015184-015185).

204.    The Village received a copy of the State Board decision on May 8, 2020. (Ex. 87, NY State Board Decision, Village_015184-015185).

205.    Upon receipt of the decision, the Village could have challenged the decision by bringing an Article 78 proceeding within four months of the decision. CPLR 217. Ultimately, the Village did not appeal the State Board decision.

206.    On April 24, 2020, grading and fill work was conditionally approved by Village Engineering Consultant Martin E. Spence. (Ex. 88, Conditional Approval, Banks001111).

207.    On May 29, 2020, Zummo issued a grading/fill building permit. (Ex. 89, Building Permit, PLTF_0002292).

208.    On June 12, 2020, Zummo issued a building permit for the "completion of addition/renovation of a single-family house." The permit provides that "Finished house will include – 3 Car Garage, unfinished basement, 2 kitchens, playroom, 6 bedrooms, 3 bathrooms, study, cupola. Owner received variance from the state not to install sprinkler system. All work performed during the Stop Work Order must be inspected prior to continuing construction." (Ex. 90, Building Permit, Village_020995-020996).

209.    On November 5, 2020, Zummo conducted an inspection at 63 Halley Drive and, thereafter, lifted the stop work order from October 2017, although certain items were designated as needing remediation. (Ex. 91, Inspection Report, Village_012918-012920).

210.    Zummo reinspected the frame on April 13, 2021 and approved the work. (Ex. 92, Inspection Report, Village_013005).

211.    Mr. Klein testified that while he purchased tarps at Home Depot, he could not recall if he, day laborers, handymen, or the framers put up the tarps. (Ex. 7, R. Klein 3/20/2023 Dep. 20:16-23; 22:11-16). Mr. Klein testified that the tarps that were put up repeatedly came down due to the wind. (Ex. 7, R. Klein 3/20/2023 Dep. 11:3-10).

212.    Mr. Klein testified that he purchased traps after raccoons were found entering the house, but does not think he has receipts for the same. (Ex. 7, R. Klein 3/20/2023 Dep. 29:4-23).

213.    Mr. Klein testified that he, on his own, pumped out water that flooded into the basement. (Ex. 7, R. Klein 3/20/2023 Dep. 30:7-11, 30:15-17).

214.    Mr. Klein intended to put a new staircase in the house regardless of any damage sustained to the staircase. (Ex. 7, R. Klein 3/20/2023 Dep. 34:3-8).

215.    Mr. Klein claims that he has sustained damages due to exposure, but he could not provide any information regarding the amounts he allegedly spent on allegedly damaged items.

For example, Mr. Klein did not know how much it cost to replace the beams in the basement. (Ex. 7, R. Klein 3/20/2023 Dep. 32:12-16), to repair the bathroom upstairs (Ex. 7, R. Klein 3/20/2023 Dep. 36:25-37:3), to replace wood and beams on the top floor (Ex. 7, R. Klein 3/20/2023 Dep. 38:6-10, 38:15-18), to replace plywood, sheetrock, and drywall in the dining room (Ex. 7, R. Klein 3/20/2023 Dep. 44:10-25, 45:3-6), to replace sheetrock in the ceiling of the upstairs bedroom if it had to be replaced (Ex. 7, R. Klein 3/20/2023 Dep. 46:18-47:1, 47:5-10), or to replace the insulation in the entire house. (Ex. 7, R. Klein 3/20/2023 Dep. 91:13-25).

216.    Mr. Klein did not know how much the dining room set that was allegedly damaged cost and he has not yet replaced it. (Ex. 7, R. Klein 3/20/2023 Dep. 53:5-7; 53:12-18). Similarly, he could not estimate the cost of personal items damaged in closets. (Ex. 7, R. Klein 3/20/2023 Dep. 108:23-109:6).

217.    With respect to allegedly damaged electrical equipment, he did not know what work was done to repair certain wiring versus work that was going to be done regardless. (Ex. 7, R. Klein 3/20/2023 Dep. 94:20-25, 95:7-16).

218.    Mr. Klein does not know the breakdown in terms of how much he spent to make certain repairs related to alleged damage sustained by exposure to the elements. (Ex. 7, R. Klein 3/20/2023 Dep. 37:4-19).

219.    Mr. Klein has not been prevented from working on his property for any reason relating to the Village since 2020. (Ex. 5, R. Klein 11/22/2022 Dep. 242:5-9).

220.    Zummo has received new or renewed applications from Mr. Klein for permits for his home. Upon reviewing those applications, he issued permits. (Ex. 10, Zummo Dep. 190:8-15).

221.    Mr. Klein has no evidence that Banks directed Zummo to discriminate against Orthodox Jews. (Ex. 6, R. Klein 11/28/2022 Dep. 248:15-21).

222.    Mr. Klein testified that the only actions Banks took in directing Zummo and blocking Mr. Klein's construction was retaining Zummo. (Ex. F, R. Klein 11/28/2022 Dep. 151:2-8, 22-25, 152:2-8).

223.    Mr. Klein could not think of anything that Banks did to block his construction. (Ex. 6, R. Klein 11/28/2022 Dep. 153:2-5).

224.    Mr. Klein submitted an expert report from Barrett Richards, in which Mr. Richards opined that, assuming Mr. Klein's home incurred damage from exposure to the elements, the damage was $300,000. (Ex. 23, Richards Dep. 48:5-8, 63:9-64:10 (Mr. Richards was asked by Mr. Klein "to assume that there were damages due to the project not being enclosed for an extended period of time.")).

225.    Mr. Richards was not informed by Mr. Klein that the Village agreed to lift the second Stop Work Order to permit Mr. Klein to encapsulate the home with temporary protection. (Ex. 23, Richards Dep. 96:9-97:9).

226.    Mr. Richards opined that, temporary protection of construction, "if it's properly installed and maintained, it does serve to mitigate against potential damage." (Ex. 23, Richards Dep. 97:24-98:9).

227.    Mr. Richards did not opine as to the propriety of the Stop Work Orders. (Ex. 23, Richards Dep. 49:12-18, 107:21-23).

228.    Naftali Klein does not claim economic damages. (Ex. 8, N. Klein Dep. 79:5-9).

VII.    **ALLEGED ANTISEMITISM IN THE VILLAGE**

229.    Yagel never directed Zummo to look into homes at which Orthodox Jewish religious services were being held. (Ex. 10, Zummo Dep. 67:13-20).

230.    There is an eruv in the Village. Zummo is not aware of any complaints regarding the eruv. (Ex. 10, Zummo Dep. 136:25-137:18).

231.    Zummo never received any complaints regarding mikvahs, but issued permits for multiple mikvahs over the years. (Ex. 10, Zummo Dep. 138:2-8).

232.    The only discussions he had about Orthodox Jews with the mayor involved services that would be required to help the community integrate, such as moving the program that they had at the Cultural Center to a different day so more people could participate and some of the infrastructure that's required including adding additional garbage days, adding dumpsters for certain holidays, parks and playgrounds. (Ex. 10, Zummo Dep. 13:16-25, 194:2-10).

233.    Mr. Indig did not recall a non-Jewish person telling him that the building inspector or people in the building department were reasonable and/or accommodating. (Ex. 2, S. Indig Dep. 83: 18-25).

234.    Zummo never said anything in Mr. Indig's presence which Mr. Indig considered to be antisemitic. (Ex. 2, S. Indig Dep. 133:7-12).

235.    Zummo never made any statements derogatory of religion in Mr. Klein's presence. (Ex. 6, R. Klein 11/28/2022 Dep. 166:25-167:5).

236.    Mr. Indig never heard any Village official ever say anything that he would consider to be antisemitic. (Ex. 2, S. Indig Dep. 133:13-17).

237.    Mrs. Indig never heard anyone from the Village say anything antisemitic. (Ex. 3, L. Indig Dep. 90:7-12).

238.    Mrs. Indig never overheard anyone from the Village say anything antisemitic to someone else in her presence. (Ex. 3, L. Indig Dep. 90:13-18).

239.    During Mrs. Indig's conversations with Zummo, he never made an antisemitic remark. (Ex. 3, L. Indig Dep. 127:22-25, 128:2).

240.    Mr. Kahana never heard anyone in the Village say something he considered to be antisemitic. (Ex. 4, Kahana Dep. 82:18-21).

241.    Zummo has never made any derogatory comments about the Jewish religion. (Ex. 10, Zummo Dep. 134:5-10).

242.    Zummo never referred to Orthodox Jews in Pomona as a "sea of Yamakas" and never stated that the Orthodox Jews work in groups to take over and control. (Ex. 10, Zummo Dep. 194:13-25, 195:2-5).

243.    Zummo has a habit of impersonating people, regardless of their religion. (Ex. 17, Vanderbeek Dep. 37:14-38:16). When he tells a story, he impersonates everyone involved in the story including his coworkers. (Ex. 15, Tolf Dep. 68:23-69; Ex. 10, Zummo Dep. 129:19-130:15; Ex. 16, Arsa Artha Dep. 43:17-44:11). Zummo does not intend his impersonations to be offensive or degrading. (Ex. 10, Zummo Dep. 130:5-16). After Yagel asked Zummo not to do impersonations, Zummo stopped. (Ex. 10, Zummo Dep. 132:19-133:3).

244.    Tolf never expressed a concern to Zummo that she was being directed to enforce regulations selectively. (Ex. 10, Zummo Dep. 55:20-3, 56:5).

245.    Tolf never expressed a concern to Zummo that the violations occurred primarily among Orthodox Jews in Pomona. (Ex. 10, Zummo Dep. 56:6-11).

246.    Corless never heard Zummo make derogatory comments about religious Jews, Jews in general, or any other nationality. (Ex. 14, Corless Dep. 64:14-23).

247.    Spence never heard Zummo make any derogatory comments concerning Orthodox Jews or Jews in general. (Ex. 18, Spence Dep. 76:11-20).

248.     Spence never heard any Village officer or employee make any derogatory comments about Orthodox Jews or Orthodox residents in Pomona. (Ex. 18, Spence Dep. 76:21-77:2).

249.     Lasker never heard Ulman make derogatory comments towards people of Jewish faith. (Ex. 19, Lasker Dep. 167:12-16).

250.     Lasker never heard Harris make any derogatory comments towards the Jewish population. (Ex. 19, Lasker Dep. 167:20-24).

251.     Zummo never made derogatory comments about Orthodox Jews in Lasker's presence. (Ex. 19, Lasker Dep. 170:9-13).

252.     Avrohom Manes, who has filed numerous lawsuits against the Village, is paying the legal fees for the Plaintiffs with respect to the subject lawsuit. (Ex. 20, Manes Dep. 40:2-10, 61:16-62:8). In July 2019, Mr. Manes filed a lawsuit on behalf of himself and his company, Tal Properties, against the Village and certain Village officials based on discrimination. The District Court dismissed Plaintiffs' claims, and the decision was affirmed by the Second Circuit. (Ex. 93, Decision of the Second Circuit).

Dated: New York, New York
     September 15, 2023

*Kenneth E. Pitcoff*
Kenneth E. Pitcoff
*Defendant Village of Pomona*

*Janine Mastellone*
Janine Mastellone
*Defendant Louis Zummo*

*Suzanne Halbardier*
Suzanna Halbardier
*Defendants Yagel, Ulman and Harris*

*David H. Arntsen*
David H. Arntsen
*Defendant Ian Banks*