**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAMUEL INDIG, LEAH INDIG, MEIR KAHANA, ROBERT KLEIN, and NAFTALI KLEIN,<br><br>_Plaintiffs,_<br><br>-against-<br><br>THE VILLAGE OF POMONA, BRETT YAGEL, LOUIS ZUMMO, LEON HARRIS, DORIS ULMAN, and IAN BANKS,<br><br>_Defendants._ | Case No.: 7:18-cv-10204 (JCM)<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' RULE 56.1 STATEMENT AND PLAINTIFFS' COUNTERSTATEMENT** |

Plaintiffs Samuel Indig, Leah Indig, Meir Kahana, Robert Klein, and Naftali Klein

("Plaintiffs"), by and through their attorneys, hereby respond to Defendants' Rule 56.1

Statement, followed by Plaintiffs' Counterstatement, as follows:

**RESPONSE TO DEFENDANTS' RULE 56.1 STATEMENT**

## I.     PLAINTIFFS

1.      Plaintiffs Leah and Samuel Indig own a home at 21 White Birch Drive, Pomona, NY. (Ex. 2, S. Indig Dep. 16:21-17:2).

**Response: Admit**

2.      Plaintiff Meir Kahana owns a home at 68 Halley Drive, Pomona, NY. (Ex. 4, Kahana Dep. 9:9-15).

**Response: Admit**

3.      Plaintiff Naftali Klein owns a home at 63 Halley Drive, Pomona, NY, which Plaintiff Robert Klein occupies with his family. (Ex. 5, R. Klein 11/22/2022 Dep. 35:16-18).

**Response: Admit**

## II.     RELEVANT STATUTES AND LOCAL LAWS

4.      The Village of Pomona Code incorporates the requirements of the New York State Uniform Fire Prevention and Building Code. (Ex. 25, Village Code §§ 130-18(B), 130-22(B)).

**Response: Admit**


5.      Pursuant to the Village Code, removal of trees requires approval of the Code Enforcement Officer. (Ex. 25, Village Code § 130-18(G)).

**Response: Objection, statement offers a legal conclusion. In the alternative, denied as there are exceptions to the proffered statement. For example, the last sentence of Village Code § 130-18(G) states: "This section shall not apply to a residential lot improved by a residential structure which lot may not, under the bulk provisions of this Zoning Law, be further subdivided." Further, Chapter 121 of the Village Code pertaining to trees was not adopted until November 27, 2017. [https://ecode360.com/33340015]**


6.      Section 130-18(H) provides "No person shall conduct or cause to be conducted any land operations to clear, fill or grade any property without securing a building permit (hereinafter referred to in this section as 'permit') from the Building Inspector." (Ex. 25, Village Code § 130-18(H)). The Village Code sets forth the materials that must be submitted to obtain a grading permit. (Ex. 25, Village Code § 130-18(H)(1)). The Village Code further permits the Building Inspector to refer applications for grading permits to the Village Engineer and other Village agencies for review and recommendation. (Ex. 25, Village Code §130-18(H)(3)). Building Inspector Zummo did not review or approve applications for grading permits; rather, he referred them to the Village Engineer, Joseph Corless. (Ex 10, Zummo Dep. 97:13-15).

**Response: (a) First sentence: Objection, statement offers a legal conclusion. In the alternative, denied as the quotation is only a portion of § 130-18(H), and is qualified by other legal provisions. For example, § 130-18(H)(7) provides in relevant part: "A permit to clear, fill or grade property shall not be required for the planting of landscaping, grading low areas with a total of 15 or fewer cubic yards of fill material, correcting hazards representing an imminent threat to life or property, removal of dead trees, harvesting of firewood not to exceed four live trees per year 25 inches in circumference or more measured at a height 4 1/2 feet above existing ground level at the base of the tree on the uphill side, or for land development pursuant to but not prior to the issuance of a building permit, an approved and filed subdivision plat or an approved site plan."**

**(b) Second sentence: Objection, statement offers a legal conclusion. In addition, objection as to relevance, and in the alternative denied, insofar as the Village may not in practice uniformly require some or all of the materials listed, or the requirements may be qualified by other provisions of law.**

**(c) Third sentence: Objection, statement offers a legal conclusion.**

**(d) Fourth sentence: Denied. Zummo approved, denied, or withheld grading permits after review by the Village Engineer, see Plaintiffs' Counterstatement.**

7.      Pursuant to Section 130-22, the Building Inspector/Code Enforcement Officer is charged with, inter alia, (1) administering and enforcing "all provisions of laws, rules and regulations that apply to the construction, alteration, repair, removal and demolition of buildings and structures," (2) inspecting buildings or land to determine whether there has been a violation of state or local code, (3) issuing permits and certificates, and (4) issuing and posting notices of violation, stop-work orders, and orders of remedy. (Ex. 25, Village Code §§ 130-22(A)(1), (2), (3), (6)).

**Response: Objection, statement offers legal conclusions. In addition, objection as to relevance, and in the alternative denied, insofar as the Building Inspector/Code Enforcement Officer may not in practice uniformly perform some or all of the actions, or the actions may be qualified by other provisions of law.**

8.      Section 130-22(J) authorizes the Building Inspector to issue stop work orders and provides that:

> Whenever the Building Inspector shall determine that work on any building or structure is being or has been conducted in violation of any provision of this chapter, the New York State Fire Prevention and Building Code, state, federal, county or Village laws, rules or regulations or has failed to meet or violates any requirement of an approved site plan or subdivision plat, including, but not limited to, … such other plans or specifications upon which a building permit was issued, or that the work is being conducted in a dangerous or unsafe manner, then the Building Inspector shall notify the owner of the property or the owner's agent, and the person performing the work, to suspend and halt work. … Should work continue in violation of the stop-work order, the Building Inspector may, without further notice, revoke the building permit and, if there is a certificate of occupancy or use, revoke the same.

(Ex. 25, Village Code § 130-22(J)).

**Response: Objection, statement offers a legal conclusion. In addition, objection as to relevance, and in the alternative denied, insofar as the Building Inspector/Code Enforcement Officer may not in practice uniformly perform some or all of the actions, relevant provisions of the section are omitted, or the actions may be qualified by other provisions of law.**

9.      The Village Code defines a "swimming pool" as "[a] man-made body of water or receptacle for water having a depth of more than 20 inches and a water surface area of more than 80 square feet and constructed, installed or maintained in or above ground outside any building." (Ex. 25, Village Code § 130-4). The Village Code provides that swimming pools are permitted accessory uses, provided that:

> (1) Such pool or court shall be completely enclosed by a fence or wall not less than five feet in height and so constructed as to deter climbing. All gates or doors opening through such enclosure shall be equipped with a self-closing and self-latching device for keeping the gate or door securely locked at all times when the pool or court is not in actual use. (2) If located within 50 feet of any lot line, such

pool or court shall be screened from the view of the adjacent properties. Such screen shall be at least five feet high.

(Ex. 25, Village Code § 130-11(B)). The Village Code further provides that:

All swimming pools, as defined in this chapter, shall be completely enclosed by a fence or wall with a minimum height of five feet. All such fences must contain a maximum vertical interspace of two inches and must have self-closing and self-latching gates, with latches placed at least four feet above the ground or otherwise made inaccessible to small children. The fencing shall be determined by the Code Enforcement Officer to be strong enough to ensure pool security.

(Ex. 25, Village Code § 130-16).

**Response: Objection, statement offers a legal conclusion. In addition, objection as to relevance, and in the alternative denied, insofar as the Village may not in practice uniformly enforce some or all of these requirements, other relevant provisions of the Code are omitted, or the requirements may be qualified by other provisions of law.**

10.    Due to its mountainous terrain, the Village Code contains provisions regarding "steep slopes." (Ex. 25, Village Code § 119-1) (definitions of "moderately steep slope," "very steep slope" and "extremely steep slope").

**Response: Objection, statement is conclusory as to the reason for the Code provisions. Admit that the Village Code contains provisions regarding "steep slopes."**

11.    Section 119-4(A) provides that the approving authority for all applications for site development plan permits shall be the Planning Board for applications involving a very steep slope or extremely steep slope. In all other instances, the approving authority is the Village Engineer; however, the Village Engineer has discretion to refer an application concerning a moderately steep slope to the Planning Board for review and approval. (Ex. 25, Village Code § 119-4(C)).

**Response: Objection, statement offers legal conclusions. In addition, objection as to relevance, and in the alternative denied, insofar as the Village may not in practice uniformly apply or enforce some or all of the provisions cited, other relevant provisions of the Code are omitted, or the actions may be qualified by other provisions of law.**

## III.    DEFENDANTS AND OTHER VILLAGE PERSONNEL

### *Defendant Brett Yagel – Former Village Mayor*

12.    Defendant Brett Yagel ("Yagel") ran for mayor in 2011 (Ex. 9, Yagel Dep. 45:8-9). He was the Mayor of the Village of Pomona for two terms. (Ex. 9, Yagel Dep. 206:10-14).

**Response: Admit**

13.     Yagel testified that from the time he first became trustee in 2007 until the time his terms as mayor ended, the Orthodox Jewish population in Pomona increased over that time. (Ex. 9, Yagel Dep. 68:12-18).

**Response: Admit**

14.     When a Village resident complained about the use of a home for religious purposes by Orthodox Jews, Yagel advised the resident that this was permitted under the U.S. Constitution and was allowed. (Ex. 9, Yagel Dep. 61:13-21).

**Response: Denied. At his 12/8/2022 deposition, Defendant Yagel was asked whether Pomona resident Susan Montemoreno ever complained about the use of a home for religious purposes by Orthodox Jews, to which he responded:** *"Oh, yeah. I'm sure she did. And she was told that, look, if somebody wants to have people come over and pray irregardless of who they are, they are allowed under the U.S. Constitution."* **(Def. Ex. 9, Yagel Dep. 61:18-21). Yagel** *did not* **testify that** *he* **advised Ms. Montemoreno that use of a home for religious purposes was permitted under the U.S. Constitution.**

  **Moreover, Defendant Yagel received an email on 8/20/17 from Pomona resident Jennifer Bricker asking:** *"Was wondering if there is any way to prevent more homes up here from becoming shules?"* **Rather than respond that such activity was permitted under the U.S. Constitution, Yagel asked the resident:** *"What is the address? Are the cars parked in the street wrong way? Overnight, on grass,"* **and he directed Deputy Village Clerk Vanderbeek to confirm whether the home had a building permit. (VILLAGE_003019-3020). He also forwarded the complaint to Defendant Zummo and Village Clerk Artha.**

15.     When complaints for potential violations were received, Yagel sent Zummo out to investigate, but Zummo was not sent out to target a specific organization or a specific religious organization. (Ex. 9, Yagel Dep. 83:24 to 84:13). If the Village received complaints of activity going on that was not according to plans, Zummo was "probably asked to go out and take a look." (Ex. 9, Yagel Dep. 173:24 to 174:7).

**Response: Denied. Yagel repeatedly sent Zummo to target specific homes that were being used, or suspected of being used, for Orthodox Jewish religious purposes. (***See, e.g.***, YAGEL00105-106; YAGEL 00188, YAGEL00184-185, YAGEL00260, YAGEL 00302-303, YAGEL 325-326).**

16.     Yagel never directed Zummo to issue a stop work order on Mr. Klein's house. (Ex. 9, Yagel Dep. 174:24-175:7). Yagel never directed Zummo to find a reason to issue a stop work order on Mr. Klein's house. (Ex. 9, Yagel Dep. 175:8-12).

**Response: Denied. Zummo showed Robert Klein a text message from Yagel on Zummo's phone that stated, "Give Klein a Stop Work Order by 3 p.m. or you're fired." (Def. Ex. 6, Klein 11/22/22 Dep. 126:21 to 127:5). Zummo told Klein that he was directed by Yagel to issue the June 30, 2016 stop work order. (Def. Ex. 6, Klein 11/22/22 Dep. 127:8-21). (***See***
**

*also* **YAGEL01146, YAGEL01023-1024). On 10/4/17, Yagel suggested reasons to Zummo for issuing the second stop work order. (YAGEL01023-01024).**

*Defendant Louis Zummo – Village Building Inspector*

17.    Defendant Louis Zummo ("Zummo") is the Building Inspector for the Village of Pomona, a part-time position he has held since December 2013. (Ex. 10, Zummo Dep. 30:24-31:6; 32:12-15).

**Response: Admit**

18.    Prior to taking the position, Zummo was interviewed by the entire Village board. (Ex. 10, Zummo Dep. 26:23-27:2).

**Response: Admit**

19.    Zummo completed a building inspector training course in 2014. (Ex. 10, Zummo Dep. 37:16-24).

**Response: Admit**

20.    Zummo is a state certified code enforcement officer. (Ex. 10, Zummo Dep. 39:21-40:5).

**Response: Admit**

21.    Zummo never issued an inspection or stop work order because someone else told him to; rather, he only issued violations or stop work orders based upon his independent inspection or determination that there was a code violation. (Ex. 10, Zummo Dep.  253:10-254:5, 255:7).

**Response: Denied. Zummo showed Robert Klein a text message from Yagel on Zummo's phone that stated, "Give Klein a Stop Work Order by 3 p.m. or you're fired." (Def. Ex. 5, Klein 11/22/22 Dep. 126:21 to 127:5, 128:9-15). Zummo told Klein that he was under a lot of pressure, that he's basically forced to do what he has to do, and that he was directed by Yagel to issue the June 30, 2016 stop work order. (Def. Ex 5, Klein 11/22/22 Dep. 127:8-21). (*See also* VILLAGE_002403-2404, VILLAGE_002405, VILLAGE_002417-2418, VILLAGE_002421, VILLAGE_002489-2491, VILLAGE_008293-8303 (8295), VILLAGE_016496). Banks also told the Rockland County Human Rights Commission investigator that Yagel used intimidation to get what he wants and that Zummo takes directives from Yagel. (PLTF_0001667)**

22.    When Zummo became the building inspector, he was not aware of any policy to increase the number of violations issued in the Village. (Ex. 10, Zummo Dep. 83:22-25, 84:5). Zummo

never had any discussions with Yagel about issuing increased violations. (Ex. 10, Zummo Dep. 85:2-7). He never had a discussion with Yagel about amending the Village Code to provide for additional violations. (Ex. 10, Zummo Dep. 85:8-14).

**Response: Denied. (*See* VILLAGE_000138-000139).**

23.    Zummo never noticed any type of pattern in the types of potential violations Yagel and Leon Harris identified, nor in the violations he issued. (Ex. 10, Zummo Dep. 208:19-209:8).

**Response: Denied, see Plaintiffs' Counterstatement.**

24.    Zummo enforced the code even-handedly without regard to the religion of any resident or applicant. (See Ex. 10, Zummo Dep. at 253:10-19 (independently investigates potential violations); Ex. 19, Lasker Dep. at 160:8-162:9 (Trustee observed that Zummo treated residents the same); Ex. 15, Tolf Dep. at 75:10-76:12; see also Ex. 10, Zummo Dep. at 223:11-15 (Zummo did not know who owned the house at 68 Halley when he issued the pool violation); Ex. 26, Village Permit Applications and Permits Issued (The Village does not ask an applicant his religion on a permit application. The Village issues permits regardless of a resident's religion)). For example, on several occasions, when Orthodox Jewish property owners sought to use their residences as houses of worship, Zummo assisted them in obtaining the appropriate permit. (Ex. 10, Zummo Dep. 74:5-76:17).

**Response: Denied, see Plaintiffs' Counterstatement.**

25.    Zummo issued a permit for a shul located at 60 Halley in Pomona. (Ex. 10, Zummo Dep. 74:21-22, 76:2-10). Zummo did not receive any pushback from others at the Village regarding issuing that shul permit. (Ex. 10, Zummo Dep. 76:18-23). Zummo received complaints about the shul, which included complaints about parking, people walking in the street, and crowds gathering. (Ex. 10, Zummo Dep. 78:7-12). However, he never issued any violations to 60 Halley and he was never asked to. (Ex. 10, Zummo Dep. 78:16-22).

**Response: (a) First sentence: Admit that Zummo issued building permits to 60 Halley Drive, which is a home used as a shul (*i.e.*, for Orthodox Jewish religious services). (YAGEL00265-00266). Deny that there is "shul permit" or that Zummo issued a "shul permit" or a "house of worship" permit to 60 Halley Drive.**

**(b) Second sentence: Admit in part, denied in part. See Response to First sentence. In addition, although Zummo may not have received "pushback" specifically for the issuing building permits to 60 Halley Drive, he did receive and comply with directives from Yagel to investigate the use of the home as a shul, for other violations, and regarding complaints. (VILLAGE_000169-000170; 2/9/16 Appearance Ticket for "House of Worship").**

**(c) Admit, with clarification that this list of complaints is not exhaustive.**

**(d) Denied. Zummo's Activity Report for 8/17/15 to 9/14/15 shows that he investigated violations at 60 Halley during that period, and that he was called in on his day off to issue a stop work order at 60 Halley Drive on 9/4/15. (VILLAGE_010383XL). Zummo also reported investigating violations at 60 Halley on his Activity Reports for 9/2815 to 10/26/2015, 12/15/15 to 1/25/16, 1/25/2016 to 2/22/2016 (VILLAGE_010384XL, VILLAGE_010382XL, VILLAGE_016501). Zummo was directed to issue a violation to 60 Halley by Yagel, and he complied and issued the ticket. (VILLAGE_000169-000170; 2/9/16 Appearance Ticket for "House of Worship"). Zummo also issued a garbage can violation to 60 Halley a few months later. (7/20/16 Appearance Ticket).**

26.    Zummo also issued the permit for the shul at which Mr. Schwartz was the principal. (Ex. 10, Zummo Dep. 89:19-24). Zummo also issued a permit for the addition of an ark to the back of an existing shul located at 7 Galileo Court. (Ex. 26, Village Permit Applications and Permits Issued, D_01097). In addition, Zummo issued a permit to Avroham Manes for the construction of a retaining wall, driveway, fence, and drainage. (Ex. 26, Village Permit Applications and Permits Issued, D_01079). Mendy Lasker, who applied for multiple permits, felt he was treated fairly by Zummo. (Ex. 19, 161:8-162:9).

**Response: (a) First sentence: Admit that Zummo issued a building permit to a home used as a shul (*i.e.*, for Orthodox Jewish religious services) associated with Mr. Schwartz. Deny that there is "shul permit" or that Zummo issued a "shul permit" or a "house of worship" permit to 60 Halley Drive.**

**(b) Second sentence: Admit that Zummo issued building permit to add an ark to the back of an existing shul at 7 Galileo Court.**

**(c)-(d) Third and Fourth sentences: Admit**

27.    Zummo received garbage complaints regarding a shul near Sherwood Ridge from a neighbor, but no violations were issued in response to the same. (Ex. 10, Zummo Dep. 148:9-24).

**Response: Admit, with clarification that, in response to a complaint by a resident about the use of 12 Sherwood Ridge as a shul and for garbage, Yagel directed Zummo at a Board of Trustees meeting on September 25, 2017 to check the shul at 12 Sherwood Ridge on September 29, 2017 "and violate them if debris is still there." (VILLAGE_008295)**

28.    Yagel never told Zummo to delay the inspection of homes that were used for shuls. (Ex. 10, Zummo Dep. 123:20-25).

**Response: Denied, see Plaintiffs' Counterstatement.**

29.    In 2012, Peter Obe submitted a building permit application for an addition to his home at 2 Riverview Court, Pomona, NY, which was approved by a prior building inspector, not Zummo. (Ex. 27, Peter Obe Permit Application, Village_013924-013925). The permit was issued by the

prior building inspector. (Ex. 27, Peter Obe Permit Application, Village_013924-013925). Mr. Obe's construction was performed in accordance with the plans approved by the prior building inspector. (Ex. 24, Zummo Affidavit). Zummo interpreted the plans as providing for three floors above-ground, which would require a sprinkler system. As such, Zummo refused to issue a Certificate of Occupancy to Mr. Obe. Mr. Obe sold the property to a new owner without a Certificate of Occupancy being issued. The new owner installed a sprinkler system and Zummo issued a certificate of occupancy in 2019. (Ex. 24, Zummo Affidavit).

**Response: Admit, with clarification that the permit in question (No. 2367) was issued on 10/17/2012, and after Zummo became the building inspector he did not raise the issue with Obe, issue a stop work order or violation, but instead performed inspections and approved work pursuant to the permit in 2013. (VILLAGE_009905-9906). Only when Obe was selling his home to an Orthodox Jewish buyer via Orthodox Jewish realtor Solomon Fuerst did the issue of a Certificate of Occupancy come up. At that time, Yagel became upset with Zummo for meeting with the buyer and agent, telling Zummo that it is Obe's problem that he did not have all of his paperwork, to which Zummo replied, "No, it's ours because we let him do it." (Shea 2/3/17 Part 2 Recording at 40:00 to 47:00).**

**VILLAGE_013830 6/12/17 report**

### _Defendant Leon Harris – Former Village Trustee_

30.      Defendant Leon Harris ("Harris") was an elected trustee of the Village of Pomona for eight years. (Ex. 11, Harris Dep. 8:6-10; 10:22-24). He was appointed as the deputy mayor during his last term as trustee. (Ex. 11, Harris Dep. 19:10-16).

**Response: Admit**

31.      As deputy mayor, Harris would run meetings if the mayor was not available. (Ex. 11, Harris Dep. 18:12-21). Harris did not supervise any employees of the Village and had no input in hiring and firing. (Ex. 11, Harris Dep. 20:18-25).

**Response: (a) First sentence: Admit**

**(b) Second sentence: Denied, Harris was present went Noreen Shea was interviewed for the position of Deputy Clerk, and he was a Trustee when Zummo was interviewed by the Board of Trustees. (Shea 8/30/19 Dep. 12:22 to 13:05; Zummo 9/4/19 Dep. 18:24 to 19:22).**

32.      Harris never directed Zummo to issue a Stop Work Order on a property or to issue a violation. (Ex. 11, Harris Dep. 35:25 to 36:6).

**Response: Denied. Harris texted Yagel to notify him that Harris called the Village office regarding Klein's house to have Zummo "check it out when he is back in the office,"**

implying that Zummo should either issue a stop work order or violate the property. (YAGEL00829-00831).

33.    As trustee and deputy mayor, Harris would occasionally be asked by neighbors about whether houses under construction had permits. (Ex. 11, Harris Dep. 71:12-19). If residents asked him about an issue, he would contact the Village staff. (Ex. 11, Harris Dep. 26:22-27:5).

**Response: Admit**

34.    Harris is not aware of any statements by Yagel disparaging Mr. Klein. (Ex. 11, Harris Dep. 61:15-18).

**Response: Denied, *e.g.*, Yagel text message to Harris implying that Klein would illegally tear down a stop work order placard. (YAGEL00833)**

*Defendant Doris Ulman – Former Village Attorney*

35.    Defendant Doris Ulman ("Ulman") was the attorney for the Village from July 2003 until April 2019. (Ex. 12, Ulman Dep. 9:1-5; 37:3-5). Since October 2021, she has been the attorney for the current mayor of the Village, Ian Banks. (Ex. 12, Ulman Dep. 58:18-59:14).

**Response: Admit**

36.    As the Village attorney, Ulman represented the board of trustees, the planning board and the zoning board; she attended all meetings; she wrote memoranda; she represented the Village in Article 78 proceedings; and she worked with and advised all Village staff. (Ex. 12, Ulman Dep. 11:10-16).

**Response: Admit, with clarification that she resigned from representing the ZBA following Klein's 2018 ZBA hearing.**

37.    Ulman testified that the Orthodox Jewish population of the Village has significantly increased over the last ten years. (Ex. 12, Ulman Dep. 97:3-24).

**Response: Admit**

38.    Ulman did not recall that Banks, Yagel or Zummo ever discriminated against Orthodox Jewish residents. (Ex. 12, Ulman Dep. 62:19-63:14). She was not aware of complaints by residents against the Orthodox population. (Ex. 12, Ulman Dep. 97:25-98:10).  She was also unaware of complaints about homes being used as synagogues as that is a permitted use. (Ex. 12, Ulman Dep. 98:11-21). Although there were complaints by residents about the construction or use of an eruv, Ulman testified that this was a permitted use. (Ex. 12, Ulman Dep. 100:9-23).

**Response:** **(a) First sentence: Admit that Ulman so testified at her deposition, but deny that she had no knowledge of discrimination against Orthodox Jewish residents by these defendants.**

**(b)-(c) Second and Third sentences: Denied, see Plaintiffs' Counterstatement.**

**(d) Fourth sentence: Admit**

<u>*Defendant Ian Banks – Village Mayor*</u>

39.    Defendant Ian Banks ("Banks") was a trustee of the Village prior to being elected as the mayor in 2019. (Ex. 13, Banks 12/20/2022 Dep. 35:9-18).

**Response: Admit**

40.    Robert Klein and Ian Banks campaigned on the same ticket for office prior to 2019. Banks recalled that plaintiff Klein likely introduced him to Mendy Lasker, who became his Campaign Chairman during the 2019 election. (Ex. 13, Banks 12/20/2022 Dep. 7:21-8:15).

**Response: Admit**

41.    Banks was originally asked to run for Mayor by his Orthodox Jewish friends in the Village of Pomona, including Avrohom Manes and plaintiff Robert Klein. (Ex. 13, Banks 12/20/2022 Dep. 12:6-22).

**Response: Admit that Banks so testified at his deposition, deny that Manes asked him to run for mayor.**

42.    At a meeting at the Indigs' home, Banks recalled conversations of attendees about things that were going on in the Village but there was no specific discussion about discrimination or harassment against Orthodox Jews at that meeting. (Ex. 13, Banks 12/20/2022 Dep. 29:6-30:23).

**Response: Admit that Banks so testified at his deposition, but deny that that there was no discussion about discrimination or harassment against Orthodox Jews in his presence. Banks interview by HRC (PLTF_0001666)**

43.    After the April 14, 2020 decision of the New York Department of State, Hudson Valley Board of Review finding that sprinklers were not required on Klein's project. (Ex. 87, NY State Board Decision, Village_015184-015185). Banks advised the building inspector, Zummo, to have Klein clear up his plans in order to expedite the completion of Mr. Klein's project. (Ex. 13, Banks 12/20/2022 Dep. 54:15-55:25).

**Response: Deny, see Plaintiffs' Counterstatement.**

44.    Banks did not express to Mr. Klein that Orthodox Jews had too much power in the Village. (Ex. 13, Banks 12/20/2022 Dep. 58:14-21).

**Response: Admit, with clarification that Banks' comment was regarding the Orthodox Jews on the Board.**

45.    Banks never discussed with Zummo delaying the issuance of permits for plaintiff Klein. (Ex. 10, Zummo Dep. 233:12-14).

**Response: Denied, see Plaintiffs' Counterstatement.**

46.    Banks and Zummo had no discussions concerning delays regarding Mr. Klein's permits. (Ex. 10, Zummo Dep. 233-238).

**Response: Denied, see Plaintiffs' Counterstatement.**

47.    Lasker did not remember ever having a discussion with Ian Banks about religious discrimination in the Village. (Ex. 19, Lasker Dep. 80:19-21, 81:2-3).

**Response: Admit that Lasker so testified at his deposition.**

48.    Lasker did not recall Banks ever referring to an Orthodox Trustee as "you people" (Ex. 19, Lasker Dep. 108:17-19), nor did he recall Banks ever referring to Orthodox Jews in Pomona as "you people." (Ex. 19, Lasker Dep. 109:3).

**Response: Admit that Lasker so testified at his deposition.**

49.    Klein has no evidence to support the allegation in the complaint that Banks directed Zummo to harass, intimidate, and discriminate against Orthodox Jews. (Ex. 5, R. Klein 111/22/2022 Dep. 247:21-248:12). According to Klein, Banks did nothing to discriminate against Orthodox Jews when he was Mayor. (Ex. 6, R. Klein 11/28/2022 Dep. 138:6-139:4). Klein had no evidence of Banks personally harassing, intimidating, or discriminating against Orthodox Jews in Pomona. (Ex. 6, R. Klein 11/28/2022 Dep. 140:3-9).

**Response: Deny, the citations do not support the proffered statements.**

50.    Klein is not aware of any false and frivolous code violations that Banks directed someone to issue to him. (Ex. 6, R. Klein 11/28/2022 Dep. 141:14-17).

**Response: Admit**

51.    Banks never discussed with Zummo delaying the issuance of permits for plaintiff Klein. (Ex. 10, Zummo Dep. 233:12-14).

**Response: Duplicative of Statement No. 46.**

52.    Klein received building permits in 2020 when Banks was the Mayor. (Ex. 6, R. Klein 11/28/2022 Dep. 146:17-147:8).

**Response: Admit**

53.    Plaintiff Samuel Indig testified that he was told that Banks would be "very nice to the Jews in Pomona." (Ex. 2, S. Indig Dep. 189:20-24).

**Response: Admit**

*Joseph Corless – Former Village Engineer*

54.    Joseph Corless ("Corless") worked as the Village Engineer from 1978 to 2019 on a contract basis, with annual reappointments. (Ex. 14, Corless Dep. 82:2-5; 67:8-10; 11:18-12:15). His position had to be approved by the Village Board. (Ex. 14, Corless Dep. 58:17-23).

**Response: Admit**

55.    As the Village Engineer, Corless worked for the Village, not individuals. (Ex. 14, Corless Dep. 39:2-4). The work he performed for the Village had to be work that was authorized by the Village. (Ex. 14, Corless Dep. 36:11-25). Corless did not undertake an assignment unless he was instructed to do so by someone from the Village administration. (Ex. 14, Corless Dep. 37:5-12).

**Response: Admit**

56.    As the Village Engineer, Corless was responsible for reviewing site plans regarding the grading of property. (Ex. 14, Corless Dep. 23:2-3). A site plan is a representation of the improvements to be made on a private lot to provide access for vehicles or water and sewer or drainage. (Ex. 14, Corless Dep. 23:6-10).

**Response: Admit as a general matter**

57.    When Corless received a proposed site plan, he either accepted it or asked for clarification. If he was given an as-built site plan, he would take it and examine the site to ensure that the site reflected what he saw on the as-built plan. (Ex. 14, Corless Dep, 57:15-23).

**Response: Admit as a general matter**

58.     As the Village Engineer, Corless did not issue violations of the building code, but he would report them to the building inspector. (Ex. 14, Corless Dep. 52:11-19).

**Response: Admit**

59.     Yagel did not have authority to tell Corless to approve or not approve certain projects. (Ex. 14, Corless Dep. 59:7-11).

**Response: Admit that Yagel did not have proper legal authority, but deny that Yagel did not direct Corless what to do on certain projects (see Response to Statement No. 60)**

60.     No one at the Village directed Corless on how to perform his job as engineer. (Ex. 14, Corless Dep. 79:22-25).

**Response: Denied. Yagel directed Corless what to do on certain projects, *e.g.*, (VILLAGE_015456-015459) (Corless 9/14/18 at 9:32 AM: "Your questions should be directed to the Village Mayor. My role has been limited to following the directive of the Mayor"; Corless 9/14/28 at 1:22 PM: "You sent me an email to prepare the Village's claim against MS4 violations . . . At the next Board meeting, I was explicitly instructed by you, as Mayor, to prepare the violations notice per village code. I personally mailed it certified- to the property owner- as directed.")**

61.     Neither Yagel, Zummo, nor anyone else at the Village ever directed Corless to treat Mr. Klein or the Indigs differently than anyone else. (Ex. 14, Corless Dep. 79:10-21.).

**Response: Denied. On 11/7/17, Corless emailed a pdf document with the file name <Site plan requirements and discussion-63 Halley Drive-Robert Klein-signed-.pdf> to Yagel with the message: "fyi NOT sent to Mr. Klein." Yagel replied: "To my knowledge, Robert Klein does NOT own the house. Additionally, the current property owner is in violation of our property registration law!! Are there monies in escrow to pay for yours and our attorneys fees??" (The Village has not produced the attachment). This email implies that Yagel was suggesting ways to single out Klein for improper treatment. (VILLAGE_000471).**

62.     Pat Brady was Corless's alternate as Village engineer when Corless was unavailable. (Ex. 14, Corless Dep. 35:14-25).

**Response: Admit**

63.     Technical advisory committee meetings with a landowner and his engineer would be scheduled by the Village to discuss Village laws and site plan regulations that had to be complied with before getting a permit. (Ex. 14, Corless Dep. 25:21-29, 54:23-25, 55:4-8).

**Response: Admit that Technical Advisory Committee ("TAC") meetings were sometimes scheduled, but deny that they were held uniformly.**

<u>*Kathryn Tolf – Former Village Code Enforcement Officer*</u>

64.     Kathryn Tolf ("Tolf") worked as a part-time (15-hours per week) code enforcement officer for the Village of Pomona from January 2, 2018 until April 2018. (Ex. 15, Tolf Dep. 19:15-20:20, 21:11-16, 65:8-14).

**<u>Response:</u> Admit**

65.     Prior to her employment by the Village, Tolf studied to become a certified code enforcement officer and was authorized to issue violations by the time she began working for the Village. (Ex. 15, Tolf Dep. 16:6-12, 27:23-28:22).

**<u>Response:</u> Admit**

66.     Tolf submitted an application and interviewed with the Board of Trustees prior to being hired. (Ex. 15, Tolf Dep. 19:20-21:6, 23:2-6).

**<u>Response:</u> Admit**

67.     Tolf did not know Yagel or Zummo before she applied for a job with the Village. (Ex. 15, Tolf Dep. 17:5-18:13, 23:12-22).

**<u>Response:</u> Admit**

68.     When applying for the position of code enforcement officer, Tolf was informed by Yagel that the position involved patrolling the Village and enforcing the Village Code.  (Ex. 15, Tolf Dep. 20:13-20).  No one said anything to Tolf about Orthodox Jews in Pomona before she was hired or during the application process. (Ex. 15, Tolf Dep. 19:14-25:7).

**<u>Response:</u> Admit**

69.     Zummo had no supervisory power over Tolf. (Ex. 15, Tolf Dep. 25:17-26:3).

**<u>Response:</u> Admit**

70.     Tolf never engaged in selective enforcement of the Village Code. (Ex. 15, Tolf Dep. 45:14-47:15; 51:16-52:14, 55:11-15).

**<u>Response:</u> Admit that she so testified**

71.    Tolf engaged in independent investigations of any complaint or potential violation of the code and exercised her own judgment as to whether a violation existed. (Ex. 15, Tolf Dep. 45:14-46:19, 51:15-53:3, 83:2-84:4, 85:9-86:6).

**Response: Admit**

72.    If a homeowner was present at the time Tolf identified a code violation, she attempted to work with them immediately to remedy the issue. If the homeowner was able to remedy the issue while Tolf was there, she would not write out an information summons for the property. If a violation was not remedied in her presence, Tolf would write out an "Information" identifying the property and the code violation, and she would provide the Information form to the Village Clerk. The Village Clerk was responsible for issuing an Order of Remedy to the property owner. (Ex. 15, Tolf Dep. 51:22-56:22).

**Response: Denied**

73.    Tolf received two complaints regarding lighting from shuls in the Village. She investigated them and found that one was founded, and one was unfounded. With respect to the founded complaint, Tolf asked the rabbi to adjust the lights to remedy the issue. With respect to the unfounded complaint, Tolf told the property owner she did not think the lights were a problem. (Ex. 15, Tolf Dep. 83:2-84:4).

**Response: Admit**

74.    Tolf was not involved in the issuance of Stop Work Orders at the Indig or Klein properties, but part of her job as code enforcement officer was monitoring to see whether construction was taking place during a Stop Work Order. (Ex. 15, Tolf Dep. 59:4-17, 61:5-62:4). Tolf issued violations to Leah Indig for having soil unloaded on the premises while the Stop Work Order was in effect. (Ex. 37, Appearance Tickets, Village_004884, Village_004891). Tolf also issued several violations to Naftali Klein for continuing construction while the October 2017 Stop Work Order was in effect. (Ex. 70, Appearance Tickets, Village_008891-008894)). Specifically, Tolf completed an Information Summons stating that she observed workers putting a roof on the house. (Ex. 94, Information Summons, Village_008949-00951).

**Response: (a)-(c) First, Second, and Third sentences: Admit**

**(d) Fourth sentence: Denied. The Information Summons states that she observed "workers on the roof of the premises working on the roof." (VILLAGE_008949-08951).**

75.    Tolf resigned from her position with the Village in April 2018 because she obtained a better job as a full-time fire inspector for the New York State Office of Children and Family Services. (Ex. 15, Tolf Dep. 65:8-24).

**Response: Admit**

*Frances Arsa Artha – Former Village Clerk and Treasurer*

76.     Frances Arsa Artha ("Arsa Artha") was the Village Clerk and Village Treasurer from December 2014 through April 2019. (Ex. 16, Arsa Artha Dep. 6:13-18, 93:2-3).

**Response: Admit**

77.     Arsa Artha testified that she had no duties related to building inspections, the building department, or any zoning or planning issues. (Ex. 16, Arsa Artha Dep. 28:13-16, 28:22-29:1; 39:10-12).

**Response: Admit**

*Betty Vanderbeek – Former Deputy Village Clerk*

78.     Betty Vanderbeek ("Vanderbeek") was the Deputy Village Clerk from June 2017 to April 2019. (Ex. 17, Vanderbeek Dep. 15:4-6, 54:4-6).

**Response: Admit**

79.     As the Deputy Village Clerk, she took care of building permits, planning, and zoning, as well as anything else assigned to her by Arsa Artha. (Ex. 17, Vanderbeek Dep. 23:9-15). When Zummo did an inspection, she would receive a copy of the inspection report and put it into the file. (Ex. 17, Vanderbeek Dep. 27:25-28:8). When a code enforcement officer found a violation, she would receive the information and put it into the building system, and then print the necessary paperwork and leave it on the code enforcer's desk for his or her signature. (Ex. 17, Vanderbeek Dep. 51:23-52:18).

**Response: Admit that Vanderbeek's duties generally included the activities specified, objection insofar as the cited references do not support the conclusion that she performed these activities in every or any specific instance.**

80.     Vanderbeek never heard Yagel direct Zummo to issue violations on specific properties. (Ex. 17, Vanderbeek Dep. 36:14-17).

**Response: Admit**

81.     Vanderbeek could not recall a time where Yagel directed her not to provide information to someone making an inquiry. (Ex. 17, Vanderbeek Dep. 51:14-18).

**Response: Admit**

82.    Vanderbeek never had a discussion with Yagel regarding the second stop work order on Kleins' house. (Ex. 17, Vanderbeek Dep. 29:22-30:2).

**Response: Admit**

*Martin Spence – Current Village Engineer*

83.    Martin Spence ("Spence") has been the Village Engineer since May 2019. (Ex. 18, Spence Dep. 8:2-9). His firm, Spence Engineering, is engaged on a contract basis with the Village. (Ex. 18, Spence Dep. 12:18-13:6, 13:13-18). Prior to May 2019, he never did any work for the Village. (Ex. 18, Spence Dep. 8:10-15).

**Response: Admit**

84.    Spence Engineering provides municipal and civil engineering services to the Village of Pomona. (Ex. 18, Spence Dep. 19:18-24). The work Spence performs involves site work, drainage, soil erosion and sediment control, stabilization, and landscaping. (Ex. 18, Spence Dep. 20:21-25). He reviews plans and applications on engineering matters and either denies, conditionally approves, or approves the applications. (Ex. 18, Spence Dep. 24:6-9). He does not receive direction as to what determination he should make. (Ex. 18, Spence Dep. 24:10-14). He makes an independent assessment. (Ex. 18, Spence Dep. 24:15-19).

**Response: Admit**

85.    Spence testified that the criteria for site plan approval includes satisfying adequate soil erosion and sediment control, stabilization of disturbed areas, checking some criteria if there is a steep slope, looking at development coverage and the increase of impervious areas, reviewing drainage calculations and design, and determining if any improvements will have negative impacts on the adjacent properties. All these criteria are based on code. (Ex. 18, Spence Dep. 41:13-42:5).

**Response: Objection, insofar as statement offers a legal conclusion or is conclusory. Otherwise, admit.**

86.    After Spence approves an application, it is sent to the building department, which will then package it with all the other approvals required, and then issue the overall building permit. (Ex. 18, Spence Dep. 51:10-19). An individual cannot begin working on their project based on just Spence's approval. (Ex. 18, Spence Dep. 51:20-24).

**Response: Admit**

87.    Spence does not perform inspections of buildings. (Ex. 18, Spence Dep. 20:10-14). In addition, he does not do any inspection of the interior of homes or the structural components of new construction. (Ex. 18, Spence Dep. 28:7-19).

**Response: Admit**

88.      Spence was never directed to respond in a slow manner to any applications by Klein or the Indigs. (Ex. 18, Spence Dep. 55:20-56:4). Spence testified that it was never suggested to him that he should delay in or refrain from reviewing or approving any plans submitted on behalf of Klein. (Ex. 18, Spence Dep. 56:5-13). It never occurred to Spence that Zummo was treating Klein differently from other residents in Pomona. (Ex. 18, Spence Dep. 71:25-72:14).

**Response: Admit that Spence so testified**

89.      Spence never had any conversations with Banks regarding the grading permit for 63 Halley Drive. (Ex. 18, Spence Dep. 38:4-12).

**Response: Admit**

### *Mendy Lasker – Village Trustee*

90.      Mendy Lasker ("Lasker") is an appointed trustee of the Village, a position he has held since June 2019. (Ex. 19, Lasker Dep. 94:20-95:13, 159:21-22). He lives on Woodfield Road in Pomona, NY. (Ex. 19, Lasker Dep. 5:17-18).

**Response: Admit**

91.      Lasker is a member of the Orthodox Jewish community. (Ex. 19, Lasker Dep. 13:12-23).

**Response: Admit**

92.      Lasker testified that Zummo follows protocol; that while Zummo may process applications in a slower manner, he is no slower to respond to one application compared to any other application that is submitted to the Village. Lasker has seen "hundreds of applications come in" and has not noticed any particular issues with Zummo's performance as building inspector. (Ex. 19, Lasker Dep. 160:8-20).

**Response: Admit that Lasker so testified, but deny that Lasker has not seen Zummo delay scheduling inspections or processing application, specifically with regard to Klein. Before Lasker became a Trustee, he learned that Zummo and Corless were delaying performing inspections and processing Klein's permit applications and he contacted Corless and Zummo in an attempt to assist Klein in obtaining an inspection and to move forward with his applications. Lasker experienced repeated cancellations and finally learned that Yagel had directed Corless not to communicate with Lasker and not to further process Klein's application. Lasker wrote to Yagel that his actions were illegal. (PLTF_0001926-0001927).**

93.     Lasker testified that Zummo treated him fairly during his own permit applications. (Ex. 19, Lasker Dep. 161:3-162:9).

**Response: Admit**

### IV.     21 WHITE BIRCH DRIVE – THE INDIGS' PROPERTY

94.     Leah and Samuel Indig purchased their home in 2015, which had a steeply sloped yard, with the intention of doing grading work to create usable space. (Ex. 2, S. Indig Dep. 17:16-24, 21:10-19).

**Response: Admit, with clarification that the steeply sloped yard was in back yard of the house. (Def. Ex. 2, S. Indig Dep. 17:16-18:8)**

95.     During a conversation with Zummo, Mr. Indig was advised that backfilling the property was possible and Zummo directed Mr. Indig to submit a plan to the Village. (Ex. 2, S. Indig Dep. 37:18-24, 38: 5-9).

**Response: Admit**

96.     Mr. Indig hired Celentano Engineering to draw up the plans to be submitted to the Village related to the proposed grading work. (Ex. 2, S. Indig Dep. 24:13-20).

**Response: Admit**

97.     In 2016, the Indigs submitted an application for a building permit for the regrading of their backyard. (Ex. 2, S. Indig Dep. 22:9-15; 29:11-24; Ex. 28, Application for Building Permit, Village_009204-009205).

**Response: Admit, with clarification that the dates and number of applications are unclear because documents are missing from the property file and/or the Village has not produced all documents related to the property. For further clarification, the date (7/8/16) and permit number (10382) on the 2016 permit application are scratched through (*see* Def. Ex. 28, VILLAGE_009204-009205).**

98.     On July 8, 2016, Zummo emailed Corless the file submitted by Mr. Celentano to the Village regarding grading work at 21 White Birch. (Ex. 29, Email Correspondence, Village_001707).

**Response: Admit, with clarification that the "file" was the June 9, 2016 proposed grading plan forwarded from Celentano and Gross to Zummo, which Zummo forwarded to Corless. (*See* Def. Ex. 29)**

99.     Corless reviewed the site plan for 21 White Birch. (Ex. 14, Corless Dep. 52:20-53:4).

**Response: Admit**

100.    In an email dated July 10, 2016, from Corless to Zummo, Corless indicated that the submitted plan failed to meet the Village requirements. Specifically, he noted that "[a]ll proposed filling and grading of residential lots must have a site plan prepared in conformance with Chapter 119," which requires a professionally prepared plan with calculations conforming to steep slope definitions, as well as a certification from a NYS Certified Professional Engineer regarding the source of the fill material being used, compaction results, soil erosion details, and certification on final grades. Mr. Celentano was copied on this email. (Ex. 29, Email Correspondence, Village_001707).

**Response: Admit that the 7/10/16 email from Corless was sent to Zummo, Celentano, and Shea. Deny that Corless stated that the submitted plan failed to meet Village requirements, and deny that the Village Code requires applications to include all of the items mentioned in the email.** *See* **Village Code § 119-5B. (https://ecode360.com/12718312#12718312). Objection, insofar as Statement 100 offers any legal conclusion.**

101.    On or about January 8, 2017, Corless received the revised Indig site plan from Mr. Celentano. Corless responded to Mr. Celentano's email noting that the revised site plan called for the removal of ten trees with a small retaining wall, and the final grading was unclear. Corless suggested that a technical advisory committee meeting be scheduled. (Ex. 30, Email Correspondence, Village_001711-001712).

**Response: Admit, except deny that the final grading was in fact unclear (although it may have been unclear to Corless).**

102.    On April 9, 2017, Corless emailed Zummo and Celentano, with others copied, indicating that he was approving the proposed grading plan submitted and revised by Celentano on January 9, 2017, pursuant to the following conditions:
  1. The proposed fill quantity of 1,000 cy requires that the source of the material be identified prior to placement;
  2. The additional requirements of the plat require compaction results and grade certifications;
  3. The professional to be used by the homeowner/contractor should be identified, prior to the commencement of the fill and submit reports, as necessary, during the fill period;
  4. The drawing should be revised to show wetlands;
  5. The proposed 4-foot-high stone retaining wall requires clarification as to how it grades into the existing contours without impacting adjacent properties;
  6. Clarification is needed as to how discharge of water from bottom drain on wall will impact neighbors;
  7. Engineer is to provide several (3) cross sections through the final proposed plan as well as the details of the interconnection with existing grades on the adjacent

property, with the collection of drainage runoff from the proposed slope to be clearly identified;

8. The plan should not that the applicant bears responsibility for construction supervision.

In the email, Corless observed that "yesterday the erosion control details were not correctly or completely installed. The work on the site should be halted until the site is in compliance. I am requesting that you withhold any additional approvals on [the] project until the details [outlined above] have been clarified. Please issue a stop order, until they are resolved." (Ex. 31, Email Correspondence, Village_000448).

**Response: Denied as stated. The 4/9/17 email was sent to Zummo, Shea, Celentano, and Yagel, but was addressed to Zummo. Corless wrote to Zummo: "I sent you an approval on April 5th, approving the proposed grading plan by AR Celentano, drawing revised 1/9/17." (emphasis added). Corless next wrote: "Note that the plat has several conditions" and Corless then listed the following: "1. The proposed fill quantity of 1,000 cy requires that the source of the material be identified prior to its placement, and 2. The additional requirements on the plat require compaction results and grade certifications." Corless added: "3. The professional used to be used by the homeowner/contractor should be identified, prior to the commencement of the fill and submit reports, as necessary, during the fill period." Corless next described in the email several additional items he says "should" be added or clarified. The text of the email speaks for itself as to what Corless wrote, and can be better evaluated with reference to Celantano's 1/9/17 plan drawing. (See VILLAGE_001713).**

103. On August 13, 2017, Celentano responded to Corless's April 9, 2017 email with another revised plan. Specifically, Celentano noted that (1) the top and bottom wall elevations were now provided; (2) the wetland area was shown; (3) the "daylight of wall shown away from neighbors"; (4) a note was added about certifications; and (5) three cross sections were provided. On August 14, 2017, Corless responded and asked Celentano to submit a D-sized drawing directly to the Village for review as the zip file did not print. (Ex. 31, Email Correspondence, Village_000448).

**Response: Admit**

104. On September 22, 2017, a permit was issued for the regrading of the backyard. (Ex. 2, S. Indig Dep. 28:16-25, 29:2-5; Ex. 32, Building Permit, Village_013288).

**Response: Admit, with clarification that Corless approved the 8/13/17 plans on 8/14/17 (VILLAGE_016420; See S. Indig Dep. 28:16 to 29:5), and the permit was issued and signed by Zummo on 9/22/17 (see Def. Ex. 32).**

105. During the course of the work, Mr. Indig decided to do what he wanted to do irrespective of the plans submitted to the Village. (Ex. 2, S. Indig Dep. 72:15-22, 66:11-18, 67:18-20 (Mr. Indig decided on his own that he did not have to comply with any approved plan from the Village)).

**Response:** Denied, mischaracterization of testimony and misleading placement of this Statement at this point in the chronology. Zummo imposed a stop work order only 5 days after he issued the grading permit, leaving the Indig's back yard in an unusable condition *for years* while the Village repeatedly demanded submission of revised plans, delayed and denied approval, and refused to allow the Indigs to continue and complete the work. It was not "during the course of the work," but *after years of being prevented by the Village* from continuing the work and remedy an unusable yard that was effectively a construction site, that Mr. Indig determined that it was futile to continue presenting plan after plan in order to obtain the yard he had hoped for, and he decided instead to "cap it" by having his engineer instruct him how to complete the yard simply according to New York State code and provide an "as-built" certification. (Def. Ex. 2, S. Indig Dep. 65:18 to 67:25, 71:21 to 72:13).

106.    On September 27, 2017, Zummo issued a stop work order for "failure to get an appropriate permit or that work was being performed not in accordance with plans." (Ex. 10, Zummo Dep. 215:17-25, 216:4-7; Ex. 2, S. Indig Dep. 132:4-8; Ex. 33, Stop Work Order, Village_004880-004881).

**Response:** Admit that Zummo issued a stop work order on 9/27/17, otherwise denied. The quoted language is not from the stop work order and is thus misleading. The stop work order signed by Zummo states two bases: 1) "The holder of the permit has failed to meet the requirements of an approved site development plan, subdivision plat, special permit, conditional use permit, variance, zone change or other permit or approval"; and 2) "The work being performed under the permit is not in accordance with the approved application, plans, specifications or permit." (VILLAGE_004880-004881). The stop work order placard only states the first of these two bases. (VILLAGE_009170). Moreover, Mr. Indig testified that Zummo told him the stop work order was issued because the excavators were constructing a temporary road to be able to go down with their equipment and that was not on the plan. (Def. Ex. 2, S. Indig Dep. 131:4-8).

107.    The approved grading plan was for a tiered backyard with multiple tiers. However, the work being performed was for a straight out and straight down backyard, and an access road had been constructed. (Ex. 10, Zummo Dep. 216:8-14; Ex. 2, S. Indig Dep. 131:16-19).

**Response:** Denied. Mr. Indig testified that over the course of time there probably was one set of plans that included tiers, but he did not remember if that was the final plan, and he testified that Zummo did not know what he was talking about. (S. Indig Dep. 148:3-14). It would not be possible for Zummo to determine in less than five days of work since the issuance of the grading permit that the work performed was for a straight out and straight down backyard, because the excavator had only begun clearing the bottom area of the yard. The excavator did not construct a road, but merely prepared a temporary path to bring equipment down to the bottom of the slope. The shaping of the top portion of the yard (whether tiered or not) had not yet been undertaken. (Def. Ex. 2, S. Indig Dep. 132:16-22).

108.    A temporary access road would not have been required if the Indigs followed the tiered plans submitted to the Village. (Ex. 10, Zummo Dep. 216: 24-25, 217:2-11).

**Response: Objection, statement is conclusory, In the alternative, denied. See Response to Statement 107. Moreover, it would not make sense to construct a tiered top back yard first for the purpose of bringing equipment to the bottom of the slope because the process of bringing the equipment over the tiers would destroy the tiers and require them to be reconstructed.**

109.    On October 25, 2017, Zummo issued an appearance ticket as on September 27, 2017 he observed over twelve trucks of soil being dumped and spread into the Indigs' yard in violation of the stop work order. (Ex. 34, Appearance Ticket, Village_006488). Then, on November 3, 2017, Zummo issued a second appearance ticket for violating the stop work order in that on October 24, 2017 he observed work being done in the yard. (Ex. 35, Appearance Ticket, Village_013422A).

**Response: Objection, insofar as the statement offers legal conclusions. Admit that Zummo issued appearance tickets dated October 25, 2017 and November 3, 2017 to Leah Indig alleging violations on September 27, 2017 and October 24, 2017 respectively, as described in each document.**

110.    On or about December 12, 2017, the Indigs filed an application seeking review from the Zoning Board of Appeals (ZBA) with respect to the violations. In addition, they sought a special permit to finish grading in the backyard. (Ex. 36, ZBA Application, Village_006002-006023).

**Response: (a) First sentence: Admit, with clarification that the application also sought review of the 9/27/17 stop work order.**

**(b) Second sentence: Admit that the application included a request for a special permit to finish grading the backyard, but deny that a special permit, variance, or other exceptional permission was legally required.**

111.    In January 2018, Katherine Tolf issued multiple appearance tickets to the Indigs for failing to comply with the stop work order, based on her observing truckloads of soil being brought onto the Indigs' property. (Ex. 37, Appearance Tickets, Village_004884, Village_004891).

**Response: Objection, insofar as the statement offers legal conclusions. Admit that Tolf issued multiple appearance tickets to Leah Indig in January 2018 alleging violations as described in each document.**

112.    On April 25, 2018, Vanderbeek emailed Mrs. Indig indicating that a review of plans dated June 9, 2016 and last revised in March 2018 revealed that the plans exceeded the steep slope requirements and, as such, would require the approval of the planning board for site plan approval. Vanderbeek also noted that the applicant needed to address previous engineering comments. (Ex. 38, Email Correspondence, Village_003037).

**Response: Objection, insofar as the statement offers legal conclusions. Admit that Vanderbeek sent the 4/25/18 email to Mrs. Indig. Deny the statement as written. For example, the email did not state that the review "revealed that the plans exceeded the steep slope requirements . . ."; rather, the email states, "[i]t appears the revised grading plan exceeds the steep slope requirements . . ." The text of the document speaks for itself. (Def. Ex. 38).**

113.    On May 2, 2018, Vanderbeek emailed Mrs. Indig and reiterated that the Indigs needed to apply to the planning board to have the revised plans approved before the stop work order could be lifted. (Ex. 39, Email Correspondence, Village_003041).

**Response: Objection, insofar as the statement offers a legal conclusion. Otherwise, admitted.**

114.    On May 18, 2018, Mrs. Indig submitted an application review form to the planning board with a letter from Celentano Engineering attached indicating that the Indigs were seeking to "backfill/grade partial backyard area on a 3/1 slope.". (Ex. 40, Planning Board Application, Village_009443-009456).

**Response: Admit**

115.    On May 30, 2018, Vanderbeek sent a letter to the Indigs advising that the planning board application was incomplete, as landscape plans were missing. (Ex. 41, Village Letter, Village_009268).

**Response: Admit**

116.    On June 5, 2018, Rockland County issued violations to Shining Star Landscaping, Inc. for violating Laws of Rockland County Sections 286-3 (working without a license) and 286-10(A)(6) (working during a stop work order) for work performed on the Indig property. (Ex. 42, Rockland County Violations, Village_003026-003029).

**Response: Admit**

117.    On June 28, 2018, the ZBA issued its decision denying the Indigs' appeal of the appearance ticket, finding that the stop work order was properly issued because work was being performed on site that was not in compliance with the original plans and that the fill was delivered to the site after the stop work order was issued. (Ex. 43, ZBA Decision, Village_009224-009225).

**Response: Admit**

118.    On August 1, 2018, the U.S. Army Corps of Engineers issued a Cease-and-Desist Order to the Indigs after a June 22, 2018 inspection was conducted by the Army Corps of Engineers due to

fill material from the Indigs' property being discharged to a nearby waterway. (Ex. 44, Cease-and-Desist Order, Village_009038-009040; Ex. 10, Zummo Dep. 22:20-222:6 (backfilling the property was causing red clay to enter the watershed)).

**Response: Admit**

119.    The Indigs contributed to the delays to the grading project, as there were several occasions throughout the project that the Village was waiting on documentation from either the Indigs or their engineer. (Ex. 2, S. Indig Dep. 149:2-19).

**Response: Objection, insofar as the statement is conclusory or offers a legal conclusion. In the alternative, admit that Mr. Indig answered in the affirmative when asked whether there were certain occasions throughout the project that the Village was waiting on documentation either from the Indigs or the engineer, but deny that such instances contributed to the delay of the project. In follow-up testimony, Mr. Indig explained that delays were because Zummo and the Village engineer were repeatedly sending back plans for revision and imposing new requirements that caused months of back-and-forth. (Def. Ex. 2, S. Indig Dep. 151:21 to 152:23).**

120.    After December 2017, before any new site plan was approved, the Indigs resumed the work in their backyard. (Ex. 2, S. Indig Dep. 59:2-16, 62:13-63:7).

**Response: Admit, with clarification that the Indigs resumed work for a short period of time after they filed their December 2017 ZBA appeal based upon their understanding that the stop work order was stayed by the filing of that appeal. (Def., Ex. 2, S. Dep. 62:13 to 63:7).**

121.    The Indigs completed the work to their backyard in the Spring of 2021 and it became usable in May or June of 2021. (Ex. 2, S. Indig Dep. 58:19, 25; 117:18-22).

**Response: Admit**

122.    The Indigs did not end up using a tiered grading system for their property. (Ex. 2, S. Indig Dep. 65:11-14).

**Response: Admit**

123.    Mr. Indig testified that the work completed in the Indigs' backyard does not comply with any plan approved by the Village. (Ex. 2, S. Indig Dep. 66:11-15). Mr. Indig decided on his own that he did not have to comply with any approved plan from the Village. (Ex. 2, S. Indig Dep. 66:16-67:20).

**Response: Denied, mischaracterization of Mr. Indig's full testimony. Zummo imposed a stop work order only 5 days after he issued the grading permit, leaving the Indig's back yard in an unusable condition *for years* while the Village repeatedly demanded submission**

26

of revised plans, delayed and denied approval, and refused to allow the Indigs to continue and complete the work.  It was not "during the course of the work," but *after years of being prevented by the Village* from continuing the work and remedy an unusable yard that was effectively a construction site, that Mr. Indig determined that it was futile to continue presenting plan after plan in order to obtain the yard he had hoped for, and he decided instead to "cap it" by having his engineer instruct him how to complete the yard simply according to New York State code and provide an "as-built" certification. **(Def. Ex. 2, S. Indig Dep. 65:18 to 67:25, 71:21 to 72:13).**

124.    Mr. Indig did not overhear any conversations between Yagel, Harris, Ulman, and/or Zummo talking about his grading work or grading operation. (Ex. 2, S. Indig Dep. 85:11-16).

**Response: Admit**

125.    Mr. Indig is not claiming that his house is worth less money because of the Village's alleged actions. (Ex. 2, S. Indig Dep. 164:23-165:2-3).

**Response: Admit, with clarification that house was not damaged, but the use and value of the property as a whole was diminished by the Village's actions.**

126.    Mr. Indig never sought psychological help or assistance with respect to his dealings with the Village. (Ex. 2, S. Indig Dep. 165:14-19). He never took any psychological medications or psychiatric medications. (Ex. 2, S. Indig Dep. 165:23-166:2).

**Response: Admit**

127.    Mrs. Indig never sought treatment with a mental health professional for the alleged stress caused by the grading situation in her backyard. (Ex. 3, L. Indig Dep. 91:21-24).

**Response: Admit**

## V.    68 HALLEY DRIVE – MEIR KAHANA'S PROPERTY

128.    Mr. Kahana purchased his home located at 68 Halley Drive, Pomona, New York in 2016. (Ex. 4, Kahana Dep. 9:9-18, 9:24-10:3).

**Response: Admit**

129.    A fatal drowning involving a child occurred in the Village on July 18, 2017. (Ex. 4, Kahana Dep. 90:5-93:15; Ex. 45, Kahana Dep. Exhibit 11).

**Response: Admit**

130.    In or about July 2017, Zummo received a message from Leon Harris regarding a swimming pool on the driveway of a house at 68 Halley Drive asking if it was legal. (Ex. 10, Zummo Dep. 222:7-22).

**Response: Admit**

131.    On or about July 28, 2017, Zummo stopped at the property and measured the height of the pool and removed a ladder from the pool. (Ex. 10, Zummo Dep. 222:24-223:4; Ex. 46, Appearance Tickets, Village_006501). Zummo left his business card at the front door of the house with a note asking the owner of the house to call him related to the pool (Ex. 10, Zummo Dep. 223:4-10). Zummo did not know the homeowner of the property at that time. (Ex. 10, Zummo Dep. 223:11-15). The homeowner did not contact Zummo in response to the note. (Ex. 10, Zummo Dep. 223:16-22).

**Response: (a) First sentence: Deny that Zummo removed a ladder from the pool, as Mr. Kahana testified that the pool had steps rather than a ladder and he removed them from the pool every time there was nobody in the pool. (Def. Ex. 4, Kahana Dep. 103:7-14). The remaining portion of the First sentence is admitted.**

**(b) Second sentence: Denied. Mr. Kahana testified that he never received a business card from Zummo. (Def. Ex. 4, Kahana Dep. 87:18 to 88:15).**

**(c) Third sentence: Admit**

**(d) Fourth sentence: Admit**

132.    On August 2, 2017, Zummo issued two appearance tickets to Mr. Kahana for violations observed on July 28, 2017: one violation was for an above ground pool on the driveway and the second violation was for a ladder being in the pool and the pool being unfenced. (Ex. 10, Zummo Dep. 223:24-25, 224:2-4; Ex. 4, Kahana Dep. 20:18-25, 21:4, 10-13, 33:9-16, 34:24-25; Ex. 46, Appearance Tickets and Photos of Pool, Village_006501, Village_016378-013679 (also marked as Exhibit 10 at Kahana's deposition)).

**Response: Objection, insofar as statement offers a legal conclusion. Admit that Zummo issued two appearance tickets to Mr. Kahana dated August 2, 2017 alleging violations on July 28, 2017 as described in each document.**

133.    Mr. Kahana never contacted anyone from the Village regarding the pool in his driveway prior to receiving the appearance ticket. (Ex. 4, Kahana Dep. 89:23-25; 90:2-4).

**Response: Admit**

134.    The pool that Mr. Kahana was ticketed for was visible from the street adjacent to his driveway. (Ex. 4, Kahana Dep. 40:10-14).

**Response: Admit**

135.    The pool did not have a fence around it. (Ex. 4, Kahana Dep. 50:15-18).

**Response: Admit**

136.    Mr. Kahana does not know of anyone else in the Village who had a pool on their driveway. (Ex. 4, Kahana Dep. 51:11-14).

**Response: Admit**

137.    Mr. Kahana never saw nor learned of a text from someone in the Village demanding that Mr. Kahana be given a ticket or violation. (Ex. 4, Kahana Dep. 50:22-51:6).

**Response: Admit**

138.    Mr. Kahana pled guilty to having an unfenced pool and was issued a $200 fine, which he paid. (Ex. 4, Kahana Dep. 46:22-25; 47:2-7; 53:16-18).

**Response: Admit, with clarification that in his first court appearance on the ticket he protested to the court and did not plead guilty, and it was on his second appearance in court that he pled guilty to the unfenced pool.**

139.    Mr. Kahana testified that he received a written warning from the Village, not a violation or ticket, for dog waste on his property. He did not need to pay a fine related to the same. (Ex. 4, Kahana Dep. 23:15-22). After that one warning, he never received any other warning or ticket related to dog waste. (Ex. 4, Kahana Dep. 52:23-4).

**Response: Admit**

140.    Mr. Kahana did not seek any psychological counseling and did not feel like he needed any counseling as a result of getting the pool ticket. (Ex. 4, Kahana Dep. 65:13-21).

**Response: Admit**

## VI.    63 HALLEY DRIVE, POMONA – THE KLEINS' PROPERTY

141.    Naftali Klein, Robert Klein's father, purchased the house at 63 Halley Drive, Pomona, New York in 2015. (Ex. 5, R. Klein 11/22/2022 Dep. 35:16-20). Naftali Klein holds title to the house. (Ex. 8, N. Klein Dep. 29:21-25, 30:2, 24-25).

**Response: Admit**

142.    Robert Klein ("Mr. Klein") lives at the property with his wife and child. (Ex. 5, R. Klein 11/22/2022 Dep. 18-25, P43:2-4; Ex. 8, N. Klein Dep. 43:2-5).

**Response: Admit**

143.    In 2016, Mr. Klein embarked on a project to lift and expand the house located at 63 Halley Drive. (Ex. 5, R. Klein 11/22/2022 Dep. 278:4-18). Specifically, he wanted to lift the house onto temporary supports, enlarge the area of crawlspace into a usable area below ground, and build a new permanent foundation. (Ex. 5, R. Klein 11/22/2022 Dep. 40:11-25).

**Response: (a) First sentence: Admit**

**(b) Second sentence: Admit, with clarification that other changes were contemplated as well. (*See* VILLAGE_015962-015966 (6/9/16 plans); VILLAGE_021014-021018 (9/22/16 plans))**

144.    On June 20, 2016, a Regional Architect with the New York State Department of State Division of Building Standards and Codes, sent an email to Mr. Klein's architect, Eric Osborn. Zummo was copied on the email. In the email, the State explained that New York State Residential Code Section J802.3, Automatic Sprinkler Systems provides that, "Whenever a vertical addition is made to a building to create a third story above grade, or when the floor area of a legally existing third story is increased more than 10 percent, the building shall be equipped throughout with an automatic sprinkler system installed in accordance with NFPA 13D." The State employee further explained that "There are no-half stories in building code; if that bottom level has become a STORY ABOVE GRADE, then you have to comply with J802.3. It's all about the math…maybe you can manipulate the final grade." (Ex. 47, Email Correspondence, PLTF_0001974; Ex. 48, NYS Residential Code, J802.3; Ex. 49, ZBA Minutes 7/27/2016, Village_014368A (minutes show that Klein was aware of NYS Regional Architect Krieger's opinion)).

**Response: Admit, except insofar as the third sentence should be, "the State employee explained . . ." rather than, "the State explained . . .,"  and with clarification that Statement 144 does not reflect the entire content of Ms. Krieger's email.**

145.    Mr. Klein submitted an application for an interpretation of the Village Zoning Law and New York State Fire Prevention and Building Code relating to sprinkler systems in single family residences. (Ex. 49, ZBA Minutes 7/27/2016, Village_014364A-014369A). A ZBA hearing was held on the application on July 27, 2016. At the hearing, Mr. Klein stated that he was looking to raise his house by a few feet in order to enlarge his basement. (Ex. 49, ZBA Minutes 7/27/2016, Village_014365A). Mr. Klein also stated that the garage was not being raised and that he wanted to save the existing garage walls. (Ex. 49, ZBA Minutes 7/27/2016, Village_014366A). At the hearing, Ulman explained that there was a question of whether the lower level of the house, as raised, would be a story or floor based on the existing grade. (Ex. 49, ZBA Minutes 7/27/2016, Village_014366A). Mr. Klein's architect, Eric Osborne, stated that, based on the existing grade, raising the house would create an additional story. (Ex. 49, ZBA Minutes 7/27/2016, Village_014366A). Mr. Klein asserted that installing a sprinkler system would cost $40,000 and

would be a hardship. (Ex. 49, ZBA Minutes 7/27/2016, Village_014367A). The ZBA did not reach a determination on Mr. Klein's application, as two board members wanted a professional evaluation before making a determination. (Ex. 49, ZBA Minutes 7/27/2016, Village_014369A). Accordingly, the application was adjourned until the next meeting on August 17, 2016. (Ex. 49, ZBA Minutes 7/27/2016, Village_14368A).

**Response: Admit, with clarification that Statement 145 does not reflect the entire discussion reflected in the 7/27/16 ZBA minutes.**

146.    After the July 2016 ZBA meeting, Mr. Klein did not receive a ruling from the ZBA because he effectively withdrew his application for an interpretation, telling the ZBA that he would go about his construction in a different manner that did not require sprinkler installation. (Ex. 50, ZBA Minutes 5/23/2018, Village_018722-018723 (Appel noted at May 23, 2018 ZBA meeting that Klein had come before ZBA two years earlier, but withdrew the application without ZBA approval and told the ZBA he was going to do something else, i.e. "walked out saying he was going to do it another way")).

**Response: Admit that Klein did not receive a ruling from the 2017 ZBA appeal. Otherwise, denied. Yagel called the New York Department of State concerning the status of Mr. Klein's permit application and ZBA appeal on August 9, 2016 and spoke to Land Use Training Specialist Linda King in the Division of Local Government Services. Ms. King advised Yagel that, if the building inspector never denied the permit application, the applicant could not yet appeal to the ZBA. (VILLAGE_000281-000282). Based upon this advice, the Village cancelled Mr. Klein's 2016 ZBA appeal. (VILLAGE_001755).**

147.    On or about November 4, 2016, Naftali Klein submitted an application for a building permit for an addition to the house at 63 Halley Drive. (Ex. 51, Building Permit Application, PLTF_0002187-0002188). No site plans were submitted in conjunction with the permit application. (Ex. 10, Zummo Dep. 165:25-166:23).

**Response: Admit that Klein submitted building permit application for an addition to the house at 60 Halley Drive in the fall of 2016, and admit that the application shows a "Received" date of 11/4/16 and "Permit No. 10428." Deny that the application was submitted without site plans. Klein came into Village Hall on September 27, 2016, and Yagel told Klein he needed to submit a new building permit application. Klein filled out the new application and Yagel assisted Klein with attaching plans from the previous application file to the new application. Klein submitted the application at that time. The "Received" date and "Permit No." at the top of the permit application form is not filled out by the applicant. (Shea 9/27/16 Recording at 1:52:40 to 2:01:48; VILLAGE_021014-021018 (9/22/16 plans)).**

148.    On December 19, 2016, Zummo issued a permit to Mr. Klein to lift the house and replace the foundation to close the newly raised portion. (Ex. 10, Zummo Dep. 166:14-23, 185:10-186:6); Ex. 5, R. Klein 11/22/2022 278:4-18; Ex. 52, 12/19/2016 Permit, Village_013270 (marked as

Exhibit 10 at Mr. Klein's deposition)). The permit did not approve construction of a third floor. (Ex. 10, Zummo Dep. 166:24-25, 167:2-4).

**Response: (a) First sentence: Admit that Zummo issued Permit No. 10428 to Mr. Klein in December 2016. Deny that the permit was limited to lifting the house and replacing the foundation to close the newly raised portion. The scope of the work approved at this point was based upon the application and the 9/22/16 plans. There is conflicting evidence as to the exact date the permit was issued. The permit application shows an issue date of 12/13/16. (PLTF_002187-002188). The Permit sign is dated 12/19/16. (VILLAGE_013270). The December 2016 Building Permits Report shows an issue date of 12/23/16. (VILLAGE_001899).**

**(b) Second sentence: Denied. The scope of the work approved at this point was based upon the application and the 9/22/16 plans. In addition, the December 2016 Building Permits Report shows the following "Work Description": "LIFTING HOUSE 4 AND A HALF FEET, AND ADDING A THIRD FLOOR." (VILLAGE_001899).**

**Moreover, the 9/22/16 plans included markings that indicated future design and details were pending and would be supplemented, as was done in architectural plans dated 3/2/17 submitted by Klein to the Village on 3/3/17. The Shea 3/3/17 Part 1 Recording reveals that Zummo knew Klein dropped off the plans at Village Hall that morning, and Zummo discussed the specific changes in those plans that he later denied knowing about until after the house had been lifted. (VILLAGE_021014-021018; Shea 3/3/17 Part 1 Recording 22:07 to 23:10; Zummo Dep. 165:25 to 167:12).**

149.    Mr. Klein's house was lifted by contractor Wolfe House Moving in April of 2017 and remained lifted for over two months. (Ex. 5, R. Klein 11/22/2022 Dep. 284:20-285:8; Ex. 6, R. Klein 11/28/2022 Dep. 155:23-156:6; Ex. 7, R. Klein 3/20/2023 Dep. 8:19-21, 824-25). Mr. Klein scheduled Wolfe House Moving to return on July 5, 2017 to lower the house. (Ex. 5, R. Klein 11/22/2022 Dep. 285:15-286:4). Mr. Klein had to book the July 5, 2017 return date well in advance. (Ex. 5, R. Klein 11/22/2022 Dep. 285:21-286:4).

**Response: Admit**

150.    During the course of lifting the house, the contractor damaged a wall of the garage. (Ex. 6, R. Klein 11/28/2022 Dep. 156:7-13). Mr. Klein then decided to remove the entire garage. (Ex. 6, R. Klein 11/28/2022 Dep. 156:3-158:11). Removing the garage was recommended by the contractor that lifted the house. (Ex. 6, R. Klein 11/28/2022 Dep. 156:21-158:11).

**Response: Admit**

151.    Mr. Klein testified that while the house was lifted, some water leaked into the basement from the side of the house that was exposed. (Ex. 7, R. Klein 3/20/2023 Dep. 9:12-15). Mr. Klein did not put tarps or plywood around the house to prevent water from getting into the basement while it was lifted. (Ex. 7, R. Klein 3/20/2023 Dep. 12:13-20). Mr. Klein does not remember what

contents, if any, were damaged in the basement while the house was lifted. (Ex. 7, R. Klein 3/20/2023 Dep. 9:21-10:1).

**Response: Admit**

152.     On June 14, 2017, defendant Zummo performed a building inspection at 63 Halley Drive, at which time he disapproved the work because Mr. Klein did more than just raise the house. Specifically, Mr. Klein extended the front of the house and took the entire garage out, work that was not contemplated by the approved permit. (Ex. 53, Building Inspection, Village_009485; Ex. 10, Zummo Dep. 169:12-170:6 (issued first stop work order because enlargement of the garage deviated from the plans)).

**Response: Admit Zummo performed a building inspection at 63 Halley Drive on 6/14/17 and he marked the inspection disapproved. Deny that he disapproved the work "because Mr. Klein did more than just raise the house." The 9/22/16 plans contemplated more than just raising the house. *See* Response to Statement 148 above. Significantly, the 9/22/16 plans included markings that indicated future design and details were pending and would be supplemented, and this was done in architectural plans dated 3/2/17 submitted by Klein to the Village on 3/3/17. (VILLAGE_021014-021018; Shea 3/3/17 Part 1 Recording 2:38-50, 22:07 to 23:10). The Village and Zummo have claimed the 3/2/17 were never submitted or are not in the file.**

153.     On June 30, 2017, Zummo issued a stop work order, which provided: PLEASE TAKE NOTICE that there exists a violation of Section 130-22J of the Village of Pomona Code on June 30th at the above location in that current plans and specifications supplied with the permit are incorrect or have been changed. Please stop all work until new plans are submitted and reviewed by the building department. (Ex. 54, First Stop Work Order, Village_002053).

**Response: Admit, with clarification that Statement 153 is referring to the stop work order notice or placard posted at the property. The Village has not produced a stop work order form for 6/30/17. (Zummo Dep. 170:9 to 174:4). Also note that new plans had already been submitted on 3/3/17, although Zummo and the Village have claimed that the 3/2/17 plans were never received or are not in the file. (Shea 3/3/17 Part 1 Recording 2:38-50, 22:07 to 23:10; Zummo Dep. 165:25 to 167:12)**

154.     Zummo did not have any communication with Yagel prior to issuing the first Stop Work Order. (Ex. 10, Zummo Dep. 168:15-23).

**Response: Denied. In his deposition, Zummo initially denied such communications with Yagel, but then testified: "I'm sure we discussed Robert[ Klein]'s house. But nothing more." (Zummo Dep. 168:19 to 169:2). Klein testified that Zummo showed him a text message he received from Yagel that directed him to give Klein a stop work order by 3:00 pm or he would be fired. (Klein 11/22/22 Dep. 126:21 to 128:15).**

**Note also that the building inspection card for the 6/14/17 inspection discussed in Statement 152 above lists an inspection request date of 6/13/17. On 6/13/17, Deputy Clerk Shea sent an**

**event notice to Yagel and Zummo with the subject "Blocks on Foundation," the location "63 Halley Drive" and the event date as 6/14/17. (YAGEL00416).**

155.    The stop work order provided that work could continue on July 28, 2017, thereby giving Mr. Klein one month to supply the information and documentation for the changes that needed to be made. (Ex. 54, First Stop Work Order, Village_002053; Ex. 10, Zummo Dep. 174:11-14).

**Response: Admit**

156.    After issuing the stop work order, Zummo lifted the stop work order on an emergency basis to allow Mr. Klein to lower the house. (Ex. 10, Zummo Dep. 175:3-20 (Zummo "took the Stop Work Order off so he could relower the house")).

**Response: Admit**

157.    The contractor, Wolfe House Moving, lowered the house as previously scheduled on July 5, 2017, which was shortly after the stop work order was issued. (Ex. 6, R. Klein 11/28/2022 Dep. 155:23-156:6).

**Response: Admit**

158.    After the house was lowered, in early August 2017, Zummo conducted footing and foundation inspections at 63 Halley Drive. (Ex. 10, Zummo Dep. 175:21-176:9; Ex. 55, Building Inspections, PLTF_0002022-0002024). During the inspection, Zummo reviewed plans on site which, to Zummo's knowledge, were not on file with the Village. (Ex. 50, ZBA Minutes 5/23/2018, Village_018278).

**Response: (a) First sentence: Admit**

**(b) Second sentence: Denied. Klein testified that Zummo did not look at the plans when he was at the site. (Klein 11/22/22 Dep. 320:20 to 321:3). Despite Zummo's denials that the Village received <u>any</u> plans before October 6, 2017 (Zummo Dep. 165:25 to 167:12), the Shea 9/27/16 Recording records Yagel assisting Klein with attaching  plans to his building permit application on that date, (Shea 9/27/16 Recording at 1:52:40 to 2:01:48; VILLAGE_021014-021018 (9/22/16 plans)), and the Shea 3/3/17 Part 1 Recording reveals that Zummo knew Klein dropped off the 3/2/17 plans at Village Hall, and Zummo discussed the specific changes in those plans that he later denied knowing about until after the house had been lifted. (VILLAGE_021014-021018; Shea 3/3/17 Part 1 Recording 22:07 to 23:10).**

**In addition, although Zummo claims he did not know that additional plans dated 7/3/17 were submitted to the Village on 7/6/17, Deputy Clerk Vanderbeek claims she found that set of plans on 11/15/17 in the 12 Beaver Dam file with a post-it note from Village Clerk Artha that stated: "Lou- Robert dropped this off at 4:25 pm on 7/6/17."**

**(VILLAGE_3384.1365-3384.1366). However, a handwritten note-entry on Vanderbeek's calendar for 11/15/17 states: "Found Kleins missing plans in 12 Beaver Dam note on plans indicate that it was dropped off after hrs & just placed on Lou's desk by Fran [Artha]." (VILLAGE_015764-015765).**

159.    During the inspections in August 2017, Mr. Klein did not discuss revised plans with Zummo, nor had he started framing the third floor of the house. (Ex. 6, R. Klein 11/28/2022 Dep. 162:13-164:7).

**Response: Admit**

160.    On September 13, 2017, Zummo spoke with Mr. Klein via phone regarding the project. Mr. Klein was instructed to provide the Village with updated insurance information. (Ex. 56, Correspondence, PLTF_0001958-0001959).

**Response: Denied. Zummo testified that he did not remember ever having any telephone conversations with Klein. (Zummo Dep. 111:23-25). Klein did receive an email from Vanderbeek reminding him to update insurance for contractors other than East Coast Framers. (VILLAGE_3384.1531). Klein emailed the updated insurance documentation to the Village on September 15, 2017. (PLTF_0001962-0001968).**

161.    On September 18, 2017, Mr. Klein applied for a fence permit. A neighbor obtained an injunction against the fence, which was not discontinued until October 30, 2017. The fence permit was issued on December 18, 2017. (Ex. 57, Correspondence from Zummo to Mr. Klein, Village_000682; Ex. 58, Fence Permit, Village_009056).

**Response: Admit**

162.    On October 3, 2017, Zummo wrote to Mr. Klein and advised that in reviewing the permit issued on December 13, 2016, it was discovered that several required items were missing from Mr. Klein's file including letters from the counties, water and sewer districts related to disconnecting and reconnecting gas, electric, water, and sewer, as well as certificates of insurance from the contractors being used. (Ex. 56, Correspondence, PLTF_0002128-0002129).

**Response: Admit that Zummo wrote the 10/3/17 letter to Klein, deny that some or all of the items mentioned in the letter were required or missing. For example, Klein emailed updated insurance documentation to the Village on September 15, 2017. (PLTF_0001962-0001968).**

163.    On October 6, 2017, Zummo drove by 63 Halley Drive and observed, for the first time, the construction of a third floor, which was visible from the road. (Ex. 10, Zummo Dep. 167:5-12; Ex. 50, ZBA Minutes 5/23/2018, Village_018730)). No one prompted Zummo to drive by 63 Halley Drive that day. (Ex. 10, Zummo Dep. 167:17-22).

**Response: (a) First sentence: Objection, insofar as the Statement offers a legal conclusion. Admit that Zummo drove by 63 Halley Drive on 10/6/17 and observed construction work proceeding on the second level of the home above the basement after the lifting of the home. Deny that a new third floor was being constructed or that Zummo observed that that level for the first time.**

**(b) Second sentence: Denied. On 10/4/17, just two days prior, Yagel and Zummo conducted a conversation by texting discussing the basis for the second stop work order. (Y01023-01024).**

164.    Zummo issued a second stop work order on October 6, 2017 based on his observation of construction of a third floor, which was not part of the approved permit. (Ex. 10, Zummo Dep. 167:5-10, 167:23-168:5; Ex. 59, Second Stop Work Order, Village_008910).

**Response: Objection, insofar as the Statement offers a legal conclusion. Admit that Zummo issued a second stop work order on the home on 10/6/17. Deny that the work constituted construction of a new third floor, rather than work on the second level of the home above the basement after the lifting of the home. Deny that the work was not part of the approved permit.**

165.    Zummo did not have any conversation with Yagel regarding the basis for the second Stop Work Order. (Ex. 10, Zummo Dep. 178:18-21).

**Response: Denied. On 10/4/17, Yagel and Zummo conducted a conversation by texting discussing the basis for the second stop work order. (YAGEL01023-01024).**

166.    Zummo was not aware of any plans regarding 63 Halley being submitted to the Village between the issuance of the June 2017 Stop Work Order and the October 2017 Stop Work Order. (Ex. 10, Zummo Dep. 176:10-23). After the October 2017 Stop Work Order, Mr. Klein submitted building plans to the Village which showed a three-story building but did not provide for a fire sprinkler system as required by New York State building code. (Ex. 50, ZBA Minutes, Village_018728; Ex. 22, Coleman Affidavit, ¶ 9).

**Response: (a) First sentence: Denied. See Response to Statement 158.**

**(b) Second sentence: Admit that Klein again submitted building plans to the Village after the October 2017 stop work order was imposed. Otherwise, objection to the remainder of the Statement as it offers a legal conclusion. In addition, objection as the Statement is vague and does not identify the specific building plans to which it refers. In the alternative, deny that the plans show a three-story building, rather than a building with two levels about the basement due to the lifting of the house.**

**In addition, objection to legal conclusions proffered via the Coleman Affidavit.**

167.    On or about November 3, 2017, Mr. Klein attended a meeting with Corless, Zummo, Vanderbeek, and Ulman to discuss what steps needed to be taken to resolve the October 2017 Stop

Work Order. (Ex. 60, Audio Recording, Zummo 00002; Ex. 61, Correspondence from Ulman to Mr. Klein, PLTF_0002087 at ¶1). This included a discussion of regrading the property such that the lowest floor would be below grade to avoid the requirement that a three-story building be equipped with fire sprinklers. (Ex. 60, Audio Recording, Zummo 00002 at 47:10-47:50, 48:30-50:45, 57:50-58:27).

**Response: Objection, insofar as the Statement offers a legal conclusion. Otherwise, admit to the extent that the term "the lowest floor" in the Statement refers to the basement of the house after the house was lifted and does not imply a legal definition or conclusion.**

168.    Ulman explained that the Building Inspector is mandated to require compliance with the state code and that if Mr. Klein disagreed with the interpretation of the state code, the appropriate place to go is the State Code council. (Ex. 60, Audio Recording, Zummo 00002 at 36:22-38:52).

**Response: Objection, insofar as the Statement offers a legal conclusion. Otherwise, admitted that Ulman made a statement to that effect.**

169.    At the November 3, 2017 meeting, Corless and Zummo both told Mr. Klein they would grant him emergency permission to close his house. (Ex. 60, Audio Recording, Zummo 00002 at 35:35-35:49, 1:00:35-1:01:03; Ex. 7, R. Klein 3/20/2023 Dep. 19:25-20:6 (acknowledging he was informed he could cover his house)).

**Response: Objection, insofar as the Statement offers legal conclusions or is conclusory. Admit generally that the statements were made, but deny that the suggestions for protecting the home were in fact feasible, adequate, or available given the state of construction or condition of the home at that time, or that the suggestions would have been different or more effective than the steps Klein took to protect the home. Furthermore, when Klein made efforts to close the home, Zummo and Tolf issued violations for working through the stop work order.**

170.    Specifically, at the November 3, 2017 meeting, Zummo noted that he had informed Mr. Klein during their prior meeting that Mr. Klein was permitted to take whatever steps he thought were necessary to close the property. (Ex. 60, Audio Recording, Zummo 00002 at 1:00:35-1:01:03). Mr. Klein stated he wanted the Village to pay to encapsulate his house. Corless explained that the Village could not pay for construction on private property, but told Mr. Klein:

> If you needed some sort of extra permission, we are willing to go to bat for you, but we can't spend Village money on personal property. You are welcome to sue the village, that you are entitled to do, but if you want permission to encapsulate, we can give you that. I can give you a number of contractors that do that. I can give you a list if you'd like. You pay, it'll be water tight, rodent-proof and … Holt construction very large contractor. They can make your building water tight.

(Ex. 60, Audio Recording, Zummo 00002 at 1:00:48-1:04:04). Corless also stated that the contractor Hershkowitz would be capable of performing the work. (Ex. 60, Audio Recording, Zummo 00002 at 1:04:20-1:04:30).

**Response:** **Objection, insofar as the Statement offers legal conclusions or is conclusory. Admit generally that the statements were made, but deny that the suggestions for protecting the home were in fact feasible, adequate, or available given the state of construction or condition of the home at that time, or that the suggestions would have been different or more effective than the steps Klein took to protect the home. Furthermore, when Klein made efforts to close the home, Zummo and Tolf issued violations for working through the stop work order.**

171.     At the first meeting following the issuance of the October 2017 Stop Work Order, Mr. Klein agreed to raise the grade and do everything he needed to do to ensure he would not need to install fire sprinklers. (Ex. 6, R. Klein 11/28/2022 Dep. 24:13-25, 26:17-25, 27:2-9).

**Response:** **Admit, with clarification that Klein stated that he did not think he needed to raise the grade further because had retaining walls around the house and the basement was already sufficiently below grade, but he told them he would raise the grade and get it measured out and "basically do everything I needed to do to make it 100 percent bullet proof to not need fire sprinklers as per New York State code." (Klein Dep. 26:24 to 27:9).**

172.     At some point thereafter, Mr. Klein marked a line on the house showing the height to which he would re-grade. The line was covering windows of the first floor. (Ex. 62, Photographs from 2020 Inspection; Ex. 10, Zummo Dep. 181:8-18).

**Response:** **Admit, with clarification that the grading was supplemented with retaining walls and window wells. (Klein Dep. 26:24 to 27:9).**

173.     On November 20, 2017, before the issues identified by the October 2017 Stop Work Order had been resolved, Zummo observed work being conducted at 63 Halley Drive in violation of the Stop Work Order. Accordingly, an appearance ticket was issued to Naftali Klein. (Ex. 63, Appearance Ticket, PLTF_0002013).

**Response:** **Objection, insofar as the Statement offers legal conclusions. Admit that on November 20, 2017, Zummo observed actions being taken to secure and protect the home prior to the onset of winter, and that Zummo issued an appearance ticket to Naftali Klein. Deny that the alleged issues identified by the October 2017 stop work order were unresolved, as Klein's architect and engineer had both submitted plans addressing the alleged issues. (VILLAGE_21029-21033; PLTF_0001860; VILLAGE_000493; PLTF_0002027).**

174.     On November 20, 2017, by and through his attorney, the Law Offices of Menashe & Associates, Mr. Klein submitted updated plot plans dated November 10, 2017, as well as an application for a permit to grade the property in accordance with the plot plan. (Ex. 64, Correspondence, Village_008996-008998). Zummo's duties do not include review of grading permits; rather, grading permits are only issued by the Building Inspector after review and approval by the Village Engineer. (Ex. 10, Zummo Dep. 183:2-21).

**Response:** **(a) First sentence: Admit, with clarification that additional materials were also submitted with the letter, including** *inter alia* **revised architectural plans, a letter from architect Osborne, and a check for fees.**

**(b) Second sentence: Objection, insofar as the Statement offers a legal conclusion. In addition, objection as to relevance with regard to Def. Ex. 10, as the letter was addressed to the attention of Zummo, Corless, and Ulman. In the alternative, deny that Zummo does not have authority to review and approve grading permits, particularly as the application does not involve steep slopes.**

175. On November 28, 2017, Corless emailed Tony Celentano, Mr. Klein's engineer, advising of certain deficiencies related to the proposed fill drawing dated November 10, 2017. (Ex. 65, Email from Corless to Celentano, Village_000492-000493 (also marked as Exhibit 1 at Corless's deposition)). Specifically, the proposed fill drawing lacked a number of details to comply with Village site plan standards and, as such, was incomplete. (Ex. 14, Corless Dep. 28:25-29:9, 30:2-12). Corless also sent a memo to Zummo, which Celentano was copied on, dated November 28, 2017, outlining the deficiencies with the November 19, 2017 drawings. (Ex. 66, Memo, Village_009015). Corless requested clarification. (Ex. 65, Email from Corless to Celentano, Village_000492-000493 (also marked as Exhibit 1 at Corless's deposition)).

**Response:** **(a) First sentence: Admit that Corless emailed Celentano as reflected in Def. Ex. 65 (VILLAGE_000492-000493), and that Corless also sent the email "bcc" to Yagel. Objection to the term "deficiencies" as conclusory and misleading, or in the alternative deny the same. The comments in the email do not go to the substance of the proposed plan. Indeed, Corless concludes the email with: "I have a number of comments on the submission, but these are directed at presentation and clarification, as opposed to approval."**

**(b) Second sentence: Objection, the statement is conclusory and does not identify any such standards. In the alternative, denies as the email does not refer to mention any details that were incomplete.**

**(c) Third sentence: Admit that Corless sent the memo dated 11/28/17 as reflected in Def. Ex. 66 (VILLAGE_009015) to Zummo with a copy to Celentano. Objection to the term "deficiencies" as conclusory and misleading, or in the alternative deny the same. The memo likewise in almost entirely directed at presentation rather than substance of the plan. Indeed, Corless begins the memo with: "The site plan, as submitted, can be approved . . ." The statement that the plan "lacks a number details to comply with Village standards" is conclusory as there is no basis for concluding that such details are in fact required.**

176. On December 13, 2017, Ulman wrote to Mr. Menashe in response to the November 20, 2017 email. In the letter, Ulman indicated that the delay in responding was due to the Village waiting on a response from Celentano to Corless's November 28, 2017 email. Ulman reiterated that there were several deficiencies with the plans submitted on November 20, 2017. She noted that the plans also omitted revisions made on May 18, 20017 and August 29, 2017. (Ex. 67, Correspondence, PLTF_0002079-0002080).

**Response:** **(a) First sentence: Admit**

**(b) Second sentence: Admit that Ulman made the representation, but deny that that the representation was accurate. Celentano had already responded to Corless's email on 12/5/17, more than a week before Ulman's letter. (PLTF_0002014 – Celentano Cover memo specifying revision of requested points accompanying 12/5/17 plans).**

**(c) Third sentence: Denied. The only issue mentioned in Ulman's letter regarding the 11/20/17 plans was the need for an original document, which had already been provided on 12/5/17. (PLTF_0002014).**

**(d) Deny that Ulman noted that the 11/20/17 plans omitted revisions, rather Ulman claimed that the architectural plans omitted revisions. Deny that such superseded revised plans were required for approval of the more recent plans.**

177.    On December 11, 2017, Mr. Klein submitted an appeal of the October 6, 2017 Stop Work Order to the Village Zoning Board of Appeals. (Ex. 68, Appeal to ZBA, PLTF_0001976-0001987). The appeal stated that the applicant was not seeking a variance. (Ex. 68, Appeal to ZBA, PLTF_0001983).

**Response: Admit, with clarification that the ZBA appeal application also challenged alleged violations resulting from the stop work order.**

178.    On December 13, 2017, Ulman wrote to Mr. Klein, noting that his ZBA application was incomplete and identified the additional materials to be submitted. (Ex. 69, Correspondence, PLTF_0002017).

**Response: Admit**

179.    On February 2, 2018, Ulman wrote to Mr. Klein explaining the issues with the plans submitted by Mr. Klein's engineer (Celentano) and architect (Osborne), noting that the architectural plans contained numerous revision dates, and that the Village was awaiting an explanation from the architect. (Ex. 61, Correspondence, PLTF_0002087-0002088).

**Response: Admit that Ulma wrote to Klein on 2/2/18, and that she made these representations among others, but deny that the representations were accurate. Celentano had already responded to Corless's issues with revised plans and cover memo on 12/5/17 (PLTF_0002014). Deny that superseded revised plans where required for approval of the more recent plans.**

180.    On February 26, 2018, a hearing was scheduled in the Justice Court in the Town of Haverstraw on the violations issued by Katherine Tolf to Naftali Klein for working through the October 2017 Stop Work Order. (Ex. 70, Appearance Tickets, Village_008891-008894).

**Response: Admit**

181.    The Board of Appeals scheduled a hearing on the application for February 28, 2018, but Mr. Klein requested, three different times, that his appeal be rescheduled to the next month's meeting. (Ex. 71, Adjournment Requests, PLTF_0002158, Village_003464-03465, Village_006132). The appeal was heard at a ZBA hearing on May 23, 2018 and continued on June 27, 2018. (Ex. 50, ZBA Minutes 5/23/2018, Village_018733; Ex. 72, ZBA Minutes 6/27/2018, Village_006136-006138).

**Response: (a) First sentence: Admit, with clarification that Klein requested that his appeal be adjourned on 2/28/18 and 3/28/18 because these dates conflicted with Jewish religious holidays (Purim and Passover), and he requested adjournment on 4/25/18 because he did not receive adequate advanced notice of the hearing.**

**(b) Second sentence: Admit, with clarification that the record was held open at the conclusion of the 5/23/18 meeting until the 6/17/18 meeting in order to submit an architect's affidavit.**

182.    At the May 23, 2018 hearing, Zummo agreed that Mr. Klein could resolve the issue with his property by either (1) installing a fire-sprinkler system, or (2) obtaining approval of a grading plan from the Village Engineer to backfill the property so that it was no longer three floors above-grade. (Ex. 50, ZBA Minutes 5/23/2018, Village_018714). During the May 23, 2018 ZBA hearing, Mr. Klein conceded that he had never obtained a set of stamped building plans from the Village indicating that his plans were approved. (Ex. 50, ZBA Minutes 5/23/2018, Village_018728).

**Response: Admit, with clarification that Klein explained that the Village refused to give him back stamped copies.**

183.    Mr. Klein's appeal was also discussed at the June 27, 2018 ZBA meeting. Zummo was not in attendance at the June 27, 2018 meeting. Chris Riley, Esq., Special Counsel for Prosecutions for the Village attended the meeting and discussed the timeliness of the Kleins' appeal with the ZBA. Mr. Riley opined that the appeal was taken more than 60 days after the Stop Work Order was issued and could not be appealed. (Ex. 72, ZBA Minutes 6/27/2018, Village_006136-006138).

**Response: Admit**

184.    On July 18, 2018, the ZBA issued a resolution regarding Mr. Klein's appeal, finding that the appeal was not timely and dismissing the appeal. (Ex. 73, ZBA Resolution, Village_009010-009011).

**Response: Admit**

185.    A Pomona Planning Board Site Plan Check list dated May 21, 2018 indicates that the site plan was missing certain information. Specifically, the proposed grading around the residence was not clear. The plan lacked elevations for the basement and first floor and failed to address drainage concerns. In an email dated that same day from Corless to Zummo, Corless noted that "there are a number of items to be completed by this design professional to furnish a completed site plan" and

identified various items. Corless's email also noted that the plans called for removal of several trees, which would require planning board approval. Corless enclosed his prior review of the plans as it appeared that the previous outstanding items he identified remained open issues. (Ex. 74, Email with Site Plan Check List, Village_000643-000645).

**Response: Objection insofar as the statement is conclusory. Admit that Def. Ex. 74 speaks for itself.**

186.    These Planning Board Site Plan Check Lists were not completed for every application; only when the Village was having difficulty communicating with the applicant or the applicant's hired professional as to what was required. (Ex. 14, Corless Dep. 75:8-18).

**Response: Admit the statement generally**

187.    On June 19, 2018, Mr. Klein submitted an application for a tree permit. On June 22, 2018, the permit application was denied because it contained inconsistent and incomplete information. (Ex. 57, Email from Zummo to Klein, Village_000682 (e.g., the permit requested removal of three trees, but the contractor's paperwork indicated four trees)).

**Response: Admit that the permit was denied. Deny that the inconsistency was adequate basis for denial and was not pretextual.**

188.    In July 2018, Mr. Klein sent Zummo an email inquiring as to the status of an application for a tree permit, a fence permit, and "plans." (Ex. 57, Email from Zummo to Klein, Village_000682-000683).

**Response: Admit**

189.    On July 25, 2018, Zummo emailed Mr. Klein with a detailed response. Zummo explained that Mr. Klein's request for an extension of his 2016 building permit was not approved due to the October 2017 Stop Work Order and Mr. Klein's failure to submit drawings which resolved the need for a sprinkler system. Zummo noted that while Mr. Klein had submitted site plan drawings to the Village Engineer, the Village Engineer had identified a number of deficiencies, which Mr. Klein had not resolved. (Ex. 57, Email from Zummo to Klein, Village_000682-000683).

**Response: Objection insofar as the statement is conclusory. Admit that the document speaks for itself as far as Zummo's position is concerned.**

190.    On or about September 20, 2018, Mr. Klein submitted an appeal to the ZBA and architectural board regarding the denial of his request to extend his 2016 permit. The project listed was to "extend a single-family home with a basement first floor and second floor grading with retaining walls to be done in order for the basement to comply with Village and New York State

codes as a basement and not count as a story above grade." An emergency permit was requested to finish the house. (Ex. 75, ZBA Application, Village_002023-002038).

**Response: Admit**

191.    In November 2018, in the Justice Court, Naftali Klein filed a motion to dismiss the criminal proceedings against him arising from the January 2018 violations of the Stop Work Order issued by Katherine Tolf. (Ex. 76, Motion to Dismiss). The motion was denied on January 3, 2018. (Ex. 77, Decision and Order).

**Response: Admit**

192.    A non-jury trial was held on January 7 and 9, 2019, in the Justice Court on, inter alia, the Information charging that Naftali Klein had violated the October 2017 Stop Work Order in January 2018. In a Decision and Verdict dated March 29, 2019, the Justice Court found Naftali Klein guilty of violating Village Code § 130-22 on multiple dates in January 2018 when he "permitted or allowed numerous individuals to work on the roof of the subject premises in violation of a duly issue[d] posted Stop Work Order without a permit and by continuing to work on the aforementioned premises." (Ex. 78, Decision and Verdict).

**Response: Admit**

193.    Naftali Klein filed an appeal from the Decision and Verdict. (Ex. 79, 5/29/2019 Notice of Appeal). The appeal was dismissed on September 16, 2019. (Ex. 80, Order of Dismissal).

**Response: Admit**

194.    Klein obtained multiple architectural plans during the course of his project, including plans dated September 22, 2016; July 3, 2017; October 13, 2017; and October 24, 2017. (Ex. 81, Plans, Village_21014-21033).

**Response: Admit**

195.    Plans prepared by Mr. Klein's architect and dated September 22, 2016 show the house being raised by 4' 10''. (Ex. 81, Plans, Village_21014-21018; Ex. 22, Coleman Aff. ¶ 5; Ex. U, Coleman Dep. 71:4-9). The September 22, 2016 plans do not show removal and expansion of the garage. (Ex. 81, Plans, Village_21014-21018; Ex. 22, Coleman Aff. ¶ 5). The 2016 plans do not show three floors above grade. (Ex. 81, Plans, Village_21014-21018; Ex. 22, Coleman Aff. ¶ 5).

**Response: Admit**

196.    The 2017 architectural plans show three floors above grade, which would necessitate the installation of automatic sprinklers under the NY State Building Code. (Ex. 81, Plans, Village_21019-21033; Ex. 22, Coleman Aff. ¶ 9).

**Response:** **Objection, statement offers or is based upon legal conclusions. Alternatively, denied. There were multiple 2017 architectural plans, and not all plans submitted were available to or reviewed by Mr. Coleman, nor were they all legible in the format provided.**

197.    The first set of plans to demonstrate only two floors above-grade and, thus, obviate the need for sprinklers, were dated August 14, 2019. (Ex. 82, 2019 Plan, Village_020146; Ex. 21, Coleman Dep. 51:24-52:3, 71:13-19).

**Response:** **Objection, statement offers or is based upon legal conclusions. Moreover, not all plans submitted to the Village were available to or reviewed by Mr. Colemen, nor were they sufficiently legible in the format provided.**

198.    On June 21, 2019, Spence emailed Mr. Celentano based on his initial review of the site plan a list of comments with things that needed to be completed in order for Spence to approve the site plan. (Ex. 18, Spence Dep. 48:20-49:5, Ex. 83, Email from Spence to Celentano, Village_012602-012603 (also marked as Exhibit 3 at Spence deposition)).

**Response:** **Objection, insofar as the statement offers a legal conclusion. Admit that Spence offered comments, but deny that some or all of the items were required for approval.**

199.    On August 16, 2019, Spence conditionally approved Klein's application for site plan approval, meaning it was approved but certain conditions needed to be complied with during the construction. (Ex. 18, Spence Dep. 50:19-51:2, Ex. 84, Conditional Approval, Banks000157 (also marked as Exhibit 4 at Spence deposition).

**Response: Admit**

200.    On September 27, 2019, Zummo sent a letter to Naftali Klein regarding an application for a building permit to "finish/renovate home as framed." In the letter, Zummo explained that the requested building permit could not be issued at the time as the plans did not resolve the issue of having three-floors above grade with no sprinkler system, based on Zummo's understanding of the grade of the property and Code Sections 502.1 Grade Plan and Code 404.1.5 Height Above Finished Grade. Zummo stated, "There are multiple methods available to remedy this situation, [1] closing some of the walk outs and or removing window wells, which will increase the area at the higher grade[,] [2] "Installing a NFPA sprinkler system in the entire house[,] or [3] seeking a variance from the state for the codes mentioned above." (Ex. 85, Banks 001108-001109).

**Response:** **Objection to legal conclusions. Otherwise, admit that Zummo's letter speaks for itself as to Zummo's position.**

201.    In 2020, Naftali Klein submitted a petition to the NYS Uniform Fire Prevention and Building Code Board of Review "for relief related to the New York State Uniform Fire Prevention and Building Code"; in essence, a variance from the sprinkler requirement. On March 20, 2020, a hearing was held on the petition. (Ex. 86, Notice of Hearing, Village_021009).

**Response: Objection as to legal conclusion. Admit that Klein a grievance and appeal as discussed in Plaintiffs' Counterstatement. Admit that Klein requested a variance *in the alternative*, but the primary request was not for a variance. The State body did not grant a variance, as it approved Klein's appeal and overruled Zummo. (PLTF_0002282-0002283).**

202.    The Village did not receive notice of the New York State Department of State hearing on Naftali Klein's application until March 11, 2020, and Zummo did not receive notice of it until March 13, 2020, after the hearing and, thus, had no opportunity to attend the hearing. (Ex. 86, Notice of Hearing, Village_021005-021009; Ex. 10, Zummo Dep. 188:2-12).

**Response: Admit**

203.    On April 14, 2020, the New York Department of State, Hudson Valley Board of Review issued a decision based on a site development plan dated August 14, 2019, holding that Code Section R404.1.6 was not applicable such that sprinklers were not required. (Ex. 87, NY State Board Decision, Village_015184-015185).

**Response: Admit, with clarification that the decision references a grading plan dated August 16, 2019.**

204.    The Village received a copy of the State Board decision on May 8, 2020. (Ex. 87, NY State Board Decision, Village_015184-015185).

**Response: Admit**

205.    Upon receipt of the decision, the Village could have challenged the decision by bringing an Article 78 proceeding within four months of the decision. CPLR 217. Ultimately, the Village did not appeal the State Board decision.

**Response: Object, insofar as the statement offers a legal conclusion. Alternatively, Admit, with clarification that the Village has offered no basis for appeal.**

206.    On April 24, 2020, grading and fill work was conditionally approved by Village Engineering Consultant Martin E. Spence. (Ex. 88, Conditional Approval, Banks001111).

**Response: Admit**

207.    On May 29, 2020, Zummo issued a grading/fill building permit. (Ex. 89, Building Permit, PLTF_0002292).

**Response: Admit**

208.    On June 12, 2020, Zummo issued a building permit for the "completion of addition/renovation of a single-family house." The permit provides that "Finished house will include – 3 Car Garage, unfinished basement, 2 kitchens, playroom, 6 bedrooms, 3 bathrooms, study, cupola. Owner received variance from the state not to install sprinkler system. All work performed during the Stop Work Order must be inspected prior to continuing construction." (Ex. 90, Building Permit, Village_020995-020996).

**Response: Admit that the document speaks for itself. Deny that Klein received a variance from the state.**

209.    On November 5, 2020, Zummo conducted an inspection at 63 Halley Drive and, thereafter, lifted the stop work order from October 2017, although certain items were designated as needing remediation. (Ex. 91, Inspection Report, Village_012918-012920).

**Response: Deny that the post-inspection check-list used the term remediation. Otherwise admit.**

210.    Zummo reinspected the frame on April 13, 2021 and approved the work. (Ex. 92, Inspection Report, Village_013005).

**Response: Admit**

211.    Mr. Klein testified that while he purchased tarps at Home Depot, he could not recall if he, day laborers, handymen, or the framers put up the tarps. (Ex. 7, R. Klein 3/20/2023 Dep. 20:16-23; 22:11-16). Mr. Klein testified that the tarps that were put up repeatedly came down due to the wind. (Ex. 7, R. Klein 3/20/2023 Dep. 11:3-10).

**Response: Admit**

212.    Mr. Klein testified that he purchased traps after raccoons were found entering the house, but does not think he has receipts for the same. (Ex. 7, R. Klein 3/20/2023 Dep. 29:4-23).

**Response: Admit**

213.    Mr. Klein testified that he, on his own, pumped out water that flooded into the basement. (Ex. 7, R. Klein 3/20/2023 Dep. 30:7-11, 30:15-17).

**Response: Admit**

214.    Mr. Klein intended to put a new staircase in the house regardless of any damage sustained to the staircase. (Ex. 7, R. Klein 3/20/2023 Dep. 34:3-8).

**Response: Admit**

215.    Mr. Klein claims that he has sustained damages due to exposure, but he could not provide any information regarding the amounts he allegedly spent on allegedly damaged items. For example, Mr. Klein did not know how much it cost to replace the beams in the basement. (Ex. 7, R. Klein 3/20/2023 Dep. 32:12-16), to repair the bathroom upstairs (Ex. 7, R. Klein 3/20/2023 Dep. 36:25-37:3), to replace wood and beams on the top floor (Ex. 7, R. Klein 3/20/2023 Dep. 38:6-10, 38:15-18), to replace plywood, sheetrock, and drywall in the dining room (Ex. 7, R. Klein 3/20/2023 Dep. 44:10-25, 45:3-6), to replace sheetrock in the ceiling of the upstairs bedroom if it had to be replaced (Ex. 7, R. Klein 3/20/2023 Dep. 46:18-47:1, 47:5-10), or to replace the insulation in the entire house. (Ex. 7, R. Klein 3/20/2023 Dep. 91:13-25).

**Response: Admit that he could not provide estimates of these items at the time of his deposition, but deny that they cannot be estimated.**

216.    Mr. Klein did not know how much the dining room set that was allegedly damaged cost and he has not yet replaced it. (Ex. 7, R. Klein 3/20/2023 Dep. 53:5-7; 53:12-18). Similarly, he could not estimate the cost of personal items damaged in closets. (Ex. 7, R. Klein 3/20/2023 Dep. 108:23-109:6).

**Response: Admit that he could not estimate these items at the time of his deposition, but deny that they cannot be estimated.**

217.    With respect to allegedly damaged electrical equipment, he did not know what work was done to repair certain wiring versus work that was going to be done regardless. (Ex. 7, R. Klein 3/20/2023 Dep. 94:20-25, 95:7-16).

**Response: Admit that he had not done such a calculation at the time of his deposition, but deny that the amount cannot be estimated.**

218.    Mr. Klein does not know the breakdown in terms of how much he spent to make certain repairs related to alleged damage sustained by exposure to the elements. (Ex. 7, R. Klein 3/20/2023 Dep. 37:4-19).

**Response: Admit that he could not make an estimate at the time of the deposition, but deny that an estimation cannot be made.**

219.    Mr. Klein has not been prevented from working on his property for any reason relating to the Village since 2020. (Ex. 5, R. Klein 11/22/2022 Dep. 242:5-9).

**Response: Denied. These issues have not been raised at this time in this lawsuit.**

220.    Zummo has received new or renewed applications from Mr. Klein for permits for his home. Upon reviewing those applications, he issued permits. (Ex. 10, Zummo Dep. 190:8-15).

**Response: Admit for the purposes of this motion.**

221.    Mr. Klein has no evidence that Banks directed Zummo to discriminate against Orthodox Jews. (Ex. 6, R. Klein 11/28/2022 Dep. 248:15-21).

**Response: Admit**

222.    Mr. Klein testified that the only actions Banks took in directing Zummo and blocking Mr. Klein's construction was retaining Zummo. (Ex. F, R. Klein 11/28/2022 Dep. 151:2-8, 22-25, 152:2-8).

**Response: Admit**

223.    Mr. Klein could not think of anything that Banks did to block his construction. (Ex. 6, R. Klein 11/28/2022 Dep. 153:2-5).

**Response: Admit**

224.    Mr. Klein submitted an expert report from Barrett Richards, in which Mr. Richards opined that, assuming Mr. Klein's home incurred damage from exposure to the elements, the damage was $300,000. (Ex. 23, Richards Dep. 48:5-8, 63:9-64:10 (Mr. Richards was asked by Mr. Klein "to assume that there were damages due to the project not being enclosed for an extended period of time.")).

**Response: Admit**

225.    Mr. Richards was not informed by Mr. Klein that the Village agreed to lift the second Stop Work Order to permit Mr. Klein to encapsulate the home with temporary protection. (Ex. 23, Richards Dep. 96:9-97:9).

**Response: Objection, statement is conclusory and misstates the evidence. As discussed in Plaintiffs' Counterstatement, when Klein attempted to take measures to provide temporary protection of his home, the Village issued violations.**

226.    Mr. Richards opined that, temporary protection of construction, "if it's properly installed and maintained, it does serve to mitigate against potential damage." (Ex. 23, Richards Dep. 97:24-98:9).

**Response: Objection, insofar as the Statement is conclusory and irrelevant as Mr. Richards was speaking generally and not specifically as to any particular means of temporary**

protection or whether it would necessarily have mitigated against potential damages in Klein's case. In the alternative, denied, as Mr. Richards' response was, "the earlier temporary protection is provided . . . " and was qualified by, "this is making a lot of assumptions here." (Richards Dep. 98:5-9).

227.    Mr. Richards did not opine as to the propriety of the Stop Work Orders. (Ex. 23, Richards Dep. 49:12-18, 107:21-23).

**Response: Admit**

228.    Naftali Klein does not claim economic damages. (Ex. 8, N. Klein Dep. 79:5-9).

**Response: Admit**

## VII.    ALLEGED ANTISEMITISM IN THE VILLAGE

229.    Yagel never directed Zummo to look into homes at which Orthodox Jewish religious services were being held. (Ex. 10, Zummo Dep. 67:13-20).

**Response: Denied (*See, e.g.*, VILLAGE_000169-000170)**

230.    There is an eruv in the Village. Zummo is not aware of any complaints regarding the eruv. (Ex. 10, Zummo Dep. 136:25-137:18).

**Response: (a) First sentence: Admit**

**(b) Second sentence: Denied. Zummo was included in an email from Susan Montemorano complaining about the eruv. (VILLAGE_002232).**

231.    Zummo never received any complaints regarding mikvahs, but issued permits for multiple mikvahs over the years. (Ex. 10, Zummo Dep. 138:2-8).

**Response: Admit, with clarification that Yagle and Harris discussed possible ways to violate or prevent the building of a mikvah in Pomona. (YAGEL00827).**

232.    The only discussions he had about Orthodox Jews with the mayor involved services that would be required to help the community integrate, such as moving the program that they had at the Cultural Center to a different day so more people could participate and some of the infrastructure that's required including adding additional garbage days, adding dumpsters for certain holidays, parks and playgrounds. (Ex. 10, Zummo Dep. 13:16-25, 194:2-10).

**Response: Denied. There are many examples of derogatory discussions Zummo had with Yagel about Orthodox Jews, see Plaintiffs' Counterstatement.**

233.    Mr. Indig did not recall a non-Jewish person telling him that the building inspector or people in the building department were reasonable and/or accommodating. (Ex. 2, S. Indig Dep. 83: 18-25).

**Response: Denied. Mr. Indig testified that there was chatter among non-Jews in the Village that the building department was reasonable and/or accommodating, but he did not recall a specific non-Jewish person telling him that. (S. Indig Dep. 82:23 to 83:25).**

234.    Zummo never said anything in Mr. Indig's presence which Mr. Indig considered to be antisemitic. (Ex. 2, S. Indig Dep. 133:7-12).

**Response: Admit, with clarification that Mr. Indig testified that Zummo did act rude and dismissive to him. (S. Indig. Dep. 133:23-135:16).**

235.    Zummo never made any statements derogatory of religion in Mr. Klein's presence. (Ex. 6, R. Klein 11/28/2022 Dep. 166:25-167:5).

**Response: Denied. Mr. Klein testified that Zummo stood up at the July 2016 ZBA meeting and said that Mr. Klein was going to build an illegal apartment in his basement "just like them," referring to Orthodox Jews. (R. Klein 11/22/22 Dep. 99:13 to 102:10; R. Klein 11/28/22 Dep. 171:3-13).**

236.    Mr. Indig never heard any Village official ever say anything that he would consider to be antisemitic. (Ex. 2, S. Indig Dep. 133:13-17).

**Response: Denied. Mr. Indig did not testify that he never *heard* any Village official say anything that he would consider to be antisemitic; rather, he was asked whether any Village official ever said anything *to him* that he considered antisemitic. (S. Indig. Dep. 133:13-17).**

237.    Mrs. Indig never heard anyone from the Village say anything antisemitic. (Ex. 3, L. Indig Dep. 90:7-12).

**Response: Denied. Mrs. Indig was asked about antisemitic statements from Village *officials or employees*. (L. Indig Dep. 90:7-12). Moreover, she testified that their actions showed antisemitism. (L. Indig Dep. 89:21 to 90:3).**

238.    Mrs. Indig never overheard anyone from the Village say anything antisemitic to someone else in her presence. (Ex. 3, L. Indig Dep. 90:13-18).

**Response: Denied. See Response to Statement 237.**

239.    During Mrs. Indig's conversations with Zummo, he never made an antisemitic remark. (Ex. 3, L. Indig Dep. 127:22-25, 128:2).

**Response: Admit**

240.    Mr. Kahana never heard anyone in the Village say something he considered to be antisemitic. (Ex. 4, Kahana Dep. 82:18-21).

**Response: Denied. Mr. Kahana was asked whether he heard anyone *from the Village* say something he considered to be antisemitic, not whether he heard anyone *in the Village* make such statements.**

241.    Zummo has never made any derogatory comments about the Jewish religion. (Ex. 10, Zummo Dep. 134:5-10).

**Response: Denied. There are many examples in the Shea recordings, see Plaintiffs' Counterstatement.**

242.    Zummo never referred to Orthodox Jews in Pomona as a "sea of Yamakas" and never stated that the Orthodox Jews work in groups to take over and control. (Ex. 10, Zummo Dep. 194:13-25, 195:2-5).

**Response: Admit as to the specific language in the statement.**

243.    Zummo has a habit of impersonating people, regardless of their religion. (Ex. 17, Vanderbeek Dep. 37:14-38:16). When he tells a story, he impersonates everyone involved in the story including his coworkers. (Ex. 15, Tolf Dep. 68:23-69; Ex. 10, Zummo Dep. 129:19-130:15; Ex. 16, Arsa Artha Dep. 43:17-44:11). Zummo does not intend his impersonations to be offensive or degrading. (Ex. 10, Zummo Dep. 130:5-16). After Yagel asked Zummo not to do impersonations, Zummo stopped. (Ex. 10, Zummo Dep. 132:19-133:3).

**Response: Denied. See Plaintiffs' Counterstatement.**

244.    Tolf never expressed a concern to Zummo that she was being directed to enforce regulations selectively. (Ex. 10, Zummo Dep. 55:20-3, 56:5).

**Response: Denied. Tolf testified that she probably told Zummo about an incident in which Yagel was upset that she issued a violation to an African-American friend and political supporter, which she described as selective enforcement. (Tolf Dep. 45:14: to 46:19, 49:14-25).**

245.    Tolf never expressed a concern to Zummo that the violations occurred primarily among Orthodox Jews in Pomona. (Ex. 10, Zummo Dep. 56:6-11).

**Response: Admit**

246.    Corless never heard Zummo make derogatory comments about religious Jews, Jews in general, or any other nationality. (Ex. 14, Corless Dep. 64:14-23).

**Response: Admit**

247.    Spence never heard Zummo make any derogatory comments concerning Orthodox Jews or Jews in general. (Ex. 18, Spence Dep. 76:11-20).

**Response: Admit**

248.    Spence never heard any Village officer or employee make any derogatory comments about Orthodox Jews or Orthodox residents in Pomona. (Ex. 18, Spence Dep. 76:21-77:2).

**Response: Admit**

249.    Lasker never heard Ulman make derogatory comments towards people of Jewish faith. (Ex. 19, Lasker Dep. 167:12-16).

**Response: Admit**

250.    Lasker never heard Harris make any derogatory comments towards the Jewish population. (Ex. 19, Lasker Dep. 167:20-24).

**Response: Admit**

251.    Zummo never made derogatory comments about Orthodox Jews in Lasker's presence. (Ex. 19, Lasker Dep. 170:9-13).

**Response: Admit**

252.    Avrohom Manes, who has filed numerous lawsuits against the Village, is paying the legal fees for the Plaintiffs with respect to the subject lawsuit. (Ex. 20, Manes Dep. 40:2-10, 61:16-62:8). In July 2019, Mr. Manes filed a lawsuit on behalf of himself and his company, Tal Properties, against the Village and certain Village officials based on discrimination. The District Court dismissed Plaintiffs' claims, and the decision was affirmed by the Second Circuit. (Ex. 93, Decision of the Second Circuit).

**Response:** (a) First sentence: Objection as to relevance. In the alternative, admit that Manes has filed multiple lawsuits against the Village and admit that he has paid legal fees for the Plaintiffs in this case.

(b)-(c) Second and Third sentences: Objection as to relevance. In the alternative, admit.

## PLAINTIFFS' COUNTERSTATEMENT

### I.      POMONA AND ITS OFFICIALS VS. ORTHODOX JEWS

#### A. *Tartikov*: Defendants Yagel, Banks, and Ulman

1.      Yagel testified that from the time he first became trustee in 2007 until the time his terms as mayor ended, the Orthodox Jewish population in Pomona increased over that time. (Def. Ex. 9, Yagel Dep. 68:12-18). Ulman testified that the Orthodox Jewish population of Pomona has increased significantly over the last ten years. (Def. Ex. 12, Ulman Dep. 97:3-24).

2.      Over that time, many of the Village's longstanding residents and its now-former officials opposed the influx of Orthodox/Hasidic Jews into Pomona. Due to this animosity to Orthodox/Hasidic Jews, the Village and its now-former officials passed local Village laws "in order to thwart the spread of the Orthodox/Hasidic Jewish community into the Village." *Cong. Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 280 F. Supp. 3d 426, 454 (S.D.N.Y. 2017) ("*Tartikov*").

3.      Defendants Brett Yagel ("Yagel") and Ian Banks ("Banks") were both named defendants in *Tartikov*. Banks had served as a member of the Village Board of Trustees since 1997. *Id.* at 435 and n.3. Yagel was first elected to the Board of Trustees in March 2007 on a slate of three candidates explicitly opposing the Tartikov rabbinical college. *Id.* at 443-444, 465.

4.      Although Defendant Doris Ulman ("Ulman") was not a named defendant in *Tartikov*, she had served as Village Attorney since July 2003, and she drafted and recommended three of the four local laws at issue, including the two local laws adopted in 2007. *Id.* at 441-443.

5.     As evidence that the two local laws adopted in 2007 were motivated by an intent to discriminate against Orthodox/Hasidic Jews, the District Court described the "contentious" January 22, 2007 Village meeting at which both laws were discussed. The District Court described residents as "vehemently opposed" to the Tartikov project, including those who opposed the development "because it was proposed by Orthodox/Hasidic Jews." The District Court described several of the villagers' comments that revealed a fear "that the Village would turn into another 'Kiryas Joel,'" and that Tartikov and its students "were going to take over the Village and change its 'character.'" *Id.* at 451.

6.     Regarding the 2007 "Wetlands" law, the District Court found: "Village officials explicitly stated their intent to thwart Tartikov's plans. . . . Sanderson, Louis, and Yagel indicated in campaign materials that voters needed to 'stand up to the threat' that Tartikov posed, further stating '[y]ou need to vote for a team that is prepared to stand up to this threat of using the fundamentally unfair RLUIPA statute as a hammer against our village.'" *Id.* at 452.

7.     The District Court also cited published statements by Yagel that "reveal Yagel's and Louie's animus toward Tartikov and Orthodox/Hasidic Jews." *Id.* at 452 and n.19. The District Court stated: "The Court does not credit Yagel's testimony that the law [adopted in April 2007] was not adopted to discriminate against Tartikov because Yagel made discriminatory comments leading up to the adoption of the law." *Id.* at 465.

8.     The District Court also found that part of Yagel's trial testimony related to the local law adopted in April 2007 was "demonstrably false." *Id.*

9.     The District Court rejected multiple parts of Ulman's testimony, which it described as "unpersuasive," "dubious, at best," and as "show[ing] a willingness to stretch the truth and detract[ing] from her overall credibility." *Id.* at 460, 462, 464. Regarding the local law

adopted in April 2007, the District Court stated: "There are several issues with Ulman's testimony that detract from her credibility, thus yielding the conclusion that none of the stated justifications [for the law] holds any water." *Id.* at 463.

10.    On appeal, the Second Circuit <u>affirmed</u> the judgment of intentional discrimination as to the two laws adopted in 2007, although it reversed the finding of discrimination as to the challenged 2001 and 2004 local laws. *Cong. Rabbinical College of Tartikov, Inc. v Village of Pomona*, 945 F.3d 83 (2d Cir. 2019), *cert. denied*, 141 S. Ct 885 (2020).

11.    Affirming the judgment as to the 2007 local laws, the Second Circuit explained that "the 2007 Dormitory and Wetlands Laws were enacted in a significantly different context than were the 2001 and 2004 Laws. These differences are highly significant." *Id.* at 120.

12.    Among other things, the Second Circuit pointed to the activist group Preserve Ramapo's publication of an article in early January 2007 describing plans for the Tartikov rabbinical college, which generated "public outcry" and precipitated a large turnout of villagers opposed to Tartikov at the January 22, 2007 Village meeting. *Id.* at 119-120.

13.    The Second Circuit stated that the Board of Trustees heard the many villager comments opposing Tartikov and disparaging Orthodox/Hasidic Jews, and the Board's "discussion following the conclusion of the hearing demonstrates that those comments were on their minds." As an example, the Second Circuit pointed to then-Trustee Banks' suggestion that the 2007 "Dormitory" law should be even more restrictive than proposed or ultimately adopted. *Id.* at 121.

14.    The Second Circuit also found that the judgment concerning the 2007 "Wetland" law was supported by the campaign and election of Yagel and his two running mates on a platform opposing the Tartikov rabbinical college, as well their statements identified by the

District Court as "'indicative of [Pomona's] prejudice against Tartikov and Orthodox/Hasidic Jews.'" *Id.* at 119-120 (quoting *Tartikov*, 280 F. Supp. 3d. at 452).

### B.  Yagel Continues His Campaign vs. RLUIPA and Orthodox Jews

15.    Yagel continues to be an ardent opponent of the federal Religious Land Use and Institutionalized Persons Act ("RLUIPA"). He testified that RLUIPA is "unfair," that "[i]t puts property owners who are not religious or nonreligious at a disadvantage when it comes to zoning," and gives "religious organizations or people who are religious and are using RLUIPA an unfair advantage." Yagel Dep. 31:2-5, 50:15-17. Yagel's platform for his candidacy for mayor in 2011 included continuing to defend the village against the *Tartikov* lawsuit as well as his opposition to RLUIPA. Yagel Dep. 45:7-19.

16.    Yagel also testified that he believed the Tartikov organization was a "threat to diversity in Pomona." Yagel Dep. 51:25 to 52:5.

17.    In November 2022, an Orthodox Jewish congregation filed a federal lawsuit against the Town of Haverstraw challenging the town's refusal to permit it to establish a house of worship. *K'hal Bnei Torah of Mount Ivy v. Town of Haverstraw, et al.*, S.D.N.Y. No. 7:22-cv-09630.

18.    On February 11, 2023, Yagel posted a notice on his "Mayor Brett Yagel" Facebook page announcing that the Town of Haverstraw planned to settle the lawsuit and allow construction to proceed on the proposed house of worship. The notice opposed the settlement and urged "as many people as possible" to attend a February 13, 2023 meeting at which the Town would vote on a resolution approving settlement. Above the notice, Yagel wrote: "Show up Monday! We must save Haverstraw!" [FACEbook]

19.     Yagel himself attended the February 13, 2023 Town of Haverstraw meeting to

oppose the settlement. At the meeting, Yagel engaged in a heated exchange with the Town

Supervisor, leading to Yagel's removal and a subsequent charge of disorderly conduct.

https://www.lohud.com/story/news/local/rockland/2023/02/16/former-pomona-mayor-brett-

yagel-thrown-out-of-haverstraw-meeting/69907509007/

20.     On February 14, 2023, Yagel wrote the following on his Facebook page:

Last night Supervisor Howard Phillips and the town board backed down from an
RLUIPA lawsuit. SHAME ON THEM. In Pomona when I was Mayor we were sued
under RLUIPA and WE WON! The Haverstraw Town Board and the Supervisor had the
chance to be remembered as the ones that saved Haverstraw but now they are the ones
who have ruined it. Howard repeating several times 'we will lose if we don't settle' that's
not the mindset to have when peoples home values and way of life are at risk.

[Facebook] (underline added). Yagel did not explain how permitting an Orthodox Jewish house

of worship in the Town of Haverstraw would harm "home values" or the Town's "way of life."

### C.  Village of Airmont: Defendant Zummo

21.     Defendant Louis Zummo ("Zummo"), Pomona's part-time Building Inspector,

also serves as the part-time Building Inspector for the Village of Airmont. Shortly after the

present action was filed, two other federal civil rights actions were filed against the Village of

Airmont for discrimination against Orthodox Jewish institutions and individuals, both of which

included claims against Zummo in his individual and official capacity. *See Central UTA of

Monsey, et al. v. Village of Airmont, et al.*, SDNY Case No. 7:18-cv-11103; *Cong. of Ridnik, et

al. v. Village of Airmont, et al.*, SDNY Case Nos. 7:18-cv-11533.

22.      On January 22, 2020, Judge Briccetti denied a motion to dismiss claims against

Zummo (including on the basis of qualified immunity) for Zummo's actions regarding Orthodox

Jewish organizations in the building permitting process. *Central UTA of Monsey v. Village of

Airmont*, 2020 WL 377706 (S.D.N.Y. Jan. 22, 2020).

23.     On December 2, 2020, the U.S. Department of Justice filed its own federal civil rights complaint against the Village of Airmont related to the *Central UTA of Monsey* and *Cong. of Ridnik* actions. *United States of America v. Village of Airmont*, SDNY No. 7:20-cv-10121.

24.     On March 15, 2021, the Department of Justice filed, and the District Court endorsed, a consent order and preliminary injunction against the Village of Airmont. Among the documents filed in support of the consent order and preliminary injunction was an affidavit of Rabbi Moishe Berger, an Orthodox/Hasidic Jewish rabbi, detailing how Zummo unfairly calculated the worship space in his residential house and issued a violation based upon the calculation. [exhibit USA]

**D.  Whistleblower Noreen Shea**

**a.  Shea's Division of Human Rights Complaint**

25.     On November 3, 2017, Pomona's former Deputy Clerk Noreen Shea ("Shea") filed a verified employment discrimination complaint with the New York Division of Human Rights ("DHR"), asserting that Yagel fired her for refusing to comply with the Village's policy of discriminating against Orthodox Jews. (VILLAGE_011289-11292).

26.     The Rockland County Commission on Human Rights ("RCHR") conducted a six-month investigation of Shea's complaint, receiving evidence from the Village and Shea and interviewing Village officials. (PLTF_0001648-1684])

27.     Defendant Ian Banks ("Banks"), a Village Trustee at the time, was interviewed by the RCHR investigator on February 28, 2018. In a detailed witness summary, the investigator recorded *inter alia* the following statements from Banks:

a.  Banks stated that Shea said she had been criticized for providing documents to residents too quickly and she was told that she should not be doing it.

b.  Banks reported that Jewish residents have problems getting their documents quickly;

    c.   Banks stated that Shea treated everyone the same way, but Mayor Yagel did not agree with her approach and Shea reported that she was criticized for doing her job.

    d.   Banks stated that recently, a lot of the complaints are about what is going on with the building department;

    e.   Banks said he attended a meeting in which he heard residents talk about permits, plans approval, certificates of occupancy, and stop work orders; asked who complained, Banks replied, "Pretty much all the Jews";

    f.   Banks stated that there has been a recent change in the demographics of the Village, i.e., there are more Orthodox Jews;

    g.   Banks stated that Shea told him that Mayor Yagel called her a "Jew lover," and that she said the term was used by Mayor Yagel and Building Inspector Zummo;

    h.   Banks stated that Shea told him that the phrase "those people" was used in the office;

    i.   Asked if he had knowledge about an "Us vs. Them" operating model at village hall, Banks stated that there is a division of employees, Mayor Yagel and people who don't agree politically or it could be religious beliefs;

    j.   Banks stated that a resident does not speak at meetings because he is afraid of intimidation from Building Inspector Zummo;

    k.   Banks stated that Mayor Yagel uses intimidation and threats to get what he wants and he gets help from the building inspector, the clerk, and the village attorney, and possibly the engineer;

    l.   Banks stated that Shea had told him about a meeting she had with Mayor Yagel and Deputy Mayor Leon Harris at which she was reprimanded; and

    m.   Banks stated that the employees are not acting independently and they are being manipulated by Mayor Yagel, for example the building inspector, who should be independent, takes directives from the Mayor.

(PLTF_0001664-1667).

     28.    On June 4, 2018 the RCHR issued a Memorandum to the DHR that included a Final Report of Investigation submitted by the RCHR investigator, and a Basis of Determination submitted by the RCHR Deputy County Executive recommending a finding of probable cause to support the allegations of Shea's complaint. (VILLAGE_001082-1089).

29.     Among other things, the Basis of Determination included Shea's assertion that Yagel stated she should display pork rinds on the public counter to deter Jewish residents from coming to the clerk's office, numerous complaints from Jewish residents for selective ticketing of violations, actions taken by the building department to thwart Plaintiff Klein's permit and ZBA applications, and Zummo's admission that he has mimicked or performed impressions of Jewish residents for their "carrying on." (VILLAGE_001082-001089).

30.     On June 12, 2018, the DHR issued its Determination After Investigation "that PROBABLE CAUSE exists to believe that the Respondent has engaged in or is engaging in the unlawful discriminatory practice complained of." (VILLAGE_001076).

### b.  Shea's Federal Civil Rights Lawsuit

31.     On November 30, 2018, Shea filed a federal employment discrimination lawsuit against the Village and Yagel based upon her claim that Yagel fired her for refusing to comply with Pomona's discrimination against Orthodox Jews. *Noreen Shea v. Village of Pomona and Brett Yagel*, SDNY No. 7:18-cv-11170.

32.     According to Shea, Zummo repeatedly complained to her that Yagel wanted to know every detail of his activities, particularly with regard to any Jewish developers and their properties. (Shea Affid. ¶ 7).

33.     Yagel constantly interfered with Zummo's schedule, and directed Shea and Zummo to alter the schedule to delay inspections properties owned by Jews. (Shea Affid. ¶ 7).

34.     Yagel directed Zummo to find violations on properties of Jewish developers, directed Zummo to engage in what was called a "shul patrol" on the Sabbath during which Zummo went to religious sites and wrote violations, and otherwise controlled Zummo's activities. (Shea Affid. ¶ 7)

35.    Zummo repeatedly mimicked Orthodox/Hasidic Jews, often in Yagel's presence. Yagel joined in and never seemed the least offended by this behavior, and Shea never heard Yagel correct or chastise Zummo for mimicking Jews in his presence. (Shea Affid. ¶ 8).

36.    Zummo told Shea on three or four occasions that Yagel was calling her a "Jew lover" and suggested that she look for other employment. (Shea Affid. ¶ 10).

37.    Village Clerk/Treasurer Artha participated in the pervasive antisemitism Shea observed, and Artha commented repeatedly that Jewish residents were impatient and wanted service more quickly than she wished to provide it. (Shea Affid. ¶ 14).

38.    Yagel and Zummo repeatedly directed Shea to slow down the processing of applications, responses to FOIA requests or any other service she was engaged in performing for Orthodox/Hasidic people. (Shea Affidavit ¶ 15).

39.    In many instances, including but not limited to Avrohom Manes, Herskowitz, Indig and Klein, Jewish applicants had to wait extensively for approvals or permit, and their motives were often questioned, for example, continuous references to Klein's desire to build a "hotel." *Id.*

40.    Robert Klein was one of the targets of Yagel's antisemitic conduct. (Shea Affid. ¶ 16).

41.    Shea testified that her complaints of antisemitism "went to the core of the Village." Shea testified that some in the Village were deeply concerned that Pomona would be "overtaken" by Orthodox/Hasidic families. (Shea Affid. ¶ 18).

42.    Zummo explained to Shea that there were four or five levels of Jews and "the lowest are the real Hasidics" and he did this "whole impression" of them. (Shea Dep. 53:11-15).

43.    Yagel told Shea to record the Orthodox Jews when they came into the office and he showed her on her phone how to do it. (Shea Dep. 155:15-18).

44.    Regarding an Orthodox Jewish realtor, Yagel told Shea: "Naomi Streiker [sic], when that b**** comes in here I want you to record her." (Shea Dep. 190:24 to 191:3).

45.    Shea testified that she recorded a few interactions with Orthodox Jewish people, decided it was wrong, and began recording the Mayor. (Shea Dep. 155:23 to 156:9).

46.    In the course of discovery, Shea disclosed that she had recorded many hours of conversations that transpired in her presence at Village Hall. The recordings documented frequent and repeated derogatory statements made by Yagel, Zummo, and Village Clerk/Treasurer Artha against Orthodox/Hasidic Jews. (Shea Dep. 195-216)

47.    Relying upon such recordings as well as other evidence, Judge Cathy Seibel at a hearing on January 11, 2021 denied summary judgment motions by the Village and Yagel (including on the basis of qualified immunity). [TX] The parties subsequently settled the case in 2021.

**E.  The Shea Recordings**

48.    While employed as Village Deputy Clerk, Shea used her phone to record conversations in her presence with Yagel, Zummo, and others in Village Hall. Shea was present when she recorded the conversations. The recordings were date- and time-stamped by Shea's phone. (Shea Dep. at 189, 193).

49.    Shea heard Yagel make derogatory comments about a number of Orthodox/Hasidic residents, developers, and business-people in Pomona, including inter alia the Indig Plaintiffs, Plaintiff Klein, Avrohom Manes, and Mr. Herskowitz. (Shea Dep. at 195-216).

50.    These stereotypic comments typically involved their desire to violate the law for the sake of making money. (Shea Aff. at ¶ 14).

51.    On September 27, 2016, Yagel discussed with Shea a motion to dismiss filed by Orthodox Jewish realtor Naomi Streicher's attorney in the Village's prosecution of tickets issued to her for alleged sign violations. Yagel stated: "Noreen, just so you know, Mr. Churgin has filed a motion to dismiss on the Streicher case and he's basically citing the Village's animosity toward religious Jews as a defense." (Shea 9/27/16 Part 1 Recording at 16:03).

52.    Yagel also told Shea that another Orthodox Jewish realtor, Fuerst & Fuerst, also filed an affidavit and exhibits in support of Streicher's motion. Yagel further stated to Shea:

This is going to cost us more in Chris's time and Doris's time hourly-wise than the fine itself. And the fact that now they're raising this issue and they're trying to bring it into another lawsuit against us under RLUIPA, they're trying to bring it into the big case, that's why I say everyone in this office, we've all got to keep our mouths shut because now Fuerst & Fuerst and Naomi Streicher are teaming up with Saved Churgin to come back at us and say you're doing this because its religious animosity. You're selectively enforcing the law and that's illegal.

(Shea 9/27/16 Part 1 Recording at 16:03)

53.    On October 5, 2016, Zummo told Shea and Artha a long story about a non-Jewish businessman who wanted to put the Jewish store "Bagel Boys" in Airmont out of business. Zummo told them that Bagel Boys did not own the property where the business was located, but only leased it from the owner, and he exclaimed, "This is how stupid the Jews are!" (Shea 10/05/17 Recording at 2:02:07).

54.    Zummo stated that the non-Jewish businessman paid a high price to buy the building in which Bagel Boys was located so that he could evict them from the property. (Shea 10/05/17 Recording at 2:02:07).

55.     Zummo stated that when Bagel Boys learned about the sale of the property and threatened to oppose it, Zummo met with the non-Jewish businessman and devised a strategy to "diffuse the situation." Zummo stated that he put a temporary stop work order on the non-Jewish businessman's project until the purchase of the property closed. Zummo said this would make the Jewish store owner think that the non-Jewish businessman is being punished and he would leave the non-Jewish businessman alone. Zummo stated that once the purchase closes, the non-Jewish businessman will bring the papers to Zummo and he will lift the stop work order and the non-Jewish businessman can do whatever he wants to do. (Shea 10/05/17 Recording at 2:07:27 to 2:10:08).

56.     Several minutes later, Zummo, Shea, and Artha discussed how much money Orthodox Jews spend on bar mitzvah celebrations and the expensive clothes Hasidic women wear. (Shea 10/05/17 Recording at 2:14:41).

57.     Their conversation turned to Orthodox Jewish religious practice, and Artha stated: "The bizarre thing . . . that's the stuff that really is, like, irritating. It's like these weird, like, restrictions and customs that really have nothing to do with religion. You know, I don't know where it comes from." (Shea 10/05/17 Recording at 2:16:45).

58.     Zummo responded, "My favorite is the ones on Shabbos where you can't touch any lights . . ." Zummo elaborated on a conversation he said he had with an Orthodox resident about such restrictions. (Shea 10/05/17 Recording at 2:17:04).

59.     Artha responded, "That's just pure stupidity, I'm sorry." *Id.* at 2:17:52. Zummo exclaimed, "That's, I'm like, that's the dumbest f****** thing I ever heard, why would you do that? (Shea 10/05/17 Recording at 2:17:54).

60.     Shea asked, "Why do they have so many rules and laws? I mean, what happened to simplicity?" *Id.* at 2:18:01. Zummo stated: "And the joke is, they're all ancient. They're all like, before [Shea: Old Testament], yeah before. And some of them are even before the Old Testament. You just sit there going, 'Who the f***?' You know, modernize a little. Stop with the s*** because it's ridiculous." (Shea 10/05/17 Recording at 2:18:06).

61.     Shea stated: "Yeah, you know you cant touch, like if I touch a Hasidic, I mean UHHH . . . I mean that's just crazy. But even if I bump into him on accident, like if I was on a train." *Id.* at 2:18:20. Artha responded, "They have to shower for seven days if you touch them," and Shea replied, "Well, they should shower ever day anyway, so maybe we should run around and touch them all." (Shea 10/05/17 Recording at 2:18:32).

62.     Artha stated that she had a friend that used to pay "twenty bucks" for them to go up to Hasidic men in the mall and touch them, "just to watch them freak out." (Shea 10/05/17 Recording at 2:18:40).

63.     On February 1, 2017, Zummo and Yagel discussed Orthodox Jewish resident Ronnie Schwartz's building plans for 12 Beaver Dam. Zummo told Yagel that he had a letter from the chief of the Hillsborough fire department stating that the fire chief reviewed the building plans and found 12 things wrong with it. (Shea 2/1/17 Part 1 Recording at 25:10).

64.     Zummo told Yagel that he was going to take the list to Schwartz, and Yagel responded, "Is it [for] us to let him know every little detail?" Zummo replied: "You don't have to because you already got a letter denying it, so it doesn't really matter at this point, but I want to make sure we bolster that with as many facts as we can to bury them in so he can't have a super shul on 12 Beaver Dam." (Shea 2/1/17 Part 1 Recording at 25:29).

65.     Yagel told Zummo, "Ronnie needs to know this is the law and you need to follow it, and just because Rabbi Berman comes up from Brooklyn to sit in the audience . . ." (Shea 2/1/17 Part 1 Recording at 25:46). Zummo stated: Why doesn't anybody do what they're supposed to do? Because they'll get ahead that way. Everybody thinks that the secret way of getting ahead is to either bend the law or f*** somebody. So that's the object we got to figure out a way to get around because nobody in the world wants you to get ahead just by working hard and they want to think some other way to get ahead. (Shea 2/1/17 Part 1 Recording at 26:16).

66.     On February 1, 2017, Yagel called an official at the Town of Ramapo to challenge properties in Pomona claiming non-profit religious tax-exemptions. (Shea 2/1/17 Part 1 Recording at 1:16:42). Yagel told the official that he just received a listing of Village tax exemption reports, and stated, "I know for a fact that some of these exemptions the C of O is for single family homes and not for houses of worship." (Shea 2/1/17 Part 1 Recording at 1:17:37). Yagel subsequently asked the staff to pull the file on 12 Sherwood, one of the homes used for Orthodox Jewish religious meetings, and he stated that he would not sign a document regarding tax exemption. (Shea 2/1/17 Part 1 Recording at 1:32:39).

67.     On February 3, 2017, Zummo told Yagel about a court case concerning multiple violations Zummo had written up on a property owner in Airmont. Zummo laughed as he told Yagel that the property owner received $12,500 in fines, adding "he got screwed!" (Shea 2/3/17 Part 1 Recording at 43:00).

68.     Yagel asked Zummo who was the guy, and Zummo said, "A house flipper, he's a Hasidic house flipper." (Shea 2/3/17 Part 1 Recording at 44:00). Yagel replied, "okay," and then

banged his hand and said, "That's what I want over here!" (Shea 2/3/17 Part 1 Recording at 43:04).

69.     Yagel continued, "That's what we need over here because if we start banging these house flippers . . ." (Shea 2/3/17 Part 1 Recording at 44:16). Zummo told Yagel that the Pomona special prosecutor usually negotiates a little bit, and Yagel stated: "I don't want any negotiation. With everything going on in Ramapo and this f****** county and these judges are not sticking people to the letter of the law . . ." (Shea 2/3/17 Part 1 Recording at 44:39). Zummo apparently agreed, stating: "We gotta stop people like that. . . . That'll slow that guy down." (Shea 2/3/17 Part 1 Recording at 44:39).

70.     Yagel continued: "I mean, Herskowitz. Herskowitz and Wolfson. I want the maximum on that property, the absolute maximum." (Shea 2/3/17 Part 1 Recording at 44:57). Herskowitz is an Orthodox Jewish builder and Wolfson is an Orthodox Jewish homeowner in Pomona.

71.     On the same day, Yagel was present when two Orthodox Jewish visitors with an accent entered Village Hall seeking assistance. (Shea 2/3/17 Part 1 Recording at 51:40).

72.     The visitors asked Shea and Zummo questions about various Village rules, such as placement of shipping containers, mobile homes and tiny homes on a specific property. Zummo told them that the Village does not permit shipping containers, mobile homes, or tiny homes on properties, unless they are placed behind a larger main home. (Shea 2/3/17 Part 1 Recording at 52:00 to 1:01:01).

73.     After the visitors left, Zummo asked Shea, "So what do you think they were, they weren't Jewish . . . I don't know, Chechnyan, maybe Slavic?" Shea responded that one had a

yarmulke on and the other had a beard and they looked like they were brothers. (Shea 2/3/17 Part 1 Recording at 1:02:04).

74.     When Zummo realized the visitors were Jewish, he started mocking them with an Orthodox/Hasidic Jewish accent and then said, "'Cause that's what they want to do, they want to buy a piece of land cheap, put a trailer on it, live in it for ten years, *make big monies, make monies!* Or have all their friends park all their midget trailers on it *and make monies*." (Shea 2/3/17 Part 1 Recording at 1:02:27).

75.     Several minutes after the visitors left, Yagel asked Zummo and Shea what the two visitors wanted. (Shea 2/3/17 Part 1 Recording at 1:10:55). Zummo responded, "Oh, Yacko and Wacko?" Zummo made a mocking impression of one of the visitors in an Orthodox/Hasidic accent, asking about putting 4-5 tiny homes on one property. Zummo told Yagel that the visitors suggested they maybe they could get on the Village board to change the rules. (Shea 2/3/17 Part 1 Recording at 1:11:00 to 1:12:20).

76.     Yagel responded, "People like that, look at the code. Don't even give them information."  Yagel continued: "These two bozos that come in here, they can FOIL. Our laws are online. Please don't give any more information out because – let them talk, and as much as they're going to aggravate, don't say a f****** word. Because they're trying their hardest. You know they're trying their f****** hardest." (Shea 2/3/17 Part 1 Recording at 1:12:25).

77.     On the same day, Yagel was present in the office when the phone rang and Shea answered it. Shea put the line on hold and announced, "CGA Engineering, second time calling." Zummo and Yagel both asked, "for what?" Shea said, "I don't know, I don't know the property." Yagel stated: I bet it's [Orthodox Jewish realtor] Schlomo Fuerst. If it is, hang up." Zummo

corrected Yagel that the name was "Solomon Fuerst," to which Yagel replied, "Whatever." (Shea 2/3/17 Part 2 Recording at 16:28).

78.    Later that day, Yagel raised the subject of Orthodox Jewish builder Mr. Herskowitz with Zummo. Yagel stated: "I didn't realize Mr. Herskowitz has really moved his properties along. . .  in a month and a half [Zummo: "And there's two more houses"], and there's two more f****** – what the hell's going on?" Zummo responded, "He making monies." (Shea 2/3/17 Part 2 Recording at 39:03).

79.    Yagel replied, "That's fine, but I have to call and thank him for saving me a plot in the cemetery," and then laughed. Yagel was laughing about the fact that, at Yagel's direction, the Village was suing Mr. Herskowitz for selling a plot of land with an alleged cemetery. (Shea 2/3/17 Part 2 Recording at 39:18).

80.    Shortly afterwards, Yagel learned that Zummo had scheduled a ten-minute meeting with Orthodox Jewish realtor Solomon Fuerst for 1:00 p.m. that day. Yagel again referred to Mr. Fuerst as "Schlomo" and was again corrected by Zummo. (Shea 2/3/17 Part 2 Recording at 40:00).

81.    Upon learning of the meeting, Yagel said, "No, wait a second. No, does he have an application in here? Does he own property in here? Does he own property in the Village?" (Shea 2/3/17 Part 2 Recording at 40:15). Zummo replied, "Yes, he owns four lots." (Shea 2/3/17 Part 2 Recording at 40:24).

82.    Yagel responded, "He owns four lots? Our codes are online. Tell him to get an architect. Good luck with that." (Shea 2/3/17 Part 2 Recording at 40:32).

83.     Zummo told Yagel that meeting was not for Mr. Fuerst; rather, Mr. Fuerst was bringing in the Orthodox Jewish doctor who was buying the house of Peter Obe, a member of the Zoning Board of Appeals. (Shea 2/3/17 Part 2 Recording at 40:36).

84.     Yagel responded, "That's nice. We are not here to provide personal service to him. . . You are not their personal building inspector, and you have to draw the line with them." (Shea 2/3/17 Part 2 Recording at 40:41).

85.     Yagel told Zummo that he is not allowed to meet with Mr. Fuerst and the doctor. (Shea 2/3/17 Part 2 Recording at 42:06). Zummo told Yagel they had questions about the property, and Yagel responded: "Have them put it in writing. [Zummo: "Ok, have them FOIL it"]. Have them put everything in writing. If they have questions, they can put it in writing." (Shea 2/3/17 Part 2 Recording at 42:42).

86.     Zummo told Yagel that a FOIL request would not help because a lot of Obe's documents were not in the record "because his documentation is s***." (Shea 2/3/17 Part 2 Recording at 46:26). Yagel responded, "Well then that is Obe's problem," and Zummo replied, "No, it's ours because we let him do it." (Shea 2/3/17 Part 2 Recording at 46:36). Yagel claimed that they did not know he was doing it. (Shea 2/3/17 Part 2 Recording at 46:40).

87.     Yagel then stated, "Now that you found out about it, guess what? He's got to get a stop work order." (Shea 2/3/17 Part 2 Recording at 46:45). Zummo laughed and said, "A stop work order would f*** up the sale of the house." Yagel replied, "I don't care. This man thinks that he can go rogue . . ." (Shea 2/3/17 Part 2 Recording at 46:55).

88.     On February 6, 2017, Zummo and Shea discussed setting up a Technical Advisory Committee (TAC) meeting for an Orthodox Jewish property owner, Mr. Ecker, which was

necessary to obtain approval to pave the roads near his home and obtain building permits. (Shea 2/6/17 Recording at 27:00).

89.     Shea suggested to Zummo that she could contact Mr. Brady, the Acting Village Engineer to work out scheduling. Zummo agreed and Shea began to search for Brady's phone number. (Shea 2/6/17 Recording at 29:00).

90.     Yagel later called the office and asked why Shea needed Brady's phone number. When Shea told Yagel they needed to schedule a TAC meeting for Mr. Ecker, Yagal asked to speak with Zummo. (Shea 2/6/17 Recording at 1:15:03-25).

91.     Zummo spoke with Yagel for several minutes and then hung up the phone. (Shea 2/6/17 Recording at 1:16:00-17:50).

92.     When Shea asked Zummo again about Brady's phone number, Zummo told her, "You ain't getting it . . . Brett said no TAC meeting." (Shea 2/6/17 Recording at 1:19:58). Zummo told Shea that Yagel told him, "Nobody's rushing to give Mr. Ecker a TAC meeting." (Shea 2/6/17 Recording at 1:20:12).

93.     On February 10, 2017, Yagel personally called a resident, Steve I. Hodavonic, to discuss his appearance as a witness in a court case against Sima Abensen, an Orthodox Jewish realtor. (Shea 2/10/17 Part 1 Recording at 07:12-55).

94.     When Hodavonic told Yagel that he was not able to attend court on the specified date, Yagel told Mr. Hodavonic that he would try to change the court date to ensure that he was able to attend as a witness. (Shea 2/10/17 Part 1 Recording at 08:20).

95.     Yagel then called Christopher Riley, the Village prosecuting attorney to attempt to change the court date. (Shea 2/10/17 Part 1 Recording at 9:00 to 10:00).

96.    When he reached Riley, Yagel learned that Ms. Abensen was expected to plead guilty at the next court date. Yagel told Riley, "Get her for the maximum fine, because she's a f****** idiot and she's a nasty, nasty b****." (Shea 2/10/17 Part 1 Recording at 19:15). Yagel continued: "Full fine, baby. Five hundred bucks. That'll jerk her around." (Shea 2/10/17 Part 1 Recording at 19:45).

97.    On February 13, 2017, Zummo told Shea that he would be meeting with the on Orthodox/Hasidic institution, United Talmudical Association ("UTA"), during the week. (Shea 2/13/17 Recording at 1:00:30).

98.    Zummo told Shea that UTA wanted approval for a school in the Village of Airmont, and he stated that he is "the mean b****** stopping them from doing it." (Shea 2/13/17 Recording at 1:00:38). Zummo told Shea that he had discussed the UTA's documentation and issues with them and their "f****** lawyers" multiple times." (Shea 2/13/17 Recording at 1:00:50).

99.    Zummo then mocked the UTA in an Orthodox/Hasidic Jewish accent saying: "Why can't you do this for me? You don't understand it. It's always been used as a school . . . What, what make you illegal? Why is it illegal, because it's a Jewish school?" (Shea 2/13/17 Recording at 1:01:15).

100.    Zummo then stated, "You people are really beginning to p*** me off." (Shea 2/13/17 Recording at 1:01:42).

101.    Zummo further mentions wearing his "Hitler-was-right hat." (Shea 2/13/17 Recording at 1:02:00).

102.    On February 14, 2017, Shea asked Yagel about a recent fire at the home of Aaron

Cohen, an Orthodox Jewish resident. Yagel responded, "Cohen's a b****." (Shea 2/14/17 Part 1

Recording at 08:49).

103.    Shortly afterwards, when Shea mentioned scheduling an early morning inspection

of Mr. Cohen's home in order to complete the inspection before March 1, Yagel told her that she

did not have to do so and stated: "Well, Mr. Cohen wants it before the first, because you know

why, that's when the tax assessment gets reduced. That's why Aaron Cohen is all over this."

(Shea 2/14/17 Part 1 Recording at 38:12-20). Yagel added: "Why should the rest of us pay for it

because you have fire damage?" (Shea 2/14/17 Part 1 Recording at 38:50).

104.    On March 1, 2017, when discussing a violation at the home of an Orthodox

Jewish resident, Zummo stated: "The Jewish mentality works that way. I could go over there

every day and they're going to go and do what they want because they don't want restrictions.

They're like 6-year-olds." (Shea 3/1/17 Recording at 09:20).

105.    The same day, an female Orthodox/Hasidic Jewish resident entered the office

while Yagel, Zummo, and Shea were present. (Shea 3/1/17 Recording at 34:30). Both Zummo

and Yagel spoke with the resident in a friendly tone and remarked on her unusual accent. (Shea

3/1/17 Recording at 34:40). The resident told them that she had moved to the Village two years

ago. (Shea 3/1/17 Recording at 41:10).

106.    After the resident left, Zummo remarked that, "For a Hasidic woman, she was

very normal." (Shea 3/1/17 Recording at 51:20). Yagel replied, "She's not from around here,

that's why." (Shea 3/1/17 Recording at 51:25).

107.    On March 3, 2017, Yagel and Zummo discussed the work of an Orthodox Jewish

builder in the Village. (Shea 3/3/17 Part 2 Recording at 50:40).

108.    Zummo told Yagel that he suspected the builder was planning to add apartments in the basement of a home, but that he had not yet received the final plans. (Shea 3/3/17 Part 2 Recording at 50:40 to 51:00).

109.    Yagel asked Shea if the builder had submitted a check to the Village. (Shea 3/3/17 Part 2 Recording at 51:00).

110.    Shea told Yagel that the builder had not yet submitted a check. (Shea 3/3/17 Part 2 Recording at 51:02).

111.    Yagel told Shea and Zummo, "Have him write a check. Accept the plans. Cash the check. Then write him a letter and deny." (Shea 3/3/17 Part 2 Recording at 51:03-10).

112.    Yagel further stated, "Can we get his license pulled? He's a slimy bag." (Shea 3/3/17 Part 2 Recording at 53:05).

113.    Yagel then commented that he thought the builder's "skin color doesn't look right." (Shea 3/3/17 Part 2 Recording at 53:17).

114.    On the same day, Zummo and Shea discussed a vehicle fine received by a worker who drove to Ulster County to complete a job for a Jewish resident. (Shea 3/3/17 Part 1 Recording at 1:31:30).

115.    Zummo mimicked the speech of an Orthodox/Hasidic Jewish man asking the worker to come to complete a job. (Shea 3/3/17 Part 1 Recording at 1:31:55).

116.    Also on March 3, Shea, Zummo, and Artha were present in the office when a resident came to the counter to ask about Village code involving the parking of ambulances and police cars. (Shea 3/3/17 Part 2 Recording at 1:14:50).

117.    The resident complained that multiple police cars and ambulances from the Town of Ramapo were parked on her street. (Shea 3/3/17 Part 2 Recording at 1:15:00 to 16:00).

118.    Artha then told the resident, "You know what they use those ambulances for? Chauffeurs." (Shea 3/3/17 Part 2 Recording at 1:16:55).

119.    Zummo tells the resident, "They use them to shuttle rabbis in. They get away with it all the time." (Shea 3/3/17 Part 2 Recording at 1:17:00).

120.    Zummo further tells the resident, "They use the lights and sirens. The police won't stop an ambulance." (Shea 3/3/17 Part 2 Recording at 1:17:30).

121.    On March 31, 2017, Shea, Yagel, and Zummo discussed an upcoming inspection for an Orthodox Jewish resident. (Shea 3/31/17 Part 1 Recording at 47:45).

122.    Yagel stated that he spoke with the resident previously and warned him to get his property inspected before started work on the plumbing system. Zummo then mimicked the Orthodox Jewish homeowner stating, "In Brooklyn and in Ramapo this does not happen." (Shea 3/31/17 Part 1 Recording at 48:05).

123.    On March 31, 2017, Yagel and Zummo discussed the removal of trees at an Orthodox Jewish home in the Village. Zummo stated, "That's the way the Orthodox like it, 'I don't want to maintain anything. I don't want anything near my house. I want a nice big flat yard for my kids to play in. So I'm going to clear anything that grows." (Shea 3/31/17 Part 1 Recording at 10:00).

124.    The same day, Yagel, Shea, and Zummo discussed a home being built by an Orthodox Jewish builder. (Shea 3/31/17 Part 1 Recording at 11:00).

125.    Zummo told Yagel that the building plans for the property contained several different structures and required building close to the property line. (Shea 3/31/17 Part 1 Recording at 12:10-40).

126.    Yagel asked why the department was allowing the property to move forward and was not denying the plans. (Shea 3/31/17 Part 1 Recording at 12:44).

127.    Shea explained to Yagel that the builder had already attended two TAC meetings to receive approval and only needed approval from the Planning Board at that point. (Shea 3/31/17 Part 1 Recording at 12:57).

128.    Yagel then suggested that an attorney should attend the Planning Board meeting with the builder. (Shea 3/31/17 Part 1 Recording at 12:55).

129.    In discussing the plan for a wall around this property, Zummo stated that he told the builder, "This isn't Tel Aviv. Cut it back." (Shea 3/31/17 Part 1 Recording at 16:35).

130.    Yagel received numerous email messages from resident Mitch Archer openly complaining about Orthodox Jews in Pomona, particularly with regard to home-shuls. He referred to Orthodox Jews as "Corporate Members" and shuls as "LLCs" and sent pictures to Yagel of Orthodox Jews walking on Saturday. Yagel usually forwarded the messages to Zummo to act on. Yagel considered hiring Archer as a Code Enforcement Officer, but ultimately appointed him to the ZBA, where he sat as one of the judges of Klein and Indig in 2017. (VILLAGE_008246-008252)

131.    On December 1, 2016, Yagel texted the following to Zummo about a Jewish resident: "Levin's wife came in today BIT[**]ing about Health department; She even said they fixed pool issue, but Noreen doesn't have permit for that! And they were calling riley who said I don't know what you are speaking of....amazing the networking! Lock them all up." (YAGEL00923).

132.

## II.    KLEIN – 63 HALLEY DRIVE

133.    Klein engaged architect Eric Osborn to prepare plans to renovate his home at 63 Halley Drive.

134.    Klein submitted an application for a building permit for an alteration and addition to his him, and the application was marked "Permit No. 10379." (VILLAGE_015961).

135.    On Thursday, June 9, 2016, Shea sent an email to Zummo and Yagel with the subject line "63 Halley owner Robert Klein." The email was addressed to Zummo and stated: "The architect stopped in for 63 Hally with new drawings. I am leaving them on my desk with the file, and old drawings. I told him you were not available until Monday to review new plans. I have all his contact information. (FYI…..this is the military hummer guy with the machine gun mounted on it)" (YAGEL00281).

136.    The June 9, 2016 Osborn plans show a "submission" date of May 24, 2016, and a "revised grading" date of June 8, 2016. (VILLAGE_015960-015966).

137.    The June 9, 2016 Osborn plans show a lifting of the house above the basement. Page A-5 of the Osborn plans show the existing grade around the house as well as a higher proposed new grade around the house. (VILLAGE_015960-015966).

138.    Klein paid a building permit fee of $510 on July 1, 2016 for permit application number 10379. (VILLAGE_013313).

139.    Zummo did not approve Klein's permit application number 10379. (VILLAGE_000281-000282).

140.    Klein appealed Zummo's refusal to approve Klein's permit application number 10379 and paid the $150 ZBA fee on July 8, 2016. (VILLAGE_013314).

141.    The July 8, 2016 email from Erica Krieger to Osborn (with cc to Zummo) includes a definition of "STORY ABOVE GRADE" that distinguishes a basement from other finished floors. Regarding compliance with the three-story sprinkler requirement, Krieger suggested, "maybe you can manipulate the final grade." (PLTF_0001974).

142.    On July 13, 2016, Zummo emailed Shea and Yagel, asking: "How did he apply for the ZBA without a denied building permit?" (YAGEL00282)

143.    On Saturday, July 16, 2016, at the direction of Yagel, Zummo performed a "Saturday Violation Patrol" in the Village from 4 a.m. to 9 a.m. (VILLAGE_000261; VILLAGE_013491-013498). (Zummo 9/4/19 Dep. 125:12 to 127:14). Shea testified that Zummo called it the "shul patrol." (Shea Dep. 175:21 to 176:17). On July 20, 2016, Zummo issued an appearance ticket to Naftali and Frieda Klein at 63 Halley Drive as part of the "Saturday Violation Patrol" for an alleged "garbage and recycling containers" violation alleged to have occurred at 4:25 a.m. on July 16, 2016. (VILLAGE_015397).

144.    The ZBA held a hearing on July 27, 2016 on Klein's appeal "of a determination by the Building Inspector of the Village of Pomona, for an interpretation of the Zoning Law of the Village of Pomona and the New York State Fire Prevention and Building Code relating to sprinkler systems in single family residences." (VILLAGE_014363A-014369A).

145.    At the July 27, 2016 ZBA hearing, Ulman said regarding the basement, "whether it is or isn't a story has to be based on existing grade . . . you can lift the house but you can't change the elevation of the property around it to accommodate the process." Neither Ulman nor Zummo provided any basis for these statements.

146.    At the July 27, 20176 ZBA hearing, Ulman also stated: "Ms. Krieger does not know or interpret the zoning law for the Village of Pomona. Ms. Krieger knows the NYS

Building Code. Based upon her knowledge of the Building Code she told you what she thought would be acceptable. Its not acceptable under our zoning law." Neither Ulman nor Zummo provided any basis for these statements. (VILLAGE_014363A-014369A).

147.    At the July 27, 2016 ZBA hearing, Zummo stated that Klein wanted to expand his basement in order to build an illegal apartment "just like them," which Klein understood as referring the Orthodox Jews. (Klein Dep. 99:13 to 101:20).

148.    The July 27, 2016 ZBA hearing was adjourned with taking any action on Klein's appeal. (VILLAGE_014363A-014369A).

149.    Zummo testified at his deposition that the October 2017 stop work order was the first time he mentioned the issues of sprinklers, grading, or whether the lifted house resulted in a third story. (Zummo Dep. 164:23 to 165:8). He also testified that prior to October 6, 2017, he was not of the opinion that the construction would produce a third story. (Zummo Dep. 167:13-16).

150.    Before the ZBA reconvened on Klein's 2016 appeal, Yagel called the New York Department of State on August 9, 2016, concerning the status of Mr. Klein's permit application and ZBA appeal and spoke to Land Use Training Specialist Linda King in the Division of Local Government Services. Ms. King advised Yagel that, if the building inspector never denied the permit application, the applicant could not yet appeal to the ZBA. (VILLAGE_000281-000282). Based upon this advice, the Village cancelled Mr. Klein's 2016 ZBA appeal. (VILLAGE_001755).

151.    In September 2016, Klein submitted revised plans prepared by Osborn, signed and dated September 22, 2016. (VILLAGE_21014-21018).

152.    Klein came into Village Hall on September 27, 2016, and Yagel told Klein he needed to submit a completely new building permit application. Klein filled out the new application and Yagel assisted Klein with attaching plans from the previous application file to the new application. Klein submitted the application at that time. (Shea 9/27/16 Recording at 1:52:40 to 2:01:48).

153.    Klein's new building permit application was assigned Permit No. 10428. The "Received" date of the application is hand-written "11-4-16." (VILLAGE_013268-013269).

154.    On October 5, 2016, Zummo and Shea were talking about Klein's house project in Village Hall. At one point, Zummo started to make fun of Klein with an Orthodox/Hasidic accent and stated the following:

The only reason he wants it is to make, "*I have to make monies with my basement.*" He's going to turn his basement into a f[******] rental, and he's either going to put an apartment down there and rent it out to his Mexican buddies, or he's going to do some f[******] business in there. And that's fine. I'm going to let him do what he's going to do, and then I'm going to watch him like a f[******] hawk and if I see extra vehicles in the yard and I see sh[**] going on, I'm going to get a search warrant and I'm going to search his f[******] basement and then he's going to go to jail for an illegal boarding house. Because I'm sick and tired of the bast[****]. The bast[****] can't keep going on. It can't. We can't Keep letting these morons do what they want to do.

(Shea 10/5/16 Recording at 2:35:58).

155.    On November 4, 2016, Zummo issued an appearance ticket (No. 1030) to Naftali Klein at 63 Halley Drive for an alleged violation of blowing leaves on the street at 3 p.m. on that day. The ticket was reissued (No. 1031) to Robert Klein with a note: "Appearance ticket should go to Robert Klein, not Naftali Klein." (PLTF_0002140-0002142)

156.    Klein's building permit application for Permit No. 10428 was approved by Zummo in December 2016. The permit application shows an issue date of 12/13/16 signed by Zummo. (PLTF_002187-002188). The Permit sign is dated 12/19/16. (VILLAGE_013270). The

December 2016 Building Permits Report shows an issue date of 12/23/16, and includes the following "Work Description": "LIFTING HOUSE 4 AND A HALF FEET, AND ADDING A THIRD FLOOR." (VILLAGE_001899).

157.    In February 2017, Yagel removed Peter Obe from the ZBA, and on February 27, 2017 he appointed Mitch Archer to take Obe's seat on the ZBA. (VILLAGE_014292-014301).

158.    The September 22, 2016 Osborn plans included markings that indicated future design and details were pending and would be supplemented. (VILLAGE_21014-21018). On March 3, 2017, Klein submitted revised Osborn plans dated March 2, 2017 to the Village. The Shea 3/3/17 Part 1 Recording reveals that Zummo knew Klein dropped off the plans at Village Hall that morning, and Zummo discussed the specific changes in those plans that he later denied knowing about until after the house had been lifted. (VILLAGE_021014-021018; Shea 3/3/17 Part 1 Recording 22:07 to 23:10; Zummo Dep. 165:25 to 167:12).

159.    On March 22, 2017, Klein was elected to the Village Board of Trustees, and he became a member of the Board on April 1, 2017. Klein was the first Orthodox Jew to be elected to the Board. After Klein was elected, Yagel told Klein to "watch your back" because "people are watching you." (VILLAGE_011599; Klein Aff. ¶ 8).

160.    On March 31, 2017, Yagel sent a text to Zummo that stated: "Lou. Huge 40 us dumpster at kleins house on 63 Halley. Filled! Appears to be pulling siding off south side of home I would guest in anticipation of raising house. Please check to ensure no violations." (YAGEL00924).

161.    On or about April 24, 2017, the first phase of Klein's project began – the house was lifted and placed on temporary supports. (Klein Aff. ¶ 9).

162.    On April 24, 2017, Yagel emailed Corless (with cc to Harris and Zummo) the following: "Please confirm damage to roadway in front of trustee Klein' house due to heavy equipment and raising of house. Keep Lou informed as restoration will be required and possible violation."  (YAGEL00205).

163.    On June 6, 2017, Zummo sent a text to Yagel that stated:

Brett I didn't get a chance to finish the letter to Klein. If I stay in the office I will kill Noreen. I just got a 25 min speech about how I am not helping the village by listening to Brett And digging into Klein and Banks. I should be like she thought I was when she started a helpful person looking to get things solved. Apparently she has been having discussions with Klein about his property and what we need to know. She even went up to the site to see the work. I am done fighting the
residents. The builders
And my own damed clerk to do the legal correct thing. I don't need this attitude or aggravation.

(YAGEL01034). Yagel forwarded the message to Harris. (YAGEL00822).

164.    On June 13, 2017, Shea sent an event notice to Yagel and Zummo with the subject "Blocks on Foundation," the location "63 Halley Drive" and the event date as 6/14/17. (YAGEL00416).

165.    On June 14, 2017, Zummo performed a building inspection at 63 Halley Drive and he marked the inspection disapproved. The building inspection card for the June 14, 2017 inspection lists an inspection request date of June 13, 2017.

166.    On Friday, June 30, 2017, Zummo issued a stop work order on Klein's home while the home was still suspended on temporary supports. (VILLAGE_002053).

167.    Zummo subsequently showed Klein a text message he received from Yagel on June 30, 2017 that directed Zummo to give Klein a stop work order by 3:00 pm or he would be fired. (Klein 11/22/22 Dep. 126:21 to 128:15; Klein Aff. ¶ 12).

168.     Zummo claimed that the Osborn plans revised March 2, 2017 were not in the Village file and directed Klein to resubmit them. (Klein Aff. ¶ 13). The plans were newly dated and signed July 3, 2017, and were submitted to the Village on July 6, 2017. (VILLAGE_3384.1365-3384.1366; VILLAGE_015764-015765).

169.     On July 10, 2017, Yagel sent a text to Zummo asking: "Lou. When did you see Klein last week?" Zummo responded on July 11, 2017: "I did not see him I stopped at the house on thursday and against on Friday at3 pm to talk to him about the dirt." Yagel replied: "When did you see him last and what had you discussed with him?" (YAGEL01146).

170.     On July 26, 2017, Yagel sent the following text to Zummo: "Lou, what is happening with dirt at 63 Halley? Have you violated under MS4 and other provisions of our local law? If Not, under what basis of law haven't you violated? (YAGEL01146).

171.     On July 31, 2017, Zummo issued an appearance ticket (No. 1037) to Naftali  and Frieda Klein at 63 Halley Drive for an alleged violation of "mounds of dirt being pushed or graded across the side yard and into the rear" on July 6, 2017. (VILLAGE_006526).

172.     Zummo conducted and approved two inspections in early August 2017. (VILLAGE_015384, VILLAGE_006060).

173.     On August 15, 2017, Harris and Yagel had the following text exchange: Harris: "Is Klein's house under a stop work order"; Yagel: "Not that I am aware of. Fran might know. Why?? Is he regrading like crazy?" Harris: "No just saw some workers I will call office." (YAGEL00827).

174.     On September 6, 2017, Vanderbeek entered an event-notice for September 1, 2017 with the Subject "63 Halley" and Location "taking down trees – violation??" (VILLAGE_003682).

175.    On September 13, 2017, Vanderbeek sent Klein an email from reminding him to update insurance for contractors other than East Coast Framers. (VILLAGE_3384.1531). Klein emailed the updated insurance documentation to the Village on September 15, 2017. (PLTF_0001962-0001968).

176.    On September 28, 2017, Harris and Yagel had the following text exchange:

Harris: Is Klein allowed to increase his foot print
Yagel: Don't know?
Yagel: I would think that it depends upon the setbacks from each of the side yards and back yards in front yards
Yagel: Supposedly he is on a true acre
Harris: Well I called the office to have Lou check it out when he is back in office
Yagel: Would have to review plans. I thought though that there is a stop work order on his house?
Yagel: Checking with Betty
Yagel: He was required to submit plans for work being done. However, just because the plans have been submitted does t mean the SWO should be lifted. [REDACTED]
Yagel: I ask Betty to make sure that lou gets specific law in writing
Harris: [sends 5 photos of Klein's house]
Harris: Can we contract out a code enforcer for a day or two and pay prevailing wages
Yagel: Hmmm.

(YAGEL00830-00832). On that same day, Yagel forwarded one of the photos of Klein's home from Harris to Zummo. (YAGEL01022).

177.    On October 3, 2017, Zummo wrote a letter to Klein stating that in reviewing the permit issued on December 13, 2016, it was discovered that several required items were missing from Mr. Klein's file including letters from the counties, water and sewer districts related to disconnecting and reconnecting gas, electric, water, and sewer, as well as certificates of insurance from the contractors being used. Zummo also wrote: "If we do not receive the required information needed from you a Stop Work Order shall be issued as of October 23, 2017 as well as the Certificate of Occupancy be pulled from the property stated above." (PLTF_0002028-0002129).

178.    On October 4, 2017, Yagel and Zummo had the following text exchange:

Yagel: Have you followed up with utilities regarding 63 Halley disconnect?? Was it ever done?
Zummo: I am not following up with anybody. I am not doing his work for him. He was sent a letter today approved by Doris, of all the shut offs and reconnects I need as well as insurance and other items I need by the 20th or his co gets pulled and he has to move out
Yagel: He was working property today.
Yagel: Why not a Swo until such things are presented ?
Zummo: I have to give him the get me the information. Then slam his fingers in the door
Yagel: Omg! Total bullsh[**]!
Yagel: What does our code state about disconnects and demolition. Technically he has demolished a portion of the foundation upon which the house was built upon.
Yagel: Doesn't his activity require SPDES permit?
Yagel: Since he is on steep slope?
Yagel: Do his plans have the architects or engineers signature, seal, and. NYS license number?
Yagel: And what happened with 6 Frances and all that fill?
Yagel: Has he made false statements or misrepresentation of material fact in the application, plans, specifications or other accompanying documents upon which the building permit was based?
        Or
The work being performed under the permit …

(YAGEL01023-01024).

179.    On October 6, 2017, during the Jewish religious holiday of Sukkot when Klein was not present and work had been suspended for the Jewish holiday, Zummo posted a new stop work order. (Klein Aff. ¶ 14). Klein first learned of the October 2017 stop work order on October 17, 2017, when he was handed the stop work order and the letter from Zummo dated October 3, 2017 in Village Hall. (Klein Aff. ¶ 15).

180.    A meeting was convened with Klein, Ulman, Corless, Zummo, and Vanderbeek on November 3, 2017, with the ostensible purpose of establishing a list of items that needed to be completed in order for the stop work order to be lifted and construction resumed before the winter weather set in. (Klein Aff. ¶ 16). Without notifying Klein, Zummo recorded the meeting on his phone. (*See* Def. Ex. 60, Audio Recording Zummo 00002).

181.    Zummo did not stop recording at the conclusion of the meeting. After the meeting Zummo and Vanderbeek continued to discuss Klein's situation. At one point Zummo stated: "Just cover you're a[**] on the file, can I have the file?" Vanderbeek: "Which file?" Zummo: "Which file?" Vanderbeek: "Klein's?" Zummo: "Yes. I'm gonna sanitize the file." (Zummo 00007 at 1:22:45).

182.    A bit later, Zummo apparently checked the news on the internet, and exclaimed: "Oh sh[**], the Hassids are going to be so upset!" Vanderbeek: "What?" Zummo: "Child marriages are now prohibited in New York." Vanderbeek: "Yeah." Zummo: "Did your read that? Yeah, you have to be a certain age, more than 17 . . . [mimicking accent:] *Well I like to marry them when they're 14, you get more babies that way. Get more for your money, and it's all about the money, you know?*" (Zummo 00007 at 1:49:15).

183.    Shortly afterwards Vanderbeek and Zummo discussed Doris Ulman, who is Jewish. Vanderbeek stated, "I notice Doris got out of here pretty fast." Zummo responded: "She ran, dude. Right now she's up at Klein's house kissing his a[**] [mocking:] *Robert, I'm so sorry, I didn't Joe was going to be so angry. Robert, trust me, there's a way we could do this. We have to keep the tribe moving forward.*" (Zummo 00007 at 1:51:32).

184.    As a result of the November 3, 2017 meeting, Klein received a list of items needed in order to have the stop work order lifted. (VILLAGE_009017). Klein's attorney sent the documents to the Village by overnight mail on November 20, 2017. (VILLAGE_006052-006054).

185.    On November 28, 2017, Corless sent an email to Celentano (with bcc to Yagel) with a number of comments, which concluded: "I have a number of comments on the

submissions, but these are directed to presentation and clarification, as opposed to approval."

(VILLAGE_000492-000493).

186.    On December 11, 2017, Klein submitted a ZBA appeal application to the Village

related to the October 6, 2017 stop work order and associated tickets. (PLTF_0001976-

0001987).

187.    On May 23, 2018, the ZBA held a hearing on Klein's appeal. The ZBA took

testimony and received exhibits from Klein and Zummo. After the hearing the evidence, the

ZBA adjourned the hearing until June 27, 2018, to allow Klein to add an affidavit from his

architect to the record. (Klein Aff. ¶ 21).

188.    Christopher Riley, an attorney Yagel hired as Pomona's part-time "Special

Prosecutor" of Village tickets, showed up at the June 27, 2018 ZBA hearing to argue that the

ZBA application was untimely and the appeal should be dismissed on that basis. Ulman, the

Village Attorney who officially represented the ZBA, did not know that Riley was going to

appear at the hearing, and she disputed that that the application was untimely. However, the ZBA

accepted Riley's claim that the appeal was untimely and dismissed it on that basis. (Klein Aff. ¶

22).

189.    That evening, immediately after the June 27, 2018 ZBA meeting, Ulman notified

Yagel and the Board of Trustees (including Klein) in writing of her resignation from further

representing the ZBA. (Klein Aff. ¶ 24). (That letter has been withheld by the Village as

privileged).

190.    The next day Ulman wrote a separate letter to Riley and copied to Yagel and the

Board of Trustees, stating that Riley's appearance at the ZBA hearing was "inappropriate" and

that Riley's "statements to the [Zoning] Board, which the [Zoning] Board relied upon in dismissing Mr. Klein's appeal, were inaccurate." (Klein Aff. ¶ 24).

191.    As Klein continued to submit new applications and plans to attempt to move forward, he only received delays and refusals from Zummo. At one point, Mendy Lasker (who subsequently became a Village Trustee), attempted to assist Klein with getting Zummo or Corless to conduct inspections and process my submissions. However, when Yagel became aware of Lasker's efforts, he directed Corless not to continue with review of the project. (PLTF_0001926-0001927).

192.    After attempting to obtain relief in state court, Klein next turned to the State of New York, by filing a grievance and appeal with the New York Department of State Division of Code Enforcement and Administration, challenging Zummo's assertion that the project converted the home into a three-story structure and required installation of a sprinkler system. His appeal went to the Department of State's Hudson Valley Board of Review. (Klein Aff. ¶ 32).

193.    On March 10, 2020, the Review Board held a public hearing on Klein's appeal, and voted unanimously to grant the appeal. The Review Board issued a written order dated April 14, 2020 with findings of facts overruling Zummo's determination and granting Klein's appeal. (PLTF_0002282-0002283).

194.    The Review Board specifically determined that the state code section requiring a three-story home to have a sprinkler system does not apply to the construction plans for Klein's home. In light of this order, there was no basis for Defendants to continue to deny his application for a renewed construction permit and to prohibit me from immediately resuming and completing the restoration of his home.

195.    Nevertheless, after receiving the Review Board's decision, Zummo delayed lifting the stop work order and only issued a conditional building permit. With the District Court's intervention, Zummo finally conducted an inspection of Klein's home on November 4, 2020, and lifted the stop work order that day.

### III.    INDIG – 21 WHITE BIRCH

196.    Mr. Indig hired engineer Celentano to prepare plans for grading and filling his backyard at 21 White Birch Drive to create a large usable space for his family. (S. Indig: 24:13-20).

197.    On March 2, 2016, Shea sent an email to Corless (with cc to Zummo) regarding 21 White Birch that stated: "A gentleman stopped in today and asked if he could fill in his backyard with dirt to make it flat. I informed him to call our Building Inspector Louis Zummo tomorrow. He asked for our Engineer's phone number, so I took his name and number and told him we would get back to him. Please advise." (SHEA/INDIG-000051).

198.    On March 3, 2016, Zummo replied to Shea and Corless: "I called and left a message. I will call again later today. I got it." (SHEA/INDIG-000051).

199.    Celentano drew up original plans for grading and filling the backyard at 21 White Birch dated June 9, 2016. (VILLAGE_001711-001713).

200.    On June 29, 2016, Mr. Indig sent an email to Yagel introducing himself as an Orthodox Jew who tries to respect each individual, adding in a follow-up email that he wants to "try to keep the peace between all residents." (VILLAGE_000243-000244).

201.    Mrs. Indig submitted a building permit application for regrading the backyard at 21 White Birch in 2016. The Indig permit application on file at the Village for that work is dated

July 8, 2016 and shows Permit No. 10382, although the date and permit number are both

scratched through. (VILLAGE_009204-009204).

202.    On July 8, 2016, Zummo received the Celentano plans via email and forwarded

them to Corless. (VILLAGE_001707).

203.    On July 10, 2016, Corless emailed Zummo, Celentano, and Shea identifying the

21 White Birch Drive site plan prepared by Celentano and provided what appear to be general

guidelines for proposed filling and grading of residential lots. Corless did not accept or reject the

Celentano plan in the email. (P000986).

204.    On July 21, 2016, Shea forwarded Corless's July 10 email to Zummo, and wrote

in relevant part: "Please let me know the status of 21 White Birch. . . . Also, there are drawings, a

check and permit application on my desk for two weeks waiting for grading approval on this

address. Please advise." (P000986).

205.    On January 8, 2017, Celentano emailed a revised plan dated January 9, 2017.

(VILLAGE_001711-01713). Corless forwarded Celentano's January 8, 2017 email to Zummo,

Shea, and Celentano and wrote: "Received site plan directly from surveyor. Proposal calls for 10

trees to be removed w small retaining wall. Final grading unclear. Suggest you set up TAC

meeting for review." (VILLAGE_001711-01713).

206.    On February 3, 2017, Shea wrote a note on a copy of Corless's July 10, 2016

email stating: "Leah came in 2-3-17 again. Looking for the status of her permit application from

July." (VILLAGE_009050). That day, Zummo and Shea discussed the Indigs' grading permit

application. Shea told Zummo: "She came in again. Here. I have 21 White Birch. This permit

application from in July. Remember this, remember I kept asking you over and over and over …

This is the check from July." Zummo said they can give the check back because "they're not

going to allow it." (Shea 2/3/17 Recording at 27:37). Zummo stated: "There's no way in hell she's going to get a permit, there's no way Joe [Corless] is going to sign off on this." Shea asked, "So what is her next step?" Zummo replied: "F[******] too bad, move to another house. You know, it's funny, I saw her husband today." (Shea 2/3/17 Recording at 28:52).

207.    Zummo also stated that Leah Indig's husband owns East Coast Framing, which is working with Avrohom Manes, working on Klein's house, and another Orthodox resident's house ("Shimmy"), "lots of other houses, so they're all … it'll be fun to watch." (Shea 2/3/17 Recording at 35:54).

208.    Later that day, Yagel joined the conversation with Zummo and Shea about Mrs. Indig. Yagel asked, "Is that the Mrs. White Birch person?" Zummo: "Why, you met her?" Yagel: "No, she came in here . . . how long has it been sitting on the desk?" Shea: "July." Zummo: "She ain't gettin' it. This is the b[****] that took out four truckloads of trees." Yagel: "Oh, so she's not getting it?" Zummo: She's ain't gettin' that, what are you out of your freaking mind?" Yagel: "Oh, good!" (Shea 2/3/17 Recording at 46:07).

209.    On March 3, 2017, Zummo mentioned that Indig is working on another Orthodox Jewish home (Nussbaum), and remarked, "Yeah, they're all interconnected." (Shea 3/3/17 Part 2 Recording at 1:02:26).

210.    On March 1, 2017, Julie Celentano forwarded Corless's January 8, 2017 email to Shea.  Shea then forwarded that email to Corless on March 2, 2017 with the message: "Mr. Tony Celentano sent me this e-mail from Jan 9, 2017. I will run this by Doris and see if she wants to set up a TAC meeting." Corless replied to Shea (with cc to Zummo): "Thanks Surveyor should file amended plan." (VILLAGE_001723-001726).

211.     On April 3, 2017, Shea emailed Zummo notifying him that "Samuel Indig stopped in about the back fill of 21 White Birch." She told Zummo that Indig would call him Wednesday morning or stop in. (P001438).

212.     At 10:19 a.m. on Wednesday, April 5, 2017, Shead sent an email to Corless reminding him about 21 White Birch grading. At 11:46 a.m., Corless responded: "21 White Birch, June 9, 2016 dwg by Celentano is approved." Shea forwarded the email to Zummo at 1:51 p.m. (P001439).

213.     On April 9, 2017, Corless wrote to Zummo: "I sent you an approval on April 5th, approving the proposed grading plan by AR Celentano, drawing revised 1/9/17." Corless next wrote: "Note that the plat has several conditions" and Corless then listed the following: "1. The proposed fill quantity of 1,000 cy requires that the source of the material be identified prior to its placement, and 2. The additional requirements on the plat require compaction results and grade certifications." Corless added: "3. The professional used to be used by the homeowner/contractor should be identified, prior to the commencement of the fill and submit reports, as necessary, during the fill period." Corless next described in the email several additional items he says "should" be added or clarified. (VILLAGE_000448). Although the plans specified erosion control was to be installed "before any filling operations take place on site," (VILLAGE_001713), Corless wrote that erosion control details were not correctly or completely installed and "work on the site should be halted until the site is in compliance." (VILLAGE_000448).

214.     On August 13, 2017, Celentano emailed a newly revised plan of that same date with a cover memo highlighting five changes that had been made as Corless had requested. (VILLAGE_003384.1201-1203; VILLAGE_000448).

215.    Corless approved the August 13, 2017 plans on August 14, 2017 (VILLAGE_016420; See S. Indig Dep. 28:16 to 29:5), and the building permit for Grading/Fill work was issued and signed by Zummo on 9/22/17. (VILLAGE_013288).

216.    Just five days after the permit was issued, Zummo imposed a stop work order on the grading project on September 17, 2017. (VILLAGE_004880-004881; VILLAGE_009170).

217.    Mr. Indig testified that Zummo told him the stop work order was issued because the excavators were constructing a temporary road to be able to go down into the backyard with their equipment and that was not on the plan. (S. Indig Dep. 131:4-8).

218.    Klein testified that he was at a meeting at which a complaint was raised about 21 White Birch, and Yagel turned to Zummo and said, "What's going on? He's making a road in his backyard? Well, give him a stop work order. Go after him and give him a stop work order if he's making a road." Klein later asked Zummo about it, and Zummo said, "Well, he's building a road to put an excavator on the bottom." Klein asked, "What is he supposed to do? How is he supposed to get the excavator to the bottom of the hill?" Zummo responded, "He should take a helicopter and fly it down. I don't give a crap." (Klein 11/28/22 Dep. at 175:21 to 176:22).

219.    On October 5, 2017, Vanderbeek emailed engineer Pat Brady, Corless's substitute, regarding 21 White Birch, stating that "they have also changed to drawing so it needs approval again." (VILLAGE_3384.1115). The record shows that Celentano prepared a revised plan dated October 2, 2017. (VILLAGE_013517A).

220.    On October 25, 2017, Zummo issued an appearance ticket dated October 25, 2017, alleging a violation of working through a stop work order on September 27, 2017, the very day the stop work order was imposed. (VILLAGE_006488).

221.    On October 13, 2017, Vanderbeek emailed Brady: "The guy from 21 white birch is driving me crazy. Any time frame on when you will have an answer?" (VILLAGE_003384.1112).

222.    On October 16, 2017, Brady emailed to Vanderbeek (with cc to Corless) a list of three comments on the October 2, 201721 White Birch plans (VILLAGE_003384-1110, which Vanderbeek then copied and emailed to Indig. (VILLAGE_00384-1108).

223.    On October 17, 2017, contractor Scott Perri emailed a Celentano revised plan dated October 17, 2017 to Vanderbeek (VILLAGE_003384.1106-1107), which she forwarded to Brady on October 18, 2017. (VILLAGE_003384.1106-1107).

224.    On October 23, 2017, Vanderbeek emailed Brady and stated: "The contractor called and said that the changes were made by him writing that it [the temporary road] would be restored – I reattached the plan with  wording highlighted." The attachment to the email showed the highlighting described. (VILLAGE_003384.1102-1103).

225.    On the note page of Vanderbeek's calendar for October 24, 2017 a handwritten note stating: "Sott Perri – License expired Sept. 30, renewed but not in system yet. Send a letter that knowingly went thru stop work order." Another handwritten note on the page states: "12:55 Leah 21 White Birch [Tel No] wanted to know where you were w/the permit – can they schedule work for tomorrow." (VILLAGE_005246-005247).

226.    Celentano prepared another plan revision dated October 26, 2017, which was submitted to the Village. (VILLAGE_013518A)

227.    On November 1, 2017, Corless emailed Zummo, Vanderbeek, Artha, Celentano, and Brady, concerning the Celantano plans revised October 26, 2017, stating that the drawing

had previously been reviewed, but it has many different fonts and colors and should be redone, to include Brady's comments from October 16, 2017. (VILLAGE_003384.1168).

228.    On November 3, 2017, Zummo issued an appearance ticket alleging a violation of working through a stop work order on October 24, 2017. (VILLAGE_013422A).

229.    On or about December 12, 2017, the Indigs filed a ZBA appeal application related to the stop work order and associated tickets. (VILLAGE_006002-006023).

230.    On May 23, 2018, the ZBA held a hearing on the Indig's appeal. At the conclusion of the hearing, the ZBA voted to deny the appeal. (VILLAGE_014424A-014453A

231.    The Indigs continued to submit new applications and plans to attempt to move forward, but they only received delays and refusals from Corless and Zummo. Ultimately, after years of being prevented by the Village from continuing the work and remedy an unusable yard that was effectively a construction site, Mr. Indig determined that it was futile to continue presenting plan after plan in order to obtain the yard he had hoped for, and he decided instead to "cap it" by having his engineer instruct him how to complete the yard simply according to New York State code and provide an "as-built" certification. (S. Indig Dep. 65:18 to 67:25, 71:21 to 72:13)

232.    The Indigs completed the work to their backyard in the Spring of 2021 and it became usable in May or June of 2021. (S. Indig Dep. 58:19, 25; 117:18-22). However, because they were obstructed by the Defendants, the finished backyard is significantly smaller than the Indigs had originally planned.

IV.    **KAHANA – 68 HALLEY DRIVE**

233.    Meir Kahana in an Orthodox Jew who lives at 68 Halley Drive, just a few homes down from a home-shul at 60 Halley Drive and down and across the street from Klein at 63 Halley Drive.

234.    As demonstrated by his text message with Yagel, Harris frequently took note of possible violations by Orthodox Jews, including both Klein and the home-shul at 60 Halley Drive. Yagel testified that he thinks that the majority of residents in that area are Othodox Jews.

235.    Harris noticed that Kahana had set up a portable pool next to his house in his driveway, and he emailed pictures of it to Yagal and Zummo with the message: "Is this legal?" Yagel directed Zummo to investigate and violate. (VILLAGE_002406-002407).

236.    Without any warning, Zummo issued two appearance tickets to Kahana for alleged pool violations. On a previous occasion, Zummo had issued a written warning to Kahana for dog waste although Kahana does not have a dog.

237.    In another instance, Tolf testified that she was sent to issue a violation for a play-set in a resident's front yard, and on the way she say a similar violation in another resident's yard. She testified that when she violated both, Yagel was upset with her because the resident she noticed on her own was an African-American supporter of Yagel. (Tolf Dep. 45:14 to 46:19, 49:14-25).

238.    Klein testified that Zummo confided in him afterwards regarding the Kahana tickets. Klein testified that Zummo said: "You think it's my thing? I have no choice. I have to do what I have to do. . . . I'm going to lose my job. You don't understand how Yagel works." (Klein 11/28/22 Dep at 179:2-16).

Dated: November 22, 2023

By:  S/ Daniel G. Ashburn
     Daniel G. Ashburn, Esq.
     ASHBURN LAW OFFICE, LLC
     1300 Carolyn Drive
     Atlanta, GA 30329
     404-939-1323
     *Attorney for Plaintiffs*

TO:    Counsel of Record via ECF