# ROCKLAND COUNTY
# COMMISSION ON HUMAN RIGHTS

## MEMORANDUM

TO:    Linda Fenstermaker
Regional Director
New York State Division of Human Rights

FROM:  Constance L. Frazier
Commissioner

DATE: June 4, 2018

CASE NO: 10190879-17-E-C-E

Federal Charge No. 16GB800346

SUBJECT:    Noreen Shea v. Village of Pomona

## FINAL INVESTIGATION REPORT AND BASIS OF DETERMINATION

### I. CASE SUMMARY

This is a verified complaint, filed by Complainant, Noreen Shea, on Fri 11/3/2017. Complainant who is referred to as a "Jew Lover," charges Respondent with unlawful discriminatory practices in relation to employment because of creed.

### II. SUMMARY OF INVESTIGATION

Complainant's Position:

Complainant who is non-Jewish states that she has worked as Respondent's Deputy Village Clerk since 2/1/2016 until she was wrongfully terminated on 6/23/2016. While Respondent's mayor, Mayor Yagel, failed to provide her a reason for her termination, Complainant states that Mayor Yagel had referred to her as a "Jew Lover," and has been told by Mayor Yagel and her supervisor, Village Clerk/Treasurer Frances Arsa-Artha to stop being too cooperative with Jewish residents. Mayor Yagel has also advised her to purchase pork rinds and display them on the counter as snacks for the public as a deterrence against the growing Orthodox Jewish population. Complainant asserts that there is an "Us vs. Them" culture that the Mayor promotes among Respondent's employees and believes that because of her refusal to abide by that model, Respondent has refused to reappoint her as the Deputy Clerk and terminated her employment.

Respondent's Position:

Repondent denies that it terminated Complainant's employment because of her association with Jewish residents. Respondent asserts that it had a legitimate nondiscriminatory reason for refusing to reaappoint her as the Deputy Village Clerk, namely because she was insubordinate, unprofessional, and poor performance. Respondent asserts that she has used foul language against the Mayor and has denigrated her supervisor by calling her "Debbie Downer" and "Cold-Hearted Hannah." Respondent notes that Complainant does not take criticism well and refuses to learn from her mistakes. She has not provided the public correct information and has failed to abide by Village procedure, including issuing building permits without the inspector's signature and scheduling inspections without prior consultation with the inspector. Respondent denies calling Complainant Jew Lover.

Complainant's Rebuttal:

Complainant asserts that Respondent's employees have an ongoing hidden agenda against Respondent's Jewish residents. Complainant disclosed that she has received reports of selective ticketing of Jewish residences related to their garbage cans, and observed the numerous phone calls and complaints she received and zoning board issues that substantiate her observation that Respondent has targeted the Jewish community for disparate treatment. According to this Complainant, Respondent has promoted this climate by prohibiting her from serving all residents in an equal and professional manner.

Complainant denies that she exhibited poor performance.

Investigator's Observations:

The investigator interviewed multiple officials for Respondent, including Mayor Brett Yagel, Building Inspector Louis Zummo, Deputy Mayor Leon Harris, Trustees Ian Banks, Robert Klein, and Nicholas Wilson, Village Clerk Frances Arsa Artha and Deputy Clerk Barbara Vanderbeek.

During the interview, Mayor Brett Yagel disclosed that he appointed Complainant as Respondent's Deputy Clerk in February 2016 to replace the retiring prior Deputy Clerk. Mayor Yagel, who disclosed that he is a Lutheran Christian, denied telling Complainant to stop being cooperative with certain Jewish residents; he denied advising Complainant to display pork rinds on the counter. He admitted telling Complainant, "Don't you know we are in litigation?" Mayor Yagel acknowledged that he observed Complainant interacting with someone from Tal Properties, and asked her, "Don't you know we are in litigation?" Mayor Yagel disclosed that "from the get go," he had concerns about Complainant's conduct. According to the Mayor, Complainant made "inappropriate remarks," had "no filters," was insubordinate, dispensed incorrect information to constituents, wrote unprofessional letters, and made numerous errors in the course of her duties. He decided not to reappoint Complainant because of her incompetence, insubordination, threats to an elected official, inability to get along with staff. He noted that Complainant made disparaging remarks about her supervisor, Frances Arsa-Artha, including calling Ms. Arsa-Artha a "Debbie Downer" and "Hanna Rain Cloud." Mayor Yagel stated that he did not have to explain the reason

VILLAGE_001083

for his refusal to reappoint her. To substantiate his claim that Respondent respects its Orthodox Jewish residents, Mayor Yagel notes that Respondent does not require permits for home-synagogues, does not hold Board meetings on Jewish holidays, and observed that Orthodox Jewish residents have served on Respondent's 50th Anniversary committee celebration where Respondent served kosher food to accommodate Orthodox Jewish residents.

Inspector Louis Zummo disclosed that he has been the part-time Building Inspector since November 2013. He acknowledged that he received text messages from Mayor Yagel but denied showing Complainant any text message where the Mayor referred to her as a "Jew lover." In response to whether there were delays in processing requests for permits, Inspector Zummo delineated the steps for obtaining a permit and disclosed that the processing of some permits may take longer, including those that require drawings and plumbing. Inspector Zummo denied that the Mayor directed him to issue stop work orders. He admitted that the Mayor had made such requests but he would issue such orders only if he found validity to support the issuance. He denied issuing a stop work order to Mr. Klein but disclosed that Mr. Klein had drawings that did not match the work being performed. Inspector Zummo stated that the Mayor may not tell him to issue stop work order because the inspector's position is akin to that of the police. The inspector disclosed that there is a 30-day window permitted by village code for issuing permits. However, there is no penalty for the failure to issue permits within that time frame. The process of issuing permits may be delayed where the Village Engineer must sign off. According to Inspector Zummo, most applications are processed in less than 30 days.

Inspector Zummo denied the existence of an "Us v. Them" operating model. He denied that the Mayor directed him to find something wrong with Trustee Ian Banks' barn. Inspector Zummo stated that he inspected Trustee Banks' barn and found three open permits spanning twelve years that required correction. He acknowledged that Trustee Banks initiated an Article 78 action against the Village.

Inspector Zummo performed multiple inspections on Mr. Klein's property and found multiple concerns including the absence of a sprinkler system. Mr. Klein sought to bring the matter before the Zoning Board of Appeals but could not because he received no denial letter. Mr. Klein received no denial letter because no permit had been issued. Inspector Zummo disclosed that he discovered that Complainant issued Mr. Klein an unsigned permit. When he questioned Complainant, Complainant disclosed that the inspector was not available and the permit was needed right away. The inspector notified the Zoning Board that Mr. Klein did not meet the qualifications for appearing before the Board. Inspector Zummo issued the stop work order on Mr. Klein's property. He denied that the Mayor directed the inspection of Mr. Klein's home. He complained that Complainant scheduled inspections on days when the inspector was not working. Inspector Zummo denied knowing the official reason for Complainant's termination and stated that he had complained to the Mayor to "do something about her." He found that Complainant did not take direction well, that her performance was deficient, including her inability to maintain the building system and tax system database, taking incomplete telephone messages, misspellings and grammatical errors. He denied telling Complainant that the Mayor wanted to get rid of her. Inspector Zummo told Complainant that he wanted her to leave because it was not working out. According to Inspector Zummo, the Mayor told him to relax and that he would speak to Complainant.

VILLAGE_001084

Inspector Zummo acknowledged that he had done impressions/impersonations in the office of Jewish residents and said that he "joked about how people were carrying on." Inspector Zummo disclosed that the Mayor had directed him to work once during the weekend "to do garbage."

The investigator reviewed emails Mayor Yagel sent to Inspector Zummo directing Inspector Zummo to perform tasks, including issuing violations. These emails include those dated 8/11/2017 (Mayor Yagel: "Please go out and violate this property when you return from vacation."), 7/13/2017 ("Lou, Has this been violated?? Please do so"); 6/30/2017 ("Please ensure that this is notice for violation and removed asap"); 6/30/2017 ("MS4 violation!!!! Violate!); 5/25/2017) ("Lou, Issue immediate STOP WORK ORDER!").

Trustee Nicholas Wilson disclosed that he was appointed Trustee in October 2013. According to Trustee Wilson, Complainant expressed frustration over her responsibilities and inability to make decisions without approaching supervisors. He directed Complainant to submit her questions by email and to include the Mayor in her correspondence. Trustee Wilson stated he was unaware that the Mayor had directed an investigation of Complainant. He denied knowledge that the permit applications of Orthodox Jews were delayed to the last day for the issuance of permits or knowledge that anyone had complained about differential treatment. He denied knowledge about any directive to buy pork rinds, denied knowledge of any "Us v. Them" culture at the Village Hall and denied hearing that Complainant's employment was terminated because of her association with Jewish residents.

Trustee Robert Klein disclosed that he was voted Trustee in March 2017. Trustee Klein disclosed that as a consequence of Respondent's Building Department's failure to issue permits in a timely fashion, he incurred $15,000 in damages to his home. Trustee Klein disclosed that the Building Department held up his requests for permits for five to six months or failed to notify him when permits were granted. He has received multiple stop work orders and reported that the plans he submitted to the Building Department have been missing seven or eight months, delaying approval of his applications. He noted that while the building inspector claimed he did not have sufficient hours to issue permits, the inspector's time sheets show that he worked 40 hours per week, twice the number of hours for which he was employed. Trustee Klein disclosed that he has been falsely cited for violation while other residents with similar infractions were not cited. He reported that the current Deputy Clerk refused to accept his ZBA application and then refused to stamp the application necessary for him to receive a rejection letter for proceeding before the ZBA. He ultimately received the rejection letter from the Village Attorney and the Deputy Clerk. The current Deputy Clerk refused to issue receipts for plans submitted. He noted that five plans submitted to the Village have disappeared since the arrival of the new Deputy Clerk and believes that Complainant was blamed for those missing plans.

Trustee Klein disclosed that he received multiple complaints from Jewish residents reporting similar problems at the Village Hall.

Trustee Ian Banks, believed to be a political rival for Mayor Yagel, disclosed that he has been elected Trustee since 1996. Trustee Banks disclosed that the public had positive feedback about

VILLAGE_001085

Complainant's performance. Any negative feedback about Complainant came from certain Village officials. Complainant had sent two memos to the Trustees reporting that building files were in disarray, her inability to access files and the absence of training. Trustee Banks tried to work with the Building Department to address her concerns but there had been no follow up discussions with the Board to address Complainant's concerns. Trustee Banks denied that the Mayor had complained about Complainant. Trustee Banks described Complainant as aggressive and liked to "do things fast" and to work. He found Complainant to be capable, that she "d[id] not play games and she does not lie." He disclosed that he was surprised that Complainant was not reappointed because Complainant was "doing a good job." Prior to her termination, he had heard rumors that she was targeted for termination. He had heard critiques that she provided documents to residents too quickly and was told she should not be doing it. He stated that the Mayor did not agree with her approach and Complainant disclosed that she was criticized for doing her job.

Trustee Banks reported that he had received complaints from Jewish residents about the Building Department prior to Complainant's arrival related to issuance of permits, plan approvals, certificates of occupancy and stop work orders. He confirmed that prior to her termination, Complainant reported that the Mayor and Building Inspector had used the term "Jew Lover" to describe her and that "those people" have been used to refer to Jewish residents in the Building Department; Trustee Banks however made no inquiries about that report nor raised this issue in meetings. He had no information about directives related to pork rinds. Trustee Banks stated that those who criticize Complainant are employees who are paid by the Mayor. He states that the Building Inspector, who should be independent, takes directives from the Mayor. He states that Complainant is "outspoken" and yells but if one observed the Mayor's capability "in terms of intimidation," then "one would understand." Trustee Banks states that the Trustees are now unable to get any important documents from the Village Hall, including information related to FOIL requests that were denied, whereas Trustees were able to obtain in the past. Trustees are also denied access to information to perform their functions.

Betty Vanderbeek states she was appointed Deputy Clerk in June 2017 and was previously the Building Clerk for the Village of Airmont. She denies reporting to the Mayor but disclosed that the Mayor has asked her to look into a situation in the Village and if she knows anything about it.

Deputy Mayor Leon Harris disclosed he is Catholic, and that he was appointed Deputy Mayor in April 2014 and later reappointed in 2015. Deputy Mayor Harris disclosed that he witnessed a telephone conversation between Complainant and a builder. He directed her to tell the builder that 24-hour notice is needed to schedule an inspection. She did not want to tell the builder, so he did. Deputy Mayor Harris denied that the Building Inspector complained about Complainant. He denied knowledge that the Mayor referred to Complainant as a "Jew Lover" and unaware of any reference to the Orthodox Jewish community as "those people." He denied that there were delays in authorizing requests from the Orthodox Jewish community. He acknowledged that there were "a lot" of FOIL requests for records. He denied that there was a directive from the mayor to display pork rinds on the counter or to refrain from providing effective service to the Jewish community. He denied the existence of an "Us vs. Them" culture. He stated that the Mayor directed that everyone follows the process.

VILLAGE_001086

Frances Arsa Artha has served as the Village Clerk/Treasurer since 2014. As such, she reports to the Mayor. The Deputy Clerk serves as the backup for the Village Clerk. She states that she was "shocked" by Complainant's complaint and found it to be "inaccurate" and "off base" and "untrue." She found that Complainant did not understand the job requirements and had behavioral issues. She found Complainant difficult to work with and did not take criticism well. She believed that Complainant was terminated because of her office demeanor and outbursts of anger. Those who complained about Complainant are the Building Inspector, the Mayor and Ms. Arsa-Artha. She complained that Complainant provided a lot of information to real estate agents and noted that a building contractor complained about Complainant because she gave out a lot of information. She found Complainant failed to recall instructions and failed to perform tasks taught to her correctly after repeated training. She disclosed that Complainant had referred to the witness as a "Debbie Downer," a "cold-hearted Hannah" in an email to the Building Inspector. She reported Complainant's performance issues to the mayor. She denied knowing if the Mayor referred to Complainant as a "Jew Lover." She found that Complainant would be less cooperative to individuals who were argumentative. Complainant was directed to follow building code. She had never heard that the Mayor had directed Complainant to buy pork rinds and denied that there was an "Us vs. Them" culture.

The investigator reviewed Respondent's copy of correspondence completed by Complainant that Respondent asserts substantiates its claim of Complainant's poor performance. They show that Complainant presented inaccurate or absence of information in her correspondence (6/15/2016 letter; 4/18/2017 email; 3/29/2017 email) and lack of professionalism (3/27/2017 email). Respondent's Exhibits A, B, C, D.

The investigator reviewed correspondence submitted in support Complainant's assertion of her professional conduct and to rebut Respondent's assertion of poor performance and professionalism. The authors of these correspondence assert that Complainant exhibited courteous nondiscriminatory assistance at the Clerk's office to all residents and Complainant's refrain from giving residents the "run around" with regard to service they sought. In these correspondence, Jewish writers assert that Jewish residents regularly receive negative treatment from Respondent's employees and point out that Complainant's performance stands in contrast to that treatment.

The investigator reviewed a list of open complaints produced by Respondent related to code violations. They include violations related to signs, unregistered vehicles, garbage, littering and fire code. Of the approximately 116 open complaints for 2018, almost half were issued to individuals with names traditionally recognized as names of individuals of Jewish heritage.

Submitted by: _____
Daniel Jean-Gilles
Human Rights Specialist

VILLAGE_001087

## III. BASIS FOR DETERMINATION

Complainant alleges that Respondent promoted a hostile work environment for Complainant because Complainant sought to provide equal access to Respondent's residents, including those residents who are Jewish. To support her claim, Complainant points to Mayor Brett Yagel's reference to her as a "Jew Lover," his recommendation that she display pork rinds on the public counter as a deterrence to Jewish residents visiting the Clerk's office, objections to her cooperative approach to Jewish residents and his admonishments for her to be less cooperative with "those people." Complainant alleges that Respondent's harassment and subsequent decision to terminate her are grounded in her refusal to abide by Respondent's culture of treating Jewish residents disparately compared to its non-Jewish residents.

On the other hand, Respondent denies that its decision to reject her reappointment was grounded in its disapproval of her cooperative approach toward Jewish residents. Respondent also denies referring to Complainant as a "Jew Lover" or promoting a culture of "Us vs. Them." Instead, Respondent asserts, it has legitimate nondiscriminatory bases for refusing to reappoint Complainant, namely her insubordination and poor performance, including her inability to absorb constructive criticism, failure to recall instructions and numerous errors in her work.

A review of the record shows that there are material issues of fact and credibility which are best resolved at a public hearing before an Administrative Law Judge where testimony is taken under oath, and witnesses are subject to cross examination, and a full record is made.

The record includes interviews of multiple officials for Respondent. Interviews of Trustee Robert Klein and others disclosed that prior to Complainant's assumption as Respondent's Deputy Clerk in the Building Department, Jewish residents expressed frustrations over their encounters with members of the Building Department where Complainant was employed. These complaints included receiving tickets for violations from the Building Department that were selectively issued to Jewish residents, the Clerk's office's refusal to perform tasks or to complete the procedural steps necessary to permit him to proceed before the ZBA. Trustee Klein disclosed that a purported "misplacement" of the building plans he submitted with his permit applications frustrated timely review of those applications. Trustee Klein also disclosed that the Clerk's office has refused to stamp his submitted application, and obstructed his ability to qualify procedurally for his appearance and review request before the ZBA.

The record also includes Building Inspector Zummo's admission that he has mimicked Jewish residents or performed impressions of them for their "carrying on." While Building Inspector Zummo denied that Mayor Yagel directed him to issue invalid stop work orders, the inspector admits that the mayor has requested that he "look into situations" and has asked the inspector to perform garbage inspections on a weekend.

Further, while Respondent asserts that Complainant exhibited poor performance, the record includes insufficient evidence to corroborate that prior to filing of the instant complaint, Respondent reprimanded Complainant for her work performance related to errors in her work, insubordination, failure to accept constructive criticism, which Respondent claims herein as the basis for refusing to reappoint Complainant. The record includes correspondence from the public Complainant served exhorting her professionalism in the performance of her duties as Deputy Clerk.

VILLAGE_001088

Given the conflicting evidence, a hearing is necessary to determine whether Complainant's refusal to engage in unlawful discriminatory practices toward Jewish residents was the motivating factor behind Respondent's refusal to reappoint her as Deputy Clerk.

Legal standards regarding probable cause determinations require that, once the investigation is complete, all remaining genuine issues of fact must be hypothetically resolved in favor of the Complainant. A determination of probable cause is not a final adjudication, but merely a determination that there should be a formal hearing on the matter.

It is recommended that the matter proceed to public hearing where the issues can best be resolved by an administrative law judge and where all the parties will obtain a full and fair opportunity to present their contentions and testimony under oath.

## IV.   RECOMMENDATION

Based on the foregoing, I recommend a finding of probable cause to support the allegations of the complaint.

Submitted by: _____
J. Guillermo Rosa, MPA
Deputy County Executive

## V.   DETERMINATION

Based on the foregoing, I find probable cause to support the allegations of the complaint.

_____
Linda Fenstermaker
Regional Director

VILLAGE_001089