UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
SAMUEL INDIG, LEAH INDIG, MEIR KAHANA,
ROBERT KLEIN, and NAFTALI KLEIN,

                             Plaintiffs,                    **OPINION AND ORDER**

         -against-                           18 Civ. 10204 (JCM)

THE VILLAGE OF POMONA, BRETT YAGEL,
LOUIS ZUMMO, LEON HARRIS, DORIS
ULMAN, and IAN BANKS,

                         Defendants.
----------------------------------------------------------------X

      Plaintiffs Samuel Indig, Leah Indig, Meir Kahana, Robert Klein and Naftali Klein

("Plaintiffs") bring this action against Defendants, the Village of Pomona (the "Village"), Brett

Yagel, Louis Zummo, Leon Harris, Doris Ulman and Ian Banks (collectively, "Defendants"),

alleging unlawful discrimination based on religion in violation of the Equal Protection Clause of

the Fourteenth Amendment and 42 U.S.C. §§ 3604 and 3617 (the "Fair Housing Act" or

"FHA"). (Docket No. 151).[1]

      Currently before the Court is Defendants' motion for summary judgment pursuant to

Rule 56 of the Federal Rules of Civil Procedure (the "Motion"). (Docket Nos. 261, 262).

Plaintiffs opposed the Motion, (Docket No. 270), and Defendants replied, (Docket No. 275).  For

the reasons set forth below, Defendants' Motion is granted in part and denied in part.

Specifically, the Court grants summary judgment for Defendants on Plaintiff Meir Kahana's

---

[1] Counts three and four of Plaintiffs' Third Amended Complaint, pleading violations of the New York State
Constitution and "imposition of unconstitutional conditions on the provision of governmental benefits and services
in violation of the rights to free speech, petition for redress of grievances, resort to federal courts, due process, equal
protection, and the takings clause" under the United States Constitution, (Docket No. 262 at 3-4), were dismissed by
Order of the Hon. Philip M. Halpern on August 24, 2021. (Docket No. 211).

claims, and on Plaintiffs' claims against Doris Ulman and Ian Banks. However, the Court denies summary judgment on Samuel and Leah Indig's claims, as well as on Robert and Naftali Klein's claims, against the remaining Defendants.[2]

## I.    BACKGROUND

The following facts are taken from Defendants' Joint Statement of Material Facts, submitted pursuant to Local Civil Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York ("Def. 56.1"), (Docket No. 263), Plaintiffs' Response and Counterstatement to Defendants' Local Civil Rule 56.1 Statement ("Pl. 56.1 Resp."), (Docket No. 271), and the affidavits and exhibits submitted by the parties in support thereof.[3] The following facts are construed in the light most favorable to Plaintiffs as the side opposing summary judgment. *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018). Any disputes of material fact are noted.[4]

Plaintiffs are Orthodox Jews who own real property in the Village of Pomona ("Village"). They claim that Defendants discriminated against them on the basis of their religion by slow-walking approval for construction permit requests, wrongfully issuing stop work orders after construction began, and selectively enforcing the Village's municipal codes against them. (*See generally* Pl. 56.1 Resp. at 53-76).[5] The individual Defendants are officials that worked in

---

[2] The parties have consented to the undersigned for all purposes, pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (*See* Docket No. 227).

[3] Specifically, Defendants submitted an affirmative declaration from counsel attaching 95 exhibits, (Docket No. 264), and Plaintiffs submitted a responsive declaration from counsel attaching 136 exhibits, one of which is a declaration from Plaintiff Robert Klein, (Docket No. 272).

[4] Defendants argue that nearly all of their statements of fact submitted under Rule 56.1 should be deemed admitted because Plaintiffs' responses are conclusory and do not cite to admissible evidence. (Docket No. 275 at 5). Rather than issue a blanket ruling, the Court will address the sufficiency of Plaintiffs' responses on a statement-by-statement basis as necessary for resolution of the pending Motion.

[5] Unless otherwise noted, all page numbers refer to the numbers generated by the Court's electronic case filing system ("ECF").

the Village at the time of the alleged discrimination, and include: (1) Brett Yagel, who was the

Mayor of the Village from 2011-2019, (Def. 56.1 ¶ 12); (2) Louis Zummo, who has been the

Building Inspector for the Village since December 2013, (*id.* ¶ 17); (3) Leon Harris, who was a

Trustee of the Village and the Deputy Mayor during the relevant time period, (*id.* ¶ 30); (4) Doris

Ulman, who was the Village Attorney from 2003-2019, (*id.* ¶ 35); and (5) Ian Banks, who was a

trustee in the Village before becoming Mayor in 2019, (*id.* ¶ 39).

## A.    Samuel and Leah Indig

Plaintiffs Samuel and Leah Indig (the "Indigs") own a home at 21 White Birch Drive in

the Village. (*Id.* ¶ 94).  In 2016, they decided to modify their backyard, which was unusable at

the time due to a steep slope. (*Id.*).  Following a conversation with Zummo about the feasibility

of the work, they applied for a building permit to regrade their backyard. (*Id.* ¶¶ 95-97).  Zummo

forwarded the application to the Village Engineer, Jospeh Corliss, who responded that the plan

failed to conform to Chapter 119 of the Village Code, requiring a professionally prepared plan

"conforming to steep slope definitions" and a certification from a New York State Certified

Professional Engineer "regarding the source of the fill material being used on the project,

compaction results of the material installed, soil erosion details and certification on final grades."

(*Id.* ¶ 100); (*see also* Docket No. 264-30).  The Indigs submitted a revised plan on January 8,

2017. (Docket No. 364-31)  Corliss responded by suggesting that a technical advisory meeting

should be scheduled to discuss the revised plan as the final grading for the Indigs' backyard was

still unclear. (*Id.*).  Ultimately, the work was approved and Zummo issued a permit on September

22, 2017, allowing the Indigs to modify their backyard using a tiered grading system. (Docket No. 264-33); (*see also* Def. 56.1 ¶ 107).[6]

Immediately thereafter, the Indigs began construction on their yard.  However, five days later, on September 27, 2017, Zummo issued a stop work order after determining that the Indigs were using a "straight out and straight down backyard" plan rather than the approved tiered grading system, and had also constructed a temporary road on the property that was not contemplated in the permit application. (Def. 56.1 ¶¶ 106-07).  The Indigs disagree and argue that: (1) the plan no longer called for a tiered grading system; (2) even if it did, "[i]t would not [have been] possible for Zummo to determine in less than five days of work" that the Indigs were not following the plan; and (3) "[t]he excavator did not construct a road, but merely prepared a temporary path to bring equipment down to the bottom of the slope." (Pl. 56.1 Resp. at 23). Subsequently, Zummo issued two appearance tickets to the Indigs for violating the previously issued stop work order. (Def. 56.1 ¶ 109).

On December 12, 2017, the Indigs appealed the stop work order and appearance tickets to the Zoning Board of Appeals ("ZBA"), (*id.* ¶ 110), which denied the appeal on June 28, 2018, (*id.* ¶ 117).  While the appeal was pending, however, the Indigs submitted numerous revised plans to the Village for approval, but each time the Village's Deputy Clerk, Betty Vanderbeek, pointed out issues preventing approval of the revised plans. (*Id.* ¶¶ 112-15).  This led the Indigs to abandon their plan for a tiered grading system in the backyard, instead finishing it in a smaller manner that allowed them to get an "as-built certification" in Spring of 2021. (Pl. 56.1 Resp. at 95).  The Indigs claim that the Village's decision to issue a stop work order preventing them

---

[6] The Indigs dispute that the approved plan called for a tiered grading system, arguing instead that they had modified the proposal before the final plan was approved, and the revised plan no longer called for tiered grading. (Def. 56.1 ¶ 107).

from continuing to work on their backyard, even though they submitted numerous revised proposals for the work, was not because the plans violated the Village Code, but because they were Orthodox Jews. (Pl. 56.1 Resp. at 93-95). In support of this allegation, the Indigs point to recordings secretly taken by Noreen Shea, a former Deputy Clerk in the Village, who previously filed an employment discrimination lawsuit against the Village in 2017, alleging that she was fired for refusing to comply with the Village's practice of discriminating against Orthodox Jews. *See Noreen Shea v. Vill. of Pomona*, No. 18 Civ. 11170 (CS) (S.D.N.Y). In one recording, taken on February 3, 2017, Zummo states that: "there's no way in hell [the Indigs are] going to get a permit, there's no way Joe [Corliss] is going to sign off on this." (Pl. 56.1 Resp. at 91) (in this recording, Zummo also references Mr. Indigs' company, East Coast Framing, and its connection to other construction projects in the Village, stating "they're all . . . it'll be fun to watch."). In another recording taken the next day, Zummo states to Yagel: "[Ms. Indig] ain't gettin' [the permit]. This is the bitch that took out four truckloads of trees." (*Id.*). Yagel responds: "oh good." (*Id.*).

A month later, Shea recorded Zummo remarking that "they're all interconnected . . . they don't do anything outside the tribe" in reference to Mr. Indig's company, which was doing work on another Orthodox Jew's home in the Village. (*Id.*). The recordings reveal numerous other aggressive statements from Zummo and Yagel regarding their skepticism that the Indigs' proposed work was legal, but none that reference their religion. (*See, e.g.*, *id.* at 93) (Zummo responding to a question about how the Indigs could get their excavator to the bottom of the backyard without a temporary road, that Mr. Indig should "take a helicopter and fly it down. I don't give a crap."). Eventually, the Indigs finished their backyard, but in a "significantly smaller" manner than they had planned. (*Id.* at 95).

**B.    Meir Kahana**

Plaintiff Meir Kahana owns a home at 68 Halley Drive in the Village. (Def. 56.1 ¶ 128). In July 2017, Harris took pictures of an above-ground pool Kahana had in his driveway and e-mailed them to Yagel, asking if the pool was legal. (Docket No. 272-45). Yagel sent the e-mail to Zummo and, in response, on July 28, 2017, Zummo stopped at the home to inspect the pool. (Def. 56.1 ¶ 131). Zummo claims that he left a business card at the front door of the property with a note for the owner to call him. (*Id.*). Zummo further claims that at the time, he did not know who owned the home. (*Id.*). A few days later, having not heard from Kahana, Zummo issued two appearance tickets to him: one for having an illegal above ground pool on the driveway, and the other for leaving a ladder in an unfenced pool. (*Id.* ¶ 132). Kahana paid a $200 fine as a result. (*Id.* ¶ 138). Kahana admits all of this, but argues that: (1) in prior instances, Zummo would give him a written warning before issuing an appearance ticket; (2) Harris "frequently took note of possible violations by Orthodox Jews;" (3) in at least one instance, Yagel chided a Village employee for giving a violation to an African-American supporter of his, even though the employee issued the same ticket to an Orthodox Jewish resident without comment; and (4) Zummo told Plaintiff Robert Klein that he had "no choice" but to issue the tickets or Yagel would fire him. (Pl. 56.1 Resp. at 96). Defendants counter that the Village was motivated to inspect Kahana's pool not because of his religion, but because the Village was on high alert for pool-related violations since a child drowned in a pool in the Village earlier that summer. (Def. 56.1 ¶ 129).

**C.    Robert and Naftali Klein**

Robert and Naftali Klein (the "Kleins") live in a home purchased by Robert Klein's father, located at 63 Halley Drive in the Village. (*Id.* ¶¶ 141-42). In 2016, the Kleins decided to

remodel their home by lifting and expanding it. (*Id.* ¶ 143). This required putting the home on temporary supports, enlarging the crawlspace under the home, and building a new foundation. (*Id.*). They applied for a building permit on June 9, 2016. (Pl. 56.1 Resp. at 77). On June 20, 2016, Zummo and a Regional Architect with the New York State Department of State informed the Kleins that, pursuant to Section R404.1.6 of New York's Building Code, if they increased the size of their crawlspace by more than 10%, creating a third story above grade, they would need to install an automatic sprinkler system (the "sprinkler requirement") unless they could "manipulate the final grade." (Def. 56.1 ¶ 144). As a result, no permit was issued. (Pl. 56.1 Resp. at 77). The Kleins then applied to the ZBA, effectively seeking a variance from the sprinkler requirement, and a hearing on the application was held on July 27, 2016. (*Id.* ¶ 145). The ZBA reserved its decision pending receipt of a professional evaluation of the construction plan. (*Id.* ¶ 146).

The parties disagree as to what happened from this point forward. Defendants argue that the ZBA dismissed the application because the Kleins "effectively withdrew" by submitting alternate plans that did not trigger the sprinkler requirement. (*Id.* ¶¶ 146-47). However, the Kleins dispute this and argue that the ZBA dismissed their application because Yagel interfered with its consideration by e-mailing the Department of State on August 9, 2016, seeking ways to dismiss it on procedural grounds. (Pl. 56.1 Resp. at 31). They point to an e-mail from the Department of State in response to Yagel, informing him that applicants cannot appeal from a permit that was never denied, prompting the Village to cancel the Kleins' appeal. (*Id.* at 79); (*see also* Docket No. 272-30) (e-mail from Department of State notifying Yagel that "[i]f the building inspector did not rule on [the permit] because the application was incomplete, then the resident . .

. would not yet have 'standing' to go before the ZBA.").[7]  With their prior application in limbo, the Kleins submitted a new application for a building permit on November 4, 2016. (Def. 56.1 ¶ 147).  Zummo granted the application and issued a permit for the Kleins to lift their house and replace the foundation on the raised portion on December 19, 2016. (*Id.* ¶ 148).

The Kleins lifted their home in April of 2017. (Def. 56.1 ¶ 149).  When the home was lifted, its garage was damaged, so the Kleins removed it. (*Id.* ¶ 150).  Mr. Klein testified that the basement also suffered water damage from the lift as one side of the home was exposed. (*Id.* ¶ 151).  On June 14, 2017, Zummo inspected the construction site and noticed that the Kleins had exceeded the scope of their permit by removing the garage without approval. (*Id.* ¶ 152).  As a result, he issued a stop work order on June 30, 2017. (*Id.* ¶ 153).  The Kleins contend that this stop work order was directed by Yagel, but Zummo testified that he had no communication with Yagel prior to issuing the June 30 order. (Pl. 56.1 Resp. at 33).  The stop work order gave the Kleins until July 28, 2017, to revise their plans and continue construction. (Def. 56.1 ¶ 155). However, Zummo temporarily lifted the stop work order on an emergency basis in early July 2017, so the Kleins could lower their house. (*Id.* ¶ 156).  Zummo conducted two additional inspections in August, at which time he claims to have reviewed plans at the home that were not previously filed with the Village. (*Id.* ¶ 158).  Plaintiffs dispute this by pointing to: (1) an audio recording from September 27, 2016, where Yagel assists Mr. Klein with attaching construction plants to a permit application; (2) an audio recording from March 3, 2017, where Zummo acknowledges that one set of the Kleins' plans called for "adding another story;" and (3) a

---

[7] The Kleins also point to testimony from Mr. Klein that during the ZBA appeal, Zummo referred to the Kleins as "just like them" in reference to other Orthodox Jews living in the Village that wanted to modify their homes. (Pl. 56.1 Resp. at 79).

handwritten note from Vanderbeek noting that she found a file that Mr. Klein dropped off on July 6, 2017, with revised plans. (Pl. 56.1 Resp. at 34-35).

Regardless, on October 6, 2017, Zummo issued a second stop work order after driving by the Kleins' home and noticing that they were adding a third floor without approval. (Def. 56.1 ¶ 163).  The parties disagree on whether the Kleins' revised permit application, submitted in September 2016, contemplated the addition of a third floor to the home. (*Id.* ¶¶ 148-49). Defendants point to testimony from Zummo that the Kleins' modified plans did not reference the addition of a third story. (*Id.* ¶ 163).  The Kleins respond that Zummo's understanding of the scope of work contemplated was incorrectly based on a June 2016 permit application, even though the Kleins submitted revised plans in September 2016, which referenced "adding a third floor." (Pl. 56.1 Resp. at 32) (quoting Docket No. 272-40).  Plaintiffs also vehemently deny that Zummo drove by their home unprompted.  They claim that Zummo's drive-by and subsequent stop work order was prompted by Yagel who had been sending photos of the Kleins' home to Zummo as early as September 28, 2017, to get him to issue the order. (Pl. 56.1 Resp. at 84-85). In addition, the Kleins point to a text message exchange between Yagel and Zummo on October 4, 2017, in which Zummo states that he had been asking for additional information from Mr. Klein so that if he fails to respond they can "slam his fingers in the door." (*Id.*).  Yagel replies positively and mentions other potential violations the Kleins could face. (*Id.*).  Further, the Kleins argue that Zummo deliberately chose to drive by the home and issue the stop work order, on October 6, 2017, because it was the Jewish holiday of Sukkot when he knew the Kleins would not be at the home. (*Id.*).

Following issuance of the October 6, 2017 stop work order, Mr. Klein, Corless, Zummo, Vanderbeek and Ulman met to discuss the steps necessary for work to continue at the Kleins'

home. (Def. 56.1 ¶ 167). During that meeting, the Village told Mr. Klein that if he wanted to build a third floor, he needed to install a sprinkler system in accordance with state code, but in the meantime, they would grant him emergency authorization to encapsulate the home to protect it from the elements during the upcoming winter. (*Id.* ¶¶ 168-69). Plaintiffs argue that encapsulation at this point was not feasible given ongoing construction and the unfinished nature of the home. (Pl. 56.1 Resp. at 86). Nevertheless, the Village provided the Kleins with a list of items they needed to submit before work could proceed. (*Id.* ¶ 171). On November 20, 2017, Zummo observed work being done at the Kleins home despite the stop work orders in effect. (*Id.* ¶ 173). As a result, he issued an appearance ticket to Ms. Klein. (*Id.*). That same day, the Kleins submitted updated plans for the project, which were given to Corless to review. (*Id.* ¶ 174). While the plans were being reviewed, the Kleins appealed the October 6, 2017 stop work order to the ZBA. (*Id.* ¶ 177). A hearing on the appeal was held on May 23, 2018, and the appeal was also discussed at a ZBA meeting on June 27, 2018. (*Id.* ¶¶ 181-83). At the June 27, 2018 meeting, the Village's Special Counsel for Prosecutions appeared on behalf of the Village for the first time and argued that the appeal was untimely. (*Id.*). The ZBA agreed and dismissed the appeal on July 18, 2018. (*Id.* ¶ 184). The Kleins contend that Yagel hired the Special Counsel because Ulman was not being aggressive enough against the Kleins, that Ulman, who was the Village Attorney and normally represented the Village at ZBA hearings, was not aware the Special Counsel would be appearing, and that she resigned the very next day as a result. (Pl. 56.1 Resp. at 87).

On May 21, 2018, the Village Planning Board informed the Kleins that their proposed plans were still missing information concerning drainage and grading. (Def. 56.1 ¶¶ 185-86). On June 19, 2018, the Kleins applied for a tree permit, which was denied three days later. (*Id.*

¶ 187).  A month later, Mr. Klein wrote to Zummo asking for an extension of his 2016 permit

and a status update on his other pending applications. (*Id.* ¶ 188).  Zummo responded that the

permits could not be approved because the stop work orders were still in effect and Mr. Klein

had not addressed the need for a sprinkler system for the third floor being added to his home. (*Id.*

¶ 189).  The Kleins appealed Zummo's refusal to grant an extension to the ZBA on September

20, 2018. (*Id.* ¶ 190).  In November of that year, Ms. Klein was found guilty of violating the

Village Code by continuing to work on the home despite the stop work order. (*Id.* at ¶¶ 191-92).

On August 14, 2019, the Kleins submitted a new proposal, this time with what they believed

included only two floors above grade, so there would be no sprinkler requirement. (*Id.* ¶ 197).

The new proposal was conditionally approved on August 16, 2019, but on September 27, 2019,

Zummo told the Kleins that a permit could not be issued because the plans still had three floors

above grade, requiring a sprinkler system. (*Id.* ¶¶ 198-200).

Seemingly out of options, the Kleins filed a petition for a variance from the sprinkler

requirement to the New York State Uniform Fire Prevention and Building Code Board of

Review ("Board of Review"), which held a hearing on March 20, 2020. (*Id.* ¶ 201).  Defendants

claim they were not given proper notice of the hearing, so Zummo was not able to attend and

present the Village's position. (*Id.* ¶ 202).  On April 14, 2020, the Board of Review held that

Section R404.1.6 of the New York State Code, requiring sprinklers when adding a third story to

an existing structure, did not apply to residential homes. (*Id.* ¶ 203).  The Village did not appeal,

and on May 29, 2020, Zummo issued the first of several subsequent building permits to the

Kleins. (*Id.* ¶ 207).  The Kleins claim that Zummo intentionally waited as long as possible to

issue the building permits and lift the prior stop work orders after the Board of Review's decision

was issued, and that he only did so when this Court entered an Order requiring him to reinspect

- 11 -

the home and consider lifting the orders in light of the Board of Review's finding. (Pl. 56.1 Resp. at 89); (*see also* November 3, 2020 Minute Entry).  The Kleins further claim that while the permits were pending, and the stop work orders were issued, their partially open home was damaged by the elements, sustaining $300,000 worth of damages as a result. (Def. 56.1 ¶¶ 211-18).  Defendants argue that the Kleins could have encapsulated their home in 2017 to prevent the damage they now complain of, and that their expert's damages calculation is unsupported by the record. (*Id.* ¶¶ 224-25).

While Defendants argue that the delays the Kleins suffered in modifying their home were legitimate construction-related stoppages, the Kleins paint a very different picture.  They argue it was part of a long-running campaign of discrimination against them because of their religion.  In support of this argument, they point to:

- Testimony from Shea that Zummo used to conduct "shul[8] patrol[s]" on Saturday nights, in which he "would ticket everybody from Friday to Saturday" during Shabbat. (Docket Nos. 272-4 at 89, 175-76).  The Kleins allege that they were the victims of one such patrol on July 13, 2016, when Zummo gave them an appearance ticket "for an alleged garbage and recycling containers violation alleged to have occurred at 4:24 a.m. on July 16, 2016." (Pl. 56.1 Resp. at 78).

- Audio from an October 5, 2016 Shea recording where Zummo mocks Mr. Klein while discussing his housing project, stating (while at times faking a Hassidic accent): "[t]he only reason he wants it is to make, 'I have to make monies with my basement.'  He's going to turn his basement into a fucking rental, and he's either going to put an apartment down there and rent it out to his Mexican buddies, or he's going to do some fucking business there.  And that's fine.  I'm going to watch him like a fucking hawk . . . [b]ecause I'm sick and tired of the bastard.  The bastard can't keep going on.  It can't.  We can't keep letting these morons do what they want to do." (*Id.* at 80).

- Testimony from Mr. Klein that when he was elected to the Village's Board of Trustees in Spring of 2017, Yagel told him to "watch [his] back" because "people [were] watching [him]." (Docket No. 272-3 ¶ 8).

---

[8] "Shul" refers to Jewish houses of worship. *See Shul*, MERRIAM-WEBSTER'S DICTIONARY.

- Audio from a recording Zummo secretly made of the November 3, 2017 meeting with Mr. Klein, in which Zummo states that he is "gonna sanitize the file" related to the Kleins' proposed construction. (Pl. 56.1 Resp. at 86).

- Audio from the same recording in which Zummo mocks Hassidic Jews, stating: "[o]h shit, the Hassids are going to be so upset. . . . Child marriages are now prohibited in New York. . . . [Proceeding with a fake Hassidic accent] 'Well I like to marry them when they're 14, you get more babies that way. Get more for your money and it's all about the money, you know?'" (*Id.*).

- Additional audio from the Zummo recording where he mocks Ulman for trying to work with Mr. Klein, stating (in a fake Hassidic accent): "Robert, I'm so sorry, I didn't [know] Joe was going to be so angry. Robert, trust me, there's a way we could do this [referring to the construction]. We have to keep the tribe moving forward." (*Id.*).

Defendants argue that these are just examples of Zummo's and Yagel's "politically incorrect" sense of humor and have nothing to do with the violations issued to the Kleins, or their ongoing battle to get construction permits to modify their home. (Docket No. 275 at 8-9).

## D.    Other Allegations of Discrimination

In addition to the discrimination Plaintiffs allege they suffered directly, they also allege a broader pattern of religious discrimination by Defendants against the Village's Orthodox Jewish community. First, Plaintiffs point to the case *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill of Pomona, N.Y.*, 945 F.3d 83 (2d Cir. 2019) ("*Tartikov*"). In *Tartikov*, the Second Circuit affirmed a lower court's ruling in favor of the plaintiffs, which held that the Village had intentionally discriminated against Orthodox Jews in 2007 by passing two zoning laws to thwart construction of a rabbinical college in Pomona. *Id.* at 122. Second, Plaintiffs argue that Yagel has persistently opposed plans for additional Jewish synagogues to be built in the Village, citing testimony he gave that the Religious Land Use and Institutionalized Persons Act ("RLUIPA") is "unfair" and that "religious organizations or people who are religious [] are using RLUIPA [for] an unfair advantage." (Pl. 56.1 Resp. at 56-57). Plaintiffs also cite to Yagel's public campaign against the Village's efforts to settle a lawsuit filed by an Orthodox Jewish congregation that was

trying to build a temple in the Town of Haverstraw, New York. (*Id.*). Third, as for Zummo, Plaintiffs note that he is also the Building Inspector in the Village of Airmont, New York, where he was sued for similar discrimination against Orthodox Jews previously. (*Id.*) (citing *Central UTA of Monsey, v. Vill. of Airmont*, No. 18 Civ. 11103 (VB); *Cong. of Ridnik v. Vill. of Airmont*, No. 18 Civ. 11533 (NSR)).

Finally, Plaintiffs rely extensively on Shea's employment discrimination lawsuit against the Village and Yagel for firing her for allegedly refusing to partake in his efforts to discriminate against the Village's Orthodox Jews. *See Shea*, No. 18 Civ. 11170 (CS). The lawsuit settled after the court denied defendants' motion for summary judgment, but recordings Shea made in preparation for the suit reveal:

- Zummo stating on October 5, 2017, "[t]his is how stupid the Jews are!" when retelling the story of a non-Jewish businessman trying to evict a Jewish restaurant owner in the town of Airmont, New York. (Pl. 56.1 Resp. at 63).

- Zummo stating on October 5, 2017 that the Orthodox Jewish practice of not turning lights on during Shabbat is "the dumbest fucking thing I've ever heard." (*Id.* at 65).

- Zummo stating on February 1, 2017, in denying another Village resident's building plans, that he wanted to "bolster [the denial] with as many facts as we can to bury them in so he can't have a super shul on 12 Beaver Dam." (*Id.* at 65).

- Zummo, on February 3, 2017, mocking two Village residents that came to the Village Hall for assistance in obtaining permits with a fake Hassidic accent, stating "they want to buy a piece of land cheap, put a trailer on it, live in it for ten years, make big monies, make monies." (*Id.* at 68).

- Yagel referring to a local Orthodox Jewish realtor on February 3, 2017, as "Schlomo Fuerst," even after being told his name was Solomon. (*Id.* at 68).

- Zummo referring to the United Talmudical Association on February 13, 2017 as "you people," and mentioning wearing a "Hitler was right hat" when discussing their requests for approval to build a school in the Village of Airmont where Zummo also worked as a Building Inspector. (*Id.* at 72).

- Zummo stating, on March 1, 2017, when discussing a violation of the Village Code, "[t]he Jewish mentality works that way. I could go over there every day and they're

going to go and do what they want because they don't want restrictions.  They're like 6-year-olds." (*Id.* at 73).

- Zummo telling a builder in the Village on March 31, 2017, that his plans for building a wall around a property needed to be changed because "[t]his isn't Tel Aviv." (*Id.* at 76).

The recordings also reveal numerous instances where Yagel and Zummo reject building permits without giving due consideration to the plans. *Id.*  Moreover, in testimony provided in this lawsuit, Shea alleges that Yagel and Zummo would frequently direct her to slow applications of Orthodox Jews in the Village, that Zummo told her Yagel referred to her as a "Jew lover," and that Zummo told her Hassidic Jews are the "lowest" of the Jews. (*Id.* at 61-62).

## II.    SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, the Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine dispute as to a material fact "exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (citation omitted); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247-48 (1986).  "A fact is material if it might affect the outcome of the suit under the governing law." *Casalino v. N.Y. State Catholic Health Plan, Inc.*, No. 09 Civ. 2583 (LAP), 2012 WL 1079943, at *6 (S.D.N.Y. Mar. 30, 2012) (citation and internal quotations omitted).

In reviewing a motion for summary judgment, the Court "must draw all reasonable inferences in favor of the nonmoving party" and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (citations omitted).  That said, the Court may not weigh the evidence or determine the truth of the matter, but rather conducts "the threshold inquiry of

determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250.  The moving party

bears the initial burden of "demonstrating the absence of a genuine issue of material fact."

*Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323).

Under federal law, the moving party may meet this burden by pointing to the absence of

evidence to support an essential element of the nonmoving claim. *See Tenay v. Culinary*

*Teachers Ass'n of Hyde Park*, 281 F. App'x 11, 12-13 (2d Cir. 2008) (summary order) ("[T]he

moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence

to support an essential element of the nonmoving party's claim.") (citation and internal

quotations omitted); *see also Hughes v. U.S.*, No. 12 Civ. 5109 (CM), 2014 WL 929837, *4

(S.D.N.Y. Mar. 7, 2014) (holding that a defendant may meet its burden by "'showing'—that is,

pointing out to the district court—that there is an absence of evidence to support the nonmoving

party's case," but need not "raise a *prima facie* case") (quoting *Celotex*, 477 U.S. at 325).

Once the moving party has met its initial burden, the burden shifts to the nonmoving

party to "present evidence sufficient to satisfy every element of the claim." *Holcomb*, 521 F.3d at

137.  "The non-moving party is required to 'go beyond the pleadings' and 'designate specific

facts showing that there is a genuine issue for trial,'" *id.* (quoting *Celotex*, 477 U.S. at 324;

*Anderson*, 477 U.S. at 249-50), and "must do more than simply show that there is some

metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586 (1986).  In doing so, Plaintiff "may not rely on conclusory allegations

or unsubstantiated speculation, but must support the existence of an alleged dispute with specific

citation to the record materials." *Hughes*, 2014 WL 929837, at *3 (citations and internal

quotations omitted); *see also* Fed. R. Civ. P. 56(c).  Additionally, "[o]nly disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment." *Anderson*, 477 U.S. at 248.  If the nonmoving party fails to establish the existence of an essential element of the case on which it bears the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

In the Southern District of New York, the party moving for summary judgment must submit a short and concise statement of material facts it contends are undisputed, supported by evidence that would be admissible at trial. Local Civ. R. 56.1.  The party opposing summary judgment must specifically controvert the moving party's statement of material facts, or the moving party's facts will be deemed admitted for purposes of the motion. Local Civ. R. 56.1(c); *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible.").  However, "allegations of uncontested fact cannot be deemed true simply by virtue of their assertion in a Local Rule 56.1 statement." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001), *abrogated on other grounds*, *Moll v. Telesector Res. Grp., Inc.*, No. 20-3599, 2024 WL 820179 (2d Cir. Feb. 28, 2024). "[W]here there are no[] citations or where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion." *Id.* (citations and internal quotations omitted).  Furthermore, the Court is "not required to consider what the parties fail to point out." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (citations and internal quotations omitted).

## III.    DISCUSSION

### A.    Equal Protection Under the Fourteenth Amendment

Defendants argue that they are entitled to summary judgment on Plaintiffs' 42 U.S.C. § 1983 Equal Protection claim in Count One of the Amended Complaint.  Specifically, Defendants

claim that Plaintiffs have failed to show: (1) that they were treated differently than similarly situated comparators for purposes of a selective enforcement claim, or (2) "compelling evidence of intentional discrimination" sufficient to establish a claim pursuant to *Pyke v. Cuomo*, 258 F.3d 107 (2d Cir. 2001). (Docket No. 262 at 6-13). Plaintiffs contend in response that there is "evidence of an extensive history of the Village and some of very officials [sic] whose actions have been adjudicated as motivated by discriminatory animus against Orthodox/Hasidic Jews and by the desire to limit or exclude them from the Village." (Docket No. 269 at 5).

The Fourteenth Amendment states that, "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Second Circuit has held that "there are 'several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause,'" including: (1) pointing "to a law or policy that expressly classifies persons on the basis of race," (2) identifying "a facially neutral law or policy that has been applied in an intentionally discriminatory manner," or (3) alleging "that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." *Pyke*, 258 F.3d at 109 (quoting *Brown v. Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000)). "Additionally, a plaintiff may claim selective prosecution, or selective enforcement of the law." *Savino v. Town of Southeast*, 983 F. Supp. 2d 293, 301 (S.D.N.Y. 2013) (citations omitted), *aff'd*, 572 F. App'x 15 (2d Cir. 2014).

To state an Equal Protection claim based on a theory of selective enforcement, the plaintiff must demonstrate: "(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Hu v.*

*City of New York*, 927 F.3d 81, 91 (2d Cir. 2019) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 684 (2d Cir. 1995)).  "Similarly situated does not mean identical, but rather a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, to the extent that an objectively identifiable basis for comparability exists." *Walker v. City of New York*, No. 05-CV-1283 (RER), 2010 WL 5186779, at *7 (E.D.N.Y. Dec. 15, 2010) (citations and internal quotations omitted).  This means that Plaintiffs "must identify comparators whom a prudent person would think . . . [were] roughly equivalent[,] . . . [but] need not show an exact correlation between himself and the comparators." *Abel v. Morabito*, No. 04 Civ. 07284 (PGG), 2009 WL 321007, at *5 (S.D.N.Y. Feb. 10, 2009) (citations and internal quotations omitted).  Whether individuals are similarly situated is typically for the jury to decide, but summary judgment may be granted "where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001).

However, in *Pyke*, the Second Circuit held that "a plaintiff who . . . alleges that a facially neutral law or policy has been applied in an intentionally discriminatory [] manner . . . is not obligated to show a better treated, similarly situated group of individuals . . . in order to establish a claim of denial of equal protection." *Pyke*, 258 F.3d at 110.  A plaintiff asserting an Equal Protection claim under *Pyke* "must demonstrate that [] the application of the law was motivated by discrimination." *Savino*, 983 F. Supp. 2d at 302.  This does not require proof "that a government decisionmaker was motivated solely, primarily, or even predominantly by" the plaintiff's religion, just that it "was *a* motivating factor." *United States v. City of Yonkers*, 96 F.3d 600, 611-12 (2d Cir. 1996) (citations and internal quotations omitted) (emphasis in original).  "Once it is shown that a decision was motivated at least in part by a [] discriminatory

purpose, the burden shifts to the defendant to show that the same result would have been reached even without consideration of [religion]." *Id.*; *see also Janfeshan v. U.S. Customs & Border Prot.*, 16-CV-6915 (ARR)(LB), 2017 WL 3972461, at *9 (E.D.N.Y. Aug. 21, 2017) (citations and internal quotations omitted) ("[o]nce a plaintiff shows that a decision was so motivated at least in part, a defendant must show that the same result would have been reached even without the impermissible consideration.").

### 1.    The Indigs' Equal Protection Claim

Defendants argue that Plaintiff's Equal Protection claim fails under both the selective enforcement and *Pyke* theories. Defendants maintain that the Indigs cannot make out a selective enforcement claim because they have failed to identify similarly situated comparators that were treated differently than them. The Indigs contend that Defendants prevented them from modifying their backyard because of their religion. (Pl. 56.1 Resp. at 95). However, the Indigs have not identified any other non-Jewish individuals in the Village who similarly wanted to regrade their backyard and deviated from the initial plans without approval but were allowed to complete the work anyway. (*Id.* at 89-94). Nor have they pointed to any non-Jewish individuals who were permitted to construct a temporary road on their property for heavy machinery without first getting Village approval. (*Id.*). Since establishing comparators that were treated differently on the basis of religion is a required element to establish selective enforcement, and the Indigs have failed to meet their burden, the Indigs' Equal Protection claim cannot proceed under this theory. *See, e.g.*, *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 623 (S.D.N.Y. 2016) (granting summary judgment and holding that "Plaintiffs' failure to identify a sufficient comparator is fatal to their equal protection claim"); *Lawtone-Bowles v. Katz*, No. 14-CV-606 (CS), 2016 WL 6834018, at *10 (S.D.N.Y. Nov. 17, 2016) ("in order to state a viable claim, a

plaintiff must show that she was treated differently compared to others similarly situated")
(internal quotations omitted); *Little v. Soulia*, 9:19-CV-0263 (TJM)(TWD), 2021 WL 4524220,
at *20 (N.D.N.Y. June 16, 2021) (recommending summary judgment be granted where "Plaintiff
claims he was discriminated against on account of his race and religion, but has not identified
any comparator"), *report and recommendation adopted*, 2021 WL 4521048 (N.D.N.Y. Oct. 4,
2021).

  Although the Indigs' selective enforcement theory fails, their Equal Protection claim
under *Pyke* survives because there are numerous disputed issues of fact regarding whether
Defendants improperly slow-walked approval of their modified permit applications due to their
religion.  The Indigs contend that Defendants prevented them from finishing their backyard work
because they are Orthodox Jews. (Pl. 56.1 Resp. at 89-95).  To satisfy their initial burden of
showing that Defendants' conduct was motivated by a discriminatory animus, the Indigs point to:
(1) profane statements from Zummo that he was not inclined to issue a permit to them for the
work; (2) Zummo's statement that "they're all interconnected . . . they don't do anything outside
the tribe" in reference to Mr. Indig's company doing work on another Orthodox Jew's home; and
(3) inappropriate language used by Zummo when he learned the Indigs were building a
temporary road on their property for machinery to be transported. (*Id.* at 91-94).  In response,
Defendants point to statements and testimony from Zummo and Yagel indicating that the stop
work orders were issued, not as a result of discrimination, but because the Indigs failed to follow
the Village's Building Code when working on their backyard.  For example, Defendants point to
Zummo's testimony that "[t]he grading plan as approved was a tiered backyard, multiple tiers,"
(Docket No. 264-10 at 216), which Mr. Indig did not deny. (*See* Docket No. 264-2 at 31) ("Q: So
did you submit a plan to the village that originally called for tiers in that slope? A: Like I said, I

don't remember because it was so many different changes on that plan"); (*id.*) ("Q: [W]ere you

ever told that the slope would be a slope of 25 feet and then a four foot drop for the tiers? A:

Could be.  Could be.  Again, like I said, this changed ten times."); (*id.* at 32) ("Q: Well, the plans

that were approved, they called for a tiered grading system, correct? A: Okay. Maybe.").

In addition, Defendants note that Mr. Indig admitted during his deposition that they did

not use a tiered grading system, despite the approved plans, (*id.* at 66) ("Q: To be clear, you did

not use a tiered system to create the area, correct? . . . A: No tier, no."), and that the initial stop

work order was not issued solely because of the Indigs' failure to abide by the tiered grading

plan, but also because the Indigs constructed a temporary road for an excavator on the property

without approval, (Docket No. 264-10 at 217) (testifying that the stop work order was issued

because "[t]he grading plan as approved was a tiered backyard, multiple tiers.  And it changed

into a straight out and straight down with a[n] access road").  Indeed, Mr. Indig admitted that this

temporary road was built without approval and testified that he "saw what [Zummo] meant"

when he told him that he issued the stop work order because the Indigs "did not apply for a

road." (Docket No. 264-2 at 130-32).  The problem for Defendants is that even if all of this is

true, and they had non-discriminatory reasons for issuing the stop work orders, there remains

issues of fact regarding whether they also slow-walked approval of the Indigs' revised plans

because they were Orthodox Jews, and whether "the same result would have been reached

without consideration of their religion." *City of Yonkers*, 96 F.3d at 611-12.

The record is replete with comments tinged by the scourge of antisemitism.  Zummo and

Yagel frequently used inappropriate language when discussing Village residents' construction

plans, and Zummo specifically commented, in reference to Mr. Indig's company, that, "they're

all interconnected . . . they don't do anything outside the tribe." (Pl. 56.1 Resp. at 91).  In

addition, when Ms. Indig went to the Village office to check on the status of one of their permit applications, Zummo stated that, "[t]here's no way in hell she's going to get a permit, there's no way" and that her next step should be "to move to another house." (Pl. 56.1 Resp. at 91). Zummo goes on to note that he "saw her husband today," that Mr. Indig's company was also working on the Kleins' house, and that "they're all . . . it'll be fun to watch." (*Id.*). Finally, when Yagel learned that Zummo was not going to approve the Indigs' construction plans, he responded positively: "[o]h, good!" (*Id.*). While "secondhand allegations" are insufficient to establish intentional discrimination where "there is no evidence directly connecting the[] comments to [Defendants'] actions against Plaintiffs," *see Weinberg v. Vill. of Clayton, New York*, 537 F. Supp. 3d 344, 357 (N.D.N.Y. 2021), at least some of the discriminatory comments at issue here relate directly to Mr. Indig and his company. Therefore, a jury must decide whether Defendants' treatment of the Indigs was motivated by religious animus, as well as whether the delays the Indigs suffered during their backyard project would have occurred even in the absence of such animus. *See Savino*, 983 F. Supp. 2d at 303 ("Even if Defendants had met their burden, Plaintiffs have proffered sufficient evidence for a trier of fact to conclude that [Defendants] w[ere] motivated in part by [the Plaintiffs' protected class] when enforcing the zoning code and that the same result would not have been reached despite discriminatory animus.").

Accordingly, Defendants' motion for summary judgment on the Indigs' Equal Protection claim is denied.

### 2.    Meir Kahana's Equal Protection Claim

Plaintiff Meir Kahana's Equal Protection claim fails to raise a genuine dispute of material fact. Kahana argues that Defendants were motivated to issue two appearance tickets to him in connection to an above-ground pool in his driveway because of religious animus. (Pl. 56.1 Resp.

at 96).  In support of this argument, he submits: (1) an e-mail from Harris reporting the pool's illegality to Yagel; (2) testimony from Kathryn Tolf, the former Village Code Enforcement Officer, that she previously issued "violations for a play-set in a resident's front yard, and on the way she say [sic] a similar violation in another resident's yard[,]" which upset Yagel because one "was an African-American supporter" of his; and (3) testimony from Mr. Klein that Zummo told him after issuing the tickets to Kahana that he had no choice but to do so and that Mr. Klein does not "understand how Yagel works." (*Id.*).

First, Harris' e-mail to Yagel does not mention that he knew the owner of the property at the time he reported it, nor whether the owner of the property was an Orthodox Jew. (*See* Docket No. 272-45) (Harris asking "[i]s this pool legal at 68 Halley[?]").  Likewise, Zummo testified, and Kahana admits, that Zummo "did not know the homeowner of the property" when he conducted an inspection based on the tip from Harris. (Def. 56.1 ¶ 131) (citing Docket No. 264-10 at 224).  Consequently, Kahana's allegation that Harris was motivated by discriminatory animus in reporting his home is unsupported by the record because there is no indication that Harris even knew Kahana lived there at the time.

Second, while Kahana points to Tolf's testimony regarding an African American supporter of Yagel, presumably to establish a comparator to show that Yagel treated his supporters and non-Jews differently than Orthodox Jews in the Village, the situations are not comparable.  As an initial matter, the violations issued to Kahana's neighbors were not related to pools (the subject of Kahana's claim in the Amended Complaint), but because they both had "swing set[s] . . . in the front yard." (Docket No. 264-15 at 46-47).  Thus, the underlying violative conduct was not the same for purposes of establishing a comparable situation. However, even if the situations were comparable, the allegation undermines Kahana's argument

since Tolf issued tickets to *both* neighbors at the time—she did not treat one differently on the basis of religion. (*Id.* at 46-48).  Moreover, Tolf testified that she told Yagel, when he complained to her about the ticket being issued to a supporter of his, that what he was asking for "was selective enforcement and I don't do selective enforcement." (*Id.* at 47).  Therefore, Kahana has not proven that Defendants were issuing tickets to Village residents selectively based on religion, or that a similarly situated comparator was treated differently on the basis of religion.

Third, Mr. Klein's self-serving hearsay testimony that Zummo told him he had to do what Yagel wanted or he would get fired, is both unreliable and irrelevant because Kahana does not dispute that his pool was in violation of the Village Code. *See Adler v. Penn Credit Corp.*, No. 19-CV-7084 (KMK), 2022 WL 744031, at *9 (S.D.N.Y. Mar. 11, 2022) ("a non-moving party's self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment") (citations and internal quotations omitted) (cleaned up).  Kahana admits that he had an above-ground pool in the driveway and that the pool was unfenced. (Pl. 56.1 Resp. at 28).  While he claims that there was no ladder in the pool for Zummo to remove, he concedes that there were removable stairs. (*Id.*).  Moreover, he admits that shortly before Defendants issued a ticket to him for his pool, a child in the Village died in a fatal drowning incident, prompting renewed focus on pool safety in the Village. (*Id.* at 27).  Thus, Kahana has failed to establish that Defendants were motivated by discriminatory animus towards his religion when they issued the appearance tickets to him, or that they would have followed a different course of action in the absence of such animus, if it did exist, since the Village was on high alert for unsafe pools at the time.

Accordingly, Defendants' motion for summary judgment on Kahana's Equal Protection claim is granted.

**3.      The Kleins' Equal Protection Claim**

In contrast to Meir Kahana, the Kleins have satisfied their burden of raising a genuine dispute of material fact requiring denial of summary judgment.  Defendants argue that they are entitled to summary judgment on the Kleins' Equal Protection claim because: (1) the comparators named are not similarly situated to the Kleins and even if they were, Defendants did not treat them differently; and (2) the Kleins have not shown that Defendants were motivated by a discriminatory purpose in issuing the stop work orders to the Kleins since: (i) "the purported [discriminatory] statements [made by Defendants] have nothing to do with the Village's enforcement actions against Plaintiffs or their property and, thus, are too attenuated to support a Pyke claim as a matter of law," (ii) the Village routinely issued permits to other Orthodox Jewish residents without issue, and (iii) the sprinkler requirement was from the state, not the Village. (Docket Nos. 262 at 7-8, 11-13; 275 at 6-7).  In response, Plaintiffs generally point to discriminatory statements made by Defendants, as well as the Village's history of discrimination as evidence that the Kleins were denied equal protection under the law. (Docket No. 269 at 4-6).

As an initial matter, Defendants are correct that the Kleins have failed to identify comparators sufficient to sustain their selective enforcement argument.  The only potential comparator the Kleins identify to show that they were treated differently due to their religion is a Village resident named Peter Obe. (Pl. 56.1 Resp. at 8-9).  The Kleins assert that as a non-Jewish resident, Obe was "permitted to move forward with even more ambitious construction renovation projects with no pretextual delays," including building a four-story home without a sprinkler system. (Docket No. 151 ¶¶ 102-03).  They claim that the Village did not begin investigating the

work until Obe sold his home to a Jewish family. (*Id.*).  However, as Defendants point out, the Obes are not proper comparators since their permit application was submitted to, and approved by, the Village's prior Building Inspector—not Zummo. (Docket No. 262 at 7); (*see also* Docket No. 264-28).  In addition, when the construction was complete and Zummo learned that the Obes' home now had more than two floors, he refused to issue a Certificate of Occupancy until they installed a sprinkler system. (Docket No. 264-24 at 3).  While the Kleins allege that the missing Certificate of Occupancy did not come up until the Obes attempted to sell their home to a Jewish buyer, they cite nothing to support this allegation other than a statement by Zummo that "it's our[] [problem] because we let him do it." (Pl. 56.1 Resp. at 9).  However, this statement, made in response to Yagel being upset that Zummo met with a potential buyer of the Obe's home, supports Defendants', not the Kleins', argument.  It proves that Zummo's realization that the Obe's home lacked a sprinkler system, in contravention of the Village's interpretation of the New York Building Code at the time, was a motivating factor when Zummo subsequently enforced the requirement against the Kleins. (*Id.*).  Thus, since both the Obes and the Kleins were hindered by the sprinkler requirement, and Defendants did not treat the Obes differently based on their religion, the Kleins have failed to identify a proper comparator and their selective enforcement argument fails as a matter of law.

    Despite failing to raise a triable issue of fact on their selective enforcement theory, the Kleins have satisfied their burden of establishing a potential Equal Protection claim under *Pyke*.  There is substantial evidence in the record from which a reasonable jury could determine that Yagel, Zummo and Harris purposely impeded the Kleins' construction plans, at least in part, because of hostility toward their religion. *See supra* Section I.C.  Specifically, the Kleins have proffered evidence that: (1) Zummo conducted what he called a "shul patrol" on the Kleins'

property at 4:25 a.m. on July 16, 2016—shortly after they filed their initial permit application—
to find violations of the Village Code; (2) Zummo mocked Mr. Klein's Hassidic accent and said
he only wanted to add a third level to his house to make more money[9] because he "can't keep
letting these morons do what they want to do;" (3) Zummo mocked Ulman for trying to work
with Mr. Klein, saying in a Hassidic accent that Ulman and Mr. Klein "have to keep the tribe
moving forward;" (4) Defendants claim to have lost, or not received, the Kleins' revised permit
applications on numerous occasions even though the Shea recordings reveal that they were
dropped off at the Village's office; (5) Yagel called the Department of State to find ways to
dismiss the Kleins' ZBA appeal without addressing its merits;[10] (6) Zummo and Yagel texted
each other about their plan to "slam [Mr. Klein's] fingers in the door" once he provided
sufficient information on his permit applications; (7) Zummo issued the October 6, 2017 stop
work order on the Jewish holiday of Sukkot when he knew the Kleins would not be present at
their home; and (8) Defendants delayed lifting the stop work orders on the Kleins' home even
after the Board of Review held that the sprinkler requirement did not apply to residential homes.
*Id.*

---

[9] "The negative stereotype of the money-hoarding Jew is at least as old as Christopher Marlowe's sixteenth century play 'The Jew of Malta,' in which the villainous title character is introduced to the audience 'in his counting-house, with heaps of gold before him' rhapsodizing about '[b]eauteous rubies, sparkling diamonds' and gold, and opining: '[a]nd thus methinks should men of judgment frame [t]heir means of traffic from the vulgar trade, [a]nd, as their wealth increaseth, so inclose [i]nfinite riches in a little room.'" *Weiss v. Dep't of Educ. of City of New York*, No. 09 Civ. 1689 (LTS)(DCF), 2012 WL 1059676, at *6 n.5 (S.D.N.Y. Mar. 29, 2012) (quoting Christopher Marlowe, "The Jew of Malta" Act I, available at The Project Gutenberg, https://www.gutenberg.org/files/901/901-h/901-h htm, last visited August 29, 2024).

[10] Defendants argue that the appeal was formally "cancelled by ZBA Chairperson Rhoda Appel," who said that it "was cancelled after Mr. Klein effectively withdrew his application." (Docket No. 275 at 14 n.6).  Yet, the Kleins submitted an e-mail showing the ZBA responding to an e-mail Yagel sent a month earlier in which he sought ways to dismiss the appeal on procedural grounds. (Docket No. 272-30).  Moreover, cancellation of the appeal did not occur until nearly four months after the date upon which Defendants allege the Kleins withdrew it. (*Compare* Def. 56.1 ¶ 146 *with* Docket No. 272-39).  This type of uncertainty, over whether cancellation of the appeal was motivated by discriminatory animus, is a factual dispute that must be resolved by a jury and not the court in a motion for summary judgment.

Indeed, this list only contains references to evidence of discrimination connected directly to the Kleins, but Plaintiffs have also cited to evidence that Defendants acted with discriminatory animus against Jews in general as well. (*See, e.g.*, Pl. 56.1 Resp. at 63) (Zummo stating, "[t]his is how stupid the Jews are!" when retelling the story of a non-Jewish businessman trying to evict a Jewish restaurant owner in the town of Airmont, New York); (*id.* at 69) (Yagel referring to a local Orthodox Jewish realtor as "Schlomo Fuerst," even after being told his name was Solomon); (*id.* at 72) (Zummo referring to the United Talmudical Association as "you people," and mentioning wearing a "Hitler was right hat" when discussing their requests for approval to build a school in the Village of Airmont where Zummo also worked as a Building Inspector).

Defendants' argument that this evidence is insufficient to sustain the Klein's burden of raising a triable issue of fact as to discriminatory motive is unavailing. First, most of the statements, messages, and actions listed above were taken during the period in which the Kleins were trying to obtain a permit for their home renovation, so Defendants are incorrect when they assert that the statements the Kleins rely on "have nothing to do with the Village's enforcement actions against Plaintiffs or their property." (Docket No. 262 at 11). Second, "[t]he mere fact that other members of a protected class were not discriminated against does not bar a discrimination claim, *per se*." *Rowe v. Bell Atl.*, No. 02-CV-0756 (DRH)(JO), 2006 WL 297710, at *3 (E.D.N.Y. Feb. 7, 2006). While it may weaken the claim, (*id.*), here, the Kleins argue that Defendants' legal history, encompassing numerous allegations of similar discriminatory conduct, rebuts any weakness their claim would otherwise suffer due to other Orthodox Jews receiving permits at the time, because it shows a pattern of intentional discrimination. Whether the Kleins are correct is a factual dispute that requires weighing credibility and intent, which is the role of the jury. Third, even though the sprinkler requirement was created by operation of state law, not

the Village Code, (Docket No. 262 at 12), this fact is of limited relevance to the question of whether Defendants' manner of enforcing it was motivated by discriminatory animus towards the Kleins' religion.[11]

Since the Kleins have raised a genuine dispute as to whether Defendants' actions were motivated by a discriminatory purpose, the burden shifts back to Defendants to show that the "same result would have been reached even without the impermissible consideration." *Janfeshan*, 2017 WL 3972461, at *9 (citations and internal quotations omitted). To do this, Defendants argue that "Plaintiffs have not presented evidence indicating that they did not violate the code provisions they were charged with violating and have not retained an expert to opine that their properties were in compliance with the Uniform Code." (Docket No. 262 at 13). However, the Kleins present evidence that: (i) they changed their construction plans, so that the grading would not trigger the sprinkler requirement; (ii) Defendants frequently delayed and/or misplaced their proposals in order to slow down the construction; (iii) their garage had to be removed immediately because it was damaged during construction, which caused water damage in their basement; and (iv) they had been telling Defendants since the commencement of their construction project that their interpretation of the sprinkler requirement was erroneous, which was confirmed when the Board of Review held that the requirement did not apply to residential homes. (Pl. 56.1 Resp. at 78-88).

As an initial matter, there is nothing in the record indicating that Defendants knew their interpretation of the sprinkler requirement was wrong. Indeed, they even belatedly attempted to

---

[11] Defendants note that "the Village's permit application does not ask for a resident's religion," and that "the Code Enforcement Officer does not always know who the property owner of a specific property is when issuing a violation," but are careful not to assert that they did not know the Kleins owned the home at 63 Halley Drive during the events preceding this lawsuit, or that the Kleins were Orthodox Jews. (Docket No. 262 at 13). Nor could they, as the record indicates that Defendants met personally with Mr. Klein about his construction plans, (*see* Def. 56.1 ¶¶ 169-70), Zummo mocked him with a Hassidic accent, and referred to him as a member of the "tribe," (Pl. 56.1 Resp. at 86).

enforce it against the Obes, by withholding a Certificate of Occupancy, upon learning the prior Building Inspector failed to do so. (Def. 56.1 ¶ 29). Therefore, the Kleins' argument that Defendants' application of the sprinkler requirement to them was itself discriminatory is unavailing. The same is true for the Kleins' argument that they had to remove the garage, without approval, due to imminent damage. There is nothing in the record indicating that imminent damage is a permissible justification for not obtaining approval for construction plans. In fact, the opposite is true. *See* Pomona Village Code § 130-18(H) ("No person shall conduct or cause to be conducted any land operations to *clear*, fill or grade any property without securing a building permit") (emphasis added). Thus, this argument also fails.

However, the Kleins have proffered evidence in support of arguments (i) and (ii) above, namely, that they revised their plans to avoid triggering the sprinkler requirement, and that Defendants intentionally delayed, lost, or ignored those plans because of their religion. (Pl. 56.1 Resp. at 80-88). For example, the Kleins' September 22, 2016 permit application "included markings that indicated future design and details were pending," which was supplemented by architectural plans submitted on March 2, 2017. (*Id.*). A March 3, 2017 Shea recording reveals that Zummo knew the new plans were delivered to the Village, even though he later denied that he ever received them. (*Id.* at 81). While Defendants disagree, their level of awareness, and whether Zummo was intentionally misplacing the Kleins' applications, is a factual dispute that must be presented to a jury for adjudication. As a result, Defendants have failed to satisfy their burden of proving that the same results were inevitable regardless of discriminatory intent.

Accordingly, Defendants' motion for summary judgment on the Kleins' Equal Protection claim is denied.

B.        **Discrimination and Retaliation Under the Fair Housing Act**

1.        **FHA Discrimination**

The FHA makes it illegal to: "otherwise make unavailable or deny, a dwelling to any

person because of . . . religion[;] . . . [or] [t]o discriminate against any person in the terms,

conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities

in connection therewith, because of . . . religion." 42 U.S.C. § 3604(a)-(b).  "The phrase

'otherwise make unavailable' has been interpreted to reach a wide variety of discriminatory

housing practices, including discriminatory zoning restrictions." *LeBlanc-Sternberg v. Fletcher*,

67 F.3d 412, 424 (2d Cir. 2008).  In addition, "FHA discrimination claims can proceed on a

theory of intentional discrimination, *i.e.* disparate treatment, or on a theory of disparate impact."

*Reed v. Friedman Mgmt. Corp.*, 11-CV-7547 (JPO), 2019 WL 1409726, at *3 (S.D.N.Y. Mar.

28, 2019).  In deciding a motion for summary judgment on a FHA claim based on intentional

discrimination, the court must apply the burden shifting framework established in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Burris v. Hous. & Servs. Inc.*, 17-CV-

9289 (JGK), 2023 WL 1966120, at *8 (S.D.N.Y. Feb. 13, 2023) (citing *Mitchell v. Shane*, 350

F.3d 39, 47 (2d Cir. 2003)).

Under *McDonnell Douglas*, Plaintiffs bear the initial burden of establishing "a prima

facie case of discrimination." *Mitchell*, 350 F.3d at 47 (citing *McDonnell Douglas*, 411 U.S. at

802-02).  To establish a *prima facie* case of housing discrimination, Plaintiffs must "mak[e] a

modest showing that a member of a statutorily protected class was not offered the same terms,

conditions or privileges of a . . . dwelling or not provided the same services or facilities in

connection therewith made available to others under circumstances giving rise to a reasonable

inference of prohibited discrimination." *Reed*, 2019 WL 1409726, at *4 (internal quotations

omitted).  Once Plaintiffs satisfy their initial burden, Defendants must "assert a legitimate, nondiscriminatory rationale for the challenged decision." *Mitchell*, 350 F.3d at 47.  "If the defendant makes such a showing, the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the defendant's action." *Id.* (citing *Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000)).  "Summary judgment is appropriate if no reasonable jury could find that the defendant's actions were motivated by discrimination." *Mitchell*, 350 F.3d at 47.

i.      **The Indigs' FHA Discrimination Claim**

Defendants maintain that the Indigs' FHA discrimination claim should be dismissed because they cannot establish a *prima facie* case of discrimination and even if they did, Defendants had legitimate, non-discriminatory reasons for their actions.  Defendants do not dispute that the Indigs are members of a protected class as Orthodox Jews, but they argue that "Plaintiffs fail to cite any evidence indicative of discrimination towards the Indigs that would call into question the legitimate non-discriminatory reasons for issuance of SWOs and violations regarding their property." (Docket No. 275 at 11).  In response, Plaintiffs argue that the Court should deny summary judgment because "[t]he Indigs were repeatedly harassed and hindered from using and enjoying their home and property to the fullest, singled out by as interconnected with other Orthodox Jews like Manes, Klein, the Nussbaums, and providing construction services to other Orthodox Jews in Pomona." (Docket No. 269 at 7).

Here, the Indigs have met their initial burden of establishing a *prima facie* case of discrimination.  They point to statements Defendants made indicating a hostility to the Indigs' religion, which a jury could conclude influenced the Village's decision-making.  Zummo repeatedly disparaged Mr. Indig and implied that his construction company was responsible for many of the issues the Village was having with other Jewish residents' projects in the Village.

*See supra* Section III.A.1.  In addition, when Zummo implied he would not approve subsequent permit applications from Ms. Indig, Yagel responded enthusiastically. *Id.*  These statements, combined with the numerous other discriminatory statements made by Defendants generally about Orthodox Jews in the Village, raise an inference of discrimination sufficient to satisfy the Indigs' initial burden under *McDonnell Douglas*.  Therefore, the burden shifts to Defendants to establish legitimate, non-discriminatory reasons for issuing the stop work orders, slow-walking approvals, and denying the Indigs' revised permit applications.

Defendants have satisfied this burden.  The record reflects that the Indigs' initial permit applications were approved, and the stop work orders were issued, because Defendants believed the Indigs departed from their submitted plans by using a "straight out and straight down" pattern rather than a tiered system. (Def. 56.1 ¶ 107).  Although there is a material factual dispute as to whether Defendants subsequently slow-walked approval of the Indigs' modified plans, as well as whether the temporary road constructed was implicit in the prior permit applications or if it was a road at all, (*see* Pl. 56.1 Resp. at 23-25), the Defendants burden at this stage is "is one of production, not persuasion; [and] it can involve no credibility assessment," *Birch Fam. Servs., Inc. v. Wlody*, 19-cv-03301 (DLI)(PK), 2021 WL 2312852, at *6 (E.D.N.Y. June 7, 2021) (citations and internal quotations omitted), *aff'd*, 2022 WL 1468160 (2d Cir. May 10, 2022). Therefore, the Court must accept Defendants' proffered non-discriminatory reasons for their actions against the Indigs and the burden shifts back to Plaintiffs to prove that these reasons were merely pretext for discrimination.  Here, Plaintiffs have raised a triable issue of fact regarding Defendants' motivation for slowing the permit approval process and issuing stop work orders in connection to construction of the temporary road.  The Indigs argue that their permit applications implicitly indicated that a temporary road would need to be constructed for the work; that it was

not actually a road, but a path constructed; and that even after they modified their plans to no longer utilize a tiered grading system, Defendants dragged their feet because the Indigs were Jewish. (Pl. 56.1 Resp. at 23, 93).  Considering the discriminatory comments made by Zummo and Yagel about the Indigs personally, and Orthodox Jews in the Village generally, a reasonable jury could conclude that Defendants stated reasons for their actions were merely pretext for discrimination and Plaintiffs have met their burden.

Accordingly, Defendants' motion for summary judgment on the Indigs' FHA discrimination claim is denied.

### ii.    Meir Kahana's FHA Discrimination Claim

In support of their motion for summary judgment on Meir Kahana's FHA discrimination claim, Defendants argue that: (1) issuing an appearance ticket for "a temporary swimming pool does not constitute conduct which makes a 'dwelling unavailable' under Section 3604(a), nor does it constitute the 'provision or services' in connection with 'the sale or rental of a dwelling' under Section 3604(b);" and (2) even if it did, Kahana "cannot make out a prima facie case of discrimination and Defendants had legitimate non-discriminatory reasons for issuing the ticket." (Docket No. 262 at 16) (quoting 42 U.S.C. § 3604(a)-(b)).  In response, Kahana reiterates that "[f]or the same reasons the evidence supporting claims of Equal Protection defeat defendants' motion for summary judgment, the evidence likewise overcome defendants' motion for summary judgment as to Plaintiffs' FHA claims." (Docket No. 269 at 7).

Just as Kahana's Equal Protection claim fails as a matter of law, so too does his FHA discrimination claim.  At the outset, the Court notes that it is not clear if disabling an above-ground pool would constitute making a dwelling unavailable under § 3604(a), or impeding the "provision of services or facilities" under §3604(b).  The FHA defines dwelling as "any building,

structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." 42 U.S.C. § 3602(b).  Thus, it appears that Kahana's pool would not qualify for FHA protection since its operability had no effect on whether he could reside, use or enjoy his home.[12]  However, the Court need not resolve this question here since Kahana's claim fails under the *McDonnell Douglas* framework.

Here, Kahana alleges that Defendants violated the FHA by issuing two appearance tickets in connection to an above-ground pool in his driveway. (Pl. 56.1 Resp. at 96).  He does not argue that the underlying violations did not occur, just that Defendants' motivation for issuing the tickets was improperly based on his religion. (Def. 56.1 ¶¶ 131-38).  While Kahana is a member of a protected class, he has not shown that Defendants' actions were improperly based on discriminatory animus, nor that similarly situated comparators were treated differently than him. *See supra* Section III.A.2.  Moreover, Kahana acknowledges that Defendants had a legitimate, non-discriminatory reason for issuing the appearance tickets, as his pool was unfenced and had some sort of ladder or steps that were left unattended.[13] (Pl. 56.1 Resp. at 28).  For Kahana to overcome this, he needs to show that the Village's proffered reason for acting was pretextual, but his only attempt to do so is to point to the allegedly improper motivation of Harris in reporting

---

[12] Defendants only cite a single case in support of their argument that Kahana's pool does not qualify for FHA protection. *See Weingarten Realty Invs. v. Albertson's, Inc.*, 66 F. Supp. 2d 825 (S.D. Tex. 1999), *aff'd*, 234 F.3d 28 (5th Cir. 2000).  But the court in *Weingarten* did not determine where the line should be drawn as to what constitutes an impediment to the use of one's dwelling, it merely held that the FHA does not apply "to commercial real estate." *Id.* at 849.  Thus, it provides little help to the Court in answering the question presented here.

[13] Kahana claims that "he removed [the stairs] from the pool every time there was nobody in the pool," (Pl. 56.1 Resp. at 28) (citing Docket No. 264-4 at 103:7-14), but only cites to his own deposition testimony in support of this denial, which is insufficient to meet his burden. *See Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

him, and to testimony from Tolf regarding a completely different violation. (*Id.* at 96); *see also*

*supra* Section III.A.2.  In contrast, Defendants point out that only a month earlier there was a

fatal drowning of a child in a Village resident's pool, which prompted the Village's renewed

focus on pool safety. (Def. 56.1 ¶ 129).  As a result, Defendants have satisfied their burden of

proving that their actions were neither discriminatory nor pretextual as a matter of law.

Accordingly, Defendants' motion for summary judgment on Kahana's FHA

discrimination claim is granted.

### iii.    The Kleins' FHA Discrimination Claim

Defendants argue that summary judgment should be granted on the Kleins' FHA

discrimination claim because "they cannot establish a prima facie case of discrimination, and

even if they could, the Defendants had legitimate non-discriminatory reasons for issuing the stop

work orders and violations because it is undisputed that the Plaintiffs engaged in construction in

violation of the Village Code and New York State Building Code." (Docket No. 262 at 16-17).

Specifically, Defendants assert that the Kleins admit they removed their garage without approval,

failed to submit plans meeting the sprinkler requirement, and were issued a building permit

before they began violating the Village Code. (Docket No. 275 at 13-15).  In response, the Kleins

rely on the same arguments made in support of their Equal Protection claim. (Docket No. 269 at

7).

Summary judgment on the Kleins' FHA discrimination claim must be denied for

substantially the same reasons their Equal Protection claim must be denied.  The Kleins have

established a *prima facie* case of discrimination.  They are members of a protected class and

have proffered substantial evidence from which a jury could determine that Defendants

purposely impeded their construction plans, at least in part, because they are Jewish. *See supra*

Section I.C.  For example, Zummo made numerous comments that could be perceived as antisemitic and were directly related to the Kleins' construction plans, such as conducting a "shul patrol" on the Kleins' property at 4:25 a.m. on July 16, 2016, mocking Mr. Klein's Hassidic accent, teasing Ulman for trying to work with Mr. Klein, texting Yagel about their plan to "slam [Mr. Klein's] fingers in the door" once he provided sufficient information on his permit applications, and issuing a stop work order on the Jewish holiday of Sukkot when he knew the Kleins would not be home. *Id.*  Therefore, the burden shifts to Defendants to show that they had a legitimate, non-discriminatory reason for their actions.

Defendants maintain that they issued the stop work orders because the Kleins' permit applications did not meet the sprinkler requirement applicable when a third floor is added to a home, and because the Kleins removed their home's garage without approval. (Docket No. 275 at 11-15).  The Kleins counter that the sprinkler requirement should never have been applied to their home, and that removal of the garage was necessary due to imminent damage. *See supra* Section I.C.  However, as indicated previously, there is nothing in the record indicating that Defendants knew their interpretation of the sprinkler requirement was wrong; or that imminent damage is a permissible justification for not obtaining approval for construction plans. *Id*. Therefore, the burden shifts back to the Kleins to prove that Defendants' justifications were merely pretext for their allegedly discriminatory conduct.  The Kleins do this by noting that: (1) Defendants should have considered the possibility that the sprinkler requirement did not apply to residential properties, as held by the Board of Review; (2) they modified their plans to no longer include adding a third floor, but Defendants purposefully impeded consideration of those plans; and (3) even after the Board of Review determined the sprinkler requirement did not apply to residential properties, Defendants delayed in withdrawing their stop work orders. (Pl. 56.1 Resp.

- 38 -

at 77-89). They argue these actions were motivated by discriminatory animus. (Docket No. 269 at 5-6). Since a reasonable jury could conclude by Defendants' statements that their actions were motivated by discriminatory animus, summary judgment must be denied.

Accordingly, Defendants' motion for summary judgment on the Kleins' FHA discrimination claim is denied.

## 2.    FHA Retaliation

Retaliation against an individual exercising his or her rights under the FHA is illegal. 42 U.S.C. § 3617 states: "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person . . . on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section . . . 3604." Just like discrimination claims under the FHA, retaliation claims under the FHA "are governed by the *McDonnell Douglas* burden-shifting framework." *Burris*, 2023 WL 1966120, at *9 (citing *Johnson v. YWCA Residence, LLC*, No. 12-CV-3301, 2014 WL 12782728, at *4 (S.D.N.Y. 2014)). "To establish a prima facie case under § 3617, Plaintiffs must show (1) that they were engaged in a protected activity; (2) that [Defendants were] aware of this activity; (3) that [Defendants] took adverse action against the [P]laintiff; and (4) that a causal connection exists between the protected activity and the adverse action." *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 432 F. Supp. 3d 46, 77 (D. Conn. 2019) (citation and internal quotations omitted) (alterations in original); *see also Burris*, 2023 WL 1966120, at * 9. Causation can be proven either: "'(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow [individuals] who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Burris*, 2023 WL 1966120, at

* 9 (quoting *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (citations and internal quotations omitted)).

Kahana has not alleged what protected activity he was engaged in when Defendants purportedly retaliated against him by issuing appearance tickets for his above-ground pool.  In addition, the availability of the pool arguably does not affect his ability to use and enjoy his home. *See supra* Section III.B.1.ii.  But assuming, *arguendo*, that it did, Kahana admits that Zummo did not know who owned the house when he initially inspected it. (Pl. 56.1 Resp. at 28). Since there is no evidence that Defendants knew his religion at the time the violations were discovered, they could not have retaliated against him because of his religion. (*Id.*).  Moreover, even if Kahana could make out a *prima facie* case of retaliation under the FHA, Defendants have established a legitimate, non-discriminatory reason for issuing the appearance tickets and Kahana has failed to proffer evidence of pretext.  Specifically, Defendants explain that they issued a ticket for the pool because "[a] fatal drowning involving a child occurred in the Village on July 18, 2017," and they were on heightened alert. (Pl. 56.1 Resp. at 27).  Since Kahana admits Defendants' had a non-discriminatory reason, and does not proffer any evidence of pretext, his FHA retaliation claim fails as a matter of law. *See also supra* Section III.B.1.ii (noting the recent pool-related death in the Village as well as Kahana's admission that his pool was unfenced). Accordingly, Defendants' motion for summary judgment on Kahana's FHA retaliation claim is granted.

In contrast, the Indigs have raised a viable FHA retaliation claim.  The Indigs argue that they engaged in a protected activity by filing this lawsuit, and Defendants retaliated against them by slow-walking approval of their revised permit applications after the initial stop work orders were issued. (Docket No. 151 at 33); (*see also* Pl. 56.1 Resp. at 23-25).  They claim Defendants'

- 40 -

actions forced them to abandon their pending permit applications, and settle for a small backyard

so they could obtain an "as built certification from the state." (Pl. 56.1 Resp. at 95). Defendants

deny this, and assert that the Indigs "contributed to the delays to the grading project, as there

were several occasions throughout the project that the Village was waiting on documentation"

from them. (Def. 56.1 ¶ 119). Since Defendants have articulated legitimate, non-discriminatory

reasons for their actions—the Indigs' purportedly deficient applications—the burden shifts back

to the Indigs to establish that these reasons were merely pretext for discrimination. The Indigs

have satisfied this burden by pointing to Defendants' discriminatory statements about them and

their neighbors, which a jury could conclude were the true motivation for their actions.

Accordingly, Defendants' motion for summary judgment on the Indigs' FHA retaliation claim is

denied.

Similarly, the Kleins' FHA retaliation claim raises a genuine factual dispute over

whether, as a result of this lawsuit, Defendants delayed in lifting the stop work orders after the

Board of Review held that Section R404.1.6 of the New York State Code did not apply to

residential homes. (Pl. 56.1 Resp. at 88). In support of this argument, the Kleins note that

Defendants waited months before "finally conduct[ing] an inspection of Klein's home . . . and

lift[ing] the stop work order." (*Id.* at 89). It is well-established that "manipulation of municipal

processes to delay plaintiffs' ability to obtain needed permits" is sufficient to make out a *prima*

*facie* case of FHA discrimination. *Gilead Cmty. Servs., Inc.*, 432 F. Supp. 3d at 77 (citing *S.*

*Middlesex Opportunity Council, Inc. v. Town of Framingham*, 752 F. Supp. 2d 85 (D. Mass.

2010)). While Defendants argue they had legitimate, non-discriminatory reasons for waiting to

conduct a final inspection, (Def. 56.1 ¶¶ 205-10), and for withholding final approval before

lifting the prior stop work orders, (*id.*); (*see also* Docket No. 262 at 16-17), the Kleins have

pointed to numerous statements, which a reasonable jury could find were pretext for discrimination. *See supra* Section III.B.1.iii.

Accordingly, Defendants' motion for summary judgment on the Kleins' FHA retaliation claim is denied.

## C.    The Individual Defendants

Defendants argue that even if Plaintiffs' claims against the Village and Zummo survive, the Court should dismiss Banks, Harris, Ulman and Yagel from the case because Plaintiffs "fail to establish . . . that any particular action by [them] . . . would itself constitute or suggest involvement in any constitutional deprivation or violation of law allegedly suffered by the Plaintiffs." (Docket No. 262 at 18).  Plaintiffs respond by asserting that, "Yagel and Harris were on the lookout for any opportunity to violate, harass, or otherwise make their new Orthodox Jewish neighbors feel unwelcome," and that "Ulman also participated . . . by approving delay tactics and advising how to enforce unfair limitations without being overt enough to get caught." (Docket No. 269 at 8).

To impose individual liability under 42 U.S.C. § 1983, a plaintiff must demonstrate that the individual defendant was personally involved with the alleged constitutional violation. *See Dawson v. Cnty. of Westchester*, 351 F. Supp. 2d 176, 196 (S.D.N.Y. 2004).  "An individual cannot be held liable . . . 'merely because he held a high position of authority,' but can be held liable if he was personally involved in the alleged deprivation." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (quoting *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996)).  In addition, "liability for an Equal Protection Clause violation under § 1983 requires personal involvement by a defendant, who must act with discriminatory purpose." *Reynolds v. Barrett*, 685 F.3d 193, 204 (2d Cir. 2012) (citation omitted).  In other words, a

plaintiff must demonstrate "that each Government-official defendant, through the official's own

individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676-77

(2009).  "Personal involvement can mean either (1) direct participation, (2) failure to remedy the

wrong after learning of it, (3) creation of a policy or custom under which unconstitutional

practices occurred, or (4) gross negligence in managing subordinates." *Dawson*, 351 F. Supp. 2d

at 196 (citations and internal quotations omitted).

      "[P]urposeful discrimination requires more than intent as volition or intent as awareness

of consequences. . . . It instead involves a decisionmaker's undertaking a course of action

because of, not merely in spite of, the action's adverse effects upon an identifiable group."

*Reynolds*, 685 F.3d at 204 (quoting *Iqbal*, 556 U.S. at 676-77) (alteration in original) (quotation

marks omitted).  A defendant's "discriminatory intent . . . often must be inferred from

circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys.,

Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted).  "[Q]uestions of subjective intent can

rarely be decided by summary judgment." *United States v. City of New York*, 717 F.3d 72, 82 (2d

Cir. 2013) (citation omitted).  However, "[t]he summary judgment rule would be rendered sterile

. . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an

otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

## 1.    Ian Banks

      Plaintiffs offer no argument as to Banks' involvement in Defendants' alleged

discrimination.  Plaintiffs' Counterstatement to Defendants' Rule 56.1 Statement of Material

Facts only references Banks twice.  First, in connection to his interview in 2018 with a Rockland

County Commission on Human Rights investigator and, second, in a paragraph that quotes from

a text Zummo sent Yagel in which Zummo complains that Shea was telling him that he was "not

helping the village by listening to Brett and digging into Klein and Banks." (Pl. 56.1 Resp. at 58-59, 82).  Neither instance includes any facts or allegations that would allow a reasonable juror to conclude that Banks individually discriminated against Plaintiffs.  In fact, the opposite is true, as Banks was helpful in uncovering, through his interview with the investigator, that Yagel and Zummo frequently discriminated against Jews in the Village through "intimidation and threats." (*Id.* at 59).  Indeed, Plaintiffs admit that: (1) "Banks was originally asked to run for Mayor by his Orthodox Jewish friends in the Village, including . . . plaintiff Robert Klein," (*id.* at 11); (2) "Banks did not express to Mr. Klein that Orthodox Jews had too much power in the Village," (*id.* at 12); (3) Mr. Klein testified: (i) he had no "evidence . . . of Mr. Banks personally harassing, intimidating, or discriminating against Orthodox Jews," (Docket No. 264-6 at 138-40), (ii) he did not "have evidence that [he] know[s] . . . that [Banks] directed [Zummo] to [discriminate against Orthodox Jews in the Village]," (Docket No. 264-5 at 248-49), and (iii) he "is not aware of any false and frivolous code violations that Banks directed someone to issue to him," (Pl. 56.1 Resp. at 12); and (4) Mr. Indig testified that Mr. Klein told him "Mr. Banks would be very nice to the Jews in Pomona," (*id.* at 13).

While Plaintiffs deny that "Banks never discussed with Zummo delaying the issuance of permits for plaintiff Klein," (*id.* at 12), and argue that Banks said "you people have too much power" in reference to Orthodox Jews in the Village, (Docket No. 151 ¶ 121), they offer no citation in support of either, which is plainly insufficient. *See Guerrero v. City of Yonkers*, 18-CV-5353 (NGG)(RER), 2023 WL 6141604, at *1 n.3 (E.D.N.Y. Sept. 20, 2023) (noting that where a party fails to support denial of an allegation in a Rule 56.1 response with admissible evidence, the Court may deem it admitted).  Indeed, in the case of Banks' alleged discriminatory statement, Klein could not confirm that Banks even made the statement or what he meant if he

did, (Docket Nos. 264-5 at 216-17; 264-6 at 144-45), and a Village Trustee allegedly present

when the comment was made had no recollection of it, (Docket No. 264-19 at 108-10).  Given

the dearth of evidence indicating that Banks acted discriminatorily against Plaintiffs specifically,

or Orthodox Jews generally, Defendants' motion for summary judgment on behalf of Banks must

be granted.

Accordingly, Defendants' motion for summary judgment on Plaintiffs' claims against Ian

Banks is granted.

## 2.    Doris Ulman

The same is true for Ulman.  Neither Plaintiffs' Rule 56.1 Response, nor the Third

Amended Complaint, point to evidence supporting Plaintiffs' allegation that Ulman individually

discriminated against them or Orthodox Jews in the Village generally.  Plaintiffs only allegations

of discrimination regarding Ulman are in connection with the *Tartikov* litigation, which she was

not a party to, because she drafted the laws challenged in the lawsuit and the court held that her

testimony in support of the Village lacked credibility. *Congregation Rabbinical Coll. of*

*Tartikov, Inc. v. Vill. of Pomona, NY*, 280 F. Supp. 3d 426, 460-64 (S.D.N.Y. 2017), *aff'd in*

*part, rev'd in part and remanded*, 945 F.3d 83 (2d Cir. 2019).  However, in this case, Plaintiffs

concede that: (1) "Mr. Indig did not overhear any conversations between Yagel, Harris, Ulman

and/or Zummo talking about his grading work or grading operation," (Pl. 56.1 Resp. at 27); (2)

Vanderbeek and Zummo believed Ulman was "up at Klein's house kissing his a[**]," (*id.* at 86);

(3) Zummo mocked Ulman in a Hassidic accent, (*id.*); and (4) Ulman resigned her position as

Village Attorney after Yagel hired a Special Counsel to replace her at the ZBA hearings

regarding the Kleins' construction permits, telling him that it was "inappropriate" and the

statements made by the Special Counsel were "inaccurate," (*id.* at 87).  Plaintiffs argue in their

opposition brief that Ulman "participated and assisted Yagel and Zummo in their wrongful actions . . . by approving delay tactics and advising how to enforce unfair limitations," but fail to cite any evidence in the record supporting this allegation. (Docket No. 269 at 8).

Moreover, Ulman herself is Jewish, (Pl. 56.1 Resp. at 86), which "undercuts" any inference of discrimination since she is a member of the same protected class as Plaintiffs. *Betterson v. HSBC Bank, USA, N.A.*, 139 F. Supp. 3d 572, 587 (W.D.N.Y. 2015), *aff'd*, 661 F. App'x 87 (2d Cir. 2016); *see also Meyer v. McDonald*, 241 F. Supp. 3d 379, 391-92 (E.D.N.Y. 2017) ("[w]hen the person who allegedly discriminated against plaintiff is a member of the same protected class as plaintiff, the court applies an inference against discrimination") (collecting cases), *aff'd sub nom. Meyer v. Shulkin*, 722 F. App'x 26 (2d Cir. 2018).

Accordingly, Defendants' motion for summary judgment on Plaintiffs' claims against Doris Ulman is granted.

### 3.    Brett Yagel and Leon Harris

Unlike Banks and Ulman, there is an abundance of evidence from which a reasonable jury could conclude that Yagel and Harris acted with discriminatory animus towards Orthodox Jews. The record is full of statements and actions by Yagel that support an inference of discrimination against Plaintiffs. *See, e.g.*, *supra* Section I.D (noting that Yagel referred to a local Orthodox Jewish realtor as "Schlomo Fuerst," even though his name was Solomon, and also called Shea a "Jew lover"). As for Plaintiffs specifically, Yagel was in constant communication with Zummo regarding Plaintiffs' construction projects, often directed him to issue stop work orders, and told Mr. Klein to "watch [his] back" while erecting barrier after barrier to prevent his construction project from going forward. *See s*upra Section I.C. Thus, Defendants are not entitled to summary judgment on the claims against Yagel.

Nor are Defendants entitled to summary judgment on the claims against Harris. While there are fewer allegations against him than Yagel, there is enough evidence in the record from which a reasonable jury could conclude that he too discriminated against Orthodox Jews in the Village. For example, Harris: (1) asked Yagel if the Village could "contract out a code enforcer" in order to issue violations to the Kleins, (Docket No. 272-116); (2) texted with Yagel after a drowning occurred in the Village, implying that he agreed it was probably the result of Orthodox Jews using it for ritual baths, which he wanted stopped, (Docket No. 272-115); and (3) frequently texted Yagel and Zummo about their shared desire to investigate potential violations by Orthodox Jews in the Village, (Pl. 56.1 Resp. at 82-84, 96). Thus, Defendants are not entitled to summary judgment on the claims against Harris.

Accordingly, Defendants' motion for summary judgment on Plaintiffs' claims against Brett Yagel and Leon Harris is denied.

## D.    Qualified Immunity

Defendants argue that even if Plaintiffs' claims survive, the individual Defendants are "entitled to qualified immunity [because] their actions constitute a reasonable interpretation of the code at issue," and "Zummo's interpretation and application of the state and local code were objectively reasonable." (Docket No. 262 at 21, 23). In response, Plaintiffs contend that "[t]he discriminatory actions taken by the [D]efendants against the [P]laintiffs" were "motivated by animus against Orthodox/Hasidic Jews," and "[i]t is inconceivable" that Defendants would believe that their actions did not violate the Constitution. (Docket No. 269 at 9).

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Officials are "entitled to

qualified immunity . . . [when] their decision was reasonable, even if mistaken." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). However, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). To analyze a qualified immunity defense on summary judgment, courts ask "(1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010); *see also Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001). "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013) (citations and internal quotations omitted) (cleaned up).

Here, Defendants do not contest that the right to equal treatment and enforcement of neutral and generally applicable laws is "clearly established" or that any reasonable public official should be aware of that right. *See Oyler v. Boles*, 368 U.S. 448, 456 (1962) (noting that selective enforcement of laws "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification[,]" violates the Equal Protection Clause); *see also Savino*, 983 F. Supp. 2d at 308 ("the prohibition against the application of a neutral law because of someone's race or national origin was previously established . . . as was the prohibition against selective enforcement of a law for the same reasons") (citations and internal quotations omitted). Instead, Defendants argue that: (1) the Indigs did not follow the plans initially approved by the Village, and constructed a temporary road on the property without approval; and (2) their application of the Village Code to the Kleins, specifically the sprinkler requirement, was

in good faith and cannot be penalized merely because the state disagreed with their interpretation of the law.  The problem with the first argument is that the Indigs have raised a genuine dispute of material fact regarding whether they submitted modified plans that eliminated the tiered grading requirement, as well as whether the temporary road was implicated in the permit applications or was even a road at all. *See supra* Sections III.A.1 & III.B.1.i.  If a jury sides with the Indigs on these issues, it may also conclude that, as a result, the individual Defendants' interpretation and application of the Village and State codes was unreasonable.

Defendants' second argument fails for similar reasons. The Kleins' case is not solely dependent on Defendants' enforcement of the sprinkler requirement against them.  Rather, the Kleins argue that Yagel, Zummo and Harris also impeded their construction plans by intentionally losing and/or slowing down their permit applications out of hostility toward their religion. *See supra* Section I.C.  Moreover, Plaintiffs contend, as to the sprinkler requirement, that even after the Board of Review determined that it did not apply to residential homes, Defendants delayed in withdrawing their stop work orders. (Pl. 56.1 Resp. at 77-89).  Whether Defendants' actions during the construction process were intentionally and unreasonably dilatory is a factual dispute for a jury to decide, so granting summary judgment at this stage would be improper. *See Savino*, 983 F. Supp. 2d at 309.

Defendants' reliance on *Zahra*, 48 F.3d 674, is misplaced.  In *Zahra*, the Second Circuit held that "Zahra never alleged that he was issued the subject violations because of his race, religion, or to prevent him from exercising a constitutional right," rather he argued that "certain actions were taken against him due to personal grudges" and the town was acting out of malice. (*Id.* at 684-86).  That is a far different from this case where Plaintiffs have extensively argued

that Defendants' actions against them were motivated by discriminatory animus based on their religion.

Accordingly, the remaining individual Defendants, Yagel, Harris and Zummo, are not entitled to qualified immunity.

**E.    The Kleins' Exposure Damages Claim**

Defendants' final argument is that they are entitled to summary judgment on the Kleins' exposure damages claim because: (1) "any such alleged damages were not caused by the Defendants;" (2) the Kleins should have mitigated their damages by enclosing their home; and (3) it is speculative and unsupported by the factual record. (Docket No. 262 at 24-26). The Kleins counter that "Defendants attempt to conflate arguments about determining the measure of damages with statements by interested parties about whether there was a possibility of providing better protection" to the Kleins' home "is clearly not a summary judgment issue." (Docket No. 269 at 9-10).

A reasonable jury could conclude that the Kleins' exposure damages were proximately caused by Defendants. Defendants argue that because they told the Kleins that the Village would lift the stop work orders temporarily so their home could be professionally encapsulated to be protected from the elements, any subsequent damages after the Kleins declined that offer are not recoverable. (Def. 56.1 ¶¶ 169-70). However, Defendants ignore that the only reason the Kleins were in this situation was due to the stop work orders, so if a jury finds that those orders were motivated by discriminatory animus, then Plaintiffs may be entitled to exposure damages as a result. *See Shop Vac Corp. v. BCL Magnetics Ltd.*, No. 04-CV-262, 2005 WL 2739161, at *7 (N.D.N.Y. Oct. 24, 2005) ("Where different reasonable and legally sufficient inferences of proximate cause are possible, the question is for the jury."). In addition, part of the Kleins'

argument is that Defendants intentionally delayed the project from proceeding, and wrapping the home was only a partial solution, so even if they had wrapped it, there still would have been damage. (Pl. 56.1 Resp. at 37-38). This presents an issue of fact as to the extent and amount of damages sustained, which cannot be resolved on summary judgment.

The same is true for Defendants' arguments that the Kleins' mitigation efforts were insufficient. Plaintiffs maintain that they attempted to mitigate the damage to their home while the stop work orders were in place by placing tarps over the open home. (Pl. 56.1 Resp. at 32-33, 46). Defendants disagree, and argue that this was insufficient. However, whether a party's mitigation efforts were sufficient is a question of fact that that must be decided by a jury. *See Wiechelt v. United Parcel Serv., Inc.*, No. 03-CV-345A, 2007 WL 2815755, at *3 (W.D.N.Y. Sept. 24, 2007) ("the issue of mitigation of damages is generally a jury question"). Indeed, even if a jury finds that the Kleins could have done more to mitigate their damages, this is not a complete bar to relief as they only need to show that they took "reasonable" steps to avoid further damage. *See Leeward Const., Inc. v. Sullivan W. Cent. Sch. Dist.*, No. 05 Civ. 8384 (CS)(LMS), 2010 WL 1993842, at *10 (S.D.N.Y. Mar. 10, 2010) ("if the course of action chosen by the plaintiff was reasonable, the plaintiff can recover despite the existence of another reasonable course of action that would have avoided further damage"), *report and recommendation adopted*, 2010 WL 1993838 (S.D.N.Y. May 19, 2010). Thus, Defendants are not entitled to summary judgment based on the Kleins' alleged failure to mitigate their exposure damages.

Finally, Defendants' argument that the Kleins' exposure damages claim is too speculative to be cognizable is unavailing. Defendants rely on Mr. Klein's testimony that he could not remember or estimate what it cost him to cover the home in tarps, or the monetary amount of

damage the home sustained.  However, the Kleins proffered an expert who estimated that the Kleins' home suffered at least $300,000 in damages from exposure (in addition to $200,000 in construction costs due to delays from the stop work order). (Docket No. 264-23 at 49). Defendants argue that this number is unreliable since the expert was not told that the Village offered to allow the Kleins to encapsulate their home for protection. (Def. 56.1 ¶ 225).  However, this is a question for the jury, specifically, whether it was reasonable for the Kleins to use tarps to protect the home in place of professional encapsulation.

Accordingly, Defendants' motion for summary judgment on the Kleins' exposure damages claim is denied.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  In short, Plaintiff Meir Kahana's claims, and all claims against Doris Ulman and Ian Banks, are dismissed.  The claims by Plaintiffs Samuel and Leah Indig, as well as Robert and Neftali Klein, remain and will proceed against the remaining Defendants.  The Clerk of the Court is respectfully directed to terminate the pending motion (Docket No. 261).

Dated:    August 30, 2024
          White Plains, New York

**SO ORDERED:**

JUDITH C. McCARTHY
United States Magistrate Judge